Nos. 20-35813, 20-35815

# In the United States Court of Appeals for the Ninth Circuit

LINDSAY HECOX and JANE DOE, with her next friends Jean Doe and John Doe,

*Plaintiffs-Appellees*,

v.

BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho, et al.,

*Defendants-Appellants,*

and

MADISON KENYON and MARY MARSHALL,

*Intervenors-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:20-cv-00184-DCN
Hon. David C. Nye

**BRIEF OF NEBRASKA, ALABAMA, ALASKA, ARKANSAS, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA, OKLAHOMA, SOUTH CAROLINA, TEXAS, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

OFFICE OF THE NEBRASKA
 ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

DOUGLAS J. PETERSON
 Attorney General of Nebraska
DAVID T. BYDALEK
 Chief Deputy Attorney General
JAMES A. CAMPBELL
 Solicitor General
 *Counsel of Record*

*Counsel for Amici States*
*Additional counsel listed with signature block*

# Tables of Contents

Table of Authorities........................................................................ii

Introduction and Interest of Amici States ................................. 1

Argument .......................................................................................... 4

I.    The Act draws a permissible sex-based distinction ......................... 4

II.   The district court erred by analyzing the Act based on transgender status. ............................................................. 8

     A.   The Act does not discriminate based on transgender status. .................................................................... 8

     B.   The Idaho legislature did not have an invidious purpose to discriminate based on transgender status. ........................ 9

III.  The district court erred in condemning the Act under its transgender-based analysis. ......................................... 16

     A.   Rational-basis review applies to the transgender-based equal-protection claim in this case. .................................... 17

     B.   The Act satisfies constitutional review even if analyzed based on transgender status. ............................................. 26

Conclusion ..................................................................................... 32

Certificate of Compliance ........................................................ 34

Certificate of Service ................................................................ 35

# Table of Authorities

## Cases

*Bostock v. Clayton County, Georgia*,
    140 S. Ct. 1731 (2020) .................................................... 3, 17, 23, 24, 25

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ............................................................................... 13

*Brown v. Zavaras*,
    63 F.3d 967 (10th Cir. 1995) ............................................................... 18

*Califano v. Boles*,
    443 U.S. 282 (1979) ................................................................................ 4

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
    473 U.S. 432 (1985) .................................................................. 19, 20, 22

*Clark v. Arizona Interscholastic Ass'n*,
    695 F.2d 1126 (9th Cir. 1982) ..................................................... passim

*Doe 2 v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019) ......................................................... 20, 21

*Illinois State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) ............................................................................... 31

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ........................................... 17, 18

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ............................................................................... 21

*Holloway v. Arthur Andersen & Co.*,
    566 F.2d 659 (9th Cir. 1977) .................................................... 17, 18, 22

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers
    of Am., UAW v. Johnson Controls, Inc.*,
    499 U.S. 187 (1991) ............................................................................... 11

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ..................................................... 3, 17, 23

*Latta v. Otter*,
  771 F.3d 456 (9th Cir. 2014) ........................................................ 10, 11

*Massachusetts Bd. of Ret. v. Murgia*,
  427 U.S. 307 (1976) .............................................................. 19, 21, 22

*Michael M. v. Superior Court of Sonoma Cty.*,
  450 U.S. 464 (1981) ......................................................... 5, 11, 27, 31

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
  488 U.S. 179 (1988) ............................................................................ 15

*Nguyen v. I.N.S.*,
  533 U.S. 53 (2001) ...................................................................... passim

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ................................................................. 9, 10, 16

*Quiban v. Veterans Admin.*,
  928 F.2d 1154 (D.C. Cir. 1991) ......................................................... 21

*Schweiker v. Wilson*,
  450 U.S. 221 (1981) ....................................................................... 9, 10

*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) ............................................................ 18

*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) ............................................................................ 20

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................ 11

*United States v. Virginia*,
  518 U.S. 515 (1996) ..................................................................... 2, 4, 5

*United States v. Windsor*,
  570 U.S. 744 (2013) ............................................................................ 18

*Washington v. Davis*,
  426 U.S. 229 (1976) .............................................................................. 9

## **Statutes**

Idaho Code § 33-6202(5) ...................................................... 6, 28, 32

Idaho Code § 33-6202(12) ................................................. 6, 11, 13, 26

Idaho Code § 33-6203(1) ...................................................... 4, 8, 12

Idaho Code § 33-6203(2) ......................................................... 4, 12

## **Other Authorities**

Am. Psychological Ass'n, Answers to Your Questions about
   Transgender People, Gender Identity, and Gender
   Expression, https://bit.ly/38AaYHD ............................................ 19, 21

2020 Democratic Party Platform, https://bit.ly/32jKfLh ......................... 21

## Introduction and Interest of Amici States

Amicus Curiae States of Nebraska, Alabama, Alaska, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, Texas, and West Virginia file this brief under Fed. R. App. P. 29(a)(2) in support of Appellants seeking reversal of the district court's decision. Amici States have an interest in preserving their freedom when addressing important policy issues, including the best way to promote equal opportunities for female student-athletes and to ensure fairness in women's high-school and college sports.

