IN THE

# United States Court of Appeals for the Ninth Circuit

LINDSAY HECOX, ET AL.,

*Plaintiffs-Appellees,*

v.

BRADLEY LITTLE, ET AL.,

*Defendants-Appellants.*

MADISON KENYON, ET AL.,

*Intervenor-Appellants.*

On Appeal from the United States District Court for the District of Idaho
No. 1:20-cv-00184-DCN
The Honorable David C. Nye

**BRIEF FOR *AMICI CURIAE* NATIONAL WOMEN'S LAW CENTER, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND 60 ADDITIONAL ORGANIZATIONS IN SUPPORT OF APPELLEES AND AFFIRMANCE**

FATIMA GOSS GRAVES
EMILY MARTIN
SUNU CHANDY
NEENA CHAUDHRY
SHIWALI PATEL
CASSANDRA MENSAH
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, N.W.
Washington, D.C. 20036

JON GREENBAUM
DAVID HINOJOSA
BRYANNA A. JENKINS
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1400 K Street NW Suite 900
Washington, D.C. 20005

JESSICA L. ELLSWORTH
*Counsel of Record*
KAITLYN A. GOLDEN
DANIELLE DESAULNIERS STEMPEL
NEL-SYLVIA GUZMAN
RAY LI
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Telephone: (202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

December 21, 2020

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel certifies that none of the *amici curiae* are nongovernmental entities with a parent corporation or a publicly held corporation that owns 10% or more of its stock.

/s/ *Jessica L. Ellsworth*
Jessica L. Ellsworth

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF INTEREST...............................................................................1

INTRODUCTION ................................................................................................5

ARGUMENT ......................................................................................................9

  I.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT H.B. 500 WOULD HARM FEMALE STUDENTS WHO SEEK TO PARTICIPATE IN SCHOOL ATHLETICS...................................................9

      A.   H.B. 500 Creates a Discriminatory Ban That Will Harm All Women and Girls Who Are Transgender...........................................11

      B.   H.B. 500 Will Harm Some Women and Girls Who Are Intersex and Other Cisgender Women and Girls Who Do Not Conform to Sex Stereotypes.........................................................14

      C.   Women and Girls of Color Will Be Disproportionately Targeted and Harmed By H.B. 500.....................................................19

  II. DEFYING TITLE IX, H.B. 500 WOULD FORCE SCHOOLS TO DISCRIMINATE ON THE BASIS OF SEX AND PROHIBIT NON-DISCRIMINATORY AND TRANSGENDER-INCLUSIVE POLICIES THAT COURTS HAVE REPEATEDLY UPHELD .................24

      A.   H.B. 500 Would Force Schools to Violate Title IX............................25

      B.   Ensuring Equal Opportunity for Women and Girls Who Are Transgender Does Not Violate Title IX ..............................................28

CONCLUSION....................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*,
968 F.3d 1286 (11th Cir. 2020) ...................................................27, 29

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020)......................................................8, 25, 26

*Doe by and through Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) ........................................................29, 30

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ......................................................27, 29

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)...................................................................28

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
286 F. Supp. 3d 704 (D. Md. 2018)..................................................26

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ...........................................................30

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) ...........................................................26

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) ............................................................26

STATUTES:

Idaho Code § 33-6203(3) ......................................................10, 18, 24

Title IX of the Education Amendments of 1972 (Title IX),
20 U.S.C. § 1681 *et seq.* ..................................................................6
20 U.S.C. § 1681(a) ........................................................................25

iii

**REGULATIONS:**

34 C.F.R. § 106.31(b)(4) .........................................................28

34 C.F.R. § 106.33 .................................................................30

34 C.F.R. § 106.41(a) .............................................................28

34 C.F.R. § 106.41(b) .............................................................28

**OTHER AUTHORITIES:**

Elizabeth Adetiba, *Caster Semenya and the cruel history of contested
    black femininity*, SB NATION (Apr. 20, 2020, 1:00 PM EDT),
    https://bit.ly/2KGq6ZW .....................................................20

Alex Barasch, *The scrutiny of Caster Semenya's body fits into an ugly
    pattern*, WASH. POST: PERSPECTIVE (May 2, 2019, 2:59 PM EDT),
    https://wapo.st/38pJ8vF ....................................................16

Marcie Bianco, *Olympic champion Caster Semenya's critics couch
    misogynoir in the language of 'equality'*, NBC NEWS: THINK (Sept.
    10, 2020, 4:12 PM EDT), https://nbcnews.to/3awd8Zt ....................16

Alexandra Brodsky, et al., NATIONAL WOMEN'S LAW CENTER, *Dress
    Coded: Black girls, bodies & biases in D.C. schools* (Apr. 2018),
    https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-
    content/uploads/2018/04/5.1web_Final_nwlc_DressCodeReport.pdf ..............22

Erin E. Buzuvis, *Transgender Student-Athletes and Sex-Segregated
    Sport: Developing Policies of Inclusion for Intercollegiate and
    Interscholastic Athletics*,
    21 SETON HALL J. SPORTS & ENT. LAW 1 (2011) .........................12, 19

*Caster Semenya says testosterone case against IAAF has 'destroyed'
    her 'mentally and physically'*, BBC SPORT: ATHLETICS (July 1,
    2019), https://bbc.in/2KG2pkC .................................................16, 17

Christopher Clarey, *Russian Official is Penalized for Williams Sisters Remark*, N.Y. TIMES (Oct. 17, 2014), https://nyti.ms/3atHRq9 ..........................20

Britni de la Cretaz, *Serena Williams's Tennis Outfits Defy The Sexist, Racist Norms Female Athletes Face*, ELLE (Aug. 28, 2018), https://bit.ly/37Ar3Md .......................................................................22

Louis J. Elsas, MD, et al., *Gender verification of female athletes*, 2 GENETICS IN MEDICINE 249 (July 1, 2000) ................................................10, 15

Abbie E. Goldberg, THE WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW, *Transgender Students in Higher Education* (Aug. 2018), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Higher-Ed-Aug-2018.pdf .......................................................................12

Vanessa Heggie, *Testing sex and gender in sports; reinventing, reimagining, and reconstructing histories*, 34 ENDEAVOUR 157 (Dec. 2010) ........................................................15

