---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

LINDSAY HECOX, et al.,
Plaintiffs-Appellees,

v.

BRADLEY LITTLE, et al.,
Defendants-Appellants,

and

MADISON KENYON, et al.,
Intervenor-Appellants.

---

On Appeal from the
United States District Court for the District of Idaho
Case No. 1:20-cv-00184-DCN
before the Hon. David C. Nye

===

**Brief of *Amici Curiae* GLBTQ Legal Advocates & Defenders and
the National Center for Lesbian Rights
in Support of Plaintiffs-Appellees and Affirmance**

===

Susan Baker Manning
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
susan.manning@morganlewis.com
*Attorney for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that GLBTQ Legal Advocates & Defenders (GLAD) and the National Center for Lesbian Rights are nonprofit organizations, neither of which has a parent corporation or issues public stock.

# FED. R. APP. P. 29(A)(4)(E) STATEMENT

No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person other than *amici curiae*, their members, or their counsel contributed money intended to fund the preparation of this brief.

Dated: December 21, 2020

/s/ Susan Baker Manning
Susan Baker Manning
Attorney for *Amici Curiae*

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................................i

FED. R. APP. P. 29(A)(4)(E) STATEMENT...........................................................i

I.     INTEREST OF *AMICI CURIAE* ....................................................................1

II.    SUMMARY OF ARGUMENT .......................................................................2

III.   ARGUMENT................................................................................................4

     A.     The Purpose of The Act Is to Exclude Transgender Girls and Women From Participation, Not to Promote Sex Equality...................4

     B.     The Act Targets A Vulnerable Group for Negative Treatment. ...........8

     C.     The Act Imposes a Sweeping Categorical Ban that Inflicts "Immediate, Continuing, and Real Injuries."......................................10

     D.     The Act Does Not Further Its Purported Goals.................................10

     E.     The Act Perpetuates Unfounded Stereotypes that Fuel Discrimination Against Women in Sports. .........................................14

     F.     The Act Was Passed Under Unusual Circumstances that Support an Inference of Animus. ........................................................16

IV.   CONCLUSION............................................................................................19

CERTIFICATE OF COMPLIANCE......................................................................20

CERTIFICATE OF SERVICE ..............................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) .................................................................7, 8, 18

*Bishop v. Smith*,
  760 F.3d 1070 (10th Cir. 2014) .......................................................5, 6

*Boutillier v. Hartford Pub. Schs*,
  221 F. Supp. 3d 255 (D. Conn. 2016)...............................................7

*City of Cleburne v. Cleburne Living Center, Inc.*,
  473 U.S. 432 (1985).............................................................................4, 5

*Clark v. Arizona Interscholastic Ass'n*,
  695 F.2d 1126 (9th Cir. 1982) ...........................................................12

*Department of Agriculture v. Moreno*,
  413 U.S. 528 (1973).............................................................................5

*Doe v. Trump*,
  275 F. Supp. 3d 167 (D.D.C. 2017)...................................................5

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018) ...........................................9, 12, 18

*F.V. v. Jeppesen*,
  No. 1:17-CV-00170-CWD, 2020 WL 4726274 (D. Idaho Aug. 7,
  2020) .....................................................................................................18

*Flack v. Wis. Dep't of Health Servs.*,
  328 F. Supp. 3d 931 (W.D. Wis. 2018) ...........................................9, 12

*Gonzalez v. Douglas*,
  269 F. Supp. 3d 948 (D. Ariz. 2017) ...............................................6

*Grimm v. Gloucester Cty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .............................................................9, 12

*Hecox v. Little*,
No. 1:20-cv-00184-DCN, — F.3d —, 2020 WL 4760138
(D. Idaho Aug. 17, 2020).............................................................*passim*

*Perry v. Brown*,
671 F.3d 1052 (9th Cir. 2012) ...............................................5

*Railroad Retirement Bd. v. Fritz*,
449 U.S. 166 (1980).................................................................5

*Romer v. Evans*,
517 U.S. 620 (1996)............................................................. 3-8

