

February 21, 2023

VIA E-FILING

Ms. Molly C. Dwyer
Clerk of the Court
United States Court of Appeals
for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

      Re:    *Hecox v. Little*
              Case Nos. 20-35813, 20-35815
              Supplemental Letter Brief Re: Remaining Claims

Dear Ms. Dwyer:

This letter responds to the Court's order asking the parties to identify the remaining claims in this appeal and any legal authority since May 2021 that bears on those claims.

The intersection between sex and sports has sparked a nationwide debate. Some believe that anyone who identifies as female, including biological males, should compete in women's sports. Others remain committed to equality between the biological sexes. With this debate surging, Idaho recognized that "[p]hysical differences between men and women … are enduring" and "the two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up). It enacted the Fairness Act, Idaho Code § 33-6203, to demarcate athletics "based on biological sex." By doing so, Idaho wanted to protect equal athletic opportunities for women and prevent them from becoming bystanders to their own sporting events.

1

Within two weeks, two athletes sued to enjoin the Act. One athlete has since "graduated from high school and is planning to attend college out of state," Order at 2 n.1, ECF No. 143; her claims have been dismissed and are no longer before this Court. Lindsay Hecox's claims remain, and from them, the only question on appeal is whether the Fairness Act violates the Equal Protection Clause.

It does not. This Court has twice held that separating athletics based on sex complies with the Constitution. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (*Clark I*); *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) (*Clark II*). And since this Court heard argument in May 2021, other courts have agreed, holding that states can use sex to classify student participation in athletics, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 21-cv-00316, 2023 WL 111875, at *5–9 (S.D. W. Va. Jan. 5, 2023); *see also Neese v. Becerra*, No. 21-CV-163-Z, 2022 WL 16902425, at *11 (N.D. Tex. Nov. 11, 2022) ("[S]ex-separated sports only exist to accommodate the average physiological differences between the sexes."), and restroom use, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc). The district court remains the outlier and should be reversed.

## I.     The Fairness Act comports with the Equal Protection Clause.

In its 2022 term, the Supreme Court made clear that all constitutional interpretation "must begin with the language of the instrument, which offers a fixed standard for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244–45 (2022) (cleaned up). "[T]o inform the

meaning of [that] constitutional text," courts also look to history for guidance.[1] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). Rather than examine the Equal Protection Clause's text or its relevant history, here the district court "impose[d]" its own vision of what the Clause required and overrode the sovereign prerogative of Idahoans. *B.P.J.*, 2023 WL 111875, at *8. And in "vindicating [its] doctrinal innovation," the court "engineer[ed] exceptions to longstanding background rules" about sex-based classifications and committed reversible error. *Dobbs*, 142 S. Ct. at 2276. Like many other longstanding laws that have classified based on biological sex, the Fairness Act does not offend the Constitution.

## A. The Fairness Act makes distinctions based on biological sex, not gender identity.

Like "[m]ost laws," the Fairness Act "classif[ies]." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979). It demarcates participation in women's sports based solely on one feature: "biological sex." IDAHO CODE § 33-6203(1). Under the statute's text, all biological males—those who identify as male and those who identify as female (and those who identify as anything else)—cannot compete in women's sports.

Notably, the Act says nothing about gender identity or transgender status. "Transgender status and gender identity are wholly absent from the" Act's "classification." *Adams*, 57 F.4th at 808. A biological male who identifies as male,

---

[1] And as the State Defendants make clear in their supplemental briefing, the history of the Equal Protection Clause does not support either Hecox's arguments or the district court's erroneous conclusions.

one who identifies as female, and one who identifies as non-binary all receive the same treatment. Biology is the only classification that matters.

That the Act may *affect* transgender athletes more does not mean it classifies based on gender identity. Many laws "affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law." *Feeney*, 442 U.S. at 271–72. For instance, a law that classifies based on veteran status does not discriminate against women, even if 98% of veterans are men. *Id.* at 274–75. For similar reasons, "[t]he regulation of a medical procedure that only one sex can undergo"—like abortion—"does not trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245–46 (cleaned up). And as the Eleventh Circuit recently held, a transgender student challenging a school's policy to classify restrooms based on sex was not challenging the biological classification but rather was bringing "a claim" of "disparate impact on the transgender students." *Adams*, 57 F.4th at 810. But a "disparate impact does not prove disparate treatment." *United States v. Ayala-Bello*, 995 F.3d 710, 714 (9th Cir. 2021).

