

STATE OF IDAHO

OFFICE OF THE ATTORNEY GENERAL

RAÚL R. LABRADOR

February 21, 2023

TRANSMITTED VIA CM/ECF

Molly C. Dwyer
Clerk of the Court
United States Court of Appeals
  for the Ninth Circuit
95 7th Street
San Francisco, CA 94103

     Re: *Hecox v. Little*, Case Nos. 20-35813, 20-35815

Dear Ms. Dwyer:

     Having decided the question of mootness, this Court has ordered the parties to file supplemental briefing on the remaining claims in this appeal concerning the Idaho Fairness in Women's Sports Act, Idaho Code §§ 33-6201–06. While the mootness issues were pending in this Court, Idaho elected a new Attorney General, who now represents Defendants-Appellants in this appeal. Attorney General Labrador shares none of his predecessor's misgivings about the constitutionality of the Fairness Act.

*See Hecox v. Little*, 479 F. Supp. 3d 930, 947–48, 978 n.35 (D. Idaho 2020). Rather, as set forth in his prior briefing as counsel for Intervenors, he believes, consistent with the demands of this Court's decisions in *Clark I* and *II*,[1] that the Fairness Act is a constitutional exercise of the legislature's power to protect opportunities in sports for women based on fundamental distinctives of biological sex. This Court should so hold.

The Court's order directed the parties to file letter briefs identifying the claims that remain for decision and citing any intervening legal authority since May 2021 bearing on those claims. Plaintiff Doe has moved out of state and the parties agree her claims are moot, so the Court should dismiss her challenge to the sex verification provisions of the Fairness Act. Dkt. 143 at 2 n.1.[2] That means the only claim that remains is Plaintiff Lindsay Hecox's as-applied equal protection challenge to the Fairness Act, which the Court has ruled is not moot. And that claim

---

[1] *See Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982) (*Clark I*); *see also Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191 (9th Cir. 1989) (*Clark II*).

[2] On remand from this Court, the district court determined that it did not have jurisdiction to dismiss Doe from the case because this Court had remanded *only* to determine if claims were moot. *See* Dkt. 105 at 1 n.1. This Court should now dismiss Doe from the case for lack of standing and vacate the district court's order in Doe's favor for lack of jurisdiction.

presents a simple question: if a law facially distinguishes between the two sexes in an area where differentiation by sex has traditionally been universal, does that mean the law unlawfully discriminates against a person who identifies as transgender?  As several intervening authorities make plain, the answer is an emphatic no.

First, recent decisions of the U.S. Supreme Court reiterate that the Fourteenth Amendment furnishes a fixed standard based on the constitutional text and its original public meaning.  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  These bedrock principles of interpretation are fatal to Hecox's claim.  Women's sports teams had just begun to emerge around the time of the Fourteenth Amendment's ratification and adhered to the traditional boundary line of biological sex that is the foundation of Idaho's Fairness Act.  No one in 1868 would have thought the Fourteenth Amendment gave biological males a constitutional right to enter these women-only spaces, even if those males had sincerely claimed to be women.  Hecox does not even attempt to argue that "equal protection of the laws" in 1868 guaranteed such a right.  And

without making that showing, Hecox's claim fails under these basic principles of constitutional interpretation.

Second, other federal courts have now upheld laws similar to the Fairness Act. Most significantly, the Eleventh Circuit has now ruled en banc that a law effecting standards of traditional sex distinctions—there, for bathrooms—does not violate equal protection. The majority opinion by Judge Barbara Lagoa applied the same intermediate scrutiny framework that this Court applied in *Clark*. Even further, a federal court in West Virginia went so far as to reconsider its own prior decision enjoining a law protecting biological sex classifications in sports, ruling instead that the law complied with equal protection. And so for this Court to rule otherwise amid the changing tide of these decisions would create both inter- and intra-circuit conflict.