Through the Fairness in Women's Sports Act (the Act), Idaho has chosen to regulate participation in women's sports based on biological sex. This Court has already upheld against equal-protection challenges policies drawing this exact distinction. *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131–32 (9th Cir. 1982). Other States remain free to part ways with Idaho and adopt a different approach to this issue. The Equal Protection Clause gives ample room for States' experimentation in this area. It does not demand one path for all. Because the district court's decision takes one time-tested option off the table, the States have a substantial interest in seeing that decision reversed.

The Act draws a straightforward distinction based on biological sex and prevents biological males (regardless of how they identify) from participating in women's sports. Because of the average physiologically based differences in speed and strength between males and females, the Act is one effective way to ensure fairness in women's sports and to preserve equal athletic opportunities for women. The Constitution allows States to use these kinds of "[s]ex classifications . . . to advance full development of the talent and capacities" of women. *United States v. Virginia*, 518 U.S. 515, 533 (1996). That is exactly what the Act does.

Rather than viewing the Act as a sex-based classification and upholding it under this Court's decision in *Clark*, the district court analyzed the statute as one that discriminates based on transgender status. That was a crucial mistake. The Act does not draw distinctions based on transgender status, and in fact, it treats an athlete's gender identity as irrelevant. Nor did Idaho's legislature enact the statute for the invidious purpose of discriminating based on transgender status. Rather, its purpose is to ensure equal opportunities for women in athletics. Thus, the district court had no reason to analyze the Act as discriminating based on transgender status.

The Act nevertheless satisfies constitutional review even if analyzed based on transgender status. Such transgender-based claims do not warrant heightened scrutiny. Neither the factors for identifying quasi-suspect classes, this Court's decision in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), nor the Supreme Court's opinion in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), requires intermediate scrutiny in this case. So this Court should apply rational-basis review to the transgender-based equal-protection claim raised here. Regardless, the Act satisfies even intermediate scrutiny. The district court's contrary conclusion rested on a critical legal error that permeated its analysis: it failed to accept intermediate scrutiny's flexible standards and instead applied what was effectively a form of strict scrutiny. Once that foundational error is corrected, the district court's reasoning crumbles.

For these reasons, this Court should reject the district court's ruling and conclude that the Act complies with the Equal Protection Clause. Doing so will preserve the States' ability to regulate women's sports free from unfounded constitutional constraints.[1]

---

[1] Amici States address only Plaintiff Lindsay Hecox's equal-protection claim. They do not discuss Plaintiff Jane Doe's challenge to the Act's provision for resolving a "dispute" about an athlete's sex.

## Argument

## I. The Act draws a permissible sex-based distinction.

"The proper classification for purposes of equal protection analysis . . . begin[s] with the statutory classification itself." *Califano v. Boles*, 443 U.S. 282, 293–94 (1979). The Act draws a sex-based classification by requiring that school sports be designated as male, female, or coed "based on biological sex" and providing that women's sports "shall not be open to students of the male sex." Idaho Code § 33-6203(1)–(2).

For a sex-based classification "to withstand equal protection scrutiny, it must be established at least that the challenged classification serves important governmental objectives" and that the "means employed are substantially related to the achievement of those objectives." *Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001) (cleaned up). This constitutional standard "does not make sex a proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Rather, equal-protection analysis recognizes that "[p]hysical differences between men and women . . . are enduring" and that "a community made up exclusively of one [sex] is different from a community composed of both." *Id.*; *see also Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1129 (9th Cir.

1982) ("In applying this standard, the Supreme Court is willing to take into account actual differences between the sexes, including physical ones.").

Laws typically satisfy this intermediate-scrutiny test when they rely on real biological or physiological differences between the sexes. Indeed, the Supreme Court "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. 464, 469 (1981) (plurality opinion). In *Nguyen*, for example, the Court acknowledged that "[f]athers and mothers are not similarly situated with regard to" "proof of biological parenthood." 533 U.S. at 63. As a result, "[t]he imposition of a different set of rules" for proving biological parentage "with respect to fathers and mothers is neither surprising nor troublesome from a constitutional perspective." *Id.* Similarly here, because of the physiological differences between the sexes discussed below, the Act is not constitutionally problematic.