Jody L. Herman, Taylor N.T. Brown & Ann P. Haas, THE WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW, *Suicide Thoughts and Attempts Among Transgender Adults* (Sept. 2019), https://bit.ly/38kN6pz ......................13

Tony Hoagland, *The Change*, available at https://poets.org/poem/change ...................................................22, 23

HUMAN RIGHTS WATCH, *"They're Chasing Us Away from Sport:" Human Rights Violations in Sex Testing of Elite Women Athletes* (Dec. 4, 2020), https://bit.ly/3p7E2ev ...............................................15

Harold Jackson, *47 years ago, black tennis players took segregation to the court Serving as a Symbol*, BALT. SUN (May 15, 1995), https://bit.ly/3p8YxHE.......................................................22

Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 CDC Morbidity & Mortality Wkly. Rep. 67 (Jan 25, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6803a3.htm ........................... 14

Milton Kent, et al., THE SCHOOL OF GLOBAL JOURNALISM & COMMUNICATIONS, MORGAN STATE UNIVERSITY, *Beating Opponents, Battling Belittlement: How African-American Female Athletes Use Community to Navigate Negative Images* (June 2018), available at https://bit.ly/3reL3fi ................................................ 20, 21

Joseph G. Kosciw, et al., *The 2019 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*, GLSEN (2020), available at https://bit.ly/3mGxlOO ...................................................................... 14

Letter from K. Richey, Acting Assistant Sec'y for Civ. Rts., Dep't of Education, to L. Mizerak, et al., Att'ys for CIAC and various Connecticut public school systems (Aug. 31, 2020), https://bit.ly/2LR6KSp ........................................................................ 29

Letter from T. Mattson, Compliance Team Leader, Dep't of Educ. Off.for Civ. Rts., to K. Mooney, President, Franklin Pierce Univ. (Oct. 16, 2020),  https://bit.ly/2KfyIXP ............................................. 29

Anna North, *"I am a woman and I am fast": what Caster Semenya's story says about gender and race in sports*, VOX (May 3, 2019, 7:30 AM EDT), https://bit.ly/3rf94Tx ............................................... 16

Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. TIMES MAGAZINE (June 28, 2016), https://nyti.ms/2J6IjPU ............................................................... 17, 21

Lindsay Parks Pieper, *They qualified for the Olympics. Then they had to prove their sex*, WASH. POST (Feb. 22, 2018, 6:00 AM EST), https://wapo.st/38pKhmX ..................................................................... 21

Page(s)

Jason Pham, *Serena Williams shut down body critics: 'I am strong and muscular – and beautiful'*, BUSINESS INSIDER (May 31, 2018, 2:49 PM), https://bit.ly/34vzEOA ................................................................22

Claudia Rankine, *Open Letter: A Dialogue on Race and Poetry*, https://poets.org/text/open-letter-dialogue-race-and-poetry .............................23

J C Reeser, *Gender identity and sport: is the playing field level?*, 39 BRIT. J. SPORTS MED. 695 (2005) ....................................................17

*Serena Williams, drug tested more than other top players this year, cites "discrimination"*, CBS NEWS (July 25, 2018, 10:53 AM), https://cbsn.ws/3pbOG3I ........................................................................23

Patricia Vertinsky & Gwendolyn Captain, *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. OF SPORT HIST. 532 (1998) ........................................................19

Gina Vivinetto, *Serena Williams on how she struggles with cruel remarks about her body*, TODAY (Sept. 7, 2017, 5:42 PM EDT), https://on.today.com/3rfwDLQ ..........................................................22

David Whelan, *Does Tennis Have a Race Problem?*, VICE (June 18, 2015, 8:31 AM), https://bit.ly/2KDb8nv ..........................................22

Erin C. Wilson, et al., *The Impact of Discrimination on the Mental Health of Trans*Female Youth and the Protective Effect of Parental Support*, 20 AIDS BEHAV. 2203 (Apr. 26, 2016) ..................................................13

National Women's Law Center, *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (April 9, 2019), available at https://bit.ly/34xoBEy ..........................................5

**TABLE OF AUTHORITIES—Continued**

Page(s)

Kelly P. Troutman & Mikaela J. Dufur, *From high school jocks to college grads: Assessing the long-term effects of high school sport participation on females' educational attainment*, 38 YOUTH & SOCIETY 443 (2007).......................................................12

This brief is filed by *amici* The National Women's Law Center and the Lawyers' Committee for Civil Rights Under Law and 60 additional organizations committed to racial and gender justice and LGBTQ rights.

The National Women's Law Center is a nonprofit legal organization dedicated to the advancement and protection of the legal rights of women and girls, and the right of all persons to be free from sex discrimination. Since its founding in 1972, the Center has focused on issues of key importance to women and their families, including education, reproductive rights and health, economic security, and workplace justice, with particular attention to the needs of low-income women and girls and those who face multiple and intersecting forms of discrimination. The Center has participated as counsel or amicus curiae in a range of cases before the Supreme Court, federal Courts of Appeals, federal district courts and state courts to secure protections against sex discrimination in all aspects of society. The Center has long worked for including the full and fair enforcement of Title IX in athletics, and seeks to ensure that all individuals, including LGBTQ individuals, enjoy the full protection against sex discrimination as promised by our laws.

---

[1] This brief is filed with the consent of all parties. No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or person, aside from *amici curiae* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonpartisan, nonprofit organization that was formed in 1963 at the request of President John F. Kennedy to involve the private bar in providing legal services to address racial discrimination. Its mission is to secure equal justice under law, through the rule of law, targeting in particular the inequities confronting African-Americans and other racial and ethnic minorities. The Educational Opportunities Project at the Lawyers' Committee seeks to ensure all children have access to quality educational opportunities and to enforce civil rights protections for all students; it achieves its mission by advocating on behalf of students of color, including those students with disabilities and those who identify as women and girls and as LGBTQ. This work includes litigation, public policy advocacy, and know-your-rights trainings advocating for the rights of persons of color under Title IX and ensuring they are able to access equal educational opportunities free from discrimination based on their sex, including sexual harassment and sexual assault. Lawyers' Committee has participated as *amici* in Title IX cases where the rights of women and girls of color were threatened by discriminatory laws. *See Pennsylvania v. DeVos*, No. 1:20-cv-01468 (D.D.C. 2020); *see also Victim Rights Law Center v. DeVos*, 1:20-cv-11104 (D. Mass. 2020). That participation is consistent with its organizational mission to ensure all children have equal access to a quality education.