*United States v. Windsor*,
570 U.S. 744 (2013)............................................................5, 8

*Vasquez v. County of Los Angeles*,
349 F.3d 634 (9th Cir. 2003) ...............................................7

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)........................................................7, 8, 16

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) ..........................................9, 12

**Legislative Acts & Statutes**

Fairness in Women's Sports Act, codified at Idaho Code §§ 33-6201-
6206 .............................................................................*passim*

Idaho Code § 39-245A................................................................18

**Rules**

Fed. R. App. P. 26.1................................................................20

Fed. R. App. P. 29(a) ...............................................................2

Fed. R. App. P. 29(a)(4)(E)......................................................20

Fed. R. App. P. 29(a)(5)............................................................20

Fed. R. App. P. 32(a)(5)............................................................20

Fed. R. App. P. 32(a)(6)............................................................20

Fed. R. App. P. 32(f)...............................................................20

**Other Authorities**

Doriane Lambelet Coleman & Nancy Hogshead-Maker, Letter to
Brian Wonderlich, Gen. Counsel, State of Idaho (Mar. 19, 2020),
https://bloximages.chicago2.vip.townnews.com/idahopress.com/co
ntent/tncms/assets/v3/editorial/1/c8/1c8ecfa5-cf97-5a48-b98c-
3f8601997e70/5e742726c40f9.pdf.pdf..............................................17

Michelle M. Johns *et al.*, *Transgender Identity and Experiences of
Violence Victimization, Substance Use, Suicide Risk, and Sexual
Risk Behaviors Among High School Students — 19 States and
Large Urban School Districts*, 2017 Centers for Disease Control
and Prevention (2019), https://www.cdc.gov/mmwr/volumes/68/wr
/pdfs/mm6803a3-H.pdf.............................................................8, 9

Patricia Vertinsky, Shannon Jette & Annette Hofmann, "*Skierinas*" *in
the Olympics: Gender Justice and Gender Politics at the Local,
National, and International Level over the Challenge of Women's
Ski Jumping*, 18 Olympika 25, 34 (2009).........................................15

## I.    INTEREST OF *AMICI CURIAE*

*Amici curiae* are GLBTQ Legal Advocates & Defenders and the National Center for Lesbian Rights, both of which are legal services organizations with strong interests and deep expertise in legal issues concerning the civil rights of LGBTQ+ people.

Through strategic litigation, public policy advocacy, and education, GLBTQ Legal Advocates & Defenders ("GLAD") works in New England and nationally to create a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law in order to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals, and people living with HIV and AIDS. GLAD has worked on numerous cases on behalf of transgender students seeking equality and inclusion in schools, including advocating for them to be able to participate equally in school athletic programs.

The National Center for Lesbian Rights ("NCLR") is a national non-profit legal organization dedicated to protecting and advancing the civil rights of lesbian, gay, bisexual, and transgender people through litigation, public policy advocacy, and public education. Through its Transgender Youth Project, NCLR seeks to promote greater understanding and support for transgender children and their families. NCLR

has a particular interest in preventing all forms of sex-based discrimination, including discrimination against transgender women and girls.

All parties have consented to the filing of this amicus brief. *See generally* Fed. R. App. P. 29(a); Circuit Advisory Committee Note to Rule 29-3 (noting that Rule 29(a) permits the timely filing of an amicus curiae brief without leave of the Court if all parties consent to the filing of the brief).

## II.    SUMMARY OF ARGUMENT

*Amici* agree with the plaintiffs that Idaho's "Fairness in Women's Sports Act," Idaho Code Ann. §§ 33-6201-6206 (hereinafter the "Act"), classifies based on transgender status and sex and that, as such, it both warrants heightened scrutiny and fails that exacting test. Amici submit this brief to offer an additional fundamental and independent reason to confirm the district court's judgment: the Act bears all of the indicia of a measure enacted specifically to disadvantage a particular group without advancing any legitimate governmental interest. Such legislation fails under any standard of review as antithetical to the Equal Protection Clause.