Moreover, any disparate impact that the Fairness Act has on the transgender community is "plausibly explained on a neutral ground." *Feeney*, 442 U.S. at 275. Sex-based distinctions will almost always overlap a person's gender identity and are therefore "essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate." *Id.* at 279 n.25. Idaho's goal was to protect girls and women, not disfavor transgender athletes.

Indeed, nothing about the Fairness Act is "overtly or covertly" designed to disfavor transgender athletes. *Id.* at 274. The Fairness Act prevents all biological males from competing in women's sports, not just transgender athletes. "Too many men are affected … to permit the inference that the statute is but a pretext" for disfavoring transgender persons. *Id.* at 275; *see also Dobbs*, 142 S. Ct. at 2246. Reflecting its purpose on ensuring fairness and safety for girls and women, the Fairness Act imposes no limits on participation in men's sports: schools and universities are free to permit biological females to do so, including those who identify as male. The law "targets" women's sports; it does not target individuals who identify as transgender.

The district court wrongly suggested that the Fairness Act classifies based on gender identity "on its face." Examination of its "face" will confirm that it does not. Neither transgender status nor gender identity appear anywhere in the statute's text; only biological sex does. And "a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status." *Adams*, 57 F.4th at 809. That's exactly what the Fairness Act does. It draws a clear line based on biology and is indifferent about gender identity. The district court erred when it read into the Fairness Act a different classification.

**B. The Fairness Act makes valid distinctions based on biological sex because sex matters in sports.**

The Fairness Act classifies women's sports based on sex—and Idaho was justified in doing so. The Equal Protection Clause "does not take from the States all power of classification" but instead "measure[s] the basic validity of the legislative

classification." *Feeney*, 442 U.S. at 271–72. Most classifications "will be sustained" if they are "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Only when classifications "implicate fundamental rights or a suspect class" does heightened review apply. *United States v. Padilla-Diaz*, 862 F.3d 856, 862 (9th Cir. 2017).

"Legislative classifications based on" sex "call for a heightened standard of review." *Cleburne*, 473 U.S. at 440.[2] The Equal Protection Clause does not make sex "a proscribed classification," *Virginia*, 518 U.S. at 533, but instead requires the State to demonstrate "that the [sex-based] classification serves important governmental objectives" and that the "means employed are substantially related to the achievement of those objectives," *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (cleaned up). The Fairness Act satisfies this standard.

To start, the Fairness Act promotes equal athletic opportunities for female athletes, and as this Court has already held, "[t]here is no question" that this goal "is a legitimate and important governmental interest." *Clark I*, 695 F.2d at 1131. By barring biological males from competing in women's sports, the Fairness Act follows Title IX's lead and furthers Idaho's goal of "redressing past discrimination against women in athletics." *Id.*; *Adams*, 57 F.4th at 818 (Lagoa, J., concurring) (noting that Title IX "paved the way for significant increases in athletic participation for girls

---

[2] The parties agree that intermediate scrutiny applies, for the Fairness Act "plainly separates student athletes based on sex." *B.P.J. v. W. Va. State Bd. of Educ.*, No. 21-cv-00316, 2023 WL 111875, at *6 (S.D. W. Va. Jan. 5, 2023). Intervenors challenge how the district court got there—by finding that the Fairness Act classifies based on transgender status when it does not—and how it subsequently misapplied the test.

and women at all levels of education" (quoting Deborah Brake, *The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34 U. MICH. J. L. REFORM 13, 15 (2000))). That, too, is an important governmental objective.

And the Fairness Act fits tightly with those interests. *See B.P.J.*, 2023 WL 111875, at *8 ("The state is permitted to legislate sports rules on [the] basis [of sex] because sex, and the physical characteristics that flow from it, are substantially related to athletic performance and fairness in sports."). The Supreme Court "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). For instance, laws may penalize men—and only men—for having sex with underage women because of pregnancy risks. *Id.* at 471–73. And laws can impose "a different set of rules" to prove biological parenthood "with respect to fathers and mothers" because of "the unique relationship of the mother to the event of birth." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 63–64 (2001). In fact, as the Eleventh Circuit recently noted, "biological sex also is the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams*, 57 F.4th at 803 n.6.