And third, while it does not inform the meaning of the Constitution, it bears noting that the tide of statutory law and regulations continues to shift in favor of recognizing the biological distinctions at issue here. Other states, along with athletic governing bodies, have followed Idaho's lead in recognizing how the "inherent" physiological "differences between

men and women" impact athletic competition.[3]  Since 2021, many other states have enacted legislation imposing biological sex distinctions in sports, making Idaho no longer an outlier, but a leader.  At the same time, various athletic bodies have followed the science and issued regulations upholding competition standards grounded in the distinctives of biological sex.

This proliferation of other laws and regulations in the same space is exactly what one should expect in an area where the Constitution is silent.  And the Equal Protection Clause neither requires nor permits this Court to pick a winner in that evolving societal debate.  The Court should uphold the Fairness Act.

## I.    The original meaning standard of *Dobbs* and *Bruen* dooms Plaintiff Hecox's revisionist theory of equal protection.

The most important intervening authorities bearing on this case are the Supreme Court's decisions in *Dobbs* and *Bruen,* which reaffirm and reinforce fundamental principles of constitutional interpretation. Together, *Dobbs* and *Bruen* make clear that courts must ground all constitutional analysis in the original public meaning of the textual

---

[3] *See* Idaho Code § 33-6202 (legislative findings).

provision at issue. That standard dooms the equal protection claim brought by Plaintiff Hecox.

## A. *Dobbs* and *Bruen* reaffirm fundamental principles of textual interpretation anchored in original meaning.

*Dobbs* leaves no room for doubt that constitutional interpretation is an objective exercise based on the document itself. "Constitutional analysis must begin with 'the language of the instrument,' ... which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs*, 142 S. Ct. at 2244–45 (citation omitted). Applying that standard, *Dobbs* set out to answer "the critical" question that *Casey* "skipp[ed] over" and *Roe* largely ignored: "whether the Constitution, properly understood, confers a right to obtain an abortion." *Id.* at 2244. The Court's analysis began with the Constitution's explicit text, which it observed "makes no express reference to a right to obtain an abortion." *Id.* at 2445. And so it turned to an implicit rights analysis, which likewise looked to the text: whether the right to an abortion is part of "what the *Fourteenth Amendment* means by the term 'liberty.'" *Id.* at 2248.

In evaluating the implicit rights theory, *Dobbs* looked to the English common law's treatment of abortion, to colonial-era laws

criminalizing abortion, and to state laws criminalizing abortion from the early nineteenth to the mid-twentieth century. *Id.* at 2249–56. "[A]t the time of the adoption of the Fourteenth Amendment, over three-quarters of the States had adopted statutes criminalizing abortion (usually at all stages of pregnancy), and that from the early 20th century until the day *Roe* was handed down, every single State had such a law on its books." *Id.* at 2256. These laws showed an "overwhelming consensus" that abortion was not a "liberty" interest "deeply rooted in the Nation's history and traditions," but rather a crime. *Id.* at 2253–54. Based on that historical analysis, the original meaning of "liberty" under the Fourteenth Amendment could not include a right to an abortion. *Id.* at 2248. And so *Dobbs* overturned *Roe*'s infamous holding—"remarkably loose in its treatment of the constitutional text"—that the constitution guarantees a right to abortion and upheld Mississippi's law prohibiting abortion after a detectable heartbeat. *Id.* at 2242–45.

The Supreme Court's decision in *Bruen* likewise reinforced these objective standards of constitutional interpretation. In *Bruen*, the Supreme Court rejected the practice of "applying means-end scrutiny in

the Second Amendment context." 142 S. Ct. at 2127. Instead, *Bruen* said that interpretation of the Second Amendment must be "rooted in the Second Amendment's *text*, as informed by history." *Id.* (emphasis added). This requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