States may use "[s]ex classifications . . . to advance full development of the talent and capacities of our Nation's people." *Virginia*, 518 U.S. at

5

533. That is precisely what the Act does. As the legislature explained, separating sports based on biological sex furthers the State's interest in promoting "equality" for women "by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities" and "to obtain recognition and accolades, college scholarships, and . . . other long-term benefits." Idaho Code § 33-6202(12). The Act promotes these opportunities for women because of the undeniable "biological differences between females and males" involving their respective "strength, speed, and endurance." Idaho Code § 33-6202(5). Failing "to acknowledge [these] most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen*, 533 U.S. at 73.

Applying intermediate scrutiny, this Court in *Clark* already upheld an Arizona policy that kept biological males from competing on a high-school girls' volleyball team. 695 F.2d at 1131–32. The opinion recognized that the challenged policy furthered two "legitimate and important" interests—(1) "promoting equality of athletic opportunity between the sexes" and (2) "redressing past discrimination against women in athletics." *Id.* at 1131. Idaho's Act furthers those same interests.

*Clark* then held that "there is clearly a substantial relationship between the exclusion of males from the [girls'] team and the goal of redressing past discrimination and providing equal opportunities for women." *Id.* Arizona's policy recognized "the physiological fact that males would have an undue advantage competing against women," and "the Supreme Court allows for these average real differences between the sexes to be recognized." *Id.* If the State were forced to allow biological males to compete on women's teams, "athletic opportunities for women would be diminished." *Id.* The same is true here, and thus the Act—no less than Arizona's policy in *Clark*—is substantially related to the goal of providing equal athletic opportunities for women.

*Clark* controls this case because both the Arizona policy and the Idaho Act draw the same sex-based distinction involving women's sports. Seeking to avoid this conclusion, the district court tried to make this case about something other than a straightforward sex-based classification. But as discussed below, the district court's efforts to reach beyond the statutory classification fall flat.

## II. The district court erred by analyzing the Act based on transgender status.

Only two paths permit the district court to conduct its equal-protection analysis based on transgender status. Either the Act must facially discriminate based on that status, or the legislature must have enacted the statute with an invidious purpose to discriminate on that basis. Because neither of those prerequisites is satisfied, the district court erred by focusing its analysis on transgender status.

### A. The Act does not discriminate based on transgender status.

The district court held that "the Act on its face . . . discriminates on the basis of transgender status." Dist. Ct. Op. at 61 (ECF No. 63). But as discussed above, the Act draws a sex-based classification—requiring that school sports be designated "based on biological sex." Idaho Code § 33-6203(1). This is not a transgender-based distinction. Athletes' options are determined solely by their sex. Gender identity is irrelevant.

Trying to justify itself, the district court explained that the Act discriminates "on its face . . . between cisgender athletes . . . and transgender women athletes." Dist. Ct. Op. at 61. Yet nothing on the face of the Act draws this distinction. At best, this is an argument about the law's effect. But even as to effect, the district court's mention of only "transgender

women athletes"—that is, biological males who identify as female—implicitly concedes that the Act has no adverse effect on another group of transgender athletes: biological females who identify as male. Because the Act has no adverse effect on approximately half the transgender population, it does not discriminate based on transgender status. *See Schweiker v. Wilson*, 450 U.S. 221, 232 (1981) (finding no equal-protection violation where "the group excluded is not congruent with [the plaintiffs'] class").

### B. The Idaho legislature did not have an invidious purpose to discriminate based on transgender status.

**1.** A court conducting equal-protection analysis may look beyond the statutory classification only if the legislature adopted that classification with an "invidious" purpose to discriminate on another basis. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *see also Washington v. Davis*, 426 U.S. 229, 239 (1976) ("A purpose to discriminate must be present"). *Feeney* illustrates this. The statute in that case created a state employment preference for military veterans, so the statutory classification was veteran status. *Feeney*, 442 U.S. at 262. The plaintiff there, like the district court here, sought to look beyond the statutory classification, claiming that the challenged statute "discriminate[d]

against women." *Id.* at 259. Yet the Court refused to analyze the facially sex-neutral law as discriminating based on sex unless the plaintiff first showed "purposeful discrimination" on that basis. *Id.* at 274. Finding no evidence of legislative intent to discriminate based on sex—even though the law "operate[d] overwhelmingly to the advantage of males," *id.* at 259, and admittedly had a "severe" impact on women, *id.* at 271—the Court upheld the statute because the statutory "distinction between veterans and nonveterans" was "legitimate." *Id.* at 277-78; *see also Schweiker*, 450 U.S. at 230–34 (declining to review a statute as one that discriminates against "the mentally ill" because the law did "not classify directly on the basis of mental health").