Additional amici are:

- A Better Balance
- Anti-Defamation League
- American Federation of State, County and Municipal Employees, AFL-CIO
- American Federation of Teachers, AFL-CIO
- Bold Futures
- California Women Lawyers
- Chicago Alliance Against Sexual Exploitation
- Chicago Foundation for Women
- Clearinghouse on Women's Issues
- Colorado Organization for Latina Opportunity and Reproductive Rights
- Equal Rights Advocates
- Equality California
- Feminist Majority Foundation
- FORGE, Inc.
- Gender Justice
- Girls Inc.
- GLSEN
- Human Rights Campaign
- Idaho Coalition Against Sexual & Domestic Violence
- In Our Own Voice: National Black Women's Reproductive Justice Agenda
- Japanese American Citizens League
- Kentucky Association of Sexual Assault Programs
- Know Your IX, a project of Advocates for Youth
- KWH Law Center for Social Justice and Change
- League of Women Voters of the United States
- Legal Momentum, the Women's Legal Defense and Education Fund
- Lift Louisiana
- NARAL Pro-Choice America
- National Asian Pacific American Women's Forum
- National Association of Social Workers

- National Center for Youth Law
- National Crittenton
- National Education Association
- National Organization for Women Foundation
- National Partnership for Women & Families
- National Women's Political Caucus
- New Hampshire Women's Bar Association
- New York Lawyers for the Public Interest
- People For the American Way Foundation
- Planned Parenthood of the Great Northwest and the Hawaiian Islands
- Pride at Work
- Public Justice
- QLaw Bar Association of Washington
- QLaw Foundation of Washington
- Religious Coalition for Reproductive Choice
- Reproductive Justice Action Collective
- SisterReach
- Southern Poverty Law Center
- SPARK Reproductive Justice NOW!, Inc.
- The Women's Law Center of Maryland
- Transgender Law Center
- Unitarian Universalist Association
- Washington Lawyers' Committee for Civil Rights & Urban Affairs
- Women Lawyers On Guard Inc.
- Women's Bar Association of the District of Columbia
- Women's Bar Association of the State of New York
- Women's Institute for Freedom of the Press
- Women's Law Project
- Women Lawyers Association of Los Angeles
- WV FREE

*Amici* have a shared interest in ensuring that protections against sex discrimination include protections against discrimination based on sexual orientation and gender identity and in protecting women and girls of color from race- and sex-discrimination. The brief sets forth *amici*'s considered understanding of the harmful effects H.B. 500 will have on all women and girls if it is allowed to go into effect. In short, H.B. 500 will harm women and girls who are transgender, women and girls who are intersex and cisgender, and Black and brown women and girls. H.B. 500 will also cause schools to violate federal civil rights protections contained in Title IX. And, contrary to the assertions of some *amici* supporting H.B. 500, protecting transgender women and girl student athletes does not violate Title IX. Although Appellants incorrectly portray H.B. 500 as benefiting women and girls, many women's rights and gender justice organizations have advocated for full gender equity in schools including equal access to participation in athletics for women and girls who are transgender.[2]

## INTRODUCTION

Sex and race discrimination pervade the history of athletics. Idaho's "Fairness in Women's Sports Act" (H.B. 500) constitutes another chapter in this shameful

---

[2] *See, e.g.*, National Women's Law Center, *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People* (April 9, 2019), available at https://bit.ly/34xoBEy.

history.  H.B. 500 is the only law in the country to ban, on a statewide basis, all women and girls who are transgender and some women and girls who are intersex from participating in sports consistent with their gender identity.  That the plaintiffs here are a transgender woman and a cisgender woman underscores the wide ranging harms that H.B. 500 inflicts.  This law will negatively impact *all* women—not just women and girls who are transgender and intersex—and particularly women and girls of color.  Additionally, this type of sex discrimination violates both the text and the purpose of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*

H.B. 500 precludes women and girls from participating in sports and receiving the benefits of such participation.  Sports participation enhances women and girls' physical health and emotional and psychological well-being, improves their educational prospects, and expands their social networks.  These benefits are especially important for girls who are transgender and intersex—who are at heightened risk for feelings of isolation, discrimination, harassment and low self-esteem—and they should not be excluded from these critical opportunities.  H.B. 500's discriminatory and invasive sex testing regime undermines these important goals.

After Governor Little signed H.B. 500, Lindsay Hecox, a female college student who is transgender, and Jane Doe, a female high school student who is

cisgender, challenged the law as violating the U.S. Constitution's guarantee of equal protection, due process, and the right to be free from unconstitutional searches and seizures, as well as Title IX. ER4, ER13; *see also* ER5-6 (defining sex, transgender, cisgender, and intersex). The District Court granted a preliminary injunction on Plaintiffs' equal protection claim. ER4. That decision was correct and should be affirmed. The District Court appropriately concluded that H.B. 500 advances no legitimate, much less important, purpose other than to exclude women and girls who are transgender from participating in school sports.

*Amici* are gravely concerned about the harm H.B. 500 will cause to many women and girls, including all women and girls who are transgender and some who are intersex, by outright banning these students from playing on women's and girls' sports teams. H.B. 500 further harms *all* women and girls by allowing anyone to challenge the sex of a female student, and prohibiting any action against the complainant, even if the challenge was made in bad faith. H.B. 500 rests on old, fundamentally inaccurate and harmful stereotypes regarding athleticism, biology, and gender, which particularly harm girls who are transgender and Black and brown girls, who are likely to be additionally targeted because of their race. These stereotypes frequently result in such girls being told outright that they are not, in fact, girls. Similar policing of gender has been used to scrunitize, demean, and exclude female athletes who are transgender or cisgender, including those who may

be intersex, who do not conform to sex stereotypes regarding "femininity." More particularly, gender testing has long been used to police Black and brown female athletes' bodies; HB 500 places women and girls of color particularly at risk of being targeted for discrimination. If the injunction here were lifted, it would open the door to similar discriminatory targeting and harm to women and girls in other states.