All of the factors courts have considered in determining whether a law is motivated by an improper purpose or animus lead to the inescapable conclusion that the Act was motivated by a bare desire to harm transgender girls and young women. The context, impact, and scope of the Act show that it was enacted to disadvantage transgender girls and women and "inflicts on them immediate, continuing, and real

injuries that outrun and belie any legitimate justifications that may be claimed for it." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Transgender girls and women are an extremely small and vulnerable minority who experience high levels of discrimination, harassment, and violence. Nonetheless, for the first time in our nation's history, a state has categorically barred them from participating in any student athletics at any level. And despite imposing such an unprecedented and extreme ban, the Act was not enacted in response to any real-world problems or complaints. To the contrary, prior to the Act, Idaho already had a policy permitting sex-segregated teams and establishing criteria for permitting transgender girls and women to play on female teams. The legislature did not identify any complaint of alleged unfairness resulting from the participation of a transgender girl or woman on a girls' or women's team in Idaho or, as the district court noted, even any "history of transgender athletes ever competing in sports in Idaho." *Hecox v. Little*, No. 1:20-cv-00184-DCN, — F.3d —, 2020 WL 4760138, *30 (D. Idaho Aug. 17, 2020).

In addition, the Act undermines, rather than advances, the goals it purports to serve. Rather than promoting sex equality, it discriminates against a vulnerable subset of women, and it harms all women by perpetuating unfounded stereotypes that have long fueled sexist discrimination against women in sports.

Finally, the highly unusual circumstances under which the Act was passed and signed into law—rushed through in the midst of a pandemic along with another bill

mandating discrimination against transgender people, and signed by the governor despite the objection of the primary researcher on which the Act purports to rely— also strongly support an inference that "the Act was motivated by a desire for transgender exclusion, rather than equality for women athletes." *Hecox*, 2020 WL 4760138 at *35.

III.    **ARGUMENT**

    A.    **The Purpose of The Act Is to Exclude Transgender Girls and Women From Participation, Not to Promote Sex Equality.**

As the Supreme Court has made clear, certain laws "fail[], indeed def[y], … conventional inquiry" under the standard tiers of Equal Protection review. *Romer*, 517 U.S. at 632. They do so when, for example, they have "the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and … invalid form of legislation." *Id*. Or when they "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. 'If the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Id*. at 634 (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) (emphasis in original)); *see also City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432 (1985) (law rested on irrational prejudice against the affected class).

As Justice Stevens noted in his concurrence in *Railroad Retirement Bd. v. Fritz*, 449 U.S. 166 (1980), "[i]f the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect." *Id*. at 181. And such an aim is certainly apparent when the government takes away a specific legal right enjoyed by everyone else or "imposes a special disability upon those persons alone*." Romer*, 517 U.S. at 631.

In this line of cases—stretching from *Moreno*, *Cleburne*, and *Romer* to *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) (taking away the status of "marriage" solely from same-sex couples), *United States v. Windsor*, 570 U.S. 744 (2013) (refusing to recognize just one class of marriages—those of same-sex couples), and *Doe 1 v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 Fed. Appx. 19 (D.C. Cir. 2019) (involving "a revocation from transgender people of rights they were previously given")—government actions that suggest animus toward a class of individuals require careful scrutiny and, when animus is found, the law falls.

In a concurring opinion in *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014), Judge Holmes discussed the "animus doctrine" and identified three questions that

required answers: (1) what is animus; (2) how is it detected; and (3) what does a court do once it is found. *Id*. at 1097. As to the first question,[1] the Judge stated:

> In the interest of analytical precision, it is important to clarify exactly what types of legislative motives may be equated with animus. Those motives could be viewed as falling somewhere on a continuum of hostility toward a particular group….
>
> On the weaker end of the continuum, a legislative motive may be to simply exclude a particular group from one's community for no reason other than an "irrational prejudice" harbored against that group. *Cleburne*, 473 U.S. at 450. In this sense, animus may be present where the lawmaking authority is motivated solely by the urge to call one group "other," to separate those persons from the rest of the community (i.e., an "us versus them" legal construct). *See Romer*, 517 U.S. at 635 (invalidating "a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit"); *Cleburne*, 473 U.S. at 448 ("Mere negative attitudes, or fear unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the [intellectually disabled] differently from apartment houses, multiple dwellings, and the like."); *see also Bowers v. NCAA*, 475 F.3d 524, 554 (3d Cir. 2007) (interpreting *Cleburne* as prohibiting the construction of a "caste system"). On the more extreme end of the continuum, the legislative motive that implicates the animus doctrine may manifest itself in a more aggressive form—specifically, a "*desire to harm* a politically unpopular group." *Moreno*, 413 U.S. at 534 (emphasis added). At either end of this continuum, and everywhere in between, at its core, legislative motivation

---

[1] Judge Holmes's second question is discussed in detail below. His answer to question three is simple: the law must fall. *Id*. at 1103.

>of this sort involves hostility to a particular group and,
>consequently, implicates the animus doctrine.

*Id*. at 1099-1100.

In delineating the parameters of animus, Judge Holmes could also have recognized—as have this Circuit and other courts—that line-drawing based on stereotypes about a group of people also evidences animus. *See, e.g., Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 967 (D. Ariz. 2017) ("Where a 'code word[] consist[s] of stereotypes of Hispanics that would be well-understood in [the relevant community],' an inference of racial animus may be drawn") (quoting *Ave 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506 (9th Cir. 2016)); *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 647 (9th Cir. 2003) (Ferguson, J., dissenting) ("explicit stereotyping conveys discriminatory animus") (citing *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998)); *see also Harrington v. City of Attleboro*, No.15-CV-12769-DJC, 2018 U.S. Dist. LEXIS 7828 at *20 (D. Mass. Jan. 17, 2018) (admissible evidence of "stereotyping animus"); *Boutillier v. Hartford Pub. Schs*, 221 F. Supp. 3d 255, 269 (D. Conn. 2016) ("homosexuality is the ultimate gender non-conformity, the prototypical sex stereotyping animus").

In determining whether a law that targets a disfavored group is based on animus, courts may consider whether the harms it inflicts on the group are so "far removed from [the] particular justifications" offered to support the law that it is "impossible to credit them." *Romer*, 517 U.S. at 635. In addition, courts may also

consider the law's historical context and background and any procedural irregularities or other departures from the legislature's normal practice. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977); *see also Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (summarizing "non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose").[2] Here, all of these factors lead to the conclusion that the Idaho measure must be invalidated because it was motivated by an unconstitutional purpose to harm transgender girls and young women.

### B. The Act Targets A Vulnerable Group for Negative Treatment.

The Act targets a vulnerable group of people for negative treatment. Transgender students already face pervasive discrimination and harassment in school. A recent study by the Centers for Disease Control concluded that transgender students report bullying and mistreatment at disproportionately high rates. *See Michelle M. Johns et al.*, *Transgender Identity and Experiences of Violence*

---

[2] To be clear, although *Arlington Heights* and *Arce* involve challenges to laws that—unlike the Act here—were not facially discriminatory, the factors they cite are equally relevant to the determination of whether a facially discriminatory measure is based on animus rather than a legitimate governmental interest. *See, e.g., Romer*, 517 U.S. at 626-631 (carefully considering the historical background and sequence of events leading to the passage of measure that facially discriminated against gay persons); *see also id*. at 633 (holding that "[d]iscriminations of an unusual character" warrant "careful consideration") (internal citations omitted); *Windsor*, 570 U.S. 770-771 (examining the impact, novelty, historical background, and purpose of a law that excluded same-sex married couples from federal recognition and determining that it was based on animus rather than a legitimate governmental interest).

*Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts*, 2017 Centers for Disease Control and Prevention (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf (last visited Dec 18, 2020). Within the twelve months preceding the study, transgender students reported significantly higher incidences of being bullied, feeling unsafe traveling to or from school, being threatened with a weapon at school, and being made to engage in unwanted sexual relations. *Id.*

Numerous federal decisions have found that transgender people have long been subjected to discrimination, harassment, and violence. *See, e.g., Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018) ("[O]ne would be hard-pressed to identify a class of people more discriminated against historically . . . than transgender people."); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) ("[T]ransgender people have been the subject of a long history of discrimination that continues to this day"); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 720 (D. Md. 2018). As the district court correctly found, the purpose and effect of

the Act are to exclude transgender women and girls from participation in sports. Rather than advancing the interests of non-transgender women or girls, the Act serves only to further marginalize an already vulnerable group.

### C. The Act Imposes a Sweeping Categorical Ban that Inflicts "Immediate, Continuing, and Real Injuries."

The Act imposes an unqualified ban that categorically excludes all transgender girls and women from playing on female teams at any level under any circumstances. Because all student teams are sex-segregated, this means that transgender girls cannot play on team sports at all. As the district court found, the notion that transgender girls could renounce their identities and play on boys' teams is untenable. *Hecox*, 2020 WL 4760138 at *29.

Depriving transgender girls of the benefit of school sports takes away an important educational opportunity that is routinely provided to other students. School sports provide a unique opportunity for students to develop self-esteem, sportsmanship, leadership, and self-discipline that fosters healthy adolescent development. By singling out one group of girls uniquely to be deprived of the chance to participate on school teams and in athletic programs, the Act marks them as a disfavored class and invites more discrimination and further harassment.

### D. The Act Does Not Further Its Purported Goals.

Banning transgender girls and women from participation does not further the Act's asserted justifications. According to its findings and purpose section, the Act

seeks "to promote sex equality" and to provide "opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." *Hecox*, 2020 WL 4760138 at *37. But as the district court correctly found: "In the absence of any empirical evidence that sex inequality or access to athletic opportunities are threatened by transgender women athletes in Idaho, the Act's categorical bar against transgender women athletes' participation appears unrelated to the interests the Act purportedly advances." *Id*. at *31.

Rather than promoting sex equality, the Act undermines it. It does so directly by discriminating against a particular subset of girls and women—those who are transgender. In that fundamental respect, Idaho's law no more promotes sex equality than would a rule that excluded lesbian or bisexual women or any other subset of girls and women from playing on female teams.

In addition, although the Defendants compare the Act to policies that exclude boys from girl's teams, the exclusion at issue here is very different; it cannot be justified by the same interests used to justify sex-segregated teams. In *Clark*, this Court held that sex-specific teams may be justified as a means of "redressing past discrimination against women in athletics" and "promoting equality of athletic opportunity between the sexes." *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d

1126, 1131(9th Cir. 1982). But neither of those rationales supports the exclusion here.

As the district court correctly found, the Act does not advance any interest in redressing past discrimination against women in athletics because "like women generally, women who are transgender have historically been discriminated against, not favored." *Hecox*, 2020 WL 4760138 at *28. This finding is in line with the many recent courts to have considered the issue. *See, e.g. Grimm*, 972 F.3d at 611; *Whitaker*, 858 F.3d at 1051; *Flack*, 328 F. Supp. 3d at 953; *F.V.*, 286 F. Supp. at 1145.

Similarly, excluding transgender girls and women does not promote equality of athletic opportunity between the sexes. In *Clark*, this Court upheld a policy preventing male students from playing on a girls' volleyball team based in part on a concern that, absent that policy, "males would displace females to a substantial extent," given that there are roughly equal numbers of males and females and that, on average, males have a physiological advantage. *Clark*, 695 F.2d at 1131. But those considerations have no application here.

Transgender women are a tiny group, comprising only about half of one percent of the population. Thus, as the district court found: "It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement

one half of one percent of the population (transgender women) could cause cisgender women." *Hecox*, 2020 WL 4760138 at *29. There is simply no way "that allowing transgender women to compete on women's teams would substantially displace female athletes." *Id*.