With sports, "[t]he difference between men and women … is a real one." *Nguyen*, 533 U.S. at 73. There is "an undeniable difference" in physiology between men and women, *id.* at 68—what one court has called "a medical consensus," *B.P.J.*, 2023 WL 111875, at *7.

And "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark I*, 695 F.2d at 1131. "While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes." *B.P.J.*, 2023 WL 111875, at *7. Indeed, as Intervenors' experiences demonstrate, without distinct teams, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977).

The district court was wrong to suggest that the Fairness Act was an unjustified outlier. Far from being an exception, Idaho's Fairness Act is part of a "long-standing tradition in sports of setting up classifications whereby persons having objectively measured characteristics likely to make them more proficient are eliminated from certain classes of competition." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979). Though Idaho was the first, numerous other states have also codified these protections.[3]

So have professional sports leagues. After extensive study, World Rugby issued guidelines excluding biological males from competing in women's events

---

[3] ALA. CODE § 16-1-52; ARIZ. REV. STAT. ANN. § 15-120.02; ARK. CODE ANN. § 6-1-107; FLA. STAT. ANN. § 1006.205; IND. CODE ANN. § 20-33-13-4; IOWA CODE ANN. § 261I.2; KY. REV. STAT. ANN. § 164.2813; LA. STAT. ANN. § 4:442; MISS. CODE ANN. § 37-97-1; MONT. CODE ANN. § 20-7-1306; OKLA. STAT. tit. 70, § 27-106; S.C. CODE ANN. § 59-1-500; S.D. CODIFIED LAWS § 13-67-1; TENN. CODE ANN. § 49-7-180; TEX. EDUC. CODE § 33.0834; UTAH CODE ANN. § 53G-6-901; W. VA. CODE ANN. § 18-2-25d.

because "safety and fairness cannot presently be assured for women competing against transwomen in contact rugby." World Rugby, *World Rugby Approves Updated Transgender Participation Guidelines* (Oct. 9, 2020).[4] Fédération Internationale De Natation (FINA), "the international federation recognised by the International Olympic Committee for administering international competition in Aquatics," concluded in 2022 that the "performance gap" between biological males and females made "separate sex competition ... necessary." Fédération Internationale De Natation, *Policy on Eligibility for the Men's and Women's Competition Categories* (June 20, 2022).[5] And United Kingdom Athletics, the governing body for athletics in the United Kingdom, "reserve[s] the women's category for competitors who were female at birth, so they continue to compete fairly." United Kingdom Athletics, *UKA Position Statement on Transgender Participation in Athletics* (Feb. 3, 2023).[6] Scores of other athletic organizations impose strict hormone therapy regimens before an athlete born male can compete in women's sports. *E.g.*, USA Swimming, *Athlete Inclusion, Competitive Equity, and Eligibility Policy* (Feb. 1, 2022).[7]

---

[4] https://perma.cc/GHG6-LGN5.

[5] https://perma.cc/G3SD-UM76.

[6] https://perma.cc/2CTW-JVS9.

[7] https://perma.cc/9BGX-UQ2A. Hecox's argument that the Equal Protection Clause *requires* males who identify as female to compete in women's sports would obliterate these policies, too.

Despite the growing number of authorities that have recognized the distinct biological advantages of the male body in sports, the district court erroneously suggested that the "advantage between transgender and cisgender women athletes is based on overbroad generalizations without factual justification." ER074. But as one court recently held—and as this Court held in *Clark*, 695 F.2d at 1131—the athletic advantages inherent in the male body are "not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes." *B.P.J.*, 2023 WL 111875, at *7. "[I]t is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (Lagoa, J., concurring). "Claims to the contrary are simply a denial of science." Doriane Coleman, Martina Navratilova & Sanya Richards-Ross, *Pass the Equality Act, But Don't Abandon Title IX*, WASH. POST (Apr. 29, 2019).[8]

## C. The Act's valid focus on biological sex cannot be replaced with gender identity.

The Equal Protection Clause "does not deny to States the power to treat *different* classes of persons in different ways." *Reed v. Reed*, 404 U.S. 71, 75 (1971). Yet the district court suggested that Idaho must treat those born male who identify as female and undergo hormone therapy the same as those born female.