That analysis is context-specific. Sometimes, "that inquiry will be fairly straightforward": for example, if "a challenged regulation addresses a general societal problem that has persisted since the 18th Century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Other cases, however, might "require a more nuanced approach"—like when a present-day regulation involves a technology "unimaginable at the founding." *Id.* at 2132. But in all cases, the judge must "reason[] by analogy" and search for "a well-established and representative historical *analogue*" to a challenged law, even if it is not necessarily a "historical *twin*." *Id.* at 2132–33. This "reliance on history to inform the meaning of

8

constitutional text" is "more legitimate, and more administrable, than asking judges to make difficult empirical judgments" associated with policymaking. *Id.* at 2130 (cleaned up). And based on that historical analysis of the Second Amendment's text, the Supreme Court overturned New York's discretionary regime for granting permission to carry handguns. *Dobbs* and *Bruen* thus make clear that "all"—not some— "constitutional analysis" must begin with the fixed, original public meaning of the constitution's text, even in areas with well-developed bodies of caselaw. As Justice Alito, author of the *Dobbs* opinion, has explained, "even though we now have a thick body of precedent regarding the meaning of most provisions of the Constitution, our opinions continue to respect the *primacy of the Constitution's text*." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1894 (2021) (Alito, J., concurring) (emphasis added).

### B. No evidence suggests that "Equal Protection of the laws" would have been understood in 1868 to support Plaintiff Hecox's claim.

The original meaning of the Equal Protection clause mandates the same result as this Court's decisions in *Clark*: dismissal of Plaintiff

Hecox's claims. Beginning, as it must, "with 'the language of the instrument,'" *Dobbs*, 142 S. Ct. at 2244–45, an analysis of Hecox's equal protection claim requires the Court to consider what "equal protection of the laws" meant to the public when the Fourteenth Amendment was adopted in 1868. That does not require an "exhaustive survey" of the clause's original meaning. *Bruen*, 142 S. Ct. at 2132. Rather, it presents the narrow question of whether the original meaning of the Equal Protection Clause conferred a right on biological males to participate in women's sports. In our "adversarial system of adjudication," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6 (citation omitted). Plaintiff Hecox has not attempted to make the case that the answer is yes. Indeed, by any serious account, the answer must be no: areas of sex classification that were traditional and accepted in 1868 cannot be understood to violate equal protection.

Plaintiff Hecox has proffered no evidence that equal protection would have been understood in 1868 to embrace a right for a biological male to play on a women's team. Quite to the contrary, that history

illustrates how seriously the people that ratified the Fourteenth Amendment took the distinctions of biological sex, having created spaces and organizations exclusively for women. For example, women's colleges emerged around the same time the Fourteenth Amendment was ratified.[4] Other women's-only spaces like restrooms predate the Fourteenth Amendment and present an unbroken tradition that continues today.[5] And around that time, women began founding sports teams—the first women's baseball teams, for example, were founded at Vassar in 1866.[6] No one seriously claims that these spaces reserved for women, and women alone, violated equal protection in 1868. If that's

---

[4] *See* Elizabeth DeBra, *Women's Colleges in the United States, A Historical Context*, *in* U.S. DEP'T OF EDUC., WOMEN'S COLLEGES IN THE UNITED STATES: HISTORY, ISSUES, AND CHALLENGES 13 (1997), https://tinyurl.com/e4jyaa5b.

[5] *See generally* Peter C. Baldwin, *Public Privacy: Restrooms in American Cities, 1869–1932*, 48 J. OF SOC. HIST. 264 (2014); *cf. Dobbs* (citing the overwhelming consensus of laws criminalizing abortion at, before, and after the 14th amendment's ratification as evidence that "liberty," under the Fourteenth Amendment, did not include the right to an abortion); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in part and dissenting in part) ("A sign that says 'men only' looks very different on a *bathroom door* than a courthouse door.") (emphasis added).

[6] *See* Peter Bronski, *A Look Back: The Most Perfect Education of Body, Mind & Heart*, 107 VASSAR, THE ALUMNAE/I QUARTERLY (2011), https://tinyurl.com/2p8yzfp8.

true—and it is—*Dobbs* and *Bruen* say that the practice, as in Idaho's Fairness Act, is equally constitutional today.