These principles from *Feeney* explain why the district court was wrong to rely on this Court's decision in *Latta v. Otter*, 771 F.3d 456, 467–68 (9th Cir. 2014). *Latta* held that laws defining marriage as the union of one man and one woman involved "facial discrimination" "on the basis of sexual orientation" because they "distinguish[ed] on their face between opposite-sex couples" (composed of heterosexuals) and "same-sex couples" (composed of gays and lesbians). *Id.* Since the Court determined that the laws facially discriminated based on sexual orientation, it did not need to

consider their purpose in order to proceed with its sexual-orientation-based equal-protection analysis. *Id.* (citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Here, however, the Act does not facially discriminate based on transgender status. *Latta* thus does not excuse the plaintiffs from establishing an invidious legislative purpose to discriminate based on transgender status.

**2.** Courts "ascertain the purpose of a statute by drawing logical conclusions from its text, structure, and operation." *Nguyen*, 533 U.S. at 67–68; *see also Michael M.*, 450 U.S. at 469 (plurality opinion) ("[I]nquiries into [legislative] motives or purposes are a hazardous matter") (quoting *United States v. O'Brien*, 391 U.S. 367, 383–384 (1968)). Those factors demonstrate that the Act's purpose seeks to promote equal opportunities for female athletes rather than to discriminate based on transgender status.

The text explicitly says that the Act seeks "to promote . . . equality" for females "by providing opportunities for [them] to demonstrate their skill, strength, and athletic abilities" and "to obtain recognition and accolades." Idaho Code § 33-6202(12). The statutory language also confirms

that the State seeks to accomplish this goal by drawing a distinction based only "on biological sex" and by preventing biological males from participating in women's sports. Idaho Code § 33-6203(1)–(2). An athlete's gender identity is irrelevant. Biological males cannot participate in women's sports regardless of whether they identify as male or female.

The Act's operation further dispels the myth of transgender discrimination. For men's or coed sports, the statute permits athletes of any sex or gender identity to take part. In those contexts, transgender athletes face no bar whatsoever. And for women's sports, some athletes who identify as transgender—specifically, biological females who identify as male—are allowed to participate. It is only biological males who identify as female that may not, but they are still free to play on men's or coed teams. It strains credulity to suggest that a law leaving transgender athletes so many athletic opportunities has the purpose of discriminating against them.

For a legislative purpose to invidiously discriminate based on transgender status, that purpose must disadvantage transgender individuals

as a class *specifically because they are transgender*. *See Bray v. Alex-andria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (concluding that invidious discrimination against women "demand[s] . . . at least a purpose that focuses upon women *by reason of their sex*" or "women *because they are women*"—"a purpose . . . directed specifically at women as a class"). But no such purpose exists here. Most notably, the law does not discriminate against transgender athletes as a class. Females who identify as male are not affected at all. The only impact is on males who identify as female. And those athletes are affected not because the legislature dislikes transgender individuals but because it wants to ensure fairness in women's sports.

**3.** Attempting to impugn the legislature's motives, the district court said that the Act's "actual purpose" was to "exclude" biological males who identify as female "rather than" to "promot[e] sex equality and oppor-tunities for women." Dist. Ct. Op. at 77. But the court apparently did not believe this, for it elsewhere recognized as "beyond dispute" that "Idaho passed the Act to protect cisgender female student athletes." *Id.* at 18. Indeed, promoting equal opportunities for female athletes was Idaho's driving motivation. Idaho Code § 33-6202(12). That the legislature

thought the best way to do this is to keep all biological males (no matter how they identify) out of women's sports does not transform a laudable purpose into an invidious one.

The district court intuited bad legislative motives because it said that "the Act's criteria for determining 'biological sex' appear designed to exclude" biological males who identify as female from women's sports. Dist. Ct. Op. at 77. But those criteria prevent *all* biological males from participating in women's sports. Had the Act excluded biological males who identify as female while including males who identify consistently with their sex, that would reveal an intent to discriminate based on transgender status. But the Act does nothing of the sort.

The district court also explained that the legislature's purpose must have focused on biological males who identify as female because prior policies of the Idaho High School Activities Association (IHSAA) and the National Collegiate Athletic Association (NCAA) already barred other biological males from women's sports. *See* Dist. Ct. Op. at 79 (mentioning "the preexisting rules in Idaho"). But this argument misses the mark for at least two reasons.