Although Plaintiffs' Title IX claim was not the basis for the District Court's injunction, Appellants and their *amici* make equal protection arguments to this Court that would have dire implications for Title IX and for educational opportunities for women and girls. They wrongly suggest that H.B. 500's mandated discrimination against some women and girls is necessary to ensure equivalent athletic opportunities for other women and girls under Title IX. *See* Appellants' Br. 22-23. In fact, enforcing laws that discriminate against transgender or intersex students or others perceieved as not conforming to sex stereotypes, like H.B. 500, is itself a violation of Title IX. The Supreme Court's recent holding in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020), confirms as much. There, the Supreme Court held that discrimination on the basis of transgender status is prohibited sex discrimination under Title VII. In the six months since *Bostock* issued, multiple circuit courts have applied this ruling to prohibit discrimination against transgender students, including under Title IX. Appellants' *amici* ignore that federal courts have repeatedly held trans-inclusive policies in educational activities comply with Title

IX.  So in addition to harming Idaho's women and girls under the equal protection clause and Title IX, H.B. 500 also harms Idaho's schools by placing them in the untenable position of choosing between whether to violate this state law or provisions of the U.S. Constitution and Title IX that protect against sex discrimination.

The Court should affirm the preliminary injunction.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT H.B. 500 WOULD HARM FEMALE STUDENTS WHO SEEK TO PARTICIPATE IN SCHOOL ATHLETICS.

H.B. 500 bars all women and girls who are transgender, and some intersex women and girls, from participating on school sports teams consistent with their gender identity.  By singling out this group of women and girls for discriminatory treatment, the law will hurt all women and girls who participate in athletics in Idaho. The District Court therefore correctly enjoined H.B. 500, finding Plaintiffs were likely to succeed in their equal protection claim and that the harm was imminent and irreparable.  *See* ER84.

Unless the injunction is upheld, H.B. 500 will harm *all* women and girls in several ways.  First, it will categorically bar women and girls who are transgender from participating in team sports consistent with their gender identity, thereby depriving them of the recognized benefits of athletic participation.

Second, H.B. 500 will harm and discriminate against cisgender women and girls—particularly those who do not confirm to stereotypical notions of "femininity"—and some women and girls who are intersex. For over fifty years, some female athletes have been subjected to a variety of humiliating, unscientific practices requiring them to verify that they are, in fact, women. Louis J. Elsas, MD, et al., *Gender verification of female athletes*, 2 GENETICS IN MEDICINE 249 (July 1, 2000). H.B. 500 continues this practice by specifying that if *anyone* questions whether an athlete is female—for *any reason*—the challenged student will have to establish proof of their sex by presenting a signed statement from her physician detailing the student's internal and external "reproductive anatomy," "normal endogenously produced testosterone levels," or "genetic makeup." Idaho Code § 33-6203(3).[3] This verification process invades female students' privacy and requires the disclosure of personal and sensitive medical information based on the whim of any third party.

Third, H.B. 500 will disproportionately affect and harm women and girls of color, particularly Black and brown women and girls. Sex-verification procedures

---

[3] Appellants argue that students can rely on a health examination or statement from their health provider to verify their sex. Appellants' Br. 35-39. But as Appellees explain, this argument is both inconsistent with Appellants' position that women and girls who are transgender can be excluded as a rule from playing on sports teams consistent with their gender identity and is contrary to the language of the statute. Appellees' Br. 60-62.

are deeply intrusive and disproportionately target women and girls of color. Women and girls who play sports in Idaho—particularly Black and brown women and girls—would face similarly demeaning invasions of their privacy under H.B. 500.

The law forces female students to shoulder the burden of proving they are "enough" of a girl or woman to participate on a team matching their gender identity. Instead of "leveling the playing field," this will drive women and girls off the field altogether.

### A. H.B. 500 Creates a Discriminatory Ban That Will Harm All Women and Girls Who Are Transgender.

H.B. 500 will harm all women and girls seeking to participate in sports who are transgender. The law singles out and excludes women and girls who are transgender from sports entirely, which will lead to negative psychological consequences and deprive these students from the benefits of participating in sports. As the District Court rightly concluded, this is sex discrimination and not acceptable under the Equal Protection Clause.

By barring all women and girls who are transgender from participating in sports, H.B. 500 deprives them, as a group, of myriad benefits afforded to cisgender student athletes. *See* ER64. While participation in sports generally provides athletes with a supportive network and social status that can minimize feelings of difference and isolation, this is especially crucial for transgender student athletes as this can

help to foster acceptance.[4]  It can also improve transgender students' educational prospects,[5] which may help mitigate the "variety of barriers to attendance in school" that these students often experience.[6]  Further, the physicality of sports can contribute to positive self-image.  Buzuvis, *supra*, at 48.

These benefits are critical for transgender student athletes, who "face an elevated risk of social isolation" and experience high rates of "verbal and physical abuse and harassment at the hands of their peers."  *Id.*  Transgender students are "at a higher risk for suicide and other life threatening behaviors" because of this abuse, rejection, and harassment.  *Id.*  Participating on a sports team that is consistent with one's gender identity can help mitigate these risks and offer an important "'respite' or 'escape' from the stress and turmoil associated with" the discrimination and harassment students who are transgender face.  *See id*. at 48-49.  H.B. 500 would deprive all female transgender students of these benefits.

---

[4]   *See, e.g.*, Erin E. Buzuvis, *Transgender Student-Athletes and Sex-Segregated Sport: Developing Policies of Inclusion for Intercollegiate and Interscholastic Athletics*, 21 SETON HALL J. SPORTS & ENT. LAW 1, 48 (2011).

[5]   *See, e.g.*, Kelly P. Troutman & Mikaela J. Dufur, *From high school jocks to college grads: Assessing the long-term effects of high school sport participation on females' educational attainment*, 38 YOUTH & SOCIETY 443 (2007).

[6]   Abbie E. Goldberg, THE WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW, *Transgender Students in Higher Education* 2 (Aug. 2018), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Higher-Ed-Aug-2018.pdf.

Exclusion from sports also exacerbates the risk of mental health issues for transgender students. A recent survey by the UCLA Williams Institute indicates that 98% of transgender individuals who have experienced multiple instances of discrimination or violence in the past year have thought about committing suicide and 51% attempted suicide; as more discriminatory experiences occurred, the prevalence of suicidal thoughts and attempts increased. Jody L. Herman, Taylor N.T. Brown & Ann P. Haas, THE WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW, *Suicide Thoughts and Attempts Among Transgender Adults* 27-28 (Sept. 2019), https://bit.ly/3p8YxHE. Among survey respondents who reported being denied equal treatment because they are transgender, 61% had suicidal thoughts and 13% reported suicide attempts because of the discrimination. *Id.* at 21.