Similarly, there is no basis to assume that transgender girls and women have a physiological advantage over other girls and women. As the district court noted, "it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women." *Id*. at * 30. Indeed, both plaintiffs' experts and defendants' experts agreed on that point. *Id*. at *12. In addition, many transgender girls medically transition before puberty, thereby never gaining any potential advantages that exposure to testosterone may create. Many others suppress their testosterone. As a result, being transgender is not "a legitimate accurate proxy" for physiological advantage, as this Court required to uphold a sex-based classification in *Clark*, 695 F.2d at 1129.

In sum, as the district court concluded, "the incredibly small percentage of transgender women athletes in general, coupled with the significant dispute regarding whether such athletes actually have physiological advantages over cisgender women when they have undergone hormone suppression in particular, suggest the Act's categorical exclusion of transgender women athletes has no

relationship to ensuring equality and opportunities for female athletes in Idaho." *Hecox*, 2020 WL 4760138 at \*33.

      **E.**    **The Act Perpetuates Unfounded Stereotypes that Fuel Discrimination Against Women in Sports.**

      The Act also undermines the goal of sex equality because it perpetuates unfounded stereotypes that have long fueled discrimination against women in sports. In particular, the Act perpetuates the inaccurate stereotype that girls and women are not "naturally" strong or athletic, that they are uniquely vulnerable, and that they need to limit their physical exertion. These stereotypes are so deeply entrenched that the statements that someone plays or runs "like a girl" are synonymous with saying they are athletically incompetent or weak. Throughout history, that stereotype has been used to prevent girls and women from playing sports or to impose unwarranted restrictions on their ability to play, as well as to question the female identity of girls and women who are powerful athletes.

      Recent history is filled with examples of women and girls facing barriers to participation in sports based on unfounded fears of injury and stereotypes about what activities are appropriate for women and girls. For example, women were prohibited from running in marathons until 1972 and faced deep opposition to inclusion in most distance running events. *See* Jamie Schultz, *Breaking into the Marathon: Women's Distance Running as Political Activism*, 40(2) Frontiers: A Journal of Women Studies 1 (2019). Ski jumping is another sport in which women were irrationally

excluded for decades. Despite being an Olympic sport as early as 1924, it was not until 90 years later, in 2014, that women were permitted to compete in ski jumping during the games, despite their demonstrated abilities. *See* Patricia Vertinsky, Shannon Jette & Annette Hofmann, "*Skierinas*" *in the Olympics: Gender Justice and Gender Politics at the Local, National, and International Level over the Challenge of Women's Ski Jumping*, 18 Olympika 25, 34 (2009). The basis for the competitive exclusion was the unfounded fear that landing and the jumping itself would be particularly dangerous for women's bodies. *Id*. at 35.

The reality of women's participation and accomplishments in sports defies the stereotype. Women and girls can be and are strong and competitive athletes.

In addition to trafficking in these sexist stereotypes, the Act also perpetuates unfounded stereotypes about transgender girls in particular. The law excludes transgender athletes because of the baseless presumption that all transgender women and girls are stronger and fitter than non-transgender women and girls simply because they were not identified as female at birth. As the district court correctly found, the perceived "'absolute advantage' between transgender and cisgender women athletes is based on overbroad generalizations without factual justification." *Hecox*, 2020 WL 4760138 at \*31. The reality is that transgender girls, like non-transgender ones, have a range of athletic abilities. Though some transgender girls

may excel athletically, most will be run-of-the-mill benchsitters and second-stringers, if they play sports at all, just as most non-transgender girls will be.

F. **The Act Was Passed Under Unusual Circumstances that Support an Inference of Animus.**

When determining whether a law is motivated by an improper discriminatory purpose, courts may consider "the historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes." *See Vill. of Arlington Heights*, 429 U.S. at 267. Here, the circumstances of the ban's enactment support an inference that "the Act was motivated by a desire for transgender exclusion, rather than equality for women athletes." *Hecox*, 2020 WL 4760138 at *35.