The two are not the same. Proper comparators must be alike "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 8, 10 (1992). And what qualifies as

---

[8] https://perma.cc/MC3X-CS77.

"different and what is the same" depends on "the nature of the problem" that the State is trying to solve. *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (cleaned up).

Here, the "problem" addressed concerned objective biological facts, not questions of identity or social acceptance. Idaho recognized that "[p]hysical" and "[i]nherent differences between men and women" exist and are "enduring." *Virginia*, 518 U.S. at 533 (cleaned up). Those biological differences are generally meaningful in athletics. So, to "redress[ ] past discrimination against women in athletics and promot[e] equality of athletic opportunity between the sexes," Idaho decided to separate collegiate sports based on sex. *Clark I*, 695 F.2d at 1131. The Equal Protection Clause therefore asks whether Hecox, a biological male who identifies as female, is "different" from or the "same as" the biologically female athletes the State wanted to protect.

To ask the question is to answer it. The Fairness Act focuses on one thing, biological sex, and uses that characteristic because sex is "an accurate proxy" for athletic ability and performance, accounting for the "average real differences between the sexes." *Clark I*, 695 F.2d at 1131; *see Craig v. Boren*, 429 U.S. 190, 204 (1976) (noting that sex is a valid classification if it "represents a legitimate, accurate proxy"). Conversely, gender identity does not account for *any* of the physical differences between the sexes and is not a "proxy" for anything relevant to athletic ability. To allow even one biological male to displace "one [female] player" would take "the goal of equal participation by females in interscholastic athletics" and "set [it] back, not advance[ ]" it. *Clark II*, 886 F.2d at 1993.

The district court thought that Idaho could achieve its objective while allowing some males to participate in women's sports, such as those who suppress testosterone. But even if "specific athletic opportunities could be equalized more fully in a number of ways"—like separating sports based on skill or testosterone levels—Idaho was still justified to use biological sex as the line of demarcation. *Clark I*, 695 F.2d at 1131; *accord B.P.J.*, 2023 WL 111875, at *8. "[T]he validity of the [Fairness Act] depends on the relation it bears to the *overall* problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (emphasis added). To satisfy the Constitution, the Fairness Act need not achieve its "ultimate objective in every instance," *Nguyen*, 533 U.S. at 70, but must use "a fit that is not necessarily perfect, but reasonable," *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 461 (9th Cir. 2018) (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999)).

The Fairness Act does just that. Its separation based on biological sex is "an easily administered scheme" that in the vast majority of cases "promote[s] the … substantial interest of ensuring" that men do not displace women in athletics. *Nguyen*, 533 U.S. at 69. That remains true even if the line does not "maximize equality" and even if it "represent[s] [some] trade-offs between equality and practicality." *Clark I*, 695 F.2d at 1131–32; *B.P.J.*, 2023 WL 111875, at *8; *Petrie*, 394 N.E.2d at 862 (noting that a classification based on physical parity "would be

too difficult to devise"). Some cases may exist at the margins, but these exceptions do not defeat the rule.

However a rule based on biology looks at the margins, it advances Idaho's interests more than the rule proposed by the district court. Both the district court and Hecox would delineate participation in sports based solely on gender identity. But unlike biological sex, gender identity says nothing about athletic ability. Moreover, the district court's rule itself discriminates based on gender identity without offering female athletes *any* protection. Under the district court's injunction, males who identify as female get to compete in women's sports, while those who identify as male—regardless of athletic prowess—may not. (To say nothing of the scores of other alleged gender identities.)

Though the district court made much ado about its assertion that males who take hormone suppressants do not jeopardize women's sports (a scientifically false proposition, as Defendants will demonstrate at trial), that is a red herring. The district court's rule is just another way of saying that "transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels." *B.P.J.*, 2023 WL 111875, at *8.