Though the Fairness Act distinguishes solely on the bright line of biological sex, Plaintiff Hecox regards those distinctions as implying a separate, invidious discrimination based on gender identity. This is divorced not only from the Act's text, but from the crucial historical context of the Fourteenth Amendment. The entire modern construct of gender identity had not even been contemplated in 1868. It didn't emerge in an academic setting until the late twentieth century, and in popular understanding, only within the last decade.[7] So even while the statement "I am a woman trapped in a man's body" is one that many "ordinary people" now find both meaningful and significant, it would not have even been coherent to someone born in the early 20th century, much less to the people who ratified the Fourteenth Amendment in 1868.[8] That fact itself is fatal to Plaintiff Hecox's claim—the equal protection clause

---

[7] *See* CARL TRUEMAN, THE RISE AND TRIUMPH OF THE MODERN SELF 350-57 (2020) (citing, inter alia, MICHAEL KIMMEL, THE GENDERED SOCIETY (6th ed. 2017); LISA M. STULBERG, LGBTQ SOCIAL MOVEMENTS 68 (2018); JOANNE HERMAN, TRANSGENDER EXPLAINED FOR THOSE WHO ARE NOT (2009)).

[8] *Id.* at 19.

cannot provide protection to a social and philosophical category that did not exist until more than a century after it was adopted.

The notion that a biological man might participate in these sports based on his self-profession of female gender identity was utterly foreign at the time of the Fourteenth Amendment's adoption. And it remained so until the late 1980s, when this Court twice upheld the legitimacy of those biological lines in regulating women's athletics. *Clark I*, 695 F.2d at 1128–32; *Clark II*, 886 F.2d at 1192–94. Applying intermediate scrutiny, *Clark I* first held that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is a "legitimate and important governmental interest." *Id.* at 1131. The Court then concluded that excluding all "boys is substantially related to this interest," because "real differences"—the same differences recognized by the Fairness Act—"exist between boys and girls" that "would prevent realization of the goal if the exclusion were not allowed." *Id.* Because the categorical exclusion of boys "simply recogniz[ed] the physiological fact that males would have an undue advantage competing against women for positions on the volleyball

13

team," it satisfied intermediate scrutiny. *Id.; Clark II*, 886 F.2d at 1193. Intermediate scrutiny thus leads to the same place as original meaning.

This Court can revisit *Clark* only if subsequent authority casts doubt on its interpretation of the equal protection clause. The law provides no such warrant here—to the contrary, the Supreme Court's recent constitutional interpretation decisions reinforce the disposition in *Clark*. Even *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), applied the same textualist principles to "[t]he only question" before it, which concerned statutory construction of Title VII, not the constitution or "other laws." *Id.* at 1753–54. *Bostock*, which was expressly limited to statutory construction, focused on the meaning of the word "sex" in Title VII,. *Id.* at 1739–43. And it relied from start to finish on the reality of biological sex. *See, e.g.*, *id.* at 1739 ("[W]e proceed on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female"). So *Bostock* undercuts, rather than supports, the exorbitant revisionism of equal protection law that Plaintiff Hecox contemplates.

14

**II.    Other federal courts have upheld laws distinguishing based on sex in traditional areas of sex differentiation.**

Consistent with basic principles of constitutional interpretation and this Court's precedents in *Clark,* two other federal courts have recently upheld laws that categorically exclude biological males from women's spaces.  The district court, then, is the outlier.  Affirming its injunction here would therefore require this Court to split with both this Court's precedents and with other lower courts.