14

First, the Act was the first time that the legislature addressed this issue. That other associations had previously adopted a different approach does not impugn, diminish, or displace the legislature's motive. This is particularly true of the NCAA's policy, which is not attributable to the State. *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 195 (1988) (holding that the NCAA was not "acting under color of [state] law when it promulgated standards governing athlete . . . eligibility"). States' authority to legislate on these issues simply does not hinge on what other associations have decided to do.

Second, the IHSAA and NCAA policies embody a complex multi-faceted standard that depends on an athlete's sex, gender identity, and hormone-suppression efforts. Choosing a more straightforward course, the Idaho legislature passed the Act to establish a simple sex-based classification. Comparing these options confirms that the Act sought to promote equal athletic opportunities for women by preventing all biological males from participating in women's sports.

In the end, the district court's purpose analysis relied heavily on how the Act affects biological males who identify as female. Dist. Ct. Op.

at 78–79. But a law's impact, even if disparate, is not enough to demonstrate invidious discrimination, particularly when, as here, the Act's impact is readily "explained on a neutral ground"—preserving fairness in women's sports. *Feeney*, 442 U.S. at 275. Sex-based classifications, by their nature, preclude some transgender individuals from their preferred conduct. If that establishes an invidious purpose to discriminate, it would subject *every* sex-based classification to constitutional challenge as a form of transgender-based discrimination. But the Equal Protection Clause does not invalidate laws because of an "impact [that] is essentially an unavoidable consequence of a legislative policy"—here, preventing biological males from competing in women's sports—"that has in itself always been deemed to be legitimate." *Id.* at 279 n.25.

Because the legislature did not act with an invidious purpose to discriminate based on transgender status, the district court erred by viewing the Act through that lens. Rather, the court should have analyzed the Act according to its sex-based classification.

## III. The district court erred in condemning the Act under its transgender-based analysis.

In addition to improperly focusing on transgender status, the district court made two more missteps when conducting its constitutional

16

review. First, the court's transgender-based analysis should have applied rational-basis review instead of intermediate scrutiny. Second, the court erred in holding that the Act fails intermediate scrutiny.

## A.  Rational-basis review applies to the transgender-based equal-protection claim in this case.

Any claim of transgender-based discrimination in this case should have been reviewed under the rational-basis standard. The district court suggested that three cases—*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018), *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), and *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020)—establish that intermediate scrutiny applies. But those cases do not get the district court where it wanted to go.

**1.** *Barron* is a district-court decision holding that transgender status is a quasi-suspect classification. 286 F. Supp. 3d at 1144–45. That ruling is unsound, however, and the district court should not have followed it.

The district court in *Barron* acknowledged that this Court in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977), rejected the argument that "transsexuals are a suspect class." Yet the

court in *Barron* refused to follow *Holloway* because it said that *Holloway*'s reasoning "relies on markedly outdated notions of sex and gender." 286 F. Supp. 3d at 1143. While this Court has overruled *Holloway*'s holdings on other issues, *see Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000) (overruling *Holloway*'s interpretation of Title VII of the Civil Rights Act of 1964), it does not appear that this Court has ever rejected *Holloway*'s conclusion on the protected-class question. The district court in *Barron* was not free to ignore it.

Regardless of whether *Holloway* remains binding, its conclusion that transgender status is not a constitutionally protected classification is correct and should be followed. *See Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (holding that a transgender plaintiff was "not a member of a protected class"). When evaluating the factors for identifying quasi-suspect classes, *Barron* incorrectly said—and the district court below repeated—that the Supreme Court announced four requirements in *United States v. Windsor*, 570 U.S. 744 (2013). *See* Dist. Ct. Op. at 58 n.29 (quoting *Barron*, 286 F. Supp. 3d at 1144). The Supreme Court did not even address that issue in *Windsor*. *Barron* thus based its analysis on a faulty foundation. Focusing instead on what the Supreme Court has

actually said about this issue reveals that transgender status does not satisfy at least three of the requirements to attain protected-class status.

*First*, the classification must identify a "discrete and insular" group that is clearly definable. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976); *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (withholding protected status from the mentally disabled in part because they are an "amorphous" group). Transgender status does not satisfy this threshold requirement. The term "transgender" refers to all "persons whose gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth." Am. Psychological Ass'n, Answers to Your Questions about Transgender People, Gender Identity, and Gender Expression, https://bit.ly/38AaYHD (hereinafter "APA, *Answers*"). Transgender individuals thus include both people who *identify* as the opposite sex and people who engage in *behavior* that "does not conform to [what is] typically associated with the[ir] sex." *Id.* Yet determining what behavior is contrary to the conduct stereotypically associated with one sex is a hopelessly vague and amorphous standard. It does not define a discrete or readily identifiable group.