Another study found transgender-based discrimination doubled the odds of depression in women and girls who are transgender and increased eightfold the odds of stress caused by suicidal thoughts.[7] Erin C. Wilson, et al., *The Impact of Discrimination on the Mental Health of Trans\*Female Youth and the Protective Effect of Parental Support*, 20 AIDS BEHAV. 2203, 2208, 2209 (Apr. 26, 2016). And

---

[7]    This study noted the intersection of racial and gender minority status, finding that individuals with higher exposure to both forms of discrimination had higher odds of post-traumatic stress disorder symptoms and stress caused by suicidal thoughts. Wilson, *supra*, at 2208-09. This finding indicates a strong need to address both forms of discrimination and provide mental health supports and services, including with an intersectional focus, among girls of color who are transgender. *Id.* at 2210.

the CDC's 2019 Youth Risk Behavior Survey data found transgender students are many times more likely to experience any number of violent or harassing incidents, as well as multiplied risks for suicide and substance abuse.  Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 CDC Morbidity & Mortality Wkly. Rep. 67, 68 (Jan 25, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6803a3.htm.

Given the above, trans-inclusive policies are crucial, both in the school sports contexts and more generally, to address these alarming disparities.  *See, e.g.*, Joseph G. Kosciw, et al., *The 2019 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*, GLSEN, xxi-xxv (2020), available at https://bit.ly/3mGxlOO (students were less likely to experience harassment, violence, or hear anti-LGBTQ remarks at schools with trans-inclusive policies and educators).

> **B.    H.B. 500 Will Harm Some Women and Girls Who Are Intersex and Other Cisgender Women and Girls Who Do Not Conform to Sex Stereotypes.**

The harms from Idaho's uniquely invasive and extreme process for testing female athletes extend beyond women and girls who are transgender.  H.B. 500 also

will harm some women and girls who are intersex,[8] who may be subjected to invasive sex-verification procedures, as well as cisgender women and girls perceived as not conforming to sex stereotypes.

Sex-verification procedures have a long, checkered history in female sports that continue to this day. *See, e.g.*, HUMAN RIGHTS WATCH, *"They're Chasing Us Away from Sport:" Human Rights Violations in Sex Testing of Elite Women Athletes* (Dec. 4, 2020), https://bit.ly/3p7E2ev. The International Olympic Committee, for example, implemented sex-verification procedures to prevent women with "unfair, male-like" physical advantages from competing. Dr. Elsas, et al., *supra.* Beginning in the 1960's, female athletes were required to parade naked in front of a panel of three female doctors to prove that they were women for some international competition organizations. Vanessa Heggie, *Testing sex and gender in sports; reinventing, reimagining, and reconstructing histories*, 34 ENDEAVOUR 157, 159 (Dec. 2010). The use of these practices rightfully ended eventually based on the recognition that they were humiliating, unscientific, and ineffective. *Id*. at 160. But sex-verification procedures persist in other forms, including those required by H.B. 500. Subjecting women and girls who are perceived to not conform to sex

---

[8] Some women will not know they are intersex until they are required to undergo a sex-verification procedure. *See* ER6 (defining intersex).

stereotypes to these procedures, including those who are intersex, will harm—not help—women and girl athletes.

Caster Semenya's experience exemplifies the privacy invasions and psychological harm caused by sex-verification procedures. Semenya—a Black woman and Olympic track champion—faced intense suspicion from competitors and "experts" who questioned her athletic physique. *See* Marcie Bianco, *Olympic champion Caster Semenya's critics couch misogynoir in the language of 'equality'*, NBC NEWS: THINK (Sept. 10, 2020, 4:12 PM EDT), https://nbcnews.to/3awd8Zt; Alex Barasch, *The scrutiny of Caster Semenya's body fits into an ugly pattern*, WASH. POST: PERSPECTIVE (May 2, 2019, 2:59 PM EDT), https://wapo.st/38pJ8vF. Her body was picked apart for not comporting with Eurocentric stereotypes of femininity. Time Magazine even ran an article entitled, "Could this Women's World Champ Really Be a Man?," and an Australian newspaper labeled her a "hermaphrodite." Anna North, *"I am a woman and I am fast": what Caster Semenya's story says about gender and race in sports*, VOX (May 3, 2019, 7:30 AM EDT), https://bit.ly/3rf94Tx. On top of this public scrutiny, she was subjected to a battery of tests to assess whether she should be allowed to compete with women. *Id.* Semenya reported feeling targeted and "crucified" by this scrutiny, and stated that it "destroyed [her] mentally and physically." *Caster Semenya says testosterone case against IAAF has 'destroyed' her 'mentally and physically'*, BBC SPORT: ATHLETICS

16

(July 1, 2019), https://bbc.in/2KG2pkC. H.B. 500 will only further these kinds of harms, particularly for Black and brown women and girls.

H.B. 500 bars some women and girls who are intersex—those whose "biological sex" does not comport to one sex or the other to the satisfaction of Idaho officials—from participating on female designated sports teams. They will suffer similar social and educational harms as those experienced by transgender women and girls, particularly if their peers or teachers learn of such testing. In the ugly history of sex testing in sports, women have been hounded by public scrutiny and humiliation, subjected to invasive tests and pressured into uncessary medical procedures, and driven out of sports. *See supra*, p. 9; Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. TIMES MAGAZINE (June 28, 2016), https://nyti.ms/2J6IjPU (explaining that after one intersex athlete failed a sex-verification procedure, she was so "tormented" and "unbearably embarrassed" that "she attempted suicide" by "swallowing poison"); J C Reeser, *Gender identity and sport: is the playing field level?*, 39 BRIT. J. SPORTS MED. 695, 696 (2005) ("Numerous [intersex] athletes suffered tremendous psychological harm from the public scrutiny that ensued following the public disclosure of abnormal test results.").