As an initial matter, the Act is unusual in that it does not respond to any actual problem. Idaho already has a statewide policy addressing the inclusion of transgender girls in school sports. *Id*. at *4. No legislator could point to any problems or complaints associated with the implementation of that policy in Idaho or with the participation of transgender girls or women in female sports. In fact, "the legislative record reveals no history of transgender athletes ever competing" in Idaho at all. *Id*. at *30. Instead, the legislature relied solely on complaints about three transgender athletes from other states, each of whom was defeated by non-transgender girls. *Id*.

And yet, notwithstanding the absence of any specific basis for concern, the legislature took the extreme step of categorically barring transgender girls and

women from participation in school athletics, with no qualification or exceptions, and with no explanation of why the current policy was insufficient. Further, Idaho's governor signed the bill into law even after the sports expert, Duke Law Professor Doriane Lambelet Coleman, on whose research the legislature primarily relied took the extraordinary step of urging the governor to veto the bill because it rested on a distortion of her work. While the bill was awaiting the Governor's signature, Professor Coleman urged its veto, explaining that "Idaho [was] misusing" her scholarship and that the bill was "flawed." *See* Letter from Doriane Lambelet Coleman & Nancy Hogshead-Maker to Brian Wonderlich, Gen. Counsel, State of Idaho (Mar. 19, 2020).[3] "To pass muster at the end of the day," Professor Coleman wrote, legislation must "draw lines intelligently based on the scientific evidence, and thoughtfully based on an ethic of care for all student-athletes." *Id*. Noting that the Act "violates those principles," she urged "Governor Little to veto it." *Id*. And yet even in the face of this clear indication that the legislature had misunderstood Professor Coleman's research and that the bill lacked any sound foundation, the governor signed it.

In yet another notably circumstance, the Act is not the only piece of anti-transgender legislation passed in the 2020 session. At the same time the legislature

---

[3] Available at https://bloximages.chicago2.vip.townnews.com/idahopress.com/content/tncms/assets/v3/editorial/1/c8/1c8ecfa5-cf97-5a48-b98c-3f8601997e70/5e742726c40f9.pdf.pdf (last visited Dec. 20, 2020).

passed the Act, it also passed, and Governor Little signed into law, House Bill 509 (HB 509), codified at Idaho Code § 39- 245A, which barred transgender people from correcting the sex marker on their birth certificates. Remarkably, Idaho enacted this measure despite its conflict with a federal court order enjoining the state from automatically rejecting applications from transgender individuals to obtain corrected birth certificates and requiring the state to implement a constitutionally-sound process enabling them to do so. *F.V.*, 286 F. Supp. 3d at 1145; *F.V. v. Jeppesen*, No. 1:17-CV-00170-CWD, 2020 WL 4726274, at *3 (D. Idaho Aug. 7, 2020) (holding that HB 509 violated the existing injunction and therefore could not be enforced). The enactment of two such overtly discriminatory measures targeting a small and disfavored group in a single legislative session—particularly where one measure violated an existing federal court order—is striking and strongly suggests that the Act was based on animus rather than a legitimate governmental interest. *See e.g., Arce*, 793 F.3d at 979 n.5 (noting that simultaneous passage of multiple measures targeting a particular community may be evidence of animus).

That the legislature remained in session in the midst of a public health crisis in order to pass these measures only strengthens that inference, "particularly when the national shutdown preempted school athletic events, making the rush to the pass the law unnecessary." *Hecox*, 2020 WL 4760138 at *35.

## IV. CONCLUSION

For the reasons stated above, as well as for those presented by the plaintiffs, *amici curiae* respectfully suggest that the Court affirm the district court's order.

Dated: December 21, 2020

Respectfully submitted,

/s/ Susan Baker Manning
Susan Baker Manning (Bar No. 197350)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  +1.202.739.3000
Facsimile:    +1.202.739.3001
susan.manning@morganlewis.com

*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,328 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in Times New Roman 14-point font.

Dated: December 21, 2020        /s/ Susan Baker Manning
                                    Susan Baker Manning
                                    *Attorney for Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 21, 2020. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: December 21, 2020

/s/ Susan Baker Manning
Susan Baker Manning
*Attorney for Amici Curiae*