In the end, courts cannot "impose" a "different" (or what they see as a "more inclusive") policy than the one Idaho has enacted. *Id.* "Sex-based classifications fall under intermediate scrutiny and therefore do not have a 'narrowly-tailored' requirement." *Id.* And under intermediate scrutiny, "[t]he legislature's definition of"

13

who can participate in women's sports "as being based on 'biological sex' is substantially related to the important government interest of providing equal athletic opportunities for females." *Id.* The district court erred in concluding otherwise.

### D. Gender identity is not a suspect class.

Neither the Supreme Court nor this Court has ever recognized gender identity as a suspect class. And courts should be "very reluctant" to create new suspect categories. *Cleburne*, 473 U.S. at 441. As the Eleventh Circuit recently recognized, there is "grave doubt that transgender persons constitute a quasi-suspect class." *Adams*, 57 F.4th at 803 n.5 (cleaned up). And there are at least three reasons this Court should not repeat the district court's error and recognize gender identity as a suspect category.

First, transgender persons aren't a "discrete and insular" group objectively defined by immutable characteristics. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam). Unlike race, sex, and national origin, which are fixed and "determined solely by the accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), the term "transgender" describes anyone whose gender identity does "not align with the sex they are assigned at birth." ER790. This "gender dysphoria" may arise in childhood but may also arise later in life when a transgender person experiences "significant distress" because of their gender identity. ER790–91. Because the "precise treatment for gender dysphoria depends on each person's individualized need," some may choose to socially transition or undergo hormone therapy; others will not. ER791. Some may experience "both a male and female

gender identity." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society* Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOLOGY & METABOLISM 3869, 3873 (2017).[9] Others may "renounce any gender classification" altogether. *Id*. And some may even experience "a continuous and rapid involuntary alternation" between genders. *Id*. By definition, such "gender fluidity" cannot be a discrete, quasi-suspect class. *Adams*, 57 F.4th at 803 n.6.

To recognize transgender status as a "discrete and insular" group would risk treating the transgender community as monolithic. But not "every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring in the judgment); *see id.* at 701 (Wilkins, J., concurring) (same). In recent years, a significant number within the transgender community have desisted from their transgender identity. In 2021, Lisa Littman of Brown University conducted a study of 100 teenage and young adults who had transitioned and eventually detransitioned. Sixty percent reported they desisted because they were more comfortable living in their biological sex. Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners* (2021).[10] And in 2023, Finland's "leading expert on pediatric gender medicine" concluded that "'four out of

---

[9] https://perma.cc/Z4HQ-CMMD.

[10] https://perma.cc/8XTM-UFVD.

five' children will grow out of their gender confusion." Christina Buttons, *Finland's Leading Gender Dysphoria Expert Says 4 Out of 5 Children Grow Out of Gender Confusion* (Feb. 6, 2023).[11] With such a large insurgence of individuals reverting back to their biological sex, it is impossible to classify transgender status as an "immutable characteristic." *Frontiero*, 411 U.S. at 686.

Second, "the distinctive legislative response, both national and state," to societal difficulties faced by transgender persons "belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary." *Cleburne*, 473 U.S. at 443. Congress has considered a bill that would make gender identity a protected status under federal laws. Equality Act, H.R. 5, 117th Cong. § 2 (2021). And 22 states and around 374 municipalities make gender-identity discrimination illegal. Movement Advancement Project, *Local Nondiscrimination Ordinances*.[12]

Third, this "legislative response … negates any claim that [transgender persons] are politically powerless." *Cleburne*, 473 U.S. at 445. A class that can "attract the attention of the lawmakers," *id.*, doesn't need "extraordinary protection from the majoritarian political process," *Murgia*, 427 U.S. at 313.

### E. To maintain uniformity within this circuit and consistency with other courts, this Court must reverse the district court.

From the start, the district court's decision conflicted with this Court's binding authority. That the decision was an anomaly has only become more

---

[11] https://perma.cc/G6NB-VEV8.

[12] https://perma.cc/ZJ7Y-2TBN (last visited February 20, 2023).

apparent as more courts have upheld valid sex-based classifications—including statutes akin to the Fairness Act. This Court cannot affirm without disrupting uniformity within this circuit and creating a conflict with other courts.