First, in *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (2022), the en banc Eleventh Circuit deferred to tradition and historical practice in upholding "the unremarkable—and nearly universal—practice of separating school bathrooms based on biological sex." *Id.* at 796.  Using the same logic as *Clark I* and *II*, Judge Lagoa's majority opinion concluded that the school district's policy of assigning bathrooms based on sex did not violate the Equal Protection Clause.  *Id.* at 800.  Consistent with the original meaning framework, the Court first noted the "long tradition in this country of separating sexes in some, but not all, circumstances—and public bathrooms are likely the most frequently encountered example." *Id.* at 801.  Then, just as in *Clark*, the

15

court applied intermediate scrutiny to uphold that "long tradition," reaching the same result as original meaning. The Court concluded that the "policy [of separating bathrooms by sex] advances the important governmental objective of protecting students' privacy in school bathrooms and does so in a manner substantially related to that objective." *Id.* at 803.

The Eleventh Circuit also rejected the theory—advanced here by Hecox—that a law that distinguishes based on sex necessarily discriminates based on transgender status. "[A] policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status." *Id.* at 800. Like Idaho's Fairness Act, the bathroom law on its face classified based only on sex and "divide[d] students into two groups, both of which include transgender students." *Id.* Thus, "there is a 'lack of identity' between the policy and transgender status, as the bathroom options are 'equivalent to those provided to all' students of the same biological sex." *Id.* (internal alterations and citations omitted). The same is just as true here.

16

Finally, the Eleventh Circuit also expressed "grave 'doubt'" that transgender people are a quasi-suspect class, noting that "the Supreme Court has rarely deemed a group a quasi-suspect class." *Id.* at 803 n.5 (citing *City of Cleburne*, 473 U.S. at 442–46). But, because it applied intermediate scrutiny, the en banc court didn't reach the issue. *Id.* Here, in contrast, the district court lacked such reticence when it concluded that transgender people are a quasi-suspect class. *See* ER060–066.

This is a matter not only of the law but of basic fairness. In addition to her opinion for the en banc court, Judge Lagoa also wrote a concurrence in *Adams* that underscores the importance of protecting women's sports. As she explained, allowing "a transgender athlete, who is born a biological male . . . to try out for and compete on a sports team" for biological females "would significantly undermine the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams." *Id.* at 819 (Lagoa, J., concurring). Several studies have confirmed that irreversible physiological differences exist between biological males and females that give biological male athletes

17

significant advantages over female competitors. *Id.* at 819–20.[9] These differences endure even if a biological male undergoes testosterone suppression therapy.[10]

> [F]emale sport is by design and for good reasons, a reproductive sex classification. These reasons have nothing to do with transphobia and everything to do with the performance gap that emerges from the onset of male puberty. Whether one is trans or not, if one is in sport and cares about sex equality, this physical phenomenon is undeniably relevant.

*Id.* at 820 (quoting Coleman et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule* 133 (2020)). Idaho's recognition of these same concerns and scientific truths in the Fairness Act does not violate equal protection.

---

[9] Judge Lagoa's concurrence cites the following articles and studies: Jennifer C. Braceras et al., *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports*, INDEP. WOMEN'S F. & INDEP. WOMEN'S L. CTR. 20 (2021); Benjamin D. Levine et al., *The Role of Testosterone in Athletic Performance*, DUKE CTR. FOR SPORTS L. & POL'Y 1 (Jan. 2019); Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 200–01 (2021); Doriane Lambelet Coleman et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POL'Y 69, 87–88 (2020).

[10] *Id.* at 820.

As courts grapple with these developments in both the academic literature and the public square, litigation outcomes in the lower courts are changing—even within a single case. Thus, in *B.P.J. v. West Virginia State Board of Education,* No. 2:21-cv-00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023), a federal district court recently upheld West Virginia's "Save Women's Sports Bill"—a law substantively identical to Idaho's Fairness Act—despite having preliminarily enjoined the same law in 2021. In a straightforward analysis that tracks with *Adams* and *Clark,* the district court found that the West Virginia Law distinguished only on the basis of biological sex. *Id.* at *6. Then, applying intermediate scrutiny, the Court found that the law substantially related to West Virginia's important interest in "providing equal athletic opportunities for females" because, "on average, males outperform females athletically because of inherent physical differences between the sexes." *Id.* at *7. Though West Virginia could have "adopt[ed] a different policy" allowing transgender participation, it was "not for the court to impose such a requirement." *Id.* at *8. The same is true here.