19

Moreover, the argument to declare transgender status a quasi-suspect classification assumes that all transgender individuals live consistently with their gender identity. But "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) (the transgender classification "include[s] persons who identify with another gender but who do not wish to live or work in accordance with that preferred gender"). This diversity within the transgender community—where some live according to their gender identity and some according to their biological sex—further confirms that transgender status does not qualify as a protected status.

*Second*, quasi-suspect protection does not apply unless the "political processes ordinarily to be relied upon to protect" the group have been "curtail[ed]." *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938). The relevant question is whether the class is "politically powerless in the sense that [its members] have no ability to attract the attention of the lawmakers." *City of Cleburne*, 473 U.S. at 445.

That is not true of transgender individuals. Advancing the interests of the transgender community is a goal of one of our nation's two primary political parties. *See* 2020 Democratic Party Platform at 39, *available at* https://bit.ly/32jKfLh ("Democrats are committed to ending discrimination on the basis of . . . gender identity"). This establishes that transgender individuals have the attention of a substantial portion of our nation's lawmakers. They do not need "extraordinary protection from the majoritarian political process." *Murgia*, 427 U.S. at 313.

*Third*, the Supreme Court has extended protected status only to classifications that are immutable. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As the Supreme Court has described it, an immutable characteristic deserving protected status is one "determined solely by the accident of birth." *Id.*; *see also Quiban v. Veterans Admin.*, 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (Ginsburg, J.) (similar).

As discussed above, a person's transgender status is determined by their gender identity or their gender-nonconforming behavior. APA, *Answers*. But gender-nonconforming actions are not determined by birth. *See Doe 2*, 917 F.3d at 722 (Williams, J., concurring) (not every transgender person "wants to take steps necessary to live in accord with his or

her preferred gender"). Nor has it been proven that gender identity is established at birth. *Holloway*, 566 F.2d at 663. On the contrary, as the district court acknowledged, "the detailed mechanisms" of gender identity "are unknown." Dist. Ct. Op. at 5.

It is worth recalling that the Supreme Court has tightly cabined the classifications that qualify as suspect or quasi-suspect. This reticence for expansion reflects the Court's desire to preserve States' authority to legislate on important policy issues. *See Murgia*, 427 U.S. at 313 (declaring a classification to be constitutionally protected removes certain issues from the "majoritarian political process"). Over the years, the Supreme Court has withheld constitutional protection from many sympathetic classes of citizens, such as the mentally disabled and the aged. *See City of Cleburne*, 473 U.S. at 441–46. Thus, doing the same here does not besmirch transgender individuals as a group but merely recognizes that the constitutional standards governing this issue are demanding.

Because transgender status does not qualify as a quasi-suspect status, the district court erred in applying heightened scrutiny to its transgender-based analysis.

**2.** Just as suspect-class analysis is unavailing, so too is the *Karnoski* opinion. That case established the standard of review that applies when a military policy facially discriminates based on transgender status. This Court explained that the challenged policy "on its face treat[ed] transgender persons differently than other persons." *Karnoski*, 926 F.3d at 1201. Under those circumstances, "something more than rational basis but less than strict scrutiny applies." *Id.*

This holding does not apply here because, as discussed above, the Act does not facially discriminate based on transgender status. Nor does this case involve the military context. Accordingly, *Karnoski*'s standard does not control this case.

Tellingly, *Karnoski* did not mention—let alone purport to overrule—*Holloway*'s conclusion that transgender individuals do not qualify as a constitutionally protected class. This confirms that *Karnoski* is limited to its particular context. It did not establish that transgender status is a protected classification for other constitutional cases.

**3.** *Bostock* is also inapposite. It did not establish that heightened scrutiny applies to claims of transgender discrimination under the Equal Protection Clause. In fact, that case did not raise any constitutional

issues, but only addressed a specific question under Title VII. *Bostock*, 140 S. Ct. at 1753 ("The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"). The Court's decision thus says nothing about the standard that applies to equal-protection claims.

Nor does the Court's reasoning transfer to this case. A lynchpin of *Bostock*'s analysis is that under Title VII "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees." *Id.* at 1741 (cleaned up). But that is not true of a law (like the Act) that draws an explicit sex-based distinction. A person's sex is necessarily relevant when applying such a law, and this Court has held that it is constitutional for States to consider an athlete's sex when separating sports teams. *Clark*, 695 F.2d at 1131–32. Importing *Bostock*'s principles (which rest on the premise that sex is irrelevant) into this sports context (which rests on the premise that sex is relevant) would turn that case on its head.