H.B. 500 will also harm some women and girls who are intersex or cisgender who are targeted under the verification requirements by requiring these women and

girls to undergo unnecessary, invasive, and psychologically-traumatic testing before they may participate on teams consistent with their gender identity. This battery of invasive physical examinations and tests potentially includes a gynecology exam,[9] bloodwork, and chromosome testing. Idaho Code § 33-6203(3); *see also* Padawer, *supra*. Female students will have to share documentation of these medical results with athletic administrators and school officials, resulting in a significant invasion of privacy. And they and their families will suffer the financial harm of paying for the examinations and tests. H.B. 500 subjects all female students to these harms to prove what they already know: that they are women or girls.

This concern is real for Plaintiff Jane Doe, a female cisgender athlete, who usually does not wear skirts or dresses, has an athletic build, and largely has male friends. ER689. Doe is understandably afraid that her competitors will use H.B. 500 to force her to undergo a sex-verification procedure. *Id.* As the District Court found, these fears are "credible," because of both Doe's "specific characteristics" and the fact that H.B. 500 allows "essentially anyone [to] challenge another female athlete's sex." ER44.

Further, H.B. 500 would deprive these cisgender women and girls of the multitude of benefits that flow from playing sports. In addition to the other benefits

---

[9] For some younger athletes, undergoing testing outlined in H.B. 500 could be their first pelvic exam. That will further increase the trauma of the sex-verification procedure.

named herein, athletes benefit from teammates with diverse backgrounds and demographics; such diversity fosters understanding and acceptance among all team members, and reduces stereotypes, discrimination, and prejudice.[10] Buzuvis, *supra*, at 50.

### C. Women and Girls of Color Will Be Disproportionately Targeted and Harmed By H.B. 500.

Even before H.B. 500, Black and brown female athletes were more likely to be targeted, shamed, and dehumanized for not conforming to others' societal expectations about sex stereotypes and "femininity." If H.B. 500 were to take effect, history and experience show that it would disproportionately harm Black and brown female athletes based on negative stereotypes and anti-Black racism.

Black female athletes have often been described as masculine. This stereotypical depiction is rooted in the historical myth that African Americans were suited for physical labor during slavery because of their supposed "'natural' brute strength and endurance." Patricia Vertinsky & Gwendolyn Captain, *More Myth than History: American Culture and Representations of the Black Female's Athletic Ability*, 25 J. OF SPORT HIST. 532, 541 (1998). This antiquated, white-supremacist notion holds out the white, cisgendered female body as the model for "womanhood"

---

[10] Student athletes also gain improved academic outcomes, critical skills for social and emotional development, including leadership, teamwork, and problem-solving, and opportunities for social support. *See generally* Amicus Br. of 176 Athletes in Women's Sports.

and labels anything other than that model as "manly." Elizabeth Adetiba, *Caster Semenya and the cruel history of contested black femininity*, SB NATION (Apr. 20, 2020, 1:00 PM EDT), https://bit.ly/2KGq6ZW.

When Black women's bodies fall outside of these notions of femininity and expectations perpetuated by a white dominant society, they are subject to policing, discrimination, and harassment. *See, e.g.*, Christopher Clarey, *Russian Official is Penalized for Williams Sisters Remark*, N.Y. TIMES (Oct. 17, 2014), https://nyti.ms/3atHRq9 (discussing Russian tennis official's reference to "the Williams brothers" on a Russian television program). This persistent harassment echoes the fallacy that Black women are more masculine than non-Black women, and thus are less worthy and not "real women."

These harmful stereotypes have resulted in a long history of targeting women and girls of color, particularly Black women, by sporting bodies, competitors, and the media. For example, when Tidye Pickett and Louise Stokes became the first Black women to represent the U.S. in the 1936 Olympics, an official proposed that "the International Olympic Committee [IOC] should create a special category of competition for them [Pickett and Stokes]—the unfairly advantaged 'hermaphrodites' who regularly defeated 'normal women.'" Milton Kent, et al., THE SCHOOL OF GLOBAL JOURNALISM & COMMUNICATIONS, MORGAN STATE UNIVERSITY, *Beating Opponents, Battling Belittlement: How African-American*

*Female Athletes Use Community to Navigate Negative Images* 9 (June 2018), available at https://bit.ly/3reL3fi.  Offensive beliefs like this pushed the IOC into implementing its sex-verification procedures.  The IOC did away with compulsory sex-verification testing in 1999 after overwhelming criticism, but still engaged in case-by-case testing for any competitor found to be "suspicious" until 2010.  Lindsay Parks Pieper, *They qualified for the Olympics. Then they had to prove their sex*, WASH. POST (Feb. 22, 2018, 6:00 AM EST), https://wapo.st/38pKhmX.

Unsurprisingly, Black and brown women have been a frequent target of suspicion-based sex verifications procedures.  Santhi Soundarajan and Dutee Chand of India and Caster Semenya of South Africa were all required to undergo sex-verification testing because competitors and coaches saw their physique as "suspiciously masculine."  Padawer, *supra*.  This "suspicion-based sex verification" is similar to the process described in H.B. 500, which will further perpetuate race and sex stereotypes that Black and brown female athletes are not "feminine" enough and therefore cannot be women.  H.B. 500's sex verification requirements will lead to more policing of Black and brown female student athletes' bodies.

Perhaps the most prominent woman to suffer this type of policing is tennis star Serena Williams.  Throughout her storied career, Williams has been a consistent

target of racism, sexism, and transphobia.[11]  Because of Williams' athletic physique and dominance in an elitist and historically racially discriminatory,[12] people have said that "[s]he is built like a man" and alleged that "[she] was born a guy, all because of [her] arms, or because [she's] strong."  Gina Vivinetto, *Serena Williams on how she struggles with cruel remarks about her body*, TODAY (Sept. 7, 2017, 5:42 PM EDT), https://on.today.com/3rfwDLQ; Jason Pham, *Serena Williams shut down body critics: 'I am strong and muscular – and beautiful'*, BUSINESS INSIDER (May 31, 2018, 2:49 PM), https://bit.ly/34vzEOA.  One author—in a poem heavily criticized for its language and racist tropes—described her as a "big black girl" with an "outrageous name like Vondella Aphrodite."  Tony Hoagland, *The Change*,

---

[11]  For example, after debuting a custom Nike full-body "cat suit" designed to prevent blood clots, a health condition Williams has struggled with her entire life, the French Tennis Federation called her bodysuit "disrespectful" and announced it would change the French Open's dress code to ban outfits like hers.  Britni de la Cretaz, *Serena Williams's Tennis Outfits Defy The Sexist, Racist Norms Female Athletes Face*, ELLE (Aug. 28, 2018), https://bit.ly/37Ar3Md.  This is a common issue for female students of color both on and off the playing field, and as studies show, female students of color are more likely to be cited for dress code violations than their white student counterparts.  Black girls in particular face "unique dress and hair code burdens."  Alexandra Brodsky, et al., NATIONAL WOMEN'S LAW CENTER, *Dress Coded: Black girls, bodies & biases in D.C. schools* 1 (Apr. 2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/04/5.1web_Final_nwlc_DressCodeReport.pdf.