First, the district court's decision cannot be squared with either *Clark I* or *Clark II*. In both cases this Court held that average physiological differences between the sexes justify sex-based sports teams. The district court was wrong to attempt to bypass this binding precedent. The court suggested that "*Clark*'s holding regarding general sex separation in sport, as well as the justifications for such separation, do not appear to be implicated by allowing transgender women to participate on women's teams." ER063. But that's the very logic that this Court rejected in *Clark*. It did not matter that a "classification" based on "physical differences" might advance the state's interests in protecting sex equality in some instances. *Clark I*, 695 F.2d at 1130–32. Under intermediate scrutiny, this Court held that the appropriate focus was not the *exceptions* but the *rule*. And classifying participation in athletics based on sex would, in the overwhelming amount of cases, account for "average physiological differences." *Id.* at 1131.

Second, the district court's decision squarely conflicts with other courts across the country, including the en banc Eleventh Circuit. In *Adams*, the Court held that schools can, consistent with the Equal Protection Clause, assign student showers, restrooms, and locker rooms according to biological sex. 57 F.4th at 800–01. The Court recognized that, given the legitimate differences between the sexes, biological sex "is not a stereotype." *Id.* at 809. In fact, "the Supreme Court has repeatedly recognized

the biological differences between the sexes by grounding its sex-discrimination jurisprudence on such differences." *Id.*

If schools can assign student showers, restrooms, and locker rooms based on sex consistent with the Equal Protection Clause, then they can also do so with sports, where "[s]ex classifications are … mission-critical." Doriane Lambelet Coleman & Kimberley D. Krawiec, *Sex in Sport*, 80 L. & CONTEMP. PROBS. 63, 125 & n.317 (2017); *see Adams*, 57 F.4th at 819–21 (Lagoa, J., concurring). Like the policy in *Adams*, here the Fairness Act permissibly "classifies based on biological sex." *Id.* at 808. It "divides [athletes] into two groups": biological males, who cannot compete in women's sports, and biological females, who can. "[B]oth sides of the classification—biological males and biological females—include transgender students." *Id.* at 808–09. Since "trans women and girls remain fully male-bodied in the respects that matter for sport," *id.* at 820 (Lagoa, J., concurring), the Act, by classifying based on sex, accomplishes Idaho's interest in "promoting equality of athletic opportunity between the sexes," *Clark I*, 695 F.2d at 1131. The Fairness Act is "clearly related to—indeed, is almost a mirror of—[Idaho's] objective of" protecting women's athletic opportunities. *Adams*, 57 F.4th at 805.

The Southern District for West Virginia reached that same conclusion. In evaluating West Virginia's Save Women's Fairness Act, the court acknowledged the "longstanding recognition" that separating sports based on sex advanced the state's "important interest in providing equal athletic opportunities for females." *B.P.J.*, 2023 WL 111875, at *6. That *some* transgender athletes might not jeopardize that

interest did not matter. The Act classified based on biological sex and prevented males, "transgender girls, along with all other biological males," from competing in women's sports; since sex corresponded to athletic performance, that classification was "substantially related to athletic performance and fairness in sports." *Id.* at *7–8. The Equal Protection Clause did not demand more. *Id.*

The district court's opinion in this case thus stands alone. It twisted the Equal Protection Clause to uproot "a long tradition in this country of separating sexes" in athletics, *Adams*, 57 F.4th at 801—without any evidence that the Fourteenth Amendment's Framers would have understood the words they enacted to have that hidden meaning, *see Dobbs*, 142 S. Ct. at 2246–47. But courts must "guard against the natural human tendency to confuse what the Amendment protects with our own ardent views" about what it *should* protect. *Id.* at 2247; *accord B.P.J.*, 2023 WL 111875, at *8. This the district court did not do. To maintain uniformity within this circuit and consistency with how other courts—including the Supreme Court—interpret and understand the Equal Protection Clause, this Court must reverse the district court.

Sincerely,

*s/ Cody S. Barnett*
Cody S. Barnett
*Counsel for Intervenors-Appellants*

## CERTIFICATE OF SERVICE

I certify that this letter was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on February 21, 2023 using the appellate CM/ECF system, all participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Cody S. Barnett*
Cody S. Barnett

*Counsel for Intervenors-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-35813, 20-35815

I am the attorney or self-represented party.

**This brief contains** | 4,797 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | 01/30/2023 |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | Cody S. Barnett | **Date** | 02/21/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*