### III. Since May 2021, Other States and Athletic Boards Have Joined Idaho in Protecting Women's Sports Based on Biological Sex.

Though historical tradition under the original constitutional meaning of 1868 is the lodestar for constitutional interpretation, present-day legislative and regulatory developments have also begun to tilt toward the same principles upheld in the Fairness Act. When the district court enjoined the Fairness Act as to Plaintiff Hecox, it said that Idaho was "the first and only state to" enact such a law and that the Fairness Act stood "in stark contrast to the policies of elite athletic bodies that regulate sports both nationally and globally." ER002. But just two years after the district court's decision, the legislative and regulatory landscape has completely changed.

#### A. Idaho leads a coalition of more than a dozen states that protect women's sports based on biological sex.

It turns out that Idaho was a leader, not an outlier. Since 2021, more than a dozen states—Alabama, Arizona, Arkansas, Florida, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia—have acted to protect women's sports by passing substantially

20

similar laws that categorically bar biological males from participating in women's sports.[11]

That other states—as laboratories for "experimentation"—have taken approaches that decline to delineate based on biological sex only underscores this point. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). As Justice Ginsburg famously explained, "[d]eference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogenous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (Ginsburg, J., for the majority) (citations and quotation marks omitted). Where the Constitution is silent on an issue—as it was in 1868 and remains today—the states remain free to adopt divergent solutions to

---

[11] At the time Idaho filed this brief, eighteen states had enacted laws substantially similar to Idaho's Fairness Act, with a dozen in the period "since May 2021" called for by the Court's order. Dkt. 191.

difficult problems. And for the wisdom of those solutions, the proof is in the pudding, not in litigation.

## B. Athletic governing boards recognize biological sex distinctions.

Since May 2021, many athletic governing bodies have also issued competition regulations that, like Idaho, recognize critical distinctions grounded in biological sex. These boards have either categorically barred biological males from elite women's sports or tightened restrictions on them. And they have done so for the same scientific reasons that support Idaho's Fairness Act.

For example, in June 2022, FINA (the world governing body for swimming) voted to bar all biological males who have undergone puberty from competing in elite women's races.[12] In August 2022, British Triathlon created two classes of competition: an "open" category and a "female category" reserved exclusively for "those who are the female sex at birth."[13] And perhaps most significantly, on May 11, 2021, World

---

[12] *Fina bars transgender swimmers from women's elite events if they went through male puberty*, BBVC Sport (June 20, 2022), https://tinyurl.com/42hyexdy.

[13] British Triathlon, *Transgender Policy* (Jan. 1, 2023), https://tinyurl.com/5n8sa2yb.

Rugby issued guidelines that bar all biological males from competing in women's rugby—not just for fairness, but for physical safety.[14] The categorical policy for rugby exists "[b]ecause of the size, force- and power-producing advantages conferred by testosterone during puberty and adolescence, and the resultant player welfare risks this creates":

> When two opponents in a tackle are significantly different with respect to mass or speed, these risk factors increase significantly. All these factors are 20% and 30% greater when typical male mass is modelled against typical female body mass in the tackle.[15]

Based on this science, World Rugby determined that the only safe solution, was categorial exclusion of biological males from elite women's rugby.

In addition to these organizations that have used bright-line tests for determining participation in women's sports, other governing bodies have tightened restrictions based on biological sex by requiring males competing in women's sports to have lower levels of testosterone for

---

[14] *See* World Rugby, *Transgender Guidelines* (May 12, 2021), https://tinyurl.com/ycyxshdd.