The rules undergirding *Bostock* conflict with the applicable equal-protection precepts in at least one other way. Title VII applies even when

the protected classification is not "the sole or primary cause" for the challenged action. *Bostock*, 140 S. Ct. at 1744. But the same is not true under the Equal Protection Clause when, as here, a plaintiff wants to establish discrimination on a basis not found on the face of the statute. As discussed above, that plaintiff must establish an invidious discriminatory purpose, which cannot be done without proving that the purpose was a central reason for the government's action. It would be quite a mismatch to take a case outlawing any consideration of a protected classification and apply it in circumstances that forbid only an invidious purpose to discriminate.

In short, applying *Bostock* in this case would effectively convert all transgender-discrimination claims into sex-discrimination claims under the Fourteenth Amendment. That would be a staggering expansion of *Bostock*—far exceeding the bounds of an opinion that disclaimed any intent to address issues beyond the scope of the issues raised there. *See id.* at 1753 (noting that the Court was reserving for "future cases" the question whether "other policies and practices might or might not qualify as unlawful discrimination"). This Court should decline to read *Bostock* so broadly.

For these reasons, if this Court analyzes this case as one of transgender discrimination, it should apply rational-basis review rather than intermediate scrutiny.

### B. The Act satisfies constitutional review even if analyzed based on transgender status.

The Act passes equal-protection scrutiny even if it is viewed through a transgender-based prism. While rational basis should govern such a claim, the Act satisfies even intermediate scrutiny. That heightened standard asks (1) whether "the challenged classification serves important governmental objectives" and (2) whether the "means employed are substantially related to the achievement of those objectives." *Nguyen*, 533 U.S. at 60 (cleaned up).

**1.** Idaho undeniably satisfies the important-objective requirement. As previously explained, the State's primary goal in passing the Act is to promote "equality" for women "by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities" and "to obtain recognition and accolades, college scholarships, and . . . other long-term benefits." Idaho Code § 33-6202(12).

This Court has already held that "promoting equality of athletic opportunity" for women is a "legitimate and important" state interest.

*Clark*, 695 F.2d at 1131. It is no surprise, then, that the district court conceded that this government interest is of sufficient importance. Dist. Ct. Op. at 18, 63.

**2.** Idaho also meets the substantial-relationship prong of intermediate scrutiny. To satisfy it, the State need not show that the challenged exclusion is "*necessary,*" *Michael M.*, 450 U.S. at 473 (plurality opinion), much less an "absolute necessity," *Clark*, 695 F.2d at 1131–32, to accomplish its asserted goal. Nor must the statute "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Neither is the State obligated to choose the best option, *id.* at 63—including the one that "maximize[s] equality," *Clark*, 695 F.2d at 1131. The State may instead choose an "easily administered scheme" that substantially promotes its important interest. *Nguyen*, 533 U.S. at 69. It is for the State, "not this Court, to make that determination." *Id.* at 67. "[T]he existence of wiser alternatives than the one chosen does not serve to invalidate" a statute under intermediate scrutiny. *Clark*, 695 F.2d at 1132.

States have many options when deciding how to promote equal opportunities for women in sports. Idaho chose a simple and biologically based distinction that prevents biological males (including those who

27

identify as female) from participating in women's sports. Numerous facts that the district court did not dispute establish that the Act is substantially related to ensuring fairness in women's sports.

First, the legislature found, and the district court did not dispute, that "biological differences between females and males" produce "categorically different strength, speed, and endurance" between the sexes. Idaho Code § 33-6202(5). Second, the intervenors—Madi and MK—have run races against, and lost to, a biological male who identifies as female and participates under the NCAA's policy. ER 526–27 ¶¶ 8–12; ER 535 ¶¶ 10–11. Third, for several years, female runners in Connecticut have almost always lost to two biological males who identify as female. *See generally* ER 371–416.

While the district court did not deny these facts, it sought to diminish their relevance. In one such attempt, the court disregarded Madi's and MK's losses because they competed against the transgender athlete in another State and thus the Act would not have affected those races. Dist. Ct. Op. at 68. But all this means is that the Act, because of unavoidable limits on Idaho's jurisdiction, is not "capable of achieving its ultimate objective in *every* instance." *Nguyen*, 533 U.S. at 70 (emphasis

added). That poses no problem under intermediate scrutiny. *Id.* The Act
will still apply to countless other competitions, and it will ensure fairness
for biological females participating in those events.