[12]  David Whelan, *Does Tennis Have a Race Problem?*, VICE (June 18, 2015, 8:31 AM), https://bit.ly/2KDb8nv; Harold Jackson, *47 years ago, black tennis players took segregation to the court Serving as a Symbol*, BALT. SUN (May 15, 1995), https://bit.ly/3p8YxHE.

available at https://poets.org/poem/change.  The poem gave voice to the policing of female athletes' bodies and a prerequisite of white "feminity" in athletics, stating: "I couldn't help wanting / the white girl to come out on top / because she was one of my kind, my tribe, / with her pale eyes and thin lips / and because the black girl was so big / and so black / so unintimidated."  *Id.*  A critique to this poem, by Claudia Rankine, explores the racial—and racist—stereotypes used therein and explains the many ways in which this language is both harmful to Black women and offensive.[13]

These critiques of Williams center on the idea that a woman cannot have a natural, athletic physique; having such a physique therefore means she must not be a woman or she must be using performance enhancing drugs.  In 2018, Williams was "randomly" drug tested five times by June even though she has never tested positive for any performance enhancing drugs.  Her top competitors were tested between 0-2 times in the same time-span.  *See Serena Williams, drug tested more than other top players this year, cites "discrimination"*, CBS NEWS (July 25, 2018, 10:53 AM), https://cbsn.ws/3pbOG3I.  Williams has called out the U.S. Anti-Doping Agency because she believes that her selections for testing were discriminatory.  *Id.*

H.B. 500 will perpetuate these practices of policing the bodies of women and girls of color and will allow student-athletes to be targeted on the basis of societal

---

[13] Claudia Rankine, *Open Letter: A Dialogue on Race and Poetry*, https://poets.org/text/open-letter-dialogue-race-and-poetry.

sex stereotypes about what women's bodies *should* look like. As written, any person can dispute a student's sex and then the burden is placed on the student athlete to "verify" their sex. Idaho Code § 33-6203(3). Coaches, administrators, and other athletes thus become the arbiters of who "looks like" a girl or a woman.

## II. DEFYING TITLE IX, H.B. 500 WOULD FORCE SCHOOLS TO DISCRIMINATE ON THE BASIS OF SEX AND PROHIBIT NON-DISCRIMINATORY AND TRANSGENDER-INCLUSIVE POLICIES THAT COURTS HAVE REPEATEDLY UPHELD.

In addition to defending the constitutionality of H.B. 500 by claiming that discrimination against transgender girls is necessary to ensure athletic opportunities for cisgender girls—a position soundly rejected by the District Court—Appellants' *amici* also wrongly assert that trans-inclusive policies violate Title IX, and that Title IX requires discrimination against transgender students. *See, e.g.*, Women's Human Rights Campaign ("WHRC") Br. 13-14. By arguing that H.B. 500 is necessary to prevent violations of Title IX, those *amici* ignore the broad sweep of Title IX: to prohibit sex discrimination and ensure equal opportunities for *all girls*, not just cisgender girls. Those *amici* also ignore the many ways detailed herein that H.B. 500 harms all women and girls. And not only does H.B. 500 fail to advance the interests of Title IX, but compliance with H.B. 500 will also force schools to *violate* Title IX.

Since its enactment nearly fifty years ago, Title IX has dramatically advanced women and girls' participation in school athletics. Title IX mandates that no person

"shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has confirmed that discrimination based on a person's transgender status is a form of sex discrimination. *Bostock*, 140 S. Ct. at 1747. Title IX thus prohibits discrimination against transgender students. As a result, H.B. 500 not only fails to advance the goals of Title IX, but complying with H.B. 500 would require schools in Idaho to *violate* Title IX. Idaho may not force schools to engage in the very discrimination federal law prohibits.

## A.     H.B. 500 Would Force Schools to Violate Title IX.

Prohibiting women and girls who are transgender from playing on the sports team consistent with their gender identity *violates* Title IX. Idaho is thus putting schools to an impossible choice: comply with H.B. 500 *or* comply with Title IX.

Appellants' and their *amici*'s contrary arguments define sex discrimination incorrectly. They claim that because H.B. 500 does not discriminate on the basis of "biological" sex, it is not unlawful. *See* Appellants' Br. 16; Intervenors' Br. 31. They additionally claim, out of sync with the Supreme Court's clear analysis in *Bostock*, that gender identity is not a legally cognizable concept. *See, e.g.*, WHRC Br. 6-12; Women's Liberation Front ("WoLF") Br. 16-17. Relying on this erroneous view of sex discrimination, they argue that *failing* to exclude transgender women

and girls would violate Title IX by depriving "true" women and girls of their statutory right to participate on their "own" sports teams. WHRC Br. 13-14.

Those arguments cannot be squared with precedent from this Court or the Supreme Court. For decades, federal courts, including this one, have affirmed that sex discrimination includes discrimination on the basis of gender identity and transgender status. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1200-01 (9th Cir. 2000) (interpreting Gender Motivated Violence Act); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir. 2017) (Title IX); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018) (Title IX). The Supreme Court put it succinctly in *Bostock*: discrimination tied to sexual orientation or gender identity "necessarily entails discrimination based on sex; the first cannot happen without the second." 140 S. Ct. at 1747.

Specifically, in *Harris Funeral Homes*, one of the three underlying cases resolved in *Bostock*, the Supreme Court found that an employer violated Title VII by firing a transgender woman including because she sought to wear work uniforms that conformed to her gender identity instead of her sex assigned at birth. *Id.* at 1738. Thus, the Court found that discrimination on the basis of being transgender and discrimination on the basis of sex are inextricably linked.[14]

---

[14]   *See* NWLC Amicus Br. 23-27, *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) (Nos. 17-1618, et al.).