[15] *See* World Rugby, *Transgender Guidelines* (May 12, 2021), https://tinyurl.com/ycyxshdd.

longer periods of time. USA Swimming, following FINA's lead, now requires all elite male-to-female-transitioning athletes to show testosterone levels below 5 nmol/L continuously for at least thirty-six months.[16] USA Swimming's new policy "acknowledges a competitive difference in the male and female categories and the disadvantages this presents in elite head-to-head competition." As USA Swimming notes, "statistical data that shows that the top-ranked female in 2021, on average, would be ranked 536th across all short course yards (25 yards) male events in the country and 326th across all long course meters (50 meters) male events in the country, among USA Swimming members."[17]

Other groups have adopted similar regulations. In June 2022, UCI—cycling's global governing body—doubled the required testosterone suppression period to twenty-four months and halved the maximum

---

[16] *See* USA Swimming Policy 19.0, *Athlete Inclusion, Competitive Equity, and Eligibility Policy*, at 4 & 6(c)(i)–(iii) (Feb. 1, 2022), https://tinyurl.com/8zderdrv. Although USA swimming's new policy came out before FINA's, USA Swimming stated in its official press release that its policy was informed by "updated information regarding ... (FINA) policy development." *See infra* n.14.

[17] USA Swimming, *USA Swimming Releases Athlete Inclusion, Competitive Equity and Eligibility Policy* (Feb. 1, 2022), https://tinyurl.com/mr2k4tvp.

acceptable level of testosterone for biological males who wish to compete in women's races. Similarly, World Triathlon in August 2022 required biological males who wish to compete in elite women's events to remain below a very low permissible testosterone level (2.5 nmol/L) for twenty-four months.[18] Even the NCAA and IOC—which the district court cited in its order as models of a permissive policy—have scrapped those previous policies in favor of a "sport-by-sport" approach that looks to guidance from each sport's global governing body.[19]

These shifting regulations show that the law and the science around transgender participation in women's sports are evolving. Less than three years have passed since Idaho enacted the Fairness Act. And already, the regulatory, scientific, and political winds have shifted in Idaho's (and women's) favor. It is not bigotry or transphobia for Idaho to accept the science of biological sex and its impact in women's athletics.

---

[18] World Triathlon, *World Triathlon Executive Board approves Transgender Policy* (Aug. 3, 2022, 4:04 PM), https://tinyurl.com/yxw4syzw.

[19] Int'l Olympic Committee, *IOC Framework on Fairness, Inclusion and Non-discrimination on the Basis of Gender Identity and Sex Variations* (Nov. 16, 2021), https://tinyurl.com/msrjx7wm; NCAA*, Board of Governors updates transgender participation policy* (Jan. 19 2022, 8:41 P.M.), https://tinyurl.com/3s3bvwdw.

Nor is it unconstitutional for the State to rely on the understanding of the Fourteenth Amendment from the time it was ratified up through the 1980s, when this Court decided *Clark I* and *II*. This is an area that the Constitution, in its silence, commits to the democratic process—"citizens trying to persuade one another and then voting"—to resolve a socially divisive question. *Dobbs*, 142 S. Ct. at 2243 (quoting *Casey v. Planned Parenthood Se. Pa.*, 505 U.S. at 979 (1992) (Scalia, J., concurring in part and dissenting in part)). And so the Equal Protection Clause neither requires nor allows the courts to declare a winner in this live, ongoing, and healthy societal debate.

\* \* \*

Plaintiff Hecox's equal protection claim was not cognizable in 1868 and so it isn't cognizable now. The Court should heed *Clark I* and *II*, follow the sound logic of recent decisions from other circuits, and leave the issue of transgender participation in women's sports "to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2243. And so it should reverse the decision below and vacate the district court's injunction for Plaintiff Hecox.

Respectfully submitted,

/s/ *Lincoln Davis Wilson*
Raúl R. Labrador
  *Idaho Attorney General*
David Dewhirst
  *Chief Deputy Attorney General*
Lincoln Davis Wilson
  *Chief of Civil Litigation and*
  *Constitutional Defense*

*Counsel for Defendants-Appellants*