The district court also tried to downplay the Connecticut examples
by noting that the schools there did not have the same testosterone-
suppression policy as the IHSAA and the NCAA. Dist. Ct. Op. at 68. But
at least one of the transgender athletes who consistently beat the female
competitors in Connecticut had "been undergoing hormone therapy for
several years" and has "circulating hormones . . . comparable to the
hormone levels of [biological] girls." Motion to Intervene at 2, *Soule v.
Conn. Assoc. of Schools, Inc.*, No. 3:20-cv-00201-RNC (D. Conn. Feb. 21,
2020) (ECF No. 36). Thus, the situation in Connecticut does in fact
support Idaho's decision to approve the Act.

**3.** The district court's intermediate-scrutiny analysis boiled down
to this: it believed Idaho should have adopted the line for women's sports
that the IHSAA and the NCAA have drawn—dividing all biological males
who identify as male (the group excluded from women's sports) from all
biological females who identify as female and all biological males who
identify as female and have taken steps to suppress their testosterone for

at least one year (groups included in women's sports). Dist. Ct. Op. at 72–73. But under intermediate scrutiny, the State is free to implement any classification that satisfies the substantial-relationship test. Because the Act's sex-based distinction does, Idaho need not swap it for the district court's preferred alternative. *See Nguyen*, 533 U.S. at 63 (intermediate scrutiny does not require the State to choose the wisest or best option); *Clark*, 695 F.2d at 1131–32 (similar).

The district court also ignored that its favored approach is an inexact proxy. According to the court, "circulating testosterone" is the "primary known driver of differences in athletic performance" between the sexes. Dist. Ct. Op. at 69. But the IHSAA and NCAA policies do not measure circulating testosterone levels; they just require hormone-suppression efforts for one year. While that might reduce the sex-based physiological advantages for some, it will not in every instance (as shown by the dominance of the testosterone-suppressing Connecticut athlete mentioned above). The Constitution does not compel Idaho to trade its sex-based classification for an obviously imperfect alternative.

The district court misapplied the intermediate-scrutiny standard in other ways too. In particular, the court inflated the burden on Idaho,

demanding proof that preventing biological males who identify as females from participating in women's sports "is *required* in order to promote 'sex equality' or to 'protect athletic opportunities for females.'" Dist. Ct. Op. at 61 (emphasis added). But under intermediate scrutiny, Idaho need not show that its chosen course is *necessary* to achieve its goals. *Michael M.*, 450 U.S. at 473 (plurality opinion); *Clark*, 695 F.2d at 1131–32. It is only strict scrutiny that imposes such a burden. *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (strict scrutiny requires "a State [to] establish that its classification is *necessary* to serve a compelling interest") (emphasis added). The district court erred by smuggling strict-scrutiny demands where they do not belong.

The district court also tried to bolster its intermediate-scrutiny analysis by subtly distorting the relevant state interest, saying that the IHSAA and NCAA policies would not prevent biological females like Madi and MK "from the opportunity to compete in Division I sports." Dist. Ct. Op. at 68. But the State wants athletes like Madi and MK to have "equality of athletic opportunity" when they compete. *Clark*, 695 F.2d at 1131. They lose this when forced to run against biological males (including those who identify as female) who have inherent physiological

advantages of "strength, speed, and endurance." Idaho Code § 33-6202(5). Each race against those opponents deprives them of the fairness that the Act seeks to promote.

In sum, the district court's intermediate-scrutiny analysis was deeply flawed. This Court should correct the lower court's mistakes and hold, consistent with *Clark*, that the Act satisfies intermediate scrutiny.

## Conclusion

Amici States urge this Court to reverse the district court's decision.

Respectfully submitted,

Dated: November 19, 2020

*/s/James A. Campbell*
James A. Campbell

OFFICE OF THE NEBRASKA
  ATTORNEY GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov

DOUGLAS J. PETERSON
  Attorney General of Nebraska
DAVID T. BYDALEK
  Chief Deputy Attorney General
JAMES A. CAMPBELL
  Solicitor General

*Counsel for Amici States*
*Additional Counsel listed on next page*

## Additional Counsel for Amici States

STEVE MARSHALL
Attorney General
State of Alabama

ED SNIFFEN
Acting Attorney General
State of Alaska

LESLIE RUTLEDGE
Attorney General
State of Arkansas

CURTIS T. HILL, JR.
Attorney General
State of Indiana

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

TIM FOX
Attorney General
State of Montana

MIKE HUNTER
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

# Certificate of Compliance

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  20-35813, 20-35815

I am the attorney or self-represented party.

**This brief contains 6,137 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ James A. Campbell*    **Date**  November 19, 2020

## Certificate of Service

On November 19, 2020, this brief was electronically filed with the Clerk of this Court using the CM/ECF system, which will send a copy of this brief to all registered counsel.

*/s/ James A. Campbell*
James A. Campbell