*Bostock* and its progeny clearly indicate that prohibiting women and girls who are transgender from competing on women's sports teams would violate Title IX. Two federal circuits have already applied *Bostock* to policies that single out transgender students under Title IX.  In *Grimm v. Gloucester County School Board*, the Fourth Circuit applied *Bostock* to hold that a bathroom policy prohibiting a transgender boy from using the men's restroom was impermissible sex discrimination.  972 F.3d 586 (4th Cir. 2020).  The court found that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* at 618.  It rejected the school's reliance on a Title IX regulation allowing sex-segregated bathrooms. The regulation stated that sex-segregated restrooms are not per se discriminatory; it did not state that in "applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means." *Id.*  The Eleventh Circuit reached a similar conclusion in *Adams by and through Kasper v. School Board of St. Johns County*, 968 F.3d 1286, 1296 (11th Cir. 2020).  Applying *Bostock*, it held that a policy restricting restroom use based on "biological sex" "singles out transgender students for differential treatment *because* they are transgender." *Id.* (emphasis in original).

The notion that H.B. 500 *prevents* Title IX violations is not credible.  Title IX does not require sex segregation in sports or sex-specific standards or testing.  Just

27

the opposite: H.B. 500 singles out women and girls who are transgender *in violation of* Title IX.  Although women and girls are allowed to participate on female sports teams if they are cisgender (though some may be required to prove it), women and girls who are transgender cannot.

## B. Ensuring Equal Opportunity for Women and Girls Who Are Transgender Does Not Violate Title IX.

Title IX does not require women and girls who are transgender to compete on teams based on sex assigned at birth. Thus, Appellants' *amici* are incorrect to assert that trans-inclusive policies violate Title IX.  *See, e.g.*, WoLF Br. 41.

Under Title IX, sex discrimination exists where a school subjects someone to "separate or different rules of behavior, sanctions, or other treatment" on the basis of sex that results in the denial of an educational benefit (including participation on sports teams).  34 C.F.R. § 106.31(b)(4); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  Title IX's implementing regulations allow certain exceptions from this general nondiscrimination rule; one such exception permits schools to maintain sex-segregated athletics in limited circumstances.  *See* 34 C.F.R. § 106.41(b) (permitting the creating of sex-segregated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport").  This limited exception for the maintenance of separate sports teams does not mean that student athletics are exempt from Title IX.  Nor does the regulation specify which teams any students may—or must—participate in.  *Id*. § 106.41(a).

Appellants and their *amici* do not claim that *all* women and girls will be harmed unless women and girls who are transgender are excluded from women's sports teams.  Nor could they, since any such fear has been disproven around the country, and H.B. 500 would in fact harm many members of the very group it purports to protect.  *See supra*, pp. 14-19.  Instead, Appellants and their *amici* claim harms only to the interests of some cisgender women who object to participation by their transgender female peers.  They cite to two recent letters from the U.S. Department of Education adopting their position that it violates Title IX to allow transgender students to compete in athletics on the basis of their gender identity.[15] The reasoning in these letters is flawed and has not been used by any court.

In fact, courts have repeatedly rejected any claims that the presence of transgender peers, or trans-inclusive policies themselves, violate Title IX or other laws.  In *Doe by and through Doe v. Boyertown Area School District*, 897 F.3d 518, 535 (3d Cir. 2018), the Third Circuit addressed a school district's policy that allowed

---

[15] The Department of Education's Office for Civil Rights ("OCR") sent these enforcement action letters in the past few months to the Connecticut Interscholastic Athletics Conference and Franklin Pierce College.  *See* Letter from K. Richey, Acting Assistant Sec'y for Civ. Rts., Dep't of Education, to L. Mizerak, et al., Att'ys for CIAC and various Connecticut public school systems (Aug. 31, 2020), https://bit.ly/2LR6KSp; Letter from T. Mattson, Compliance Team Leader, Dep't of Educ. Off.for Civ. Rts., to K. Mooney, President, Franklin Pierce Univ. (Oct. 16, 2020), https://bit.ly/2KfyIXP.  The letters do not discuss the case law explicitly applying *Bostock* to Title IX and holding that it violates Title IX to discriminate against women and girls who are transgender.  *See Grimm*, 972 F.3d 586; *Adams*, 968 F.3d 1286.

transgender students to use restrooms and locker rooms consistent with their gender identity. In a similar manner to its treatment of athletics, Title IX's implementing regulations allow for sex-segregated bathrooms and locker rooms as an exception from the general rule prohibiting discrimination on the basis of sex. *See* 34 C.F.R. § 106.33. The Third Circuit determined that schools do not violate this regulation by instituting a policy that allows students to use sex-segregated restrooms based on their gender identity. *See Boyertown*, 897 F.3d at 534-535.

This Court recently followed *Boyertown* in *Parents for Privacy v. Barr*, holding that trans-inclusive policies, such as the policy of allowing transgender students to use facilities that align with their gender identity, do not violate Title IX. 949 F.3d 1210, 1239-40 (9th Cir. 2020). Following this Circuit's precedent, H.B. 500 would violate Title IX. Ultimately, ensuring protections against sex discrimination for all women and girls, including for women and girls who are transgender, aligns with Title IX.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court affirm the decision below.

December 21, 2020

Respectfully submitted,

/s/ *Jessica L. Ellsworth*

FATIMA GOSS GRAVES
EMILY MARTIN
SUNU CHANDY
NEENA CHAUDHRY
SHIWALI PATEL
CASSANDRA MENSAH
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, N.W.
Washington, D.C. 20036
Telephone: (202) 588-5180

JON GREENBAUM
DAVID HINOJOSA
BRYANNA A. JENKINS
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K. Street, N.W.
Washington, D.C. 20005
Telephone: (202) 662-8600

JESSICA L. ELLSWORTH
*Counsel of Record*
KAITLYN A. GOLDEN
DANIELLE DESAULNIERS STEMPEL
NEL-SYLVIA GUZMAN
RAY LI
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Telephone: (202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,933 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

*/s/ Jessica L. Ellsworth*
Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 21, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Jessica L. Ellsworth*
Jessica L. Ellsworth