APPEAL NOS. 20-35813, 20-35815

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LINDSAY HECOX and JANE DOE, with her
next friends Jean Doe and John Doe,

*Plaintiffs-Appellees,*

v.

BRADLEY LITTLE, in his official capacity as Governor of the State of
Idaho, et al.,

*Defendants-Appellants,*

and

MADISON KENYON and MARY MARSHALL,

*Intervenors-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:20-cv-00184-DCN
Hon. David C. Nye

## INTERVENORS-APPELLANTS'
## PETITION FOR REHEARING EN BANC

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. KIEFER
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
ckiefer@ADFlegal.org

BRUCE D. SKAUG
SKAUG LAW, P.C.
1226 E. Karcher Road
Nampa, ID 83687
(208) 466-0030
bruce@skauglaw.com

CHRISTOPHER P. SCHANDEVEL
CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy.
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org
cbarnette@ADFlegal.org

*Counsel for Intervenors-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION AND STATEMENT ....................................................1

BACKGROUND ...............................................................................3

PROCEEDINGS .............................................................................5

ARGUMENT .................................................................................6

I.     *Clark I* and *Clark II* should have controlled this case, so the panel decision creates a direct intra-circuit conflict.......................6

II.    The panel's claim that the Act discriminates by proxy based on transgender status misapplies this Court's and the Supreme Court's precedent and creates a circuit split.................11

III.   In treating transgender status as a quasi-suspect class, the panel decision conflicts with three other circuits. .........................12

IV.   The panel decision violates the original public meaning of the Equal Protection Clause. ...............................................14

V.    The panel's broad remedy exceeds the judicial power under Article III. ....................................................................15

CONCLUSION .............................................................................17

CERTIFICATE OF SERVICE.................................................................19

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams v. School Board of St. Johns County*,
　　57 F.4th 791 (11th Cir. 2022)....................................................11, 12

*Brown v. Zavaras*,
　　63 F.3d 967 (10th Cir. 1995) ..........................................................12

*City of Cleburne v. Cleburne Living Center*,
　　473 U.S. 432 (1985) ........................................................................12

*Clapper v. Amnesty International USA*,
　　568 U.S. 398 (2013) ..........................................................................5

*Clark By & Through Clark v. Arizona Interscholastic Association*,
　　886 F.2d 1191 (9th Cir. 1989) .............................................1, 6, 8, 9

*Clark, By & Through Clark v. Arizona Interscholastic Association*,
　　695 F.2d 1126 (9th Cir. 1982) ..................................................passim

*Commonwealth v. Biden*,
　　57 F.4th 545 (6th Cir. 2023)............................................................15

*Dobbs v. Jackson Women's Health Organization*,
　　142 S. Ct. 2228 (2022) ...............................................................2, 14

*Grimm v. Gloucester County School Board*,
　　972 F.3d 586 (4th Cir. 2020) ..........................................................12

*Hecox v. Little*,
　　2023 WL 1097255 (9th Cir. Jan. 30, 2023)......................................5

*Holloway v. Arthur Anderson & Co.*,
　　566 F.2d 659 (9th Cir. 1977) ..........................................................12

*John Doe No. 1 v. Reed*,
　　561 U.S. 186 (2010) ..................................................................16, 17

*L.W. ex rel. Williams v. Skrmetti*,
　　73 F.4th 408 (6th Cir. 2023)..........................................12, 13, 14, 16

*Michael M. v. Sonoma County Superior Court*,
  450 U.S. 464 (1981) ................................................................. 7, 10

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................................. 2, 14

*Pacific Shores Properties, LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ...................................................... 11

*Personnel Administrator of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ...................................................................... 11

*Scott v. Pasadena Unified School District*,
  306 F.3d 646 (9th Cir. 2002) ......................................................... 5

## Statutes

Idaho Code § 33-6203 ...................................................................... 4

## Other Authorities

American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (5th ed. 2013) ................................................... 3

J. Michael Bailey & Kiira Triea, *What Many Transgender Activists Don't Want You to Know: And Why You Should Know it Anyway*, 50 Perspectives in Biology and Medicine (Fall 2007) ....... 3

Peter A. Lee et al., *Global Disorders of Sex Development Update since 2006: Perceptions, Approach and Care*, 85 Hormone Research in Pediatrics 158 (2016) .................................................... 3

Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017) ...................................... 16

World Rugby, *Transgender Guidelines* ...................................................... 4

## Rules

Fed. R. App. P. 35 ............................................................................ 2

## INTRODUCTION AND STATEMENT

Women and girls have overcome decades of discrimination to achieve a more equal playing field in many arenas of American life—including sports. Yet across the nation, female athletes have become bystanders in their own sports, as men identifying as women have entered women's competitions and displaced female competitors.

The Idaho Legislature responded to that injustice by enacting the Fairness in Women's Sports Act, which ensures that girls do not have to compete against boys no matter how they identify. The Act—one of 22 passed by states around the country—is consistent with laws excluding male athletes from female sports that this Court has upheld against equal-protection challenges due to the "average real differences" between the sexes. *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (*Clark I*). If male athletes can displace females "even to the extent of one player," then "equal participation by females … is set back." *Clark By & Through Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) (*Clark II*).

In conflict with those precedents, other circuit decisions, and biology, the panel here invoked the Equal Protection Clause to strike down the Act because it prevents "transgender women and girls,"—i.e., males who identify as women—from competing in "women's student athletics." 8/17/23 SlipOp.12 (Ex.A). It is the first circuit decision holding that men may compete in women's sports based on their identity.

1

Rehearing en banc is warranted for multiple reasons. To begin, the decision conflicts directly with *Clark I* and *Clark II*, and it does so based on a historical analysis of the Equal Protection Clause that diverges sharply with the Supreme Court's commands in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2130 (2022), and *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Consideration by the full Court is necessary to secure and maintain uniformity of its decisions. Fed. R. App. P. 35(b)(1)(A).

The panel decision also conflicts with decisions from other circuits in its application of intermediate scrutiny. Those circuits recognize that sex is not a stereotype, and defining sex based on biology is not a proxy for transgender discrimination. Indeed, if taken to its logical conclusion, the panel's holding here will prevent states in this Circuit from *ever* classifying on the basis of biological sex. This question of exceptional importance, and the circuit split the panel has created, independently warrant this Court's review. Fed. R. App. P. 35(b)(1)(B).

Time is of the essence. The next women's sports season will begin in a matter of days, and competitors like Intervenors may be forced to compete against males, as has happened in the past. The Court should act quickly on this petition for rehearing en banc, either granting it and ordering expedited briefing and argument, or denying it so that Intervenors can take this important issue to the Supreme Court without delay. Women are entitled to a fair chance to compete.

## BACKGROUND[1]

Intervenor Madison Kenyon is a student at Idaho State University, where she runs on the women's track and cross-country teams. Before the fall 2019 cross-country season, she learned she would be competing against a University of Montana male athlete who identifies as female.[2] Competing on the men's team, that student recorded times in multiple events that would have broken national women's records. Unsurprisingly, Kenyon lost to the male athlete by a significant margin every time they competed. Indeed, male athletes identifying as females have won medals and displaced women across the country.

---

[1] As recognized in Intervenors' opening brief at 5–14, ECF No. 33. Intervenor Mary Marshall recently graduated from Idaho State University.

[2] A person's sex (male or female) is not "misleading" nor "assigned at birth." *Contra* SlipOp.13. Sex is the "biological indication of male and female (understood in the context of reproductive capacity), such as sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 829 (5th ed. 2013). While "gender dysphoria" is a recognized mental-health issue, a person's subjective feelings do not change their sex. There is no scientific basis to believe that men who identify as women *are* women "trapped" in men's bodies. J. Michael Bailey & Kiira Triea, *What Many Transgender Activists Don't Want You to Know: And Why You Should Know it Anyway*, 50 Perspectives in Biology and Medicine 521–34 (Fall 2007); *contra* SlipOp.13–14, 28–30. And the fact that 1 in 5,000 births involves a disorder of sexual development, Peter A. Lee et al., *Global Disorders of Sex Development Update since 2006: Perceptions, Approach and Care*, 85 Hormone Research in Pediatrics 158, 159 (2016); *contra* SlipOp.14, 29 (wrongly claiming 2% of babies—1 in 50—are "intersex"), does not change that. A disordered organ is not a new and different organ altogether.

Against this backdrop, Idaho enacted the Fairness in Women's Sports Act. Under the Act, sports are designated "based on biological sex." Idaho Code § 33-6203(1). The Act does not differentiate between students based on gender identity. In the event of a dispute about an athlete's sex, schools are to ask the student to provide "a health examination and consent form or other statement signed by the student's personal health care provider that shall verify the student's biological sex." Idaho Code § 33-6203(3). The provider can do this based on the provider's knowledge of the patient or a routine sports physical. *Id.*

The Act contains 12 legislative fact findings. These include data about inherent biological and physiological differences between men and women, how those differences affect equal opportunities in sports, and why hormone therapy does not eliminate the physical advantages a male athlete obtains by going through puberty. The panel second-guessed that last point, declaring that lowering "circulating testosterone levels" places men and women on equal athletic footing. SlipOp.40. But as World Rugby concluded after extensive analysis, the evidence consistently shows that, "given the size of the biological differences" between men and women, the "comparatively small effect of testosterone reduction" over 12 months still "allows substantial and meaningful differences to remain." World Rugby, *Transgender Guidelines*, https://perma.cc/R6SN-BWY9; *accord* Opening Br.40–44, ECF No. 33.

4

## PROCEEDINGS

Two plaintiffs filed suit to invalidate the Act immediately after its passage. Lindsay Hecox is a male who identifies as a woman and planned to try out for the women's cross-country team at Boise State University. After the district court issued a preliminary injunction, Hecox tried out and failed to make the women's track team. SlipOp.22 n.7. Hecox withdrew from school, then reenrolled, never completing enough credits to meet NCAA eligibility requirements. Still, the panel determined the case was not moot because Hecox (1) intended to try again, and (2) desired to play women's club soccer, and the Act allegedly prevented that, *Hecox v. Little*, 2023 WL 1097255, at *1-2 (9th Cir. Jan. 30, 2023)—even though the latter was not alleged in the Complaint.

Jane Doe is a female who identifies as a woman and speculates that her sex might someday be "disputed" by a competitor, subjecting her to the Act's verification process. SlipOp.20–21. Neither she nor Hecox showed an "imminent" or "immediate[]" danger of suffering such a verification injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 656 (9th Cir. 2002). Yet the district court and the panel decided the challenge to the Act's sex classifications *and* the verification challenge.

The district court dismissed Hecox's facial challenge, then enjoined the Act's enforcement. Idaho and Intervenors appealed. A panel of this Court affirmed in every respect.

5

# ARGUMENT

## I. *Clark I* and *Clark II* should have controlled this case, so the panel decision creates a direct intra-circuit conflict.

This Court has already held—twice—that excluding male athletes from female sports teams is substantially related to important government interests and satisfies intermediate scrutiny under the Equal Protection Clause. *Clark I*, 695 F.2d at 1131–32; *Clark II*, 886 F.2d at 1194. In *Clark I*, this Court reviewed an appeal brought by male high-school athletes arguing that a policy prohibiting them from playing on the girls' volleyball team violated the Equal Protection Clause. 695 F.2d at 1127. Under the policy, girls could play on boys' athletic teams. *Id.* And the boys' schools did not have boys' volleyball teams—leaving the girls' teams as their only available option, but for the challenged policy. *Id.*

The district court dismissed the boys' equal-protection claim, and this Court affirmed. *Id.* Applying intermediate scrutiny, this Court framed the issue as "whether the [challenged] policy regarding boys not playing volleyball on the girls' team fails substantially to further an important governmental objective." *Id.* at 1129.

In answering that question, this Court recognized that the Supreme Court has "take[n] into account actual differences between the sexes, including physical ones." *Id.* For example, in *Michael M. v. Sonoma County Superior Court*, Justice Rehnquist, writing for a plurality, observed that the "Court has consistently upheld statutes where the

6

gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Id.* (quoting *Michael M.*, 450 U.S. 464, 469 (1981)). In that case, the Court had "upheld a statutory rape statute that applied only to males, recognizing that since only women were subject to pregnancy and preventing teenage pregnancy was a legitimate purpose of the statute, [it] could apply differently to the different sexes." *Id.* The Court also rejected the petitioner's argument that the statute was "impermissibly overbroad because it [made] unlawful sexual intercourse with prepubescent females, who are, by definition, incapable of becoming pregnant," calling that a "ludicrous" suggestion. *Michael M.*, 450 U.S. at 475.

Against that backdrop, this Court held that the policy prohibiting boys from playing on girls' sports teams substantially furthered the government's important interest in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." *Clark I*, 695 F.2d at 1131. "[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* And there was "no question that the Supreme Court allows for these average real differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy." *Id.*

Seven years later, this Court reaffirmed that position in an appeal brought by the brother of one of the *Clark I* plaintiffs. *Clark II*, 886 F.2d at 1192. In *Clark II*, this Court rejected the younger brother's attempt to force his way onto his school's girls' volleyball team. *Id.* at 1193–94. "If males are permitted to displace females on the school volleyball team *even to the extent of one player* like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Id.* at 1193 (emphasis added). "While equality in specific sports is a worthwhile ideal, it should not be purchased at the expense of ultimate equality of opportunity to participate in sports." *Id.* (quoting *Clark I*, 695 F.2d at 1132). And that included the expense to "ultimate equality" caused by a single male athlete competing on the girls' volleyball team. *Id.* "As common sense would advise against this, neither does the Constitution demand it." *Id.* (quoting *Clark I*, 695 F.2d at 1132).

Until now. Following the district court's lead, the panel deemed the *Clark* cases "inapposite" on two main bases. SlipOp.39–40. First, it was "not clear" that biologically male athletes "who suppress their testosterone have significant physiological advantages" over biologically female athletes, "unlike the cisgender boys at issue in *Clark I* and *Clark II*." *Id.* at 40 (cleaned up). And second, biological males who identify as female, "like women generally," have "historically been discriminated against, not favored." *Id.* (cleaned up).

That reasoning doesn't distinguish the *Clark* cases; it rewrites them. Both endorsed laws recognizing the "*average* real differences between the sexes." *Clark I*, 695 F.2d at 1131 (emphasis added); *accord Clark II*, 886 F.2d at 1192. And in *Clark I*, it was enough that boys would "on average be *potentially* better volleyball players than girls." *Clark I*, 695 F.2d at 1127 (emphasis added). The Court did *not* suggest in either case that a male athlete can bring a successful claim simply by asserting countervailing interests in addressing past discrimination or by obtaining a court assessment that he lacks "significant physiological advantages" over female athletes. SlipOp.40 (cleaned up).

Quite the opposite, *Clark I* rejected the idea that the existence of "wiser alternatives" might invalidate girls-only policies. 695 F.2d at 1132. True, "specific athletic opportunities could be equalized more fully in a number of ways." *Id.* at 1131. "[P]articipation could be limited on the basis of specific physical characteristics other than sex." *Id.* Or boys could participate "only in limited numbers." *Id.* But the "existence of these alternatives shows only that the exclusion of boys is not *necessary* to achieve the desired goal." *Id.* Under intermediate scrutiny, "absolute necessity is not required before a gender based classification can be sustained." *Id.* Thus, even when "the alternative chosen may not maximize equality" and may instead "represent trade-offs between equality and practicality," the "existence of wiser alternatives" will not invalidate a policy that is "substantially related to the goal." *Id.* at 1131–32.

9

Intervenor's briefing highlighted that *Clark I* holding. Opening Br.21–22, 31–32, 38, ECF No. 33; Reply Br.15, ECF No. 111. But it featured nowhere in the panel majority's 60-page opinion. And the two opinions are impossible to reconcile. If the panel is right, then *any* laws or policies that distinguish based on sex must be enjoined in their entirety if a single plaintiff can show that it is "not clear," SlipOp.40, that the distinction is an "absolute necessity," *Clark I*, 695 F.2d at 1131.

That cannot be the law. And until now, it wasn't. The panel's decision here gives a green light to *other* subsets of male athletes seeking to challenge girls-only teams. A male athlete with a disability could argue it is "not clear" he has an advantage over female athletes. SlipOp.40. And he would be a member of a class of people who, "like women," have "historically been discriminated against." *Id.* (cleaned up).

Or take *Michael M.* Applying the panel's reasoning, the petitioner there should have *prevailed* on his argument that the law was overbroad because it criminalized "sexual intercourse with prepubescent females, who are, by definition, incapable of becoming pregnant." *Michael M.*, 450 U.S. at 475. After all, it is "not clear" that applying the law to men who target girls who cannot become pregnant advances an interest in preventing teenage pregnancy. The same goes for men who are infertile. Until now, such arguments were "ludicrous." *Id.* Until now, "absolute necessity [was] not the standard." *Clark I*, 695 F.2d at 1132. If allowed to stand, though, the panel's decision changes all that.

10

## II. The panel's claim that the Act discriminates by proxy based on transgender status misapplies this Court's and the Supreme Court's precedent and creates a circuit split.

Also meriting en banc review is the panel's holding that "the Act's use of 'biological sex'" is "'proxy discrimination'" for transgender status. SlipOp.31 (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)). *Pacific Shores* defines "proxy discrimination" as discrimination based on "criteria that are almost exclusively indicators of membership in the disfavored group." 730 F.3d at 1160 n.23. "For example, discriminating against individuals with gray hair is a proxy for age discrimination because the fit between age and gray hair is sufficiently close." *Id.* (cleaned up).

The Act does not do that. The Act's biological criteria are not "closely" or "almost exclusively" associated with "membership in the [transgender] group," *id.*; those criteria encompass the much larger group the law actually excludes from girls' sports teams: *all* biological males, no matter their identity. *Accord, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979) (holding veteran hiring preferences are not a "pretext" for sex discrimination because "all nonveterans—male as well as female—are placed at a disadvantage"). And the panel's holding places this circuit directly at odds with the Eleventh Circuit's recent holding that "discrimination based on biological sex" does *not* necessarily entail "discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc).

11

### III. In treating transgender status as a quasi-suspect class, the panel decision conflicts with three other circuits.

The bar for recognizing a new quasi-suspect class for purposes of an Equal Protection Clause analysis is "high." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023). And the Supreme Court has never recognized gender identity as such a class. Indeed, the Court has only recognized two such classes—and that was "over four decades" ago. *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (gender and illegitimacy)).

Both the Sixth and the Eleventh Circuits have expressly declined to treat transgender status as a quasi-suspect class. *Skrmetti*, 73 F.4th at 420; *Adams*, 57 F.4th at 803 n.5. So has the Tenth Circuit, following this Court's decision in *Holloway v. Arthur Anderson & Co.*, 566 F.2d 659 (9th Cir. 1977). *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (citing *Holloway*, 566 F.2d at 663). *But see Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (treating transgender status as a quasi-suspect class).

The panel here said that this Court recognized gender identity as a quasi-suspect class in *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019). SlipOp.34. But that's not quite right. The Court did instruct the district court there to apply "something more than rational basis but less than strict scrutiny," but it did *not* recognize transgender identity as a suspect or quasi-suspect class. 926 F.3d at 1201.

*Karnoski* involved a challenge to a policy prohibiting military service by openly transgender individuals, thus regulating based on that status "[o]n its face." *Id.* The district court applied strict scrutiny. *Id.* at 1199. And this Court reversed, directing that "[a]mong the factors to be considered on remand are the level of constitutional scrutiny applicable to the equal protection or substantive due process rights of transgender persons." *Id.* To guide that consideration, the Court did not apply "the factors ordinarily used to determine whether a classification affects a suspect or quasi-suspect class," *id.* at 1200, instead suggesting that "the district court should apply a standard of review that is more than rational basis but less than strict scrutiny." *Id.* at 1201. And the Court was clear that this analysis should be made "as-applied rather than facial," *id.* at 1200 (citation omitted)—the opposite of what the panel did here.

Idaho's Act does not classify based on transgender status—on its face or otherwise. If two boys show up for women's track tryouts, one who identifies as a woman and one as a man, both will be told to attend the men's track tryouts instead. So the full Court should clarify that the Act does not distinguish based on transgender status. After all, "[t]he burden of establishing an imperative for constitutionalizing new areas of American life is not—and should not be—a light one, particularly when the States are currently engaged in serious, thoughtful debates about the issue." *Skrmetti*, 73 F.4th at 415–16 (cleaned up).

13

## IV. The panel decision violates the original public meaning of the Equal Protection Clause.

In declaring that it violates equal protection for a state to ensure equal opportunities for female athletes, the panel made no attempt to justify its holding in accord with "the original fixed meaning" of the "equal protection guarantee." *Skrmetti*, 73 F.4th at 415. "Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate" about the best way to give women and girls a chance to be champions "from the ebbs and flows of democracy by construing a largely unamendable federal constitution to occupy the field." *Id.*

Both *Bruen* and *Dobbs* affirmed that no matter the constitutional provision at issue, courts "begin with the language of the instrument," *Dobbs*, 142 S. Ct. at 2244–45 (cleaned up), informed by careful "historical analysis," *Bruen*, 142 S. Ct. at 2130. That makes this case easy. Nothing in the Equal Protection Clause's text suggests that states cannot protect women athletes from male competitors simply because a man identifies as a woman. And in the years leading up to and immediately after the Equal Protection Clause's ratification in 1868, there is not a single law, regulation, or case that Appellees can point to where a court circumscribed the government's power to separate sports teams by sex. If three historical firearm regulations did not carry the day in *Bruen*, then *zero* examples cannot show a "broad tradition" of laws prohibiting sex-separated athletics regardless of identity. *Id.* at 2156.

14

The panel defended its contrary conclusion by asserting that the Fourteenth Amendment's Framers would not have understood "biological sex" in the scientific terms that Idaho used to define it. SlipOp.28 & n.8. But that's irrelevant. What matters is what the public in 1868 would have understood by equal protection of the laws. And no party has presented evidence showing that the public understood equal protection to mean "states cannot classify women's sports based on sex." It is also insulting to say that the public in 1868 had no grasp of "sex" because the science was lacking. *See id.*

Contradicting itself, the panel observes that "transgender people have existed since ancient times." SlipOp.28 n.8. That's not the relevant question. Officials in 1868 did not include "gender identity" in the Fourteenth Amendment's text, nor did they enact any other laws giving men who identify as women the right to participate in women's sports. That silence is dispositive in Appellants' favor.

## V. The panel's broad remedy exceeds the judicial power under Article III.

The district court enjoined the Act in all its applications—even the unintrusive act of asking a doctor to certify that a student is a boy or girl. The panel affirmed that broad injunction. But Article III confines courts to cases and controversies. That means courts should not "issue relief that extends further than necessary to remedy the plaintiff's injury." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

Hecox did not seek class certification and thus can, at most, seek to remedy only Hecox's injury. As the Sixth Circuit recently queried in upholding a state law prohibiting the use of medicines to effect a so-called gender transition on minors: "absent a properly certified class action, why" should one transgender athlete "represent … million[s]?" *Skrmetti*, 73 F.4th at 415. A "rising chorus" suggests that Article III does not allow such sweeping relief. *Id.* (collecting cases).

The panel here held that injunctive relief was proper because the Act is "unconstitutional as currently written." SlipOp.57. But courts decide discrete cases and controversies before them. They restrain applications *to particular persons*; they do not answer "questions for everyone." Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 421 (2017).

*John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010), is inapposite. *Contra* SlipOp.58 & n.22. There, certain plaintiffs wanted to bar a secretary of state "from making referendum petitions available to the public." *Reed*, 561 U.S. at 194. Enjoining the secretary from doing so would have "reach[ed] beyond the particular circumstances of [the] plaintiffs," so the Court treated the case as facial, even though the plaintiffs brought an as-applied challenge. *Id.* It was not possible to fashion relief only for the plaintiffs; the secretary either could or could not release the petitions.

The opposite is true here. Hecox sought an injunction stopping the Act from applying based on Hecox receiving certain medical interventions, and Doe sought an injunction stopping the Act's verification provisions from applying to her. That does not necessitate an application beyond their "particular circumstances." *Id.* If other male athletes in Idaho identify as women and receive different or no medical intervention yet want to compete in women's sports, nothing stops them from seeking injunctive relief. Unlike in *Doe*, there is no reason for this Court to take Plaintiffs' as-applied challenges and fashion injunctive relief to non-parties.

Finally, the injunction the panel affirmed is especially overbroad regarding the verification provision. The panel characterized the verification process as "invasive," "intrusive," and "humiliating." SlipOp.49–53. But in most instances, that process will require only that a doctor say whether a long-time patient is male or female. Yet the panel still enjoined *all* means of verifying a student's sex, not just those means the panel condemned as intrusive. That, too, exceeded the scope of the panel's jurisdiction.

## CONCLUSION

To protect women and girls in sports, time is of the essence. The Court should expeditiously grant or deny the petition for rehearing en banc.

Respectfully submitted,

Dated: August 31, 2023                    By:/s/ John J. Bursch

ROGER G. BROOKS                           JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM                CHRISTIANA M. KIEFER
15100 N. 90th Street                      ALLIANCE DEFENDING FREEDOM
Scottsdale, AZ 85260                      440 First Street, NW
(480) 444-0020                            Suite 600
rbrooks@ADFlegal.org                      Washington, DC 20001
                                          (202) 393-8690
BRUCE D. SKAUG                            jbursch@ADFlegal.org
SKAUG LAW. P.C.                           ckiefer@ADFlegal.org
1226 E. Karcher Road
Nampa, ID 83687                           CHRISTOPHER P. SCHANDEVEL
(208) 466-0030                            CODY S. BARNETT
bruce@skauglaw.com                        ALLIANCE DEFENDING FREEDOM
                                          44180 Riverside Pkwy.
                                          Lansdowne, VA 20176
                                          (571) 707-4655
                                          cschandevel@ADFlegal.org
                                          cbarnette@ADFlegal.org

*Counsel for Intervenors-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I electronically filed the foregoing Petition for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ John J. Bursch*
*Counsel for Intervenors-Appellants*

August 31, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 20-35813, 20-35815

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,178 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/John J. Bursch | **Date** | Aug 31, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11** *Rev. 12/01/2021*

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| LINDSAY HECOX; JANE DOE, with her next friends Jean Doe and John Doe, | No. 20-35813 |
| | D.C. No. 1:20-cv-00184-DCN |
| *Plaintiffs-Appellees*, | |
| v. | |
| BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho; SHERRI YBARRA, in her official capacity as the Superintendent of Public Instruction of the State of Idaho and as a member of the Idaho State Board of Education; INDIVIDUAL MEMBERS OF THE STATE BOARD OF EDUCATION, in their official capacities; BOISE STATE UNIVERSITY; MARLENE TROMP, in her official capacity as President of Boise State University; INDEPENDENT SCHOOL DISTRICT OF BOISE CITY, # 1; COBY DENNIS, in his official capacity as superintendent of the Independent School District of Boise | OPINION |

City #1; INDIVIDUAL MEMBERS
OF THE BOARD OF TRUSTEES OF
THE INDEPENDENT  SCHOOL
DISTRICT OF BOISE CITY, # 1; in
their official capacities; INDIVIDUAL
MEMBERS OF THE IDAHO CODE
COMMISSION, in their official
capacities,

*Defendants-Appellants*,

 and

MADISON KENYON; MARY
MARSHALL,

*Intervenors*.

LINDSAY HECOX; JANE DOE, with
her next friends Jean Doe and John
Doe,

*Plaintiffs-Appellees*,

 v.

BRADLEY LITTLE, in his official
capacity as Governor of the State of
Idaho; SHERRI YBARRA, in her
official capacity as the Superintendent
of Public Instruction of the State of

No. 20-35815

D.C. No. 1:20-cv-
00184-DCN

Idaho and as a member of the Idaho
State Board of Education;
INDIVIDUAL MEMBERS OF THE
STATE BOARD OF EDUCATION, in
their official capacities; BOISE
STATE UNIVERSITY; MARLENE
TROMP, in her official capacity as
President of Boise State University;
INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY, # 1;
COBY DENNIS, in his official
capacity as superintendent of the
Independent School District of Boise
City #1; INDIVIDUAL MEMBERS
OF THE BOARD OF TRUSTEES OF
THE INDEPENDENT  SCHOOL
DISTRICT OF BOISE CITY, # 1; in
their official capacities; INDIVIDUAL
MEMBERS OF THE IDAHO CODE
COMMISSION, in their official
capacities,

*Defendants*,

and

MADISON KENYON; MARY
MARSHALL,

*Intervenors-Appellants*.

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted November 22, 2022
San Francisco, California

Filed August 17, 2023

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Morgan Christen, Circuit Judges.[*]

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Christen

## SUMMARY[**]

### Equal Protection/Transgender Status

The panel affirmed the district court's order
preliminarily enjoining Idaho's Fairness in Women's Sports
Act, a categorical ban on the participation of transgender
women and girls in women's student athletics.

---

[*] Pursuant to General Order 3.2(h), Judge Christen has been drawn to
replace Judge Kleinfeld in this matter. Judge Christen has reviewed the
briefs and the record, and listened to the recording of the oral argument
in this case.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The Act bars all transgender women and girls from participating in, or trying out for, public school female sports teams at every age, from primary school through college, and at every level of competition, from intramural to elite teams.  It also provides a sex dispute verification process whereby any individual can "dispute" the sex of any female student athlete in the state of Idaho and require her to undergo intrusive medical procedures to verify her sex, including gynecological exams.  Male student athletes in Idaho are not subject to a similar dispute process.

The panel held that the district court did not abuse its discretion when it found, on the record before it, that plaintiffs were likely to succeed on the merits of their claim that the Act violates the Equal Protection Clause of the Fourteenth Amendment.

Citing *United States v. Virginia*, 518 U.S. 515, 555 (1996), and *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019), the panel stated that a heightened level of scrutiny applies to laws that discriminate on the basis of transgender status and sex. The district court did not err in concluding that heightened scrutiny applied because the Act discriminates on the basis of transgender status by categorically excluding transgender women from female sports and on the basis of sex by subjecting all female athletes, but not male athletes, to invasive sex verification procedures to implement that policy.

Because the Act subjects only women and girls who wish to participate in public school athletic competitions to an intrusive sex verification process and categorically bans transgender women and girls at all levels, regardless of whether they have gone through puberty or hormone therapy, from competing on female, women, or girls teams,

6          HECOX V. LITTLE

and because the State of Idaho failed to adduce any evidence demonstrating that the Act is substantially related to its asserted interests in sex equality and opportunity for women athletes, the panel held that plaintiffs were likely to succeed on the merits of their equal protection claim.

Concurring in part and dissenting in part, Judge Christen wrote that given the categorical sweep of the ban on transgender students, the medical consensus that circulating testosterone rather than transgender status is an accurate proxy for athletic performance, and the unusual and extreme nature of the Act's sex verification requirements, the district court did not abuse its discretion by granting injunctive relief.

Disagreeing with the majority in part, Judge Christen wrote that she read the sex dispute verification provision to apply to any student, male or female, who participates on women's or girls' athletic teams. Accordingly, it is the team an athlete chooses to join that dictates whether they are subject to the statute's verification process, not the athlete's sex. Judge Christen also wrote that the district court's injunction lacked specificity as required by Federal Rule of Civil Procedure 65(d)(1) because it failed, among other things, to specify whether it was enjoining all provisions of the Act, or only some of them, or whether it was enjoining any specific provision of the Act in its entirety or only as applied to certain classes of individuals. Finally, Judge Christen stated that the injunction was overbroad to the extent that it applies to transgender women who are not receiving gender-affirming hormone therapy.

## **COUNSEL**

W. Scott Zanzig (argued), Dayton P. Reed, Timothy Longfield, and Brian V. Church, Deputy Attorneys General; Lincoln D. Wilson; Steven L. Olsen, Chief of Civil Litigation Division; Brian Kane, Assistant Chief Deputy; Lawrence G. Wasden, Attorney General; Boise, Idaho, for Defendants-Appellants.

Kristen K. Waggoner, John J. Bursch, and Christiana M. Holcomb, Alliance Defending Freedom, Washington, D.C.; Bruce D. Skaug and Raul R. Labrador, Skaug Law PC, Nampa, Idaho; Roger G. Brooks, Alliance Defending Freedom, Scottsdale, Arizona; Christopher P. Schandevel, Alliance Defending Freedom, Ashburn, Virginia; Cody S. Barnett, Alliance Defending Freedom, Lansdowne, Virginia; for Intervenors-Appellants.

Andrew Barr (argued), Cooley LLP, Broomfield, Colorado; Chase Strangio and James D. Esseks, American Civil Liberties Union Foundation, New York, New York; Richard Eppink and Dina M. Flores-Brewer, American Civil Liberties Union of Idaho Foundation, Boise, Idaho; Elizabeth Prelogar, Cooley LLP, Washington, D.C.; Catherine West, Legal Voice, Seattle, Washington; Kathleen R. Hartnett, Cooley LLP, San Francisco, California; Selim Aryn Star, Star Law Office PLLC, Hailey, Idaho; for Plaintiffs-Appellees.

Lauren R. Adams, Women's Liberation Front, Washington, D.C., for Amicus Curiae Women's Liberation Front.

James A. Campbell, Solicitor General; David T. Bydalek, Chief Deputy Attorney General; Douglas J. Peterson, Attorney General of Nebraska; Nebraska Attorney General's Office, Lincoln, Nebraska; for Amici Curiae States of

Nebraska, Alabama, Alaska, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, Texas, and West Virginia.

Kara Dansky, Women's Human Rights Campaign – USA, Medford, Oregon, for Amicus Curiae Women's Human Rights Campaign – USA.

Randall L. Wenger, Independence Law Center, Harrisburg, Pennsylvania; Gary S. McCaleb, Flagstaff, Arizona; for Amici Curiae Medical Professionals in Support of Interveners-Appellants and Urging Reversal.

Thomas E. Chandler, Matthew J. Donnelly, and Elizabeth Hecker, Attorneys; Alexander V. Maugeri, Deputy Assistant Attorney General; Eric S. Dreiband, Assistant Attorney General; United States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C.; Candice Jackson and Farnaz F. Thompson, Deputy General Counsels; Reed R. Rubinstein, Principal Deputy General Counsel; United States Department of Education, Office of the General Counsel, Washington, D.C.; Peter L. Wucetich, Assistant United States Attorney; Bart M. Davis, United States Attorney; Boise, Idaho; for Amicus Curiae United States.

Edward M. Wenger, Tallahassee, Florida, for Amicus Curiae Sandra Bucha, Linda Blade, Vicki Huber-Rudawsky, Inga Thompson, Maria Blower, and Rebecca Dussault.

Chris N. Ryder and Gail Hammer, Lincoln LGBTQ+ Rights Clinic, Spokane, Washington, for Amicus Curiae Lincoln LGBTQ+ Rights Clinic.

Jessica L. Ellsworth, Kaitlyn A. Golden, Danielle D. Stempel, Nel-Sylvia Guzman, and Ray Li, Hogan Lovells US LLP, Washington, D.C.; Fatima G. Graves, Emily

Martin, Sunu Chandy, Neena Chaudhry, Shiwali Patel, and Cassandra Mensah, National Women's Law Center, Washington, D.C.; Jon Greenbaum, David Hinojosa, and Bryanna A. Jenkins, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; for Amici Curiae National Women's Law Center, Lawyers' Committee for Civil Rights Under Law and 60 Additional Organizations.

Carl S. Charles, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia; Paul D. Castillo, Lambda Legal Defense and Education Fund Inc., Dallas, Texas; Diana Flynn and Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund Inc., New York, New York; Sasha Buchert, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; for Amici Curiae 176 Athletes in Women's Sports, The Women's Sports Foundation, and Athlete Ally in Support of Plaintiffs-Appellees and Affirmance.

Jonah M. Knobler, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amicus Curiae interACT: Advocates for Intersex Youth.

Jesse R. Loffler, Cozen O' Connor, for Amici Curiae Transgender Women Athletes.

Aaron M. Panner, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; Scott B. Wilkens, Wiley Rein LLP, Washington, D.C.; for Amici Curiae American Academy of Pediatrics, American Medical Association, American Psychiatric Association, and 10 Additional Healthcare Organizations.

Adam R. Tarosky, Seth D. Levy, and Sarah E. Andre, Nixon Peabody LLP, Los Angeles, California, for Amicus Curiae Three Former Idaho Attorneys General.

Matthew D. Benedetto, Thomas F. Costello, William Cutler
Pickering, Hale and Dorr LLP, Los Angeles, California;
Adam M. Cambier and Alison Burton, Wilmer Cutler
Pickering, Hale and Dorr LLP, Boston, Massachusetts; for
Amici Curiae Teammates, Coaches, and Allies of
Transgender Athletes.

Angela R. Vicari, Rosalyn Richter, Arnold & Porter Kaye
Scholer LLP, New York, New York; Kirk Jenkins, Arnold
& Porter Kaye Scholer LLP, San Francisco, California; for
Amici Curiae Altria Group Inc., Amalgamated Bank, Asana
Inc., Ben and Jerry's Homemade Inc., Lush Cosmetics LLC,
Nike Inc., and The Burton Corporation.

Kaliko'onalani D. Fernandes, Deputy Solicitor General of
Counsel; Kimberly T. Guidry, Solicitor General; Clare E.
Connors, Attorney General of Hawaii; Honolulu, Hawaii;
Linda Fang, Assistant Solicitor General of Counsel; Anisha
S. Dasgupta, Deputy Solicitor General; Barbara D.
Underwood, Solicitor General; Letitia James, Attorney
General, State of New York; New York, New York; Xavier
Becerra, California Attorney General, Sacramento,
California; Philip J. Weiser, Colorado Attorney General,
Denver, Colorado; William Tong, Connecticut Attorney
General, Hartford, Connecticut; Kathleen Jennings,
Delaware Attorney General, Wilmington, Delaware;
Kwame Raoul, Illinois Attorney General, Chicago, Illinois;
Aaron M. Frey, Maine Attorney General, August, Maine;
Brian E. Frosh, Maryland Attorney General, Baltimore,
Maryland; Maura Healey, Commonwealth of Massachusetts
Attorney General, Boston, Massachusetts; Keith Ellison,
Minnesota Attorney General, St. Paul, Minnesota; Aaron D.
Ford, Nevada Attorney General, Carson City, Nevada;
Gurbir S. Grewal, New Jersey Attorney General, Trenton,
New Jersey; Hector Balderas, New Mexico Attorney

HECOX V. LITTLE 11

General, Santa Fe, New Mexico; Joshua E. Stein, North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Salem, Oregon; Joshua Shapiro, Commonwealth of Pennsylvania Attorney General, Philadelphia, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Providence, Rhode Island; Thomas J. Donovan, Jr., Vermont Attorney General, Montpelier, Vermont; Mark R. Herring, Commonwealth of Virginia Attorney General, Richmond, Virginia; Robert W. Ferguson, Washington Attorney General, Olympia, Washington; Karl A. Racine, District of Columbia Attorney General, Washington, D.C.; for Amici Curiae States of New York, Hawaiʻi, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia.

Susan B. Manning, Morgan Lewis & Bockius LLP, Washington, D.C.; for Amici Curiae GLBTQ Legal Advocates & Defenders and the National Center for Lesbian Rights.

Abbey J. Hudson, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Amicus Curiae The Trevor Project Inc.

12                         HECOX V. LITTLE

**OPINION**

WARDLAW, Circuit Judge:

In March 2020, Idaho enacted the Fairness in Women's Sports Act, Idaho Code §§ 33-6201–06 (2020) (the "Act"), a first-of-its-kind categorical ban on the participation of transgender women and girls in women's student athletics. At the time, Idaho had no history of transgender women and girls participating in competitive student athletics, even though Idaho's interscholastic athletics organization allowed transgender girls to compete on female athletic teams under certain specified conditions. Elite athletic regulatory bodies, including the National Collegiate Athletic Association (NCAA) and the International Olympic Committee (IOC), also had policies allowing transgender women athletes to compete if they met certain criteria. The Act, however, bars all transgender girls and women from participating in, or even trying out for, public school female sports teams at every age, from primary school through college, and at every level of competition, from intramural to elite teams. *See* Idaho Code § 33-6203(1)–(2). The Act also provides a sex dispute verification process whereby any individual can "dispute" the sex of any female student athlete in the state of Idaho and require her to undergo intrusive medical procedures to verify her sex, including gynecological exams. *See* Idaho Code § 33-6203(3). Male student athletes in Idaho are not subject to a similar dispute process.

Today, we decide only the question of whether the federal district court for the District of Idaho abused its discretion in August 2020 when it preliminarily enjoined the Act, holding that it likely violated the Equal Protection Clause of the Fourteenth Amendment. Because the Act

subjects only women and girls who wish to participate in public school athletic competitions to an intrusive sex verification process and categorically bans transgender girls and women at all levels from competing on "female[], women, or girls" teams, Idaho Code § 33-6203(2), and because the State of Idaho failed to adduce any evidence demonstrating that the Act is substantially related to its asserted interests in sex equality and opportunity for women athletes, we affirm the district court's grant of preliminary injunctive relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.

As the district court noted, and as we recognize in this context, "such seemingly familiar terms as 'sex and gender' can be misleading," *Hecox v. Little*, 479 F. Supp. 3d 930, 945 (D. Idaho 2020) (quoting *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018)). We therefore adopt the terminology that has been employed throughout this case.

"Gender identity" is "the term used to describe a person's sense of being male, female, neither, or some combination of both."[1] A person's "sex" is typically assigned at birth based on an infant's external genitalia, though "external genitalia" do not always align with other sex-related characteristics, which include "internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics." A "transgender" individual's gender identity does not correspond to their sex assigned at birth, while a "cisgender" individual's gender identity corresponds

---

[1] Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 N. Eng. J. Med. 2451, 2451 (2019)

with the sex assigned to them at birth. Around two percent of the population are born "intersex," which is an umbrella term for people "born with unique variations in certain physiological characteristics associated with sex, such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response." *Id.* at 946 (internal quotation marks omitted).

Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older.[2] Youth ages 13 to 17 are significantly more likely to identify as transgender, with the Center for Disease Control (CDC) estimating that roughly 1.8 percent of high school students identify as transgender. *See* Br. of Amici Curiae Am. Acad. of Pediatrics, et al. ("AAP Br.") at 10.

Transgender individuals often experience "gender dysphoria," which is defined by the Fifth Edition of the Diagnostic and Statistics Manual of Mental Disorders (DSM-5) as a condition where patients experience "[a] marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics" that "is associated with clinically significant distress or impairment in social, occupation, or other important areas of functioning."[3] For over 30 years, medical professionals have treated individuals experiencing gender dysphoria following the protocols laid out in the *Standards of Care for*

---

[2] *See* Jody L. Herman, Andrew R. Flores, Kathryn K. O'Neill, *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Inst. 1 (2022).

[3] *See* Am. Psychiatric Ass'n, *Diagnostic and Statistics Manual of Mental Disorders* 452–53 (5th ed. 2013).

*the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7)*, which were developed by the World Professional Association for Transgender Health (WPATH).  AAP Br. at 19.

### B.

On March 16, 2020, Idaho passed House Bill 500 ("H.B. 500"), a categorical ban against transgender women and girls' participation in any public-school funded women's sport, implemented by subjecting all female athletes to an intrusive sex verification process if their gender is disputed by anyone. *See* H.R. 500, 65th Leg., 2d Reg. Sess. (Idaho 2020).  Although Idaho was the first state in the nation to issue such a ban, twenty other states have enacted similar—though perhaps not as potentially intrusive against all female athletes—restrictions on female transgender athletes.[4]

---

[4] Since the Act's passage, twenty other states have passed laws limiting the participation of transgender students in women's athletics.  However, no other state appears to have enacted an enforcement mechanism for those restrictions like the sex dispute verification process in the Act.  *See* Ala. Code § 16-1-52 (2021); Ariz. Rev. Stat. Ann. § 15-120.02 (2022); Ark. Code Ann. § 6-1-107 (West 2021); Fla. Stat. Ann. § 1006.205 (West 2021); Ind. Code Ann. § 20-33-13-4 (West 2022); Iowa Code Ann. § 261I.2 (West 2022); H.B. 2238, 2023 Leg. Sess. (Kan. 2023); Ky. Rev. Stat. Ann. § 164.2813 (West 2022); La. Stat. Ann. § 4:442 (2022); Miss. Code Ann. § 37-97-1 (West 2021); Mont. Code Ann. § 20-7-1306 (West 2021); Legis. Assemb. 1489, 68th Legis. Assemb., Reg. Sess. (N.D. 2023); Legis. Assemb. 1249, 68th Legis. Assemb., Reg. Sess. (N.D. 2023); Okla. Stat. Ann. tit. 70, § 27-106 (West 2022); S.C. Code Ann. § 59-1-500 (2022); S.D. Codified Laws § 13-67-1 (2022); Tenn. Code Ann. § 49-7-180 (2022); Tex. Educ. Code Ann. § 33.0834 (West 2022); Utah Code Ann. § 53g-6-902 (West 2022); W. Va. Code Ann. § 18-2-25d (West 2021); S. 92, 67th Leg., Gen. Sess. (Wyo. 2023).

In the United States, high school interscholastic athletics are generally governed by state interscholastic athletic associations, such as the Idaho High School Activities Association (IHSAA). The NCAA sets policies for member colleges and universities, including Boise State University (BSU) and other Idaho colleges and universities. Prior to the Act's passage, IHSAA policy allowed transgender girls in K–12 athletics in Idaho to compete on girls' teams after they had completed one year of hormone therapy suppressing testosterone under the care of a physician. At that time, NCAA policy similarly allowed transgender women attending member colleges and universities in Idaho (and elsewhere) to compete on women's teams after one year of hormone therapy to suppress testosterone.[5] Idaho itself had no record of transgender women and girls participating in competitive women's sports.

On February 13, 2020, Representative Barbara Ehardt introduced H.B. 500 in the Idaho House of Representatives. At the first hearing on the bill, Ty Jones, Executive Director of the IHSSA, testified that no student in Idaho had ever complained about participation in public school sports by transgender athletes, and no transgender athlete had ever competed in Idaho under the existing IHSSAA policy. Representative Ehardt herself acknowledged that she had no

---

[5] In April 2023, the NCAA updated its policy to require that transgender student-athletes meet the "sport-specific standard[s] (which may include testosterone levels, mitigation timelines and other aspects of sport-governing body policies)" of the national governing body of that sport. *See* Press Release, NCAA, Transgender Student-Athlete Participation Policy (April 17, 2023), https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (last visited May 23, 2023).

evidence to date that any person in Idaho had ever disputed an athlete's eligibility to play based on that athlete's gender.

After the bill passed out of the Idaho House Committee, Idaho Attorney General Lawrence Wasden warned in a written opinion letter to the House that H.B. 500 raised serious constitutional questions due to the legislation's disparate treatment of transgender and intersex athletes and the potential invasion of all female athletes' privacy inherent in the sex dispute verification process. Nevertheless, the bill proceeded to a debate and passed the House floor on February 26, 2020.

After passage by the House, H.B. 500 was heard by the Senate State Affairs Committee and sent to the entire Idaho Senate on March 10, 2020. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic and many states adjourned legislative sessions indefinitely. The Idaho Senate remained in session, however, and passed H.B. 500 as amended on March 16, 2020. The House concurred in the Senate amendments on March 18, and the bill was delivered to Idaho Governor Bradley Little on March 19, 2020.

As Governor Little considered the bill, critics sharply contested the legislation's findings and legality. Professor Dorianne Lambelet Coleman, whose work on testosterone and athletics was cited in the legislative findings in support of the bill, wrote to Governor Little urging him to veto the bill and explaining that her research was misinterpreted and misused in the legislative findings. Similarly, five former Idaho Attorneys General implored Governor Little to veto

the Act, labeling it a "legally infirm statute."**6** Nonetheless, Governor Little signed H.B. 500 into law on March 30, 2020, and it went into effect on July 1, 2020.

C.

In enacting H.B. 500, the legislature made several findings purportedly based on Professor Coleman's study, including "that there are 'inherent [biological] differences between men and women,'" Idaho Code § 33-6202(1) (quoting *United States v. Virginia (*"*VMI*"*)*, 518 U.S. 515, 533 (1996)), and that men have "higher natural levels of testosterone," *id.* § 33-6202(4), which "have lifelong effects, including those most important for success in sport," *id.* § 33-6202(5). Relying on Professor Coleman's work, the legislature found that "[t]he benefits that natural testosterone provides to male athletes is [sic] not diminished through the use of puberty blockers and cross-sex hormones." *Id.* § 33-6202(11). The legislature also found that "women's performances at the high[est] level [of athletics] will never match those of men." *Id.* § 33-6202(9) (quoting Valterie Thibault et al., *Women and Men in Sport Performance: The Gender Gap Has Not Evolved Since 1983*, 9 J. of Sports Sci. & Med. 214, 219 (2010)). The legislature concluded that "[h]aving separate sex-specific teams furthers efforts to promote sex equality" by "providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities, while also providing them with opportunities to obtain recognition and accolades, college

---

6 *See also* Tony Park et al., *5 Former Idaho Attorneys General Urge Transgender Bill Veto*, Idaho Statesman (Mar. 17, 2020), https://www.idahostatesman.com/opinion/readers-opinion/article241267071.html (last visited May 23, 2023).

scholarships, and numerous other long-term benefits that flow from success in athletic endeavors." *Id.* § 33-6202(12).

Three provisions of the Act are most salient to this appeal. First, the Act provides that "[i]nterscholastic, inter-collegiate, intramural, or club athletic teams or sports that are sponsored by a [public school]" should be organized "based on biological sex." *Id.* § 33-6203(1). It specifically provides that:

> Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public primary or secondary school, a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education shall be expressly designated as one (1) of the following based on biological sex:
>
> (a) Males, men, or boys;
>
> (b) Females, women, or girls; or
>
> (c) Coed or mixed.

*Id.* The Act then provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." *Id.* at § 33-6203(2) (the "categorical ban provision"). The Act's provisions apply to all levels of competition in Idaho state schools, including elementary school and club teams, and do not include any limitation for transgender individuals who wish to participate on athletic teams designated for men. Moreover, the provisions apply to students in nonpublic schools "whose

students or teams compete against a public school or
institution of higher education." *Id.* at § 33-6203(1).

Second, the Act creates a "sex verification" process to be
invoked by any individual who wishes to "dispute" a
student's sex, providing that:

> A dispute regarding a student's sex shall be
> resolved by the school or institution by
> requesting that the student provide a health
> examination and consent form or other
> statement signed by the student's personal
> health care provider that shall verify the
> student's biological sex. The health care
> provider may verify the student's biological
> sex as part of a routine sports physical
> examination relying only on one (1) or more
> of the following: the student's reproductive
> anatomy, genetic makeup, or normal
> endogenously produced testosterone levels.

*Id.* at § 33-6203(3) (the "sex dispute verification provision").

And third, the Act creates an enforcement mechanism to
ensure compliance with its provisions by establishing a
private cause of action for any student who is "deprived of
an athletic opportunity or suffers any direct or indirect harm
as a result of a violation of [the Act]." *Id.* at § 33-6205(1).

D.

On April 15, 2020, Lindsay Hecox ("Lindsay"), a
transgender woman who wishes to try out for the BSU
women's track and cross-country teams, and Jane Doe
("Jane"), a cisgender woman who plays on high school
varsity teams and feared that her sex would be "disputed"

under the Act due to her masculine presentation, filed this lawsuit against Governor Little, Idaho Superintendent of Public Instruction Sherri Ybarra, and various school officials at both the high school and collegiate level (collectively, "Idaho"). They sought a declaratory judgment that the Act violates Title IX and the United States Constitution, including the Equal Protection Clause, and preliminary and permanent injunctions against the Act's enforcement, as well as an award of costs, expenses, and reasonable attorneys' fees.

On May 26, 2020, Madison ("Madi") Kenyon and Mary ("MK") Marshall (collectively, "the Intervenors") were permitted to intervene in this case. Intervenors are cisgender women residing in Idaho and collegiate athletes who run track and cross-country on scholarship at Idaho State University. In 2019, both athletes competed against and lost to June Eastwood, a transgender woman athlete at the University of Montana, and found it a "discouraging" and "deflating" experience.

On April 30, 2020, Plaintiffs moved for preliminary injunctive relief based solely on their equal protection claims. The district court issued preliminary injunctive relief in August 2020, ruling that both Plaintiffs were likely to succeed on the merits of their equal protection claims and would suffer irreparable harm if the injunction was not granted, and that the balance of equities weighed in favor of an injunction. Idaho and the Intervenors (collectively, the "Appellants") timely appealed.

We first held oral argument in this appeal on May 3, 2021. At that time, Lindsay informed the court that she had tried out for and failed to make the women's track team and that she subsequently withdrew from BSU classes in late

October 2020.  Because the parties' arguments raised several unanswered factual questions as to whether Lindsay's claim was moot, we remanded the case to the district court for further factual development and findings on justiciability questions on June 24, 2021.

On July 18, 2022, the district court issued factual findings and concluded that Lindsay's claim was not moot. We affirmed the district court's determination that Lindsay's claim was not moot in a separate unanimous order issued on January 30, 2023. *See Hecox v. Little* (*Hecox II*), No. 20-35813, 2023 WL 1097255, at \*1 (9th Cir. Jan. 30, 2023).[7] We then asked the parties to brief us on which claims remained for decision in this appeal and any intervening authority.  The parties agree that the only issue that we must decide is whether the district court abused its discretion in issuing the preliminary injunction.

## II. STANDARD OF REVIEW

We review a district court's grant of a preliminary injunction for an abuse of discretion. *Olson v. California*, 62 F.4th 1206, 1218 (9th Cir. 2023).  That said, "legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it

---

[7] In our January order, we determined that Lindsay's claim was not moot when she withdrew from BSU in October 2020, because when she left she expressed a concrete plan to re-enroll and try out for BSU sports teams. *Hecox II*, 2023 WL 1097255 at \*1. Lindsay followed through on those plans by re-enrolling at BSU after she established Idaho state residency and training to participate in women's sports teams. *Id.* Indeed, Lindsay plans to try out again for the BSU women's cross-country and track teams in Fall 2023, and has been playing for the BSU women's club soccer team since Fall 2022. *Id.* at \*2.  Absent the preliminary injunction against the Act's enforcement, Lindsay would be banned from participating on the BSU women's club soccer team. *Id.*

HECOX V. LITTLE                    23

based its ruling on an erroneous view of law." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000)); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). We do "not 'determine the ultimate merits'" of the case, "but rather 'determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand.'" *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141–42 (9th Cir. 2018) (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015)). However, we will reverse a grant of the preliminary injunction if the district court "based its decision . . . on clearly erroneous findings of fact." *Does 1-5 v. Chandler*, 83 F.3d 1150, 1552 (9th Cir. 1996).

We review the scope of a preliminary injunction for an abuse of discretion. *California v. Azar*, 911 F.3d 558, 567 (9th Cir. 2018).

### III. PRELIMINARY INJUNCTION

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party,

these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### A.    Likelihood of Success on the Merits

The primary issue presented by this appeal is whether the district court abused its discretion in concluding that Lindsay was likely to succeed on the merits of her equal protection challenge.  The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The state may not discriminate against classes of people in an "arbitrary or irrational" way or with the "bare . . . desire to harm a politically unpopular group." *Id.* at 446–47.

When considering an equal protection claim, we determine what level of scrutiny applies to a classification under a law or policy, and then decide whether the policy at issue survives that level of scrutiny.  Our "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest," *id.* at 440, otherwise known as rational basis review.  However, as gender classifications "generally provide[] no sensible ground for differential treatment," *id.*, "'all gender-based classifications today' warrant 'heightened scrutiny.'" *VMI*, 518 U.S. at 555 (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)).  Under heightened scrutiny, "a party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification." *Id.* at 524 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

HECOX v. LITTLE                                    25

### *1.     Heightened scrutiny applies.*

The district court did not err in concluding that heightened scrutiny applies because the Act discriminates against transgender women by categorically excluding them from female sports, as well as on the basis of sex by subjecting all female athletes, but no male athletes, to invasive sex verification procedures to implement that policy.  Appellants contend that the Act classifies based only on sex, not "transgender status," and permissibly excludes "biological males" from female sports under our precedent.  *See, e.g.*, *Clark, ex rel. Clark v. Arizona Interscholastic Ass'n* ("*Clark I*"), 695 F.2d 1126, 1131–32 (9th Cir. 1982) (holding that excluding boys from a girls' high school volleyball team was permissible to redress past discrimination against women athletes and to promote equal opportunity for women).  We conclude that while the Act certainly classifies on the basis of sex, it also classifies based on transgender status, triggering heightened scrutiny on both grounds.

a.   The Act discriminates based on transgender status.

Appellants argue that the Act does not discriminate based on transgender status because "[t]he distinction and statutory classification is based entirely on [biological] sex, not gender identity."  They assert that the Act's definition of "biological sex" describes only the "physiological differences between the sexes relevant to athletics."  But the Act explicitly references transgender women, as did its legislative proponents, and its text, structure, purpose, and effect all demonstrate that the Act categorically bans transgender women and girls from public school sports teams that correspond with their gender identity.

Section 33-6202 straightforwardly sets forth the "legislative findings and purpose" of the Act, and makes

clear that its animating purpose was to ban transgender women from "biologically female" teams. These findings explicitly discuss transgender women athletes by stating that "a man [sic] who identifies as a woman and is taking cross-sex hormones 'had an absolute advantage' over female athletes," and noting that "[t]he benefits that natural testosterone provides to male athletes is [sic] not diminished through the use of puberty blockers and cross-sex hormones." Idaho Code § 33-6202(11).

During the legislative debate on H.B. 500, the Act's supporters stated repeatedly that the Act's purpose was to ban transgender women athletes from participating on female athletic teams in Idaho. Representative Ehardt, who introduced the bill, characterized the law as a "preemptive" strike that would allow Idaho to "remove [transgender women] and replace them with the young gal that should have been on the team." Representative Ehardt reiterated that the Act would require transgender women to "compete on the side of those biological boys and men with whom they look or, about whom they look alike." Much of the legislative debate centered around two transgender women athletes running track in Connecticut high schools, as well as one running college track in Montana, and the potential "threat" those athletes presented to female athletes in Idaho. When the then-Idaho Attorney General Wasden expressed concerns about the Act's constitutionality, he expressly described it as "targeted toward transgender and intersex athletes."

The plain language of section 33-6203 bans transgender women from "biologically female" teams. The Act divides sports teams into three categories based on biological sex: "(a) Males, men, or boys; (b) Females, women, or girls; or (c) Coed or mixed." *Id.* § 33-6203(1). Sports designated for

"females, women, or girls" are not open to students of the
male sex.   *Id.* § 33-6203(2).   And the methods for
"verify[ing] the student's biological sex" are restricted to
"reproductive anatomy, genetic makeup, or normal
endogenously produced testosterone levels."   *Id.* § 33-
6203(3).  However, most gender-affirming medical care for
transgender females, especially minors, will not or cannot
alter the characteristics described in the only three
verification methods prescribed by the Act, thus effectively
banning transgender females from female sports.  As the
district court determined, "the overwhelming majority of
women who are transgender have XY chromosomes," which
indicate the male sex, and transgender women cannot change
that genetic makeup when they transition.  *Hecox*, 479 F.
Supp. 3d at 984.  Similarly, as medical expert Dr. Deanna
Adkins opined, many transgender women and girls do not
undergo gender-affirming genital surgery to alter their
external "reproductive anatomy," often because they cannot
afford it or it is inappropriate for their individual needs.

Further, because surgery cannot change transgender
women's internal reproductive anatomy by creating ovaries,
Dr. Adkins testified that transgender women "typically
continue to need estrogen therapy" even after surgery and
can never alter their "endogenously produced"—or naturally
produced—testosterone levels.  By contrast, the Act does *not*
allow sex to be verified by a transgender woman's levels of
circulating testosterone, which can be altered through
medical treatment.  A transgender woman like Lindsay, for
example, can lower her circulating testosterone levels
through hormone therapy to conform to elite athletic
regulatory guidelines, but cannot currently alter the
endogenous testosterone that her body naturally produces.
Yet the district court found and the record before it supports

that circulating testosterone is the "one [sex-related] factor
that a consensus of the medical community appears to agree"
actually affects athletic performance.  *Id.*

Appellants suggest that "biological sex" is a neutral and
well-established medical and legal concept, rather than one
designed precisely by the Idaho legislature to exclude
transgender and intersex people.[8]  But the Act's definition of

---

[8] In supplemental briefing, Appellants also argue that the Supreme
Court's recent decisions in *Dobbs v. Jackson Women's Health Org.*, 142
S. Ct. 2228 (2022) and *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142
S. Ct. 2111 (2022) "are fatal to Hecox's claim" because the ratifiers of
the Fourteenth Amendment would have understood "male" to
correspond to the definition of "biological male" written into the Act.
We fail to see how *Dobbs*, a substantive due process decision about
whether the federal Constitution protects a woman's right to obtain an
abortion, and *Bruen*, a Second Amendment decision about gun rights, are
relevant to an equal protection claim based on sex discrimination, unless
Appellants are suggesting that the Framers would have understood the
term "biological sex" by reference to reproductive anatomy, genetic
make-up, or normal endogenously produced testosterone levels.  Indeed,
the ratifiers of the Fourteenth Amendment would certainly not have
understood the Act's definition of "biological sex."  For example, the
drafters of the Fourteenth Amendment would have had no concept of
what "endogenously produced testosterone levels" meant in 1868,
because testosterone was not named and isolated as a hormone until
1935.  *See* John M. Tomlinson, *The Testosterone Story*, Trends in
Urology & Men's Health 34, 35 (2012).  Similarly, the ratifiers would
not have understood how "genetic makeup" influences sex, as
chromosomes were first discovered by Walther Flemming in 1882.  D.W.
Rudge, *The Man Who Invented the Chromosome*, 97 Heredity 136, 136
(2006) (reviewing Oren Harman, *The Man Who Invented the
Chromosome: A Life of Cyril Darlington* (2004)).

Moreover, there is evidence that transgender people have existed since
ancient times.  *See generally* Lauren Talalay, *The Gendered Sea:
Iconography, Gender, and Mediterranean Prehistory*, *in* THE
ARCHEOLOGY OF MEDITERRANEAN PREHISTORY 130–33 (Emma Blake

"biological sex" is likely an oversimplification of the complicated biological reality of sex and gender. As Dr. Joshua Safer, Executive Director of the Center for Transgender Medicine and Surgery at Mount Sinai, explained in his declaration, citing the Endocrine Society Guidelines:

> The phrase "biological sex" is an imprecise term that can cause confusion. A person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity. These attributes are not always aligned in the same direction.

Indeed, two percent of all babies are born "intersex," or with "a wide range of natural variations in physical traits— including external genitals, internal sex organs,

---

& A. Bernard Knapp eds., 2005). Appellants appear to argue that because transgender people were marginalized in 1868, they should be afforded no constitutional protections on the basis of their transgender status. But this argument would undermine decades of Supreme Court precedent striking down laws that discriminate on the basis of sex. *See Reed v. Reed*, 404 U.S. 71, 76 (1971) (holding that an Idaho statute that preferenced men as administrators of estates "ma[d]e the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment"); *Frontiero v. Richardson*, 411 U.S. 677, 687 (1973) ("[S]tatutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members."); *see also Weinberger v. Weisenfeld*, 420 U.S. 636, 645 (1975); *Craig v. Boren*, 429 U.S. 190, 210 (1976); *Duren v. Missouri*, 439 U.S. 357, 360 (1979); *VMI*, 518 U.S. at 519.

chromosomes, and hormones—that do not fit typical binary notions of male and female bodies." Br. of Amici Curiae InterACT at 3–4. Intersex people who identify as women are equally banned under the Act from playing on Idaho women's teams. And while scientists are not fully certain why some people identify as transgender, it appears likely that there is some biological explanation—such as gestational exposure to elevated levels of testosterone—that causes certain individuals to identify as a different gender than the one assigned to them at birth. *See* AAP Br. at 14.

We have previously rejected an argument like Appellants raise here—that because section 33-6203 uses "biological sex" in place of the word "transgender," it is not targeted at excluding transgender girls and women. In *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), we held that Idaho and Nevada laws that banned same-sex marriage discriminated on the basis of sexual orientation, even though the laws did so by classifying couples based on "procreative capacity" instead of sexual orientation. *Id.* at 467–68. We explained:

> Effectively if not explicitly, [defendants] assert that while these laws may disadvantage same-sex couples and their children, heightened scrutiny is not appropriate because differential treatment by sexual orientation is an incidental effect of, but not the reason for, those laws. However, the laws at issue distinguish on their face between opposite-sex couples, who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose marriages are not recognized. Whether facial

discrimination exists "does not depend on why" a policy discriminates, "but rather on the explicit terms of the discrimination." Hence, while the procreative capacity distinction that defendants seek to draw could represent a *justification* for the discrimination worked by the laws, it cannot overcome the inescapable conclusion that Idaho and Nevada do discriminate on the basis of sexual orientation.

*Id.* at 467–68 (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Here, the Act's use of "biological sex" functions as a form of "[p]roxy discrimination." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). The definition of "biological sex" in the Act is written with "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Id.*; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination . . . ."). The Act's specific classification of "biological sex" has similarly been carefully drawn to target transgender women and girls, even if it does not use the word "transgender" in the definition.

*Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.* (*"Adams"*), 57 F.4th 791 (11th Cir. 2022) (en banc), upon

which Appellants rely to support their argument that the Act
does not discriminate against transgender girls or women, is
inapposite. There, the Eleventh Circuit upheld a lower court
order rejecting an equal protection challenge to a K-12
school policy that provided female, male, and sex-neutral
bathrooms and required male students to use the male-
designated bathrooms, female students to use the female
bathrooms, and accommodated transgender students with
the sex-neutral bathrooms. *See id.* at 797. The policy
defined "male" and "female" as the gender identified on a
student's birth certificate. *See id.* The Eleventh Circuit
rejected the argument that the policy unconstitutionally
discriminated on the basis of transgender status because it
was "substantially related" to the school district's important
interest in securing its pupils' privacy and welfare and was
not targeted at transgender students—at most, it had a
disparate impact upon them which did not rise to the level of
a constitutional violation because no animus was shown. *See
id.* at 811. Importantly, in *Adams*—as opposed to here—
there was "no [record] evidence suggesting that the School
Board enacted the [] policy because of . . . its adverse effects
upon transgender students." *Id.* at 810 (second alteration in
original) (internal quotation marks omitted). To the contrary,
the school district in *Adams* had studied the issues raised by
the LGBTQ community and had also enacted policies that
affirmatively accommodated transgender students.[9]
Moreover, bathrooms by their very nature implicate

---

[9] Although *Adams* is plainly distinguishable, we express no view on the
merits of the decision.

important privacy interests and are not the equivalent of athletic teams.[10]

Appellants likewise misrely on a footnote in *Geduldig v. Aiello*, 417 U.S. 484 (1974), for the proposition that a legislative classification based on biological sex is not a classification based on transgender status. *See id.* at 496 n.20. In *Geduldig*, the Supreme Court stated that a classification based on pregnancy is not per se a classification based on sex, even though "it is true that only women can become pregnant." *Id.* However, the Court held that "distinctions involving pregnancy" that are "mere pretexts designed to effect an invidious discrimination" are subject to heightened scrutiny. *Id.* Here, it appears that the definition of "biological sex" was designed precisely as a pretext to exclude transgender women from women's athletics—a classification that *Geduldig* prohibits.

Finally, Appellants contend that the Act does not discriminate based on transgender status because the "Act does *not* prohibit biologically female athletes who identify as male from competing on male sports teams consistent with their gender identity." But a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others. *See, e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977) (holding that singling out some but not all undocumented immigrants for discrimination constituted a "classification based on alienage"); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976)

---

[10] For one, the functions of the bathroom are intended to be private, unlike sporting events.

("That the statutory classifications challenged here discriminate among illegitimate children does not mean, of course, that they are not also properly described as discriminating between legitimate and illegitimate children.").

b. Heightened scrutiny applies because the Act discriminates on the basis of transgender status.

We have previously held that heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a "quasi-suspect class." *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019).

In *Karnoski*, we reviewed an injunction against the implementation of a 2017 Presidential Memorandum and Departments of Defense and Homeland Security policies that effectively precluded transgender individuals from serving in the U.S. military. *Id.* at 1189. The district court had applied strict scrutiny in enjoining the policy, while the government argued that the policy should be reviewed under a rational basis standard. *Id.* at 1200. We held that because the implementing policy "on its face treats transgender persons differently than other persons . . . something more than rational basis but less than strict scrutiny applies." *Id.* at 1201. We therefore adopted the heightened scrutiny approach of *VMI* and *Witt v. Dep't of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008), to review the military's ban on transgender persons who experienced gender dysphoria or who have undergone gender transition.[11] *Id.* We are thus

---

[11] The Supreme Court determined in *VMI* that for "cases of official classification based on gender" a reviewing court must apply a "heightened review standard" and determine whether the state has demonstrated an "exceedingly persuasive justification" for the

compelled to review the constitutionality of the Act under heightened scrutiny as it classifies based on transgender status.

Moreover, discrimination on the basis of transgender status is a form of sex-based discrimination. It is well-established that sex-based classifications are subject to heightened scrutiny. *See VMI*, 518 U.S. at 533–34. The Supreme Court recently held in the Title VII context that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1741 (2020).[12] Indeed, "[m]any courts . . . have held that various forms of discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (applying heightened scrutiny to a bathroom policy); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

---

classification. 518 U.S. at 533–34. In *Witt*, we applied a "heightened scrutiny" approach to the military's "Don't Ask, Don't Tell" policy for gay and lesbian servicemembers, determining that "when the government attempts to intrude upon the personal and private lives of homosexuals . . . the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest." 527 F.3d at 819.

[12] *See also* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41571 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106) (clarifying that "discrimination on the basis of sex" under Title IX includes discrimination based on "sex stereotypes, sex characteristics . . . and gender identity").

858 F.3d 1034, 1051 (7th Cir. 2017), *abrogated on other grounds, Illinois Republican Party v. Pritzker*, 972 F.3d 760 (7th Cir. 2020) (same); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670–71 & n.4 (8th Cir. 2022) (applying heightened scrutiny to affirm a preliminary injunction against a law that prohibited "gender transition procedures" because the law discriminated on the basis of sex); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022) (applying heightened scrutiny to a law that prohibited various medical treatments for gender dysphoria in minors).[13]

> c.   Heightened scrutiny applies because the Act discriminates against all Idaho female student athletes.

In addition to discriminating on the basis of transgender status, the Act discriminates on the basis of sex, because only women and girls who want to compete on Idaho school athletic teams, and not male athletes, are subject to the sex dispute verification process.  The Act expressly states that only "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex."  Idaho Code § 33-6203(2).  The Act does not ban "biological females" from "teams or sports designated for males."  Therefore, transgender and cisgender men who compete on male-designated teams are not subject to the sex

---

[13] Both Idaho and the Intervenors note that the Eleventh Circuit expressed "grave doubt" in a footnote in *Adams* that transgender people constitute a "quasi-suspect class."  *Adams*, 57 F.4th at 803 n.5 (internal quotation marks omitted).  This dicta is unpersuasive, as the Eleventh Circuit declined to decide the issue or further opine on its "doubts."  In any event, as a three-judge panel we cannot overrule the binding precedent of our circuit.  *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

dispute verification process. The sex dispute verification
process simply does not apply to male athletes.[14]

The Act thus classifies on the basis of sex by subjecting
only women and girls, whether cisgender or transgender, to
the risk and humiliation of having their sex "disputed" and
then suffering intrusive medical testing as a prerequisite for
participation on school sports teams. And where women and
girls are subject to separate requirements for educational
opportunities that are "unequal in tangible and intangible"
ways from those for men, those requirements are tested
under heightened scrutiny. *VMI*, 518 U.S. at 547.

*2.     The Act likely does not survive heightened scrutiny.*

The district court correctly concluded that neither the
categorical ban nor sex dispute verification provisions likely
survive heightened scrutiny. Heightened scrutiny is a
"demanding" standard, with the burden "rest[ing] entirely on
the State" to demonstrate an "exceedingly persuasive"
justification for its differential treatment. *VMI*, 518 U.S. at

---

[14] While the ban discriminates on the basis of transgender status, it is
important to discuss how it discriminates against all young women and
girls. The partial concurrence reads the sex dispute verification
provision as applicable to men and boys who wish to participate on
women and girls' teams. But this contention disregards that, as the
concurrence itself elsewhere acknowledges, "[e]xisting rules already
prevented boys from playing on girls' teams before the Act." Partial
Concurrence at 66 (quoting *Hecox*, 479 F. Supp. 3d at 982). The record
is devoid of any evidence of "men and boys who wish to participate on
teams designated for women or girls," *id.* at 72, in Idaho. However, if
they exist, male-identifying students who wish to play on girls' teams
will never be subject to the sex dispute verification process, because they
are already banned from participation in women's teams by virtue of
their identity under existing IHSSA policies. Only women and girls will
be subject to the degrading specter of having their sex disputed and
undergoing invasive and unnecessary medical testing.

533.  To survive heightened scrutiny, the government must
demonstrate "that the [challenged] classification serves
important governmental objectives and that the
discriminatory means employed are substantially related to
the achievement of those objectives."  *Id.* at 516 (alteration
in original) (internal quotation marks and citations omitted).
Our review under heightened scrutiny is an extremely fact-
bound test, requiring us to "examine [a policy's] actual
purposes and carefully consider the resulting inequality to
ensure our most fundamental institutions neither send nor
reinforce messages of stigma or second-class status."
*SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471,
483 (9th Cir. 2014).

Appellants contend that, "[d]ue to the average
physiological differences" between men and women, the Act
substantially advances the important state interest of
"promot[ing] sex equality . . . by providing opportunities for
female athletes to demonstrate their skill, strength, and
athletic abilities [and] opportunities to obtain recognition
and accolades, college scholarships, and the numerous other
long-term benefits that flow from success in athletic
endeavors."    Idaho Code § 33-6202(12).    We have
previously held that furthering women's equality and
promoting fairness in female athletic teams is an important
state interest.  *Clark I*, 695 F.2d at 1131.  However, on the
record before us, the district court correctly determined that
the Act's means—categorically banning transgender women
and girls from all female athletic teams and subjecting all
female athletes to intrusive sex verification procedures—are
not substantially related to, and in fact undermine, those
asserted objectives.

a.  *Clark I* and *Clark II* do not control the outcome of
Lindsay's claim.

Our decisions in *Clark I* and *Clark ex rel. Clark v.
Arizona Interscholastic Ass'n*, 886 F.2d 1191 (9th Cir. 1989)
("*Clark II*") are inapposite.  In *Clark I* and *Clark II*, we held
that public high schools could constitutionally prohibit male
student athletes from participation on women's teams in
order to further the important government interest of
"redressing past discrimination against women in athletics
and promoting equality of opportunity between the sexes."
*Clark I*, 695 F.2d at 1131.

Specifically in *Clark I*, we held that an Arizona
Interscholastic Association policy that separated high school
volleyball teams by gender and prohibited boys from playing
on girls' teams did not violate the Equal Protection Clause.
*Clark I*, 695 F.2d at 1127.  There, Clark wished to play on
the girls' volleyball team because his particular high school
did not offer boys' volleyball teams.  *Id.*  We first recognized
that, in applying heightened scrutiny, "the Supreme Court is
willing to take into account actual differences between the
sexes, including physical ones." *Id.* at 1229 (citing *Michael
M. v. Sonoma Cnty. Superior Ct.*, 450 U.S. 464, 468–69
(1981) (upholding a statutory rape statute that held only
males culpable because only women can become pregnant,
thus furthering the government's interest in preventing teen
pregnancy)).  We concluded that general gender separation
in school sports was substantially related to the
government's interest in women's equality in athletics.  *Id.*
at 1131.  We reasoned that "due to average physiological
differences, males would displace females to a substantial
extent if they were allowed to compete for positions on the
volleyball team." *Id.*  Thus, if men were allowed to compete
on the women's teams, women's overall athletic

opportunities would decrease, while men's overall athletic opportunities would remain greater than women's.

Eight years later, in *Clark II*, the original *Clark I* plaintiff's brother brought a second "mystifying" action challenging the same policy, arguing that the state "ha[d] been wholly deficient in its efforts to overcome the effects of past discrimination against women in interscholastic athletics, and that this failure vitiate[d] its justification for a girls-only volleyball team." *Clark II*, 886 F.2d at 1193. Applying *Clark I*, we affirmed that the gender classification for Arizona school sports was constitutional. *Id.* at 1194.

Appellants argue that "[t]he only difference between Hecox and the Clark brothers is gender identity," which does not change the physiological advantages that "biological males" have over cisgender women. But this is a false assumption. First, Lindsay takes medically prescribed hormone therapy to suppress her testosterone and raise her estrogen levels. This treatment has lowered her circulating testosterone levels—which impact athletic prowess and have slowed her racing times by at least "five to ten percent"— and her testosterone levels were "well below the levels required to meet NCAA eligibility for cross country and track" in Fall 2022, as the district court found. *See Hecox*, 479 F. Supp. 3d at 946. Lindsay's treatment has dramatically altered her bodily systems and secondary sex characteristics. As the district court found, "it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women," unlike the cisgender boys at issue in *Clark I* and *Clark II*. *Id.* at 978.

Second, as the district court noted, transgender women, "like women generally . . . have historically been discriminated against, not favored." *Id.* at 977. A recent

study by the CDC concluded that "transgender students
reported significantly higher incidents of being bullied,
feeling unsafe traveling to or from school, being threatened
with a weapon at school, and being made to engage in
unwanted sexual relations." Br. of Amici Curiae GLBTQ
Legal Advocates & Defenders and the National Center for
Lesbian Rights, at 9; *see also Whitaker*, 858 F.3d at 1051
("There is no denying that transgender individuals face
discrimination, harassment, and violence because of their
gender identity."). Unlike the policy in *Clark I*, the Act
perpetuates historic discrimination against both cisgender
and transgender women by categorically excluding
transgender women from athletic competition and subjecting
all women to an invasive sex dispute verification process.

Moreover, the district court correctly found that "under
the Act, women and girls who are transgender will not be
able to participate in any school sports, unlike the boys in
*Clark I*, who generally had equal [or greater] athletic
opportunities." *Hecox*, 479 F. Supp. 3d at 977. Here, unlike
in *Clark I*, transgender women are not being denied one
"particular opportunity" to participate on women's teams
even though their "overall opportunity is not inferior" to that
of women. *Clark I*, 695 F.2d at 1126. As a practical matter,
the Act bars transgender women and girls in Idaho from all
participation in student athletics—under its explicit terms,
they cannot play on teams that conform to their transgender
status. The argument advanced by Representative Ehardt
that the Act does not discriminate against transgender
women because they can still play on men's teams is akin to
the argument we rejected in *Latta*, that same-sex marriage
bans do not discriminate against gay men because they are
free to marry someone of the opposite sex. *See Latta*, 771
F.3d at 467 (holding unconstitutional two marriage bans that

"distinguish on their face between opposite-sex couples who
are permitted to marry and whose out-of-state marriages are
recognized, and same-sex couples, who are not permitted to
marry and whose marriages are not recognized").     As
medical expert Dr. Jack Turban stated, "forcing [transgender
students] to play on a sports team that does not match their
gender identity would damage their mental health" by
"forcing them to express themselves as cisgender." Lindsay
declared that she would never compete on a men's team, as
it would be "embarrassing and painful to be forced onto a
team for men—like constantly wearing a big sign that says
'this person is not a "real" woman.'"

The district court also found that, on the record before it,
"transgender women have not and could not 'displace'
cisgender women in athletics 'to a substantial extent.'"
*Hecox*, 479 F. Supp. 3d at 977 (quoting *Clark I*, 695 F.2d at
1131).  Appellants misrely on a single line from *Clark II* to
argue that the participation of just one transgender woman
on a team risks displacing any individual cisgender woman:
"If males are permitted to displace females on the school
volleyball team even to the extent of one player like Clark,
the goal of equal participation by females in interscholastic
athletics is set back, not advanced." *Clark II*, 886 F.2d at
1193.  This statement, however, was made in response to the
argument in *Clark II* that because sex separation had not
fully met Arizona's goal of equality of participation in
sports, Arizona no longer had an important interest in the
policy.  We did not think Clark's proposed remedy for the
inequality of opportunities for female athletes—allowing
him to play on the girls' teams—would advance the "goal of
equal participation by females in interscholastic sports." *Id.*
Because transgender women represent about 0.6 percent of
the general population, the district court did not err in finding

it unlikely that they would displace cisgender women from women's sports.

b. The categorical ban provision likely fails heightened scrutiny.

Nor did the district court clearly err, *see Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022), in finding that the Act's categorical ban provision failed heightened scrutiny because it was not substantially related to its stated goals of equal participation and opportunities for women athletes. The district court found that the categorical ban provision did not advance its asserted objectives for three reasons, none of which were "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (citation omitted). Moreover, the Act's sweeping prohibition on transgender female athletes in Idaho—encompassing all students, regardless of whether they have gone through puberty or hormone therapy, and without any evidence of transgender athletes displacing female athletes in Idaho—is too overbroad to satisfy heightened scrutiny.

First, the district court found that there was scientifically "no evidence to suggest a categorical bar against a transgender female athlete's participation in sports is required in order to promote 'sex equality' or to 'protect athletic opportunities for females' in Idaho." *Hecox*, 479 F. Supp. 3d at 978–79. Appellants argue that the district court misread the available medical evidence, which they contend demonstrates that endogenous testosterone levels give "biological males" a permanent athletic advantage over cisgender women. However, the district court did not err by relying upon the testimony of a medical expert, Dr. Safer, who testified that there was a medical consensus that the

"primary known driver of differences in athletic
performance between elite male athletes and elite female
athletes" is "the difference in [circulating] testosterone"
levels, as opposed to "endogenously produced" testosterone
levels, and "[a] person's genetic make-up and internal and
external reproductive anatomy are not useful indicators of
athletic performance and have not been used in elite
competition for decades." The district court credited Dr.
Safer's opinion that a transgender woman who endured
hormone therapy to lower her circulating levels of
testosterone would likely not have different "physiological
characteristics" than a cisgender woman that would lead to
enhanced athletic prowess.

Appellants presented contrary medical testimony by Dr.
Gregory Brown that hormone therapy suppression did not
eliminate all of the physiological advantages that an
individual experiences through male puberty. However, as
the district court found, Dr. Brown's opinion was not
supported by the studies he relied upon, because the majority
of the studies he cited discussed the average differences
between male and female athletes in general, not the
difference between transgender and cisgender women
athletes. And one study that he cited—the Handelsman
study—actually came to the opposite conclusion, concluding
that "evidence makes it highly likely that the sex difference
*in circulating testosterone* of adults explains most, if not all,
of the sex differences in sporting performance."

The studies that the Idaho legislature relied upon to
conclude that the benefits of "natural testosterone" could not
be diminished through hormone therapy were likewise
flawed. For example, one of the studies was altered after
peer review to remove its conclusions regarding transgender
athletes, and, as Idaho admits, that "study and its findings

were not based specifically on transgender athletes." The legislature also relied on a study by Professor Coleman, who personally urged Governor Little to veto the bill because the legislature misinterpreted her work.

Moreover, as the district court found, the Act sweeps much more broadly than simply excluding transgender women who have gone through "endogenous puberty." The Act's categorical ban includes transgender students who are young girls in elementary school or even kindergarten. Other transgender women take puberty blockers and never experience endogenous puberty, yet the Act indiscriminately bars them from participation in women's student athletics, regardless of their testosterone levels. Although the scientific understanding of transgender women's potential physiological advantage is fast-evolving and somewhat inconclusive, we are limited to reviewing the record before the district court. And the record in this case does not ineluctably lead to the conclusion that all transgender women, including those like Lindsay who have gone through hormone therapy, have a physiological advantage over cisgender woman.

Second, as the district court found, there was very little anecdotal evidence at the time of the Act's passage that transgender women had displaced or were displacing cisgender women in sports or scholarships or like opportunities. In 2020, both the IOC and the NCAA required transgender women to suppress their testosterone for only a year for eligibility to compete on women's teams.**[15]** The

---

[15] Although today the IOC and NCAA policies evaluate eligibility for transgender participation in athletics on a sport-by-sport basis, neither policy endorses the categorical exclusion of transgender women. They instead favor an "evidence-based approach" with "no presumption of

record before the district court includes anecdotal evidence
of only four transgender athletes who had ever competed in
cisgender women's sports, including two high school
runners who competed in Connecticut and were
subsequently defeated by cisgender women in competition.
While the Intervenors state they were defeated by a
transgender athlete, June Eastwood, in a running
competition at the University of Montana, Eastwood
eventually lost to a different cisgender athlete in that same
competition.    Lindsay's own athletic career belies the
contention that transgender women who have undergone
male puberty have an absolute advantage over cisgender
women: she has never qualified for BSU's track team despite
trying out in Fall 2020.

There is likewise no evidence in the record of a
transgender woman receiving an athletic scholarship over a

---

advantage." Int'l Olympics Comm., *IOC Framework on Fairness,
Inclusion and Non-Discrimination on the Basis of Gender Identity and
Sex          Variations          4          (2021),
https://stillmed.olympics.com/media/Documents/Beyond-the-
Games/Human-Rights/IOC-Framework-Fairness-Inclusion-Non-
discrimination-2021.pdf#page=4 (last visited June 6, 2023); *see also*
Nat'l Collegiate Athletics Ass'n, *Transgender Student-Athlete
Participation     Policy     (April     17,     2023),
https://www.ncaa.org/sports/2022/1/27/transgender-participation-
policy.aspx (last visited May 24, 2023). And while the World Athletics
Council, the international governing body for track and field, recently
adopted a more stringent policy of categorically excluding post-
pubescent transgender women from elite athletic competitions, its policy
does not bar transgender women who have not experienced endogenous
puberty from eligibility. *See* Press Release, World Athletics Counsel,
World Athletics Council Decides on Russia, Belarus, and Female
Eligibility (Mar. 23, 2023), https://worldathletics.org/news/press-
releases/council-meeting-march-2023-russia-belarus-female-eligibility
(last visited May 24, 2023).

cisgender woman in Idaho. Moreover, as the district court
noted, the Act's broad sweep—banning transgender
women's participation not just in high school and college
athletics, but elementary school and club sports—"belies any
genuine concern with an impact on athletic scholarships,"
which are relevant to only a small portion of the competitive
teams encompassed by the Act. *Hecox*, 479 F. Supp. 3d at
983.

Of course, when applying heightened scrutiny, we "must
accord substantial deference to the predictive judgments" of
legislative bodies. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S.
622, 665 (1994). But this does not "insulate[]" predictive
judgments "from meaningful judicial review altogether." *Id.*
at 666. "[U]nsupported legislative conclusions as to whether
particular policies will have societal effects of the sort at
issue in this case—determinations which often, as here,
implicate constitutional rights—have not been afforded
deference by the [Supreme] Court." *Latta*, 771 F.3d at 469;
*see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 784 (9th
Cir. 2014) ("[T]he absence of any credible showing that the
[challenged law] addressed a particularly acute problem"
was "quite relevant" to a showing that the law did not
survive heightened scrutiny.). A vague, unsubstantiated
concern that transgender women might one day dominate
women's athletics is insufficient to satisfy heightened
scrutiny.

Third, the district court questioned the Act's true
objectives, ruling that Idaho's interest was not in "promoting
sex equality" but "excluding transgender women and girls
from women's sports entirely." *Hecox*, 469 F. Supp. 3d at
983. Before the Act's passage, the existing NCAA and Idaho
state rules governed transgender women's participation as
measured by circulating testosterone levels, and there was

no record evidence that transgender women and girls threatened to dominate female student athletics. The record indicates that Idaho may have wished "to convey a message of disfavor" toward transgender women and girls, who are a minority in this country. *See Latta*, 771 F.3d at 476. And "[t]his is a message that Idaho . . . simply may not send" through unjustifiable discrimination.**[16]** *Id.* at 476.

---

[16] Other federal and state courts have enjoined transgender sports bans, and no categorical ban has yet been upheld on appeal. *See Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *1 (D. Ariz. July 20, 2023) (granting a preliminary injunction against Arizona's categorical ban under the Equal Protection Clause and Title IX); *A.M. by E.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950, 969 (S.D. Ind. July 26, 2022), *appeal dismissed*, No. 22-2332, 2023 WL 371646, at *1 (7th Cir. Jan. 19, 2023) (granting a preliminary injunction against transgender participation in athletics under Title IX); *Roe v. Utah High School Activities Ass'n*, No. 220903262, 2022 WL 3907182, at *1 (Utah Dist. Ct. Aug. 19, 2022) (granting a preliminary injunction against a categorical ban under the Utah Constitution's equivalent of an equal protection clause); *see also Barrett v. State of Mont.*, No. DV-21-581B, at *5–7 (Mont. Dist. Ct. Sept. 14, 2022) (granting summary judgment against a categorical ban on the ground that only Montana public university officials have the authority to regulate athletic competition in public universities).

We note that in *B. P. J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D.W. Va. 2021), a district court enjoined West Virginia's similar categorical ban, finding that B.P.J., a twelve-year-old transgender girl who wished to play middle school athletics, was likely to succeed on the merits of her equal protection and Title IX claims. *See id.* at 353–57. In January 2023, the district court reversed course and granted summary judgment to the state, dissolving the injunction and holding that the state's definition of "biological sex" was "substantially related to athletic performance and fairness in sports." *B. P. J. v. W. Va. State Bd. of Educ.*, No. 21-00316, 2023 WL 111875, at *8 (S.D.W. Va. Jan. 5, 2023). The Fourth Circuit stayed the district court's January order pending appeal, and the Supreme Court denied the application to vacate that injunction.

We must "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 137 582 U.S. 47, 63 n.13 (2017). While the Act purports to further athletic opportunities for Idaho's female students, the district court correctly concluded that the Act does not further this goal, and in fact "appears unrelated to the interests the Act purportedly advances." *Hecox*, 470 F. Supp. 3d at 979. And "[i]ntentional discrimination on the basis of gender by state action violates the Equal Protection Clause[] where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994). Thus, we need not and do not decide what policy would justify the exclusion of transgender women and girls from Idaho athletics under the Equal Protection Clause, because the total lack of means-end fit here demonstrates that the Act likely does not survive heightened scrutiny.

c.  The sex dispute verification provision likely fails heightened scrutiny.

The district court also correctly concluded that the sex verification provision likely failed heightened scrutiny because Idaho failed to demonstrate an "exceedingly persuasive justification," *VMI*, 518 U.S. at 534, for subjecting only young women and girls to the humiliating and intrusive burden of the sex verification process.**[17]**

---

*See W. Va. v. B. P. J., by Jackson*, 143 S. Ct. 889 (2023). As of this writing, transgender girls such as B. P. J. may participate in West Virginia school athletics.

[17] Idaho contends that we should dismiss the challenge to the sex dispute verification provision of the Act, because the district court primarily analyzed the provision's constitutionality as to Jane's claim, which the

Under the Act, anyone—be it a teammate, coach, parent, or a member of an opposing team—may "dispute" a player's "biological sex," requiring that player to visit her "personal health care provider . . . [who will] verify the student's biological sex" through the player's "reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." Idaho Code § 33-6203(3). The Act's express terms limit the verification procedure to a "routine sports physical examination" by "relying *only* on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." *Id.* (emphasis added). By its plain text, the Act provides that a student's sex can be verified exclusively by these three enumerated methods. Thus, the district court was not unreasonable in finding incredulous

---

parties have stipulated is now moot. However, Lindsay brought the same constitutional challenges to the sex dispute verification provision as Jane did in her complaint, and argued in her motion for preliminary injunction that she also would be subjected to the sex dispute verification process. Indeed, Appellants recognized that Lindsay challenged the sex dispute verification provision when they argued in front of the district court that "Lindsay [could not] establish an injury in fact because the State Board of Education ha[d] not yet promulgated regulations governing third-party sex verification disputes," *Hecox*, 469 F. Supp. 3d at 962, and that Lindsay would not have to go through the sex dispute process because her "health care provider [could] simply sign[] an 'other statement' stating that Lindsay is female." *Id.* at 964.

The district court reviewed these arguments and concluded that Lindsay had standing to challenge the sex dispute verification provision, because "it is not speculative to suggest Lindsay's sex would be disputed." *Id.* at 961. The court then held that the sex dispute verification provision likely did not survive heightened scrutiny because of the "injury and indignity inflicted on Jane and all other female athletes," which includes Lindsay. *Id.* at 987. Thus, we decline to dismiss the challenge to the sex dispute verification provision.

defense counsel's argument that the Act merely required
Lindsay to obtain a letter from her doctor stating that
Lindsay "is female." *Hecox*, 469 F. Supp. 3d at 983. If that
was all that was required to verify a student's sex under the
Act, Lindsay could simply obtain such a statement and the
Act (and this appeal) would be rendered meaningless.

Any one of the three exclusive procedures requires far
more than a "routine sports physical" exam or simply asking
whether a patient is female or not. As Lindsay's medical
expert Dr. Sara Swobada described, analyzing a student's
"genetic makeup" would require referral to a "pediatric
endocrinologist" who would conduct a "chromosomal
microarray" that would reveal a "range of genetic
conditions" beyond sex chromosomes. Hormone testing
would also require a "pediatric endocrinologist," and is not
a "routine part of any medical evaluation." Of course, the
expense and burden of these tests would be borne only by
female students and their families.

Requiring a student to find a medical practitioner to
examine their reproductive anatomy, which is what a typical
gynecological exam entails, is unconscionably invasive,
with the potential to traumatize young girls and women. As
Dr. Swobada opined, examining a female patient's
"reproductive anatomy" would necessitate inspecting a
student athlete's genitalia and conducting a pelvic
examination or transvaginal ultrasound to determine
whether that student has ovaries. She further explained that
pelvic examinations for young patients are generally not
required for minors, including adolescents, and are only
conducted when medically necessary "with sedation and
appropriate comfort measures to limit psychological
trauma." Yet the Act's sex verification process subjects girls
as young as elementary schoolers to unnecessary

gynecological examinations merely because an individual "disputes" their sex.

The psychological burden of these searches does not just fall on transgender women like Lindsay, but on all women and girls. As amici describe, "[s]ex verification procedures have a long, checkered history in female sports that continue to this day." Br. of Amici Curiae National Women's Law Center, et al. at 15. In the 1960s, the IOC would force female athletes to strip and parade in front of a panel of doctors to prove that they were, in fact, women. *Id.* The process was discontinued after a public outcry. *Id.* One intersex athlete who failed a sex verification procedure described being "so 'tormented' and 'unbearably embarrassed' that 'she attempted suicide' by 'swallowing poison.'" *Id.* at 17 (quoting Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. Times Magazine (June 28, 2016)). Tellingly, while many athletic organizations have tightened their rules for transgender women's competition since 2020, none appears to have instituted a process that required gynecological examinations or invasive physical examinations.[18] Of the twenty other states that have passed restrictions on transgender women's participation in women's sports, none has authorized a similar sex verification process.[19]

---

[18] The IOC has expressly disavowed invasive sex verification procedures, stating that "[c]riteria to determine eligibility for a gender category should not include gynecological examinations or similar forms of invasive physical examinations, aimed at determining an athlete's sex, sex variations or gender." *See* Int'l Olympic Comm., *supra*, at 5.

[19] Most states that have instituted categorical bans on transgender participation in student athletics have verified sex via a student's birth certificate. Oklahoma and Kentucky require a student or a student's

Idaho has not offered any "exceedingly persuasive justification" warranting the imposition of this objectively degrading and disturbing process on young women and girls. Before the Act's passage, Idaho had no sex verification process in place and nonetheless separated teams by gender. The record is devoid of evidence that any boy attempted to join a girls' team. By the plain text of the Act, the purpose of the sex verification process is to identify and exclude transgender women and girls from women's athletics in Idaho. And a "bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (alteration in original) (citation omitted).

We agree with the district court that, contrary to the Act's express purpose of ensuring women's equality and opportunities in sports, the sex dispute verification process likely will discourage the participation of Idaho female students in student athletics by allowing any person to dispute their gender and then subjecting them to unnecessary medical testing and genital inspections. Because the Act's means undermine its purported objectives and impose an unjustifiable burden on all female athletes in Idaho, the district court did not abuse its discretion by finding that the sex verification provision likely would not survive heightened scrutiny.

## B. Irreparable Harm

The district court properly concluded that Lindsay faced irreparable harm absent an injunction. "It is well established

---

parent or legal guardian submit sworn affidavits to confirm their "biological sex." *See* Okla. Stat. Ann. tit. 70, § 27-106(D); Ky. Rev. Stat. Ann. § 164.2813(2).

that the deprivation of constitutional rights unquestionably
constitutes irreparable injury." *Hernandez v. Sessions*, 872
F.3d 976, 994 (9th Cir. 2017) (internal quotation marks and
citation omitted).     Therefore, as the Act is likely
unconstitutional, "it follows inexorably . . . that [Hecox]
ha[s] [] carried [her] burden as to irreparable harm." *Id.* at
995.

More concretely, if the preliminary injunction is lifted,
Lindsay will be barred from trying out for or participating on
any female sports teams at BSU, including the women's club
soccer team, which she joined to improve her running skills
and to experience "the camaraderie of being on a team." *See*
Idaho Code § 33-6203(3).  While Lindsay did not make the
track team in Fall 2020, the Act would bar her from trying
out for the team in Fall 2023, her last opportunity to play
NCAA sports.  Lindsay would also be subject to the threat
of the sex dispute verification process and unnecessary
examinations or medical testing.    These are all specific
"harm[s] for which there is no adequate legal remedy" in the
absence of an injunction.  *Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053, 1068 (9th Cir. 2014).

### C.    Balance of the Equities & Public Interest

The district court also did not err in concluding that the
balance of the equities weighed in favor of a preliminary
injunction.  When the government is a party to a lawsuit, the
balance of the equities and public interest prongs of the
preliminary injunction test merge, because government
actions presumably are in the public interest.  *See Drakes
Bay Oyster Co.*, 747 F.3d at 1092; *Nken v. Holder*, 556 U.S.
418, 435 (2009) (holding that "courts must be mindful that
the Government's role as the respondent in every removal
proceeding does not make the public interest in each

individual one negligible"). Here, Lindsay faces deeply personal, irreparable harms without injunctive relief, including being barred from all female college athletic teams and the prospect of invasive medical testing if her gender is "disputed."

A preliminary injunction does not appear to inflict any comparable harm to the Appellants, as the injunction expressly maintained the status quo. Under the status quo, the NCAA policies for college athletics and the IHSAA policies for high school athletics govern transgender female participation in sports, and Idaho schools have complied with those policies for over a decade. The district court found no "evidence that transgender women threatened equality in sports, girls' athletic opportunities, or girls' access to scholarships in Idaho" during that decade, and thus Appellants failed to demonstrate any harm from issuance of the injunction. *Hecox*, 469 F. Supp. 3d at 988. Moreover, as the district court found, Intervenors themselves may also be harmed by the sex dispute verification process, to which they are subject simply by virtue of playing sports in Idaho. Because "the public interest and the balance of the equities favor preven[ting] the violation of a party's constitutional rights," *Ariz. Dream Act*, 757 F.3d at 1060 (alteration in original) (internal quotation marks and citation omitted), we affirm that the district court did not abuse its discretion in weighing this factor.

## IV. SCOPE OF THE INJUNCTION

Finally, we reject Intervenors' argument that the scope of the injunction is improper as a matter of law. "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms 'is correspondingly narrow.'" *Lamb-*

*Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th
Cir. 1991) (quoting *Coca–Cola Co. v. Overland, Inc.*, 692
F.2d 1250, 1256 n.16 (9th Cir.1982)).  However, injunctive
relief "must be tailored to remedy the specific harm alleged,"
and "[a]n overbroad injunction is an abuse of discretion." *Id.*
(finding that a worldwide injunction to protect a trade secret
was *not* an abuse of discretion).  Under Federal Rule of Civil
Procedure Rule 65(d), "[e]very order granting an injunction
. . . must: (A) state the reasons why it issued; (B) state its
terms specifically; and (C) describe in reasonable detail—
and not by referring to the complaint or other document—
the act or acts restrained or required."      However,
"injunctions are not set aside under [R]ule 65(d) [] unless
they are so vague that they have no reasonably specific
meaning." *United States v. Holtzman*, 762 F.2d 720, 726 (9th
Cir. 1985).

Here, the scope of the injunction is clear: The district
court enjoined the enforcement of any of the provisions of
the Act.**[20]**   The district court explicitly held that the
injunction would restore the pre-Act status quo, such that the
"NCAA policy for college athletes and IHSAA policy for
high school athletes" would remain in effect.  *Hecox*, 479 F.
Supp. 3d at 988.   Nor did the district court abuse its
discretion as to the scope of the injunction.  It concluded that

---

[20] The partial concurrence states that it is unclear whether the Court was
"enjoining all provisions of the Act or only some of them."  Partial
Concurrence at 81.  However, the district court granted the motion for
preliminary injunction in full, *see Hecox*, 479 F. Supp. 3d at 989, and the
motion asked the district court to enjoin "enforc[ement of] any of the
provisions of" the Act.  It does not appear from the record that either
party argued that the injunction should apply to only certain provisions
of the Act.  Thus, no genuine confusion exists regarding whether the
entirety of the Act is enjoined.

the Act was likely "unconstitutional as currently written," *id.*, and properly enjoined enforcement of the Act in its entirety.[21]    That Lindsay's case involves an as-applied

---

[21] The partial concurrence argues that we should remand this case to the district court to tailor the injunction to provide the specificity that Rule 65(d)(1) requires because it is unclear whether the injunction is limited to "transgender women and girls who either have never undergone puberty or have suppressed their testosterone levels through hormone therapy." Partial Concurrence at 82. The concurrence also suggests that the scope of the injunction is overbroad because it might "appl[y] to transgender female athletes" who have gone through puberty and have not received hormone therapy.  *Id.* at 83.  However, the district court explicitly preserved the "status quo" in Idaho when fashioning the injunction, stating:

> [A] preliminary injunction would not harm Defendants because it would merely maintain the status quo while Plaintiffs pursue their claims.  If an injunction is issued, Defendants can continue to rely on the NCAA policy for college athletes and IHSSA policy for high school athletes, as they did for nearly a decade prior to the Act . . . [N]either Defendants nor the Intervenors would be harmed by returning to this status quo.

*Hecox*, 479 F. Supp. 3d at 988.  At the time of the injunction, both policies allowed transgender women and girls "to compete on girls' teams after completing one year of hormone therapy suppressing testosterone under the care of a physician." *Id.* at 947.  Thus, the district court specifically stated how the injunction would apply to transgender female athletes who have gone through puberty and not received hormone therapy: those individuals would be required to conform to current NCAA and IHSSA policies circumscribing the extent of their participation in female athletics.

In any event, there is no evidence that Idaho believes the terms of the injunction "have no reasonably specific meaning." *Holtzman*, 762 F.2d at 726.  To the contrary, only Intervenors, not Idaho, argued on appeal that the injunction was vague and overbroad, indicating that Idaho school administrators have clearly understood over the past three years what conduct is permissible under the injunction.

challenge does not undermine the district court's findings
that the Act is unconstitutional as applied to all women. *See,
e.g.*, *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)
(holding that a challenge to a category of applications of a
statute may be characterized as an as-applied challenge).[22]

**V.**

While we address only the Act before us, and opine on
no other regulation or policy, we must observe that both the
science and the regulatory framework surrounding issues of
transgender women's participation in female-designated
sports is rapidly evolving.　Since Lindsay filed her initial
challenge, the IOC and NCAA have adopted more limited
policies as to transgender female participation in women's
sports, requiring the governing entities for each sport to
formulate sport-specific policies.　Relying on medical

---

[22] Intervenors, but not Idaho, contend that the injunction is overbroad
because it extends to non-plaintiffs in light of the district court's
dismissal of Lindsay's facial challenge.　However, in *Doe*, the Supreme
Court explained that an as-applied claim could be "'facial' in that it is
not limited to plaintiffs' particular case, but challenges application of the
law more broadly." *Doe*, 561 U.S. at 194.　Because the district court
found that the Act harmed "the constitutional rights of every girl and
woman athlete in Idaho," *Hecox*, at 479 F. Supp. 3d at 988, it did not
abuse its discretion in issuing a preliminary injunction against the entire
category of applications of the Act.

In addition, as the partial concurrence persuasively argues, the district
court could not accord Lindsay full relief without enjoining the Act in its
entirety consistent with the principle that "an injunction 'should be no
more burdensome to the defendant than necessary to provide complete
relief to the plaintiffs before the court.'" *City & County of San Francisco
v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) (quoting *L.A. Haven Hospice,
Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)); *see also E. Bay
Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (en
banc); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020).

evidence, many sports organizations have tightened their eligibility criteria for transgender women's teams, including incorporating guidelines for lower testosterone levels for eligibility to compete.[23] The U.S. Department of Education has proposed new Title IX regulations addressing restrictions on transgender athletes' eligibility that would require "such criteria" to "be substantially related to the achievement of an important educational objective and minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied."[24] These more narrowly drawn policies, which are not before us, attempt to balance transgender inclusion with competitive fairness—a policy question that such regulatory bodies are best equipped to address.

---

[23] *See, e.g.*, USA Swimming, *USA Swimming Releases Athlete Inclusion, Competitive Equity and Eligibility Policy* (Feb. 1, 2022), https://tinyurl.com/mr2k4tvp (announcing a policy for USA Swimming that elite transgender women athletes must show testosterone levels below 5 nmol/L continuously for at least 36 months); Bicycling, *The UCI Announces Changes to Its Policy on Transgender Athletes* (June 17, 2022), https://www.bicycling.com/news/a40320907/uci-transgender-policy-2022/ (announcing a testosterone limit of 2.5 nmol/L for elite bicyclists (halved from the previous 5.0 nmol/L) for a suppression period of 24 months); Olalla Cernuda, *World Triathlon Executive Board approves Transgender Policy*, World Triathlon (Aug. 3, 2022), https://tinyurl.com/yxw4syzw (requiring below a 2.5 nmol/L testosterone level for 24 months for triathletes).

[24] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (proposed April 13, 2023) (to be codified at 34 C.F.R. pt. 106).

## VI. CONCLUSION

We recognize that, after decades of women being denied opportunities to meaningfully participate in athletics in this country, many cisgender women athletes reasonably fear being shut out of competition because of transgender athletes who "retain an insurmountable athletic advantage over cisgender women." *See* Br. of Amici Curiae Sandra Bucha, et al. at 8. We also recognize that athletic participation confers to students not just an opportunity to win championships and scholarships, but also the benefits of shared community, teamwork, leadership, and discipline. *See generally* Br. of Amici Curiae 176 Athletes in Women's Sports (describing the benefits of sports, and diversity in women's sports, on all students). Excluding transgender youth from sports necessarily means that some transgender youth will be denied those educational benefits.

However, we need not and do not decide the larger question of whether any restriction on transgender participation in sports violates equal protection. Heightened scrutiny analysis is an extraordinarily fact-bound test, and today we simply decide the narrow question of whether the district court, on the record before it, abused its discretion in finding that Lindsay was likely to succeed on the merits of her equal protection claim. Because it did not, we affirm the entry of preliminary injunctive relief against the Act's enforcement.

**AFFIRMED.**

CHRISTEN, Circuit Judge, concurring in part and dissenting in part:

The Fairness in Women's Sports Act, 2020 Idaho Sess. Laws 967–70 (codified at Idaho Code §§ 33-6201–06) (the "Act"), declares that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." Idaho Code § 33-6203(2). The Act considers transgender women and girls to be "students of the male sex." Accordingly, the Act bans all transgender women and girls from competing in school sports in Idaho on teams that are consistent with their gender identities. The ban applies broadly to all public schools, from kindergarten through college, and to all private schools and colleges whose students or teams compete against public schools or colleges. *Id.* § 33-6203(1). The ban also applies to all kinds of sports, to all grades and ages, and to all types of competition. And the ban extends to all transgender women and girls, including those who are too young to have experienced puberty, those whose use of puberty blockers prevented them from ever going through puberty, and those who have undergone a year or more of hormone therapy to suppress their levels of circulating testosterone. To enforce the ban, the Act permits any individual to "dispute" the sex of any athlete participating in women's or girls' sports. *Id.* § 33-6203(3). If a student's sex is disputed, the statute requires the student to have her health care provider "verify" her "biological sex." *Id.* To provide the necessary verification, the health care provider may rely "only on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." *Id.*

Lindsay Hecox, a student at Boise State University who wants to participate in her college's women's track team,

claims that the Act violates her statutory and constitutional rights, including her Fourteenth Amendment right to equal protection of the laws.  Lindsay is a transgender woman who undergoes gender-affirming hormone therapy that reduces her testosterone levels.  She would have been eligible to participate in women's sports in Idaho under the policies in place before the Act was adopted, but she is prevented from doing so under the Act.

In August 2020, the district court granted Lindsay's motion to preliminarily enjoin enforcement of the Act pending trial on the merits of her claims.  The court entered extensive findings and ruled that Lindsay was likely to succeed on her equal protection claim.  *Hecox v. Little (Hecox I)*, 479 F. Supp. 3d 930 (D. Idaho 2020).  In doing so, the court reasoned that the Act is not substantially related to the State's important interests in promoting sex equality and providing athletic opportunities for women, because the Act bans transgender women and girls *categorically*, rather than focusing on those transgender women and girls who, by virtue of their testosterone levels, have real athletic advantages over other women and girls.  The court also reasoned that the Act's dispute and sex verification provision was likely to hinder, rather than further, the State's important interests "by subjecting women and girls to unequal treatment, excluding some from participating in sports at all, incentivizing harassment and exclusionary behavior, and authorizing invasive bodily examinations."  *Id.* at 987.

Like the majority, I conclude that the district court did not abuse its discretion by granting preliminary injunctive relief.  The district court carefully considered the evidence and made findings amply supported by the record.  Given our limited and deferential review at this stage of the litigation, the categorical sweep of the ban on transgender

students, the medical consensus that circulating testosterone rather than transgender status is an accurate proxy for athletic performance, and the unusual and extreme nature of the Act's sex verification requirements, the district court did not abuse its discretion by concluding that Lindsay was likely to succeed on her equal protection claim.

I also agree with the majority that the district court did not abuse its discretion by enjoining enforcement of the statute against non-plaintiffs. Given the partially facial nature of Lindsay's claims and the Supreme Court's discussion of this subject in *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), I conclude that the district court acted within its broad discretion.

Although I agree with much of the majority opinion, I respectfully disagree with the majority in certain respects. First, I disagree with the majority's conclusion that "only women and girls who want to compete on Idaho school athletic teams, and not male athletes, are subject to the sex dispute verification process." Maj. Op. at 36. I read the verification provision to apply to any student, male or female, who participates on women's or girls' athletic teams. The verification provision does not apply to any student, male or female, who participates on men's or boys' athletic teams. Accordingly, I conclude that it is the team an athlete chooses to join that dictates whether they are subject to the statute's verification process, not the athlete's sex. In my view, the majority errs in holding otherwise.

Second, I disagree with the majority's conclusion that the preliminary injunction satisfies the specificity requirements set out in Federal Rule of Civil Procedure 65(d)(1). The injunction does not "state its terms specifically" or "describe in reasonable detail . . . the . . . acts restrained or required."

Finally, I disagree with the majority's conclusion that the district court properly "tailor[ed] the scope of the remedy to fit the nature and extent of the constitutional violation." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976)).  The district court appears to have enjoined § 33-6203(2) as applied to *all* transgender female athletes.  But the court made no findings suggesting that § 33-6203(2) is unconstitutional as applied to transgender women and girls who have gone through puberty and have not received hormone therapy to suppress testosterone.  Given the court's finding that the medical consensus treats circulating testosterone as the key factor in determining differences in athletic performance, the injunction is not appropriately tailored.

For these reasons, I would affirm the district court's order in part, vacate it in part, and remand.  I therefore concur in part, and respectfully dissent in part, from the court's judgment.

## I.  Interpreting § 33-6203(3)

Although the majority does not directly address the issue, I note that the parties interpret the Act's sex verification provision differently.  Idaho Code § 33-6203(3) states:

> A dispute regarding a student's sex shall be resolved by the school or institution by requesting that the student provide a health examination and consent form or other statement signed by the student's personal health care provider that shall verify the student's biological sex.  The health care

> provider may verify the student's biological
> sex as part of a routine sports physical
> examination relying *only on one (1) or more
> of the following*: the student's reproductive
> anatomy, genetic makeup, or normal
> endogenously produced testosterone levels.

*Id.* (emphasis added).

Appellants assert that a health care provider may verify
a student's biological sex through any means, not only
through the three means enumerated in the statute
(reproductive anatomy, genetic makeup, and normal
endogenously produced testosterone levels). The State
argues:

> The statute provides three separate options to
> verify sex. The first two options, (1) a health
> examination and consent form or (2) other
> statement signed by the student's personal
> health care provider, are not subject to the
> three criteria mentioned in the third option,
> the "routine sports physical examination."
> They are different means, and listed in a
> completely different sentence. Moreover, the
> separate, third option, a "routine sports
> physical examination," makes clear that it is
> permissive, not required, using the term
> "may."

State's Opening Brief at 38. Lindsay, by contrast, argues that
because the statute specifies that providers may rely "only
on one (1) or more of the following," it plainly limits health

care providers to using one of the three means enumerated in the statute.

I agree with Lindsay. Boiled down, the State interprets the statute to mean that a health care provider may verify a student's sex by: (1) a routine sports physical examination relying on one or more of the enumerated means; *or* (2) any "other statement" relying on any means at all. The State's reading sharply diverges from the language adopted by the legislature and renders the provision's second sentence inoperative. The State argues that the district court failed to apply Idaho's principles of statutory interpretation, *see* State's Opening Brief at 37, but notably fails to identify any support for its anti-textual interpretation, from Idaho or elsewhere. Because the second sentence becomes a dead letter under the State's interpretation, the statute is not reasonably susceptible to the interpretation offered by the State. *See State v. Yzaguirre*, 163 P.3d 1183, 1190 (Idaho 2007) ("In interpreting statutory language, all the words of the statute must be given effect if possible, and the statute must be construed as a whole.").

## II. Intermediate Scrutiny Applies Because the Act Discriminates Based on Transgender Status

I agree with the majority, and with the district court, that intermediate scrutiny applies.

Before the passage of the Act, Idaho prohibited "men and boys" from participating on teams designated for women and girls. As the district court pointed out, "general sex separation on athletic teams for men and women . . . preexisted the Act and has long been the status quo in Idaho. Existing rules already prevented boys from playing on girls' teams before the Act." *Hecox I,* 479 F. Supp. 3d at 982. However, Idaho's pre-Act status quo allowed transgender

women and girls (i.e., athletes assigned male at birth who
identify as female) to participate in women's and girls' sports
consistent with Idaho High School Activities Association
(IHSAA) and National Collegiate Athletic Association
(NCAA) policies.  To be eligible, these students had to
provide proof that they had undergone at least one year of
hormone therapy to suppress their testosterone levels.
Hence, although the Act is couched in terms that suggest it
classifies student athletes according to their "biological sex,"
Idaho Code § 33-6203(1), (3), and purports to preclude
students of the "male sex" from participating in women's
and girls' sports, the ban in fact serves only to prohibit
transgender women and girls from women's and girls' sports
teams.   The ban's exclusive function is to abrogate the
IHSAA and NCAA policies allowing transgender women
and girls, under limited circumstances, to participate in
women's and girls' sports.[1]

Under these circumstances, that the Act speaks in terms
of "biological sex," rather than "transgender status" or
"gender identity," is not controlling.  The Act changed the
status quo by classifying athletes, for the first time, based on
transgender status.  The conclusion that the Act classifies
based on transgender status finds extensive support in

---

[1] The principal section of the statute, Idaho Code § 33-6203, comprises
three subsections.  They are all integral parts of the statutory plan to
exclude transgender women and girls from women's and girls' sports.
Section 33-6203(2) effects a ban, or prohibition, on transgender athletes
participating in sports designated for women or girls.   Section 33-
6203(3), the sex verification provision, is the enforcement mechanism
for the ban.  Section 33-6203(2) operates exclusively against transgender
female athletes for the reasons explained in the text.  But any student—
male or female, transgender or cisgender—who participates in sports
designated for women or girls is subject to the verification provision in
§ 33-6203(3)).

controlling case law. In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), the Supreme Court recognized that a statute may classify covertly as well as overtly:

> When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.

*Id.* at 274. Under *Feeney*, a statute that is gender-neutral on its face nevertheless classifies based on gender if the statutory classification "can plausibly be explained only as a gender-based classification." *Id.* at 275.[2] In *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), for example, we held that laws defining marriage as a relationship "between a man and a woman," *id.* at 464 n.2, but making no mention of sexual orientation, nevertheless "distinguish[ed] on their face between opposite-sex couples, who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose

---

[2] I do not conclude that the ban is a transgender-based classification because it has a disproportionate adverse impact on transgender women and girls. The Supreme Court has made clear that disproportionate impact alone does not trigger heightened scrutiny under the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 242 (1976).

marriages are not recognized." *Id.* at 467.  The defendants could not "overcome the inescapable conclusion" that the laws "discriminate[d] on the basis of sexual orientation." *Id.* at 468.  We applied the same reasoning in *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013), a Fair Housing Act case, where we explained:

> Proxy discrimination is a form of facial discrimination.  It arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group. For example, discriminating against individuals with gray hair is a proxy for age discrimination because "the 'fit' between age and gray hair is sufficiently close." *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

*Id.* at 1160 n.23; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (42 U.S.C. § 1985(3)) ("A tax on wearing yarmulkes is a tax on Jews."); *McWright*, 982 F.2d at 228 (Rehabilitation Act) ("We have warned that an employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination.").

Given the Act's context, these authorities support the conclusion that the Act classifies based on transgender status.  As in *Feeney*, the Act can only be understood as a

transgender-based classification.  As in *Latta*, the Act
distinguishes on its face between cisgender women and girls,
who can compete on teams consistent with their gender
identity, and transgender women and girls, who are
categorically barred from doing so.  The Act "use[s] a
technically neutral classification"—biological sex—"as a
proxy to evade the prohibition of intentional
discrimination."  *McWright*, 982 F.2d at 228.  Indeed,
transgender women and girls are the *only* students who are
actually affected by the Act's classification; they are the only
group banned from participating on athletic teams that are
aligned with their gender identities.[3]

---

[3] Under the Act, cisgender men and boys may participate on men's and
boys' teams and may do so without being subject to the sex verification
procedure. So can transgender men and boys. Cisgender women may
participate on athletic teams designated for women and girls, though like
all athletes on these teams, they are subject to the sex verification
procedure that serves as the Act's enforcement mechanism. Transgender
women and girls are uniquely disadvantaged under the Act:

|  | Allowed to Participate on Team Aligned with Gender Identity | Subject to Verification Provision if Playing on Team Aligned with Gender Identity |
|---|---|---|
| **Cisgender men and boys** | Yes | No |
| **Transgender men and boys** | Yes | No |
| **Cisgender women and girls** | Yes | Yes* |
| **Transgender women and girls** | No* | Yes* |

An asterisk (*) indicates a change from the policies in place before the
Act's passage.

Furthermore, even putting *Feeney*, *Latta*, and *Pacific Shores* aside, no one disputes that heightened scrutiny applies "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). A discriminatory purpose is shown when "the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279.

These principles map perfectly onto Lindsay's challenge because the Act purposefully treats transgender women and girls differently from every other group. The district court found that "the law is directed at excluding women and girls who are transgender, rather than on promoting sex equality and opportunities for women." *Hecox I*, 479 F. Supp. 3d at 983. This finding is well supported. The court inferred a discriminatory purpose from the fact that the Act bars transgender athletes categorically rather than focusing on factors—such as puberty and circulating testosterone—that a consensus of the medical community actually associates with athletic performance. The district court noted that the Act's definition of "biological sex":

> excludes the one factor that a consensus of the medical community appears to agree drives the physiological differences between male and female athletic performance. Significantly, the preexisting Idaho and current NCAA rules instead focus on that factor. That the Act essentially bars consideration of circulating testosterone

> illustrates the Legislature appeared less concerned with ensuring equality in athletics than it was with ensuring exclusion of transgender women athletes.

*Id.* at 984. The district court's findings are not clearly erroneous. Indeed, the Act's legislative sponsor, Representative Barbara Ehardt, forthrightly acknowledged that the legislature's purpose in enacting the statute was to force transgender women and girls "to compete on the side of those biological boys and men . . . whom they look alike." This unvarnished record and the district court's cogent recognition of the real change effected by the Act in Idaho lend strong support for the district court's conclusion that the Act classifies based on transgender status and discriminates against transgender women and girls.

I agree with the district court, and with the majority, that intermediate scrutiny applies because the Act classifies and discriminates on account of transgender status.

## III. The Verification Provision Does Not Apply Only to Female Students

I part company, however, with the majority's conclusion that "only women and girls who want to compete on Idaho school athletic teams, and not male athletes, are subject to the sex dispute verification process." Maj. Op. at 36.

On its face, the sex verification provision is applicable to any student, male or female, participating on "[a]thletic teams or sports designated for females, women, or girls." *See* Idaho Code § 33-6203(2). By its terms, the verification process applies to men and boys who wish to participate on teams designated for women and girls, and it does not apply to athletes of any gender who participate on teams

designated for men or boys. It is the team an athlete chooses to join that dictates whether they are subject to the statute's verification process, not the athlete's sex.[4]

The majority's approach and my own differ somewhat, but we agree that the Act fails to satisfy heightened scrutiny. The majority analyzes the verification provision in isolation, decides that heightened scrutiny applies because the provision does not apply to males (a proposition with which I respectfully disagree), and then holds that the district court did not abuse its discretion in concluding that Lindsay is likely to succeed on her claim that the verification provision is not substantially related to Idaho's important governmental interests. By contrast, I see no need to analyze the verification provision in isolation. In my view, the verification provision is an integral part of the ban on transgender women and girls participating on women's and girls' teams. It is the critical mechanism by which the ban is implemented and enforced. Thus, I would simply address whether the ban as a whole survives heightened scrutiny. As explained, heightened scrutiny applies because the ban as a

---

[4] The verification process applies to both male and female students, as long as they join, or try to join, teams designated for women or girls. It applies to: (1) cisgender female students who play on women's and girls' teams, as the Act allows; (2) transgender female students who play on women's and girls' teams, as the Act prohibits; (3) transgender male students (i.e., students who are assigned female at birth but identify as male) if they choose to play on women's and girls' teams, as the Act permits; and (4) cisgender male students who play on women's and girls' teams, as the Act prohibits, or who, like the plaintiffs in the *Clark* litigation discussed below, desire to do so. The verification procedure does not apply to any students playing on teams designated for men or boys.

whole both classifies and discriminates based on transgender status.

## IV. *Clark* Does Not Control

I agree with the majority that our decision in *Clark ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982), is not controlling here. In *Clark*, we upheld an Arizona policy prohibiting boys from playing on girls' volleyball teams because: (1) "boys' overall [athletic] opportunity [wa]s not inferior to girls'"; and (2) sex served as an "accurate proxy" for "real . . . physiological differences." *Clark*, 695 F.2d at 1131. We held that the exclusion satisfied intermediate scrutiny because "[t]he record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team," and "athletic opportunities for women would [thereby] be diminished." *Id.*

Appellants' reliance on *Clark* is misplaced. First, the only issue we decided in *Clark*—whether a *sex*-based classification was constitutionally permissible—is not in dispute here. The district court dismissed Plaintiffs' facial challenges to the Act, *Hecox I*, 479 F. Supp. 3d at 971, in light of *Clark* and the State's argument that the ban "can . . . be constitutionally applied to cisgender boys," *id.* at 969. Idaho has long maintained separate teams and sports for men/boys and women/girls. *See id.* at 982. Those classifications, which for decades have been widely understood as a constitutionally permissible means of advancing equality for women and girls in sports, are not at issue here. The question that *is* presented here—whether a classification based on "biological sex" or transgender status

is constitutionally permissible—is one that was not presented in *Clark*.

Second, the facts of this case have little in common with *Clark*. The record in *Clark* made clear that sex was a valid proxy for average physiological differences between men and women. Here, by contrast, the district court found that the ban on transgender female athletes applies broadly to many students who do not have athletic advantages over cisgender female athletes. In addition, as the district court pointed out, "under the Act, women and girls who are transgender will not be able to participate in *any* school sports, unlike the boys in *Clark*, who generally had equal athletic opportunities." *Id.* at 977 (emphasis added).[5] In sum, Idaho's ban on transgender women and girls must rise or fall on its own merits; *Clark* is legally and factually distinguishable.

---

[5] *See Hecox I*, 479 F. Supp. 3d at 977 ("[T]he Act's categorical exclusion of transgender women and girls entirely eliminates their opportunity to participate in school sports."); *see id.* (noting that "forcing a transgender woman to participate on a men's team would be forcing her to be cisgender, which is 'associated with adverse mental health outcomes'"); *id.* ("Participating in sports on teams that contradict one's gender identity 'is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical.'"); Lindsay Hecox decl. ¶ 37 ("I would not compete on a men's team. I am not a man, and it would be embarrassing and painful to be forced onto a team for men—like constantly wearing a big sign that says 'this person is not a "real" woman.' I would be an outcast on the men's team.").

## V. The Act Is Not Substantially Related to the State's Important Interests and the District Court Did Not Abuse Its Discretion by Granting Preliminary Injunctive Relief

It is undisputed that the State has articulated "important governmental objectives" here: "promot[ing] sex equality" in sports and "providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code § 33-6202(12). Under intermediate scrutiny, the operative question is simply whether "the discriminatory means employed [by the Act] are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Given the district court's extensive findings and our limited and deferential review, I agree with the majority that the district court did not abuse its discretion by concluding that Lindsay is likely to succeed on her claim that the Act is not substantially related to the State's interests in promoting equality and providing athletic opportunities, including scholarships, for women.

In large part, the district court concluded that the Act was unrelated to the State's important interests because it excludes transgender women and girls from women's sports, purportedly in the interest of competitive fairness, but it excludes them in ways that bear no relationship to physiological advantages and athletic performance. After reviewing the expert evidence presented by the parties, the district court found that "the sex difference in circulating testosterone of adults explains most, if not all, of the sex

differences in sporting performance." *Hecox I*, 479 F. Supp. 3d at 980. Appellants disagree with that finding, but on the record presented to the district court at the preliminary injunction stage, the finding was well supported, and it is not clearly erroneous. Indeed, the district court drew this finding from the defense expert, Dr. Brown's, own report. *See id.*; Brown decl. ¶ 81.

Given the medical-community consensus regarding the connection between circulating testosterone and athletic performance, the district court reasonably rejected Appellants' contention that the Act's categorical ban is substantially related to the State's interests in promoting equality and providing athletic opportunities for women and girls. The district court found that the ban's broad sweep extends to many transgender women and girls who do not possess physiological advantages over cisgender women and girls. The court noted, for instance, that the ban applies to students who are too young to have experienced puberty. The court found that these girls have no competitive advantage, because, "[b]efore puberty, boys and girls have the same levels of circulating testosterone." *Id.* at 979. These findings are not clearly erroneous. On the contrary, they appear to be undisputed. *See* Brown decl. ¶ 113 ("[B]efore puberty, boys and girls do not differ in height, muscle and bone mass."), ¶ 114 ("This physical advantage in performance arises during early adolescence when male puberty commences after which men acquire larger muscle mass and greater strength, larger and stronger bones, higher circulating haemoglobin as well as mental and/or psychological differences."), ¶ 119 ("[G]ender divergences . . . arise from the increase in circulating testosterone from the start of male puberty."); Safer decl. ¶ 38 ("Increased testosterone begins to affect athletic performance at the

beginning of puberty."); Safer suppl. decl. ¶ 13 ("[B]efore puberty there are not noticeable performance difference[s] between boys and girls. . . . There is simply no basis for the assertion that pre-pubertal children have physical sex-based performance differences.").

The district court also noted that the Act applies to the "population of transgender girls who, as a result of puberty blockers at the start of puberty and gender affirming hormone therapy afterward, never go through a typical male puberty at all." *Hecox I*, 479 F. Supp. 3d at 980. The court found that these athletes too do "not have an ascertainable advantage over cisgender female athletes." *Id.* These findings are not clearly erroneous, and they also appear to be undisputed.    Plaintiffs' expert, Dr. Safer, testified consistently with the district court's findings, *see* Safer decl. ¶¶ 47–49, and the defense expert, Dr. Brown, appears to have offered no contrary opinion on this point. Although Dr. Brown argued that transgender women and girls who have gone through puberty have some enduring athletic advantages, even if they later undergo hormone therapy, *see* Brown decl. ¶¶ 11(c)–13, 126–53, 163(c), he did not challenge Dr. Safer's conclusions regarding women who are administered puberty blockers at the start of puberty and gender-affirming hormone therapy afterward.

The district court also found that the Act is unrelated to competitive fairness because it applies to women and girls who, like Lindsay, have undergone hormone therapy and testosterone suppression for twelve months or more. *See Hecox I*, 479 F. Supp. 3d at 979–80. The parties' experts disagree about whether these women and girls have lasting physiological advantages, but the district court's findings are well-grounded in the evidentiary record that was available to the court. They are consistent with Dr. Safer's opinion that

"physiological advantages are not present when a transgender woman undergoes hormone therapy and testosterone suppression," *id.* at 979; with the results of the Harper study, which the parties appear to agree is "the only study examining the effects of gender-affirming hormone therapy on the athletic performance of transgender athletes," *id.* at 980; with the "medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes," *id.*; with the findings of the Handelsman study—cited by the defense's own expert, *see* Brown decl. ¶ 81—that the "evidence makes it highly likely that the sex difference in circulating testosterone of adults explains most, if not all, of the sex differences in sporting performance," *Hecox I*, 479 F. Supp. 3d at 980; and with the IHSAA and NCAA policies that existed before the Act's adoption.

The Act's relationship to its stated purposes is also in tension with its broad application to all sports. It applies not only to elite or highly competitive sports but also to less competitive grade school and club sports. It applies to all ages and grades, and to all sports regardless of physicality, risk of injury, or selectivity. Intermediate scrutiny does not require narrow tailoring, but it does require "a substantial relationship between the exclusion of [transgender athletes] from the team and the goal of . . . providing equal opportunities for women." *See Clark*, 695 F.2d at 1131. Here, the district court reasonably concluded that the "fit" between the Act's means and ends is sorely lacking.

Finally, the district court found that an integral component of the ban—the State's uniquely invasive dispute and sex verification provision—was likely to hinder rather than advance the Act's stated interest in promoting athletic

opportunities for women. The court found that subjecting female athletes to bullying, harassment, and invasive medical procedures is likely to have the perverse effect of discouraging women from participating in scholastic sports, a result directly contrary to the Act's stated purpose. *See Hecox I*, 479 F. Supp. 3d at 985–87. These findings are not clearly erroneous.

Given the district court's extensive and well-supported findings, I agree with the majority that the district court did not abuse its discretion by concluding that Lindsay is likely to succeed on her claim that the Act is not substantially related to its purported goals of promoting sex equality, providing opportunities for female athletes, or increasing female athletes' access to scholarships. Accordingly, the district court did not abuse its discretion by concluding that Lindsay is likely to succeed on the merits of her equal protection claim.

For the reasons given by the majority, I also agree that the district court did not abuse its discretion by concluding that the remaining preliminary injunction factors favored relief. The majority correctly observes that where the State is a party, the last two factors in the *Winter* test for preliminary injunctive relief merge. I only add that the public interest factor favors relief here because "all citizens have a stake in upholding the Constitution," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005), and "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). In sum, I agree with the majority that the district court did not abuse its discretion by concluding that preliminary injunctive relief was warranted.

## VI.  The Preliminary Injunction Is Insufficiently Specific

Intervenors also raise several procedural challenges to the preliminary injunction.  I conclude that some of them have merit.

Under Rule 65(d)(1) of the Federal Rules of Civil Procedure, "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). In addition, "[u]nless the trial court carefully frames its orders of injunctive relief, it is impossible for an appellate tribunal to know precisely what it is reviewing."  *Id.* at 477. "Injunctions are not set aside under rule 65(d), however, unless they are so vague that they have no reasonably specific meaning." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

The majority deems the preliminary injunction sufficiently specific because "[t]he district court enjoined the enforcement of any of the provisions of the Act."  Maj. Op. at 56.  But the district court ruled only that "[t]he Motion for Preliminary Injunction (Dkt. 22) is GRANTED."  *Hecox I*, 479 F. Supp. 3d at 989.  The court did not specify whether it was enjoining all provisions of the Act or only some of them, or whether it was enjoining any specific provision of the Act in its entirety or only as applied to certain classes of individuals.  The court's findings could be understood as

implying that the court intended to enjoin the Act's ban solely as to transgender women and girls who do not have athletic advantages over other female athletes—i.e., transgender women and girls who either have never undergone puberty or have suppressed their testosterone levels through hormone therapy. Alternatively, the court's broad language could be read as enjoining the entire Act in all respects, as the majority suggests.

Even if it were clear that the district court intended to enjoin the Act in its entirety, the injunction remains unclear because it does not specify the eligibility rules applicable while the Act is preliminarily enjoined. The majority asserts that the injunction is sufficiently clear because it "explicitly preserved" the NCAA and IHSAA rules in place "[a]t the time of the injunction," Maj. Op. at 57 n.21 (citing *Hecox I*, 479 F. Supp. 3d at 988), rules that "allowed transgender women and girls 'to compete on girls' teams after completing one year of hormone therapy suppressing testosterone under the care of a physician,'" Maj. Op. at 57 n.21 (quoting *Hecox I*, 479 F. Supp. 3d at 947). If that was the court's intent, it did not say so, and as the parties recognize in their briefs, the NCAA rules have changed substantially since the district court granted the preliminary injunction three years ago.[6] It is unclear whether the "status quo" should be understood as the NCAA rules in place in 2020 or the NCAA rules in place today.

Rather than subjecting school administrators to uncertainty about the scope of the injunction, we should ask

---

[6] This appeal has been pending for nearly three years due to a backlog in the district court's docket arising from the COVID-19 pandemic and this court's limited remand—conditions that the district court could not have anticipated at the time it granted the preliminary injunction.

the district court to provide the specificity that Rule 65(d)(1) requires.

### VII. On the Current Findings, the Injunction Is Overbroad to the Extent It Applies to Transgender Women Who Are Not Receiving Gender-Affirming Hormone Therapy

As discussed, there are no findings in the current record to suggest that Lindsay is likely to succeed on her claim that the ban is unconstitutional as applied to transgender female athletes who have gone through puberty and are not receiving gender-affirming hormone therapy. Accordingly, if the injunction extends to these individuals, the district court likely abused its discretion. *See City & County of San Francisco*, 897 F.3d at 1244 ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." (quoting *Hills*, 425 U.S. at 293–94)); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged."). I would vacate in part and remand for the district court to tailor the scope of the remedy to the constitutional violation.

### VIII. The District Court Did Not Abuse Its Discretion by Enjoining Enforcement of the Act Against Non-Plaintiffs

Intervenors contend that the preliminary injunction is overbroad because it bars enforcement of § 33-6203 against non-plaintiffs. They argue that this relief was improper because "the district court dismissed Plaintiffs' facial challenge and proceeded only on their as-applied claims." Intervenors' Opening Brief at 59. In light of the Supreme

Court's decision in *Doe*, 561 U.S. 186, I agree with the majority that this argument is unpersuasive.

I take no issue with the general proposition that "injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996); *see United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring) ("Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally.").

Lindsay's claims, however, are neither strictly facial nor strictly as applied, and I join the majority in reading the Supreme Court's decision in *Doe* as approving of precisely the kind of relief Lindsay seeks here. In *Doe*, the plaintiffs were referendum petition signers who did not want their names and addresses, or the names and addresses of other referendum petition signers, disclosed under the state's Public Records Act (PRA). The Court explained that the plaintiffs' claim was neither purely facial nor purely as applied:

> [The claim] obviously has characteristics of both: The claim is "as applied" in the sense that it does not seek to strike the PRA in all its applications, but only to the extent it covers referendum petitions. The claim is "facial" in that it is not limited to plaintiffs' particular case, but challenges application of

HECOX V. LITTLE                                                85

>           the law more broadly to all referendum
>           petitions.

*Doe*, 561 U.S. at 194. Although the scope of permissible
remedies was not the issue before the Court, the Court made
clear that the plaintiffs could seek an injunction barring
enforcement of the PRA against non-plaintiffs:

>           The label is not what matters. The important
>           point is that plaintiffs' claim and the relief
>           that would follow—an injunction barring the
>           secretary of state "from making referendum
>           petitions available to the public"—reach
>           beyond the particular circumstances of these
>           plaintiffs. They must therefore satisfy our
>           standards for a facial challenge to the extent
>           of that reach.

*Id.* (citation omitted). Given *Doe*, and in light of the partially
facial nature of Lindsay's claims, I agree with the majority
that the district court permissibly barred enforcement of the
Act beyond the individual Plaintiffs.

The relief granted by the district court is consistent with
the principle that "an injunction 'should be no more
burdensome to the defendant than necessary to provide
complete relief to the plaintiffs before the court.'" *City &
County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir.
2020) (quoting *L.A. Haven Hospice, Inc. v. Sebelius*, 638
F.3d 644, 664 (9th Cir. 2011)); *see also E. Bay Sanctuary
Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (en
banc); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020).
Enjoining enforcement of the Act against Lindsay, while
leaving it in place as to others, risks further stigmatizing her
because she would be isolated as the only transgender female

athlete playing on women's and girls' teams in all of Idaho.
It would also deprive her of the opportunity to have
transgender teammates and the chance to compete against all
female athletes, including other transgender athletes.   It
would therefore undermine two benefits Lindsay would
derive from participating in women's sports: building
"camaraderie" and "forming relationships with [her]
teammates," Lindsay Hecox decl. ¶ 8; Lindsay Hecox suppl.
decl. ¶ 22; and "competing" against other women and girls,
Lindsay Hecox decl. ¶¶ 22, 30, 32, 39; Lindsay Hecox suppl.
decl. ¶ 17.

## IX.  Conclusion

For the foregoing reasons, I would affirm the district
court's injunction in part, vacate it in part, and remand.

The issues presented in this case are novel and difficult
and decisionmakers around the world are still in the process
of designing and implementing sensible standards regulating
the participation of transgender women and girls in women's
sports. *See generally* Nondiscrimination on the Basis of Sex
in Education Programs or Activities Receiving Federal
Financial Assistance: Sex-Related Eligibility Criteria for
Male and Female Athletic Teams, 88 Fed. Reg. 22,860–
22,891 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R.
§ 106.41).  Indeed, the parties' briefs acknowledge that since
the district court ruled, some of the world's leading athletic
organizations, including the International Olympic
Committee (IOC) and the NCAA, have revisited their
standards governing participation by transgender women in

women's athletics.  Notably, both organizations continue to allow transgender women to compete.**[7]**

The standards adopted by the IOC, the NCAA, and others aim to balance a range of important values and

---

[7] In January 2022, the NCAA adopted "a sport-by-sport approach to transgender participation that preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete."  Press Release, NCAA, Board of Governors Updates Transgender Participation Policy (Jan. 19, 2022), https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx [https://perma.cc/7ZFT-GA6L] (last visited July 27, 2023).  Under the NCAA standards, transgender student-athletes are allowed to compete but may be required to "document sport-specific testosterone levels." *Id.*; *see also* Press Release, NCAA, Transgender Student-Athlete Participation Policy, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx [https://perma.cc/FH8V-VVKA] (last updated Apr. 17, 2023).  The IOC likewise follows a sport-by-sport approach. *See* Int'l Olympic Comm., IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations 1 (Nov. 22, 2021), https://stillmed.olympics.com/media/Documents/Beyond-the-Games/Human-Rights/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf [https://perma.cc/MX6D-Y4RG] (last visited July 27, 2023).  The IOC framework states that "[n]o athlete should be precluded from competing or excluded from competition on the exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status," and that, "[u]ntil evidence . . . determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." *Id.* at 4.  It also states that "criteria to determine eligibility for a gender category should not include gynaecological examinations or similar forms of invasive physical examinations, aimed at determining an athlete's sex, sex variations or gender." *Id.* at 5.

interests, including, among others, inclusion, non-discrimination, competitive fairness, safety, and completing the still unfinished and important job of ensuring equal athletic opportunities for women and girls. *See* Women's Sports Found., *50 Years of Title IX: We're Not Done Yet* 3 (2022) ("Sports participation is vital to the development of girls and women. The benefits are far-reaching and lifelong, including improved physical, social, and emotional health; enhanced confidence; academic success; leadership opportunities; and so much more. Progress over the last 50 years is impressive, and yet it is not enough. The playing field is not yet level—it's not even close."), https://www.womenssportsfoundation.org/articles_and_rep ort/50-years-of-title-ix-were-not-done-yet/ (last visited July 27, 2023). Policymakers have long recognized that women must have an equal opportunity not only to *participate* in sports but also to *compete* and *win*.

In my understanding, nothing in today's decision, or in the district court's decision, precludes policymakers from adopting appropriate regulations in this field—regulations that are substantially related to important governmental interests. *See Clark*, 695 F.2d at 1129. This court holds only that the district court did not abuse its discretion in concluding as a preliminary matter that Lindsay is likely to succeed on her claim that this particular statute is not substantially related to important governmental interests.



Additional Links +

# Transgender Student-Athlete Participation Policy

**UPDATED 4/17/2023 TO PROVIDE INCREASED CLARITY**

At its January 19, 2022 meeting, the NCAA Board of Governors updated the transgender student-athlete participation policy governing college sports.

The new policy aligns transgender student-athlete participation with the Olympic Movement. The resulting sport-by-sport approach preserves opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete.

Like the U.S. Olympic and Paralympic Committee, the updated NCAA policy calls for transgender student-athlete participation for each sport to be determined by the policy for the national governing body of that sport. If there is no NGB policy for a sport, it would then be determined by the policy for that sport's international federation. If there is no international federation policy, it would be determined by policy criteria previously established by the International Olympic Committee. Sport-specific polices are subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors.

The policy is effective immediately, with three phases of implementation.

## Phase One – 2022 winter and spring championships

For participation in 2022 winter and spring championships, transgender student-athletes were required to provide documentation to the CSMAS within four weeks before the selections date for their championship.

The documentation had to demonstrate compliance with the 2010 NCAA policy, which calls for one year of testosterone suppression treatment. It also had to document a one-time serum testosterone level that fell below the maximum allowable level for the sport in which the student-athlete was competing within four weeks of championship selections for that sport. That means that student-athletes who already fulfilled the 2010 NCAA policy only needed provide <u>one</u> validated serum testosterone level.

Transgender student-athletes who participated in regular season competition (including conference championships) remained subject to the 2010 NCAA policy only.

## Phase Two – 2022-23 and 2023-24 regular season and championships

Beginning Aug. 1, 2022, participation in NCAA sports requires transgender student-athletes to provide documentation that meets the above criteria for the 2010 NCAA policy, plus meet the sport standard for documented testosterone levels at three points in time: 1. Prior to any competition during the regular season; 2. Prior to the first competition in an NCAA championship event; and 3. Prior to any competition in the non-championship segment. See the transgender student-athlete eligibility review procedures for more information.

## Phase Three – 2024-25 full implementation

Beginning Aug. 1, 2024, participation in NCAA sports requires transgender student-athletes to provide documentation no less than twice annually (and at least once within four weeks of competition in NCAA championships) that meets the sport-specific standard (which may include testosterone levels, mitigation timelines and other aspects of sport-governing body policies) as reviewed and approved by CSMAS. More information about the specific application of Phase Three will be provided prior to implementation.

## Additional flexibility

The Board of Governors urged the divisions to allow for additional, future eligibility if a transgender student-athlete loses eligibility based on the policy change, provided they meet the newly adopted standards.

The NCAA's Office of Inclusion and Sport Science Institute also released the Gender Identity and Student-Athlete Participation Summit Final Report. The report assists ongoing membership efforts to support an inclusive environment that promotes and develops the mental and physical health of transgender and non-binary student-athletes in collegiate sport. The foundational principles in this report will be developed further in conjunction with the Committee to Promote Cultural Diversity and Equity, CSMAS and other core membership committees that address gender identity.

### Transgender Student-Athlete Resources

- Transgender Student-Athlete Eligibility Review Procedures
- 2022-23 Spring Sport Testosterone Thresholds and Championship Submission Deadlines
- 2023-24 Fall Sport Testosterone Thresholds and Championship Submission Deadlines
- 2023-24 Winter Sport Testosterone Thresholds and Championship Submission Deadlines
- 2023-24 Spring Sport Testosterone Thresholds and Championship Submission Deadlines
- Clarifying Application and Next Steps
- 2010 NCAA Transgender Participation Policy
- NCAA Inclusion of Transgender Student-Athletes Handbook
- Gender Identity and Student-Athlete Participation Summit Final Report

- [Medical Exceptions Procedures and Form](#)



   



Terms of Service

Privacy Policy

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

© 2023 NCAA All Rights Reserved

 

LOG IN    **SUBSCRIBE NOW**



# Idaho Statesman

###### Part of the McClatchy Media Network

**Local News   Sports   Opinion   Obituaries   Idaho Politics   •   Personal Finance   Words**

**OPINION AND COMMENTARY**   Editorials and other Opinion content offer perspectives on issues important to our community and are independent from the work of our newsroom reporters.

GUEST OPINIONS

# *5 former Idaho attorneys general urge transgender bill veto*

BY TONY PARK, WAYNE KIDWELL, DAVID LEROY, JIM JONES AND AL LANCE

MARCH 17, 2020 10:53 AM

   

cited in LINDSAY HECOX, ET AL. v. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023



Nike-sponsored athlete Chris Mosier argues Idaho's HB500 is wrong, and all people should be allowed to play sports. BY KATHERINE JONES

Cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

Dear Governor Little:

We write to urge that you give great weight to the advice of our successor, incumbent Idaho Attorney General Lawrence Wasden, regarding House Bill 500. The Attorney General has opined that the legislation contains a number of legal infirmities, making it subject to invalidation in federal court proceedings. The more serious concern is apparent conflict with the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, but other provisions of federal law are implicated.

As you know, the Attorney General is a constitutional officer, charged with providing legal advice to officers and entities of state government. It is not always a comfortable position to occupy, particularly where politically-charged issues are involved. Transgender issues certainly fit into that category. Regardless of how an Attorney General may personally feel about an issue, it is his or her responsibility to observe our sacrosanct regard for the rule of law and give sound legal advice based on the law, as interpreted by the courts.

The [Attorney General has raised serious concerns about the legal viability and timing of this legislation](), which will have a difficult time withstanding a court challenge. Our State has been in this position a number of times during our respective tenures as Attorney General and rather more so during the incumbent's tenure. He has frequently cautioned against passage of legally suspect legislation and has a good record of being correct. He has urged awaiting the outcome of currently pending federal cases relating to this issue. Disregarding his sound advice has been costly for our State. It could well be with regard to House Bill 500.

We urge that you exercise your veto on House Bill 500 to keep a legally infirm statute off of the books and to save the State from having to pay out substantial legal fees to those who take it to court. The Attorney General has provided sound advice and fair warning. Please heed it.

*Tony Park was Idaho Attorney General 1971-1975; Wayne Kidwell 1975-1979; David Leroy 1979-1983; Jim Jones 1983-1991; and Al Lance 1995-2003.*

**RELATED STORIES FROM IDAHO STATESMAN**

GUEST OPINIONS

Father of transgender son sends message to Idaho Legislature: This is personal

MARCH 12, 2020 5:00 AM

THE IDAHO WAY

'Transgender people are people': Nike-sponsored athlete speaks out against 'dangerous' bill

MARCH 05, 2020 6:00 AM

cited in LINDSAY HECOX, et al. v. BRAD LITTLE, et al.
No. 20-35813 archived on August 14, 2023

# Take Us With You

Real-time updates and all local stories you want
right in the palm of your hand.

 **IDAHO STATESMAN APP** ➜

 **VIEW NEWSLETTERS** ➜

  

| SUBSCRIPTIONS | LEARN MORE | ADVERTISING |
| --- | --- | --- |
| Start a Subscription | About Us | McClatchy Advertising |
| Customer Service | Contact Us | Place an Ad |
| eEdition | Newsletters | Place a Classified Ad |
|  | Archives | Place an Obituary |
| Vacation Hold |  | Staffing Solutions |
| Pay Your Bill | Personal Finance | Political | Advocacy Advertising |

**Part of the McClatchy Media Network**

**COPYRIGHT**   **PRIVACY POLICY**   **YOUR PRIVACY CHOICES**   **TERMS OF SERVICE**

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023


International
Olympic
Committee

# IOC FRAMEWORK ON FAIRNESS, INCLUSION AND NON-DISCRIMINATION ON THE BASIS OF GENDER IDENTITY AND SEX VARIATIONS

## INTRODUCTION

Every person has the right to practise sport without discrimination and in a way that respects their health, safety, and dignity. At the same time, the credibility of competitive sport – and particularly high-level organised sporting competitions – relies on a level playing field, where no athlete has an unfair and disproportionate advantage over the rest.

Through this Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations, the International Olympic Committee (IOC) seeks to promote a safe and welcoming environment for everyone, consistent with the principles enshrined in the Olympic Charter. The Framework also acknowledges the central role that eligibility criteria play in ensuring fairness, particularly in high-level organised sport in the women's category.

This Framework is issued as part of the IOC's commitment to respecting human rights (as expressed in Olympic Agenda 2020+5) and as part of the action taken to foster gender equality and inclusion.

In issuing this Framework, the IOC recognises that it must be in the remit of each sport and its governing body to determine how an athlete may be at a disproportionate advantage against their peers, taking into consideration the nature of each sport. The IOC is therefore not in a position to issue regulations that define eligibility criteria for every sport, discipline or event across the very different national jurisdictions and sport systems.

Therefore, the aim of this Framework is to offer sporting bodies – particularly those in charge of organising elite-level competition – a principled approach to develop their criteria that are applicable to their sport. Sports bodies will also need to consider particular ethical, social, cultural and legal aspects that may be relevant in their context.

This Framework was developed following an extensive consultation with athletes and stakeholders concerned. This included members of the athlete community, International Federations and other sports organisations, as well as human rights, legal and medical experts. It replaces and updates previous IOC statements on this matter, including the 2015 Consensus Statement.

This Framework recognises both the need to ensure that everyone, irrespective of their gender identity or sex variations, can practise sport in a safe, harassment-free environment that recognises and respects their needs and identities, and the interest of everyone – particularly athletes at elite level – to participate in fair competitions where no participant has an unfair and disproportionate advantage over the rest.



International
Olympic
Committee

Lastly, the IOC also recognises that most high-level organised sports competitions are staged with men's and women's categories competing separately. In this context, the principles contained herein aim to ensure that competition in each of these categories is fair and safe and that athletes are not excluded solely on the basis of their transgender identity or sex variations.

Where eligibility criteria must be set in order to regulate the participation in the women's and men's categories, the establishment and implementation of such criteria should be carried out as part of a comprehensive approach grounded on the respect for internationally recognised human rights, robust evidence and athlete consultation. In so doing, precaution should be used to avoid causing harm to the health and well-being of athletes.

## PRINCIPLES

This Framework should be considered as a coherent whole and should be taken into consideration by International Federations and other sports organisations when exercising their responsibility in establishing and implementing eligibility rules for high-level organised competition in their respective sports, disciplines and events and, more generally, in ensuring safe and fair competition in the context of inclusion and non-discrimination on the basis of gender identity and sex variations.

While these principles have been drafted with the specific needs of high-level organised sports competitions in mind, the general principles of inclusion and non-discrimination reflected below should be promoted and defended at all levels of sport.

## 1. INCLUSION

1.1.    Everyone, regardless of their gender identity, expression and/or sex variations should be able to participate in sport safely and without prejudice.

1.2.    Measures should be put in place with a view to making sporting environments and facilities welcoming to people of all gender identities.

1.3.    Sports organisations should work together to advance inclusion and prevent discrimination based on gender identity and/or sex variations, through training, capacity-building and campaigns that are informed by affected stakeholders.

1.4.    Mechanisms to prevent harassment and abuse in sport should be further developed by taking into account the particular needs and vulnerabilities of transgender people and people with sex variations.



1.5. Where sports organisations choose to establish eligibility criteria in order to determine the participation conditions for men's and women's categories for specific contests in high-level organised sports competitions, these criteria should be established and applied in a manner that respects the principles included in this Framework. Individuals or parties responsible for issuing such criteria should be appropriately trained in order to ensure that these issues are handled in a manner consistent with these principles.

1.6. The design, implementation and evaluation of these measures and mechanisms should be done in consultation with a cross-section of affected athletes.

## 2. PREVENTION OF HARM

2.1 The physical, psychological and mental well-being of athletes should be prioritised when establishing eligibility criteria.

2.2. Sports organisations should identify and prevent negative direct and indirect impacts on athletes' health and well-being that may come from the design, implementation and or interpretation of eligibility criteria.

## 3. NON-DISCRIMINATION

3.1 Eligibility criteria should be established and implemented fairly and in a manner that does not systematically exclude athletes from competition based upon their gender identity, physical appearance and/or sex variations.

3.2 Provided they meet eligibility criteria that are consistent with principle 4, athletes should be allowed to compete in the category that best aligns with their self-determined gender identity.

3.3 Criteria to determine disproportionate competitive advantage may, at times, require testing of an athlete's performance and physical capacity. However, no athlete should be subject to targeted testing because of, or aimed at determining, their sex, gender identity and/or sex variations.

## 4. FAIRNESS

4.1 Where sports organisations elect to issue eligibility criteria for men's and women's categories for a given competition, they should do so with a view to:

a) Providing confidence that no athlete within a category has an unfair and disproportionate competitive advantage (namely an advantage gained by altering one's

LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
cited at No. 20-35813 decided on August 14, 2023



International
Olympic
Committee

body or one that disproportionately exceeds other advantages that exist at elite-level competition);

b) preventing a risk to the physical safety of other athletes; and

c) preventing athletes from claiming a gender identity different from the one consistently and persistently used, with a view to entering a competition in a given category.

## 5.  NO PRESUMPTION OF ADVANTAGE

5.1  No athlete should be precluded from competing or excluded from competition on the exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status.

5.2  Until evidence (per principle 6) determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status.

## 6.  EVIDENCE-BASED APPROACH

6.1  Any restrictions arising from eligibility criteria should be based on robust and peer reviewed research that:

a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes;

b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and

c) demonstrates that such disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate.

6.2  Should eligibility criteria prevent an athlete from entering a given competition, such athlete should:

a) be allowed to participate in other disciplines and events for which they are eligible, in the same gender category; and


International
Olympic
Committee

b) be able to contest the ultimate decision of International Federations or other sports organisations through an appropriate internal mediation mechanism, such as ombudsperson, and/or procedures before the Court of Arbitration for Sport, to seek remedy.

## 7. PRIMACY OF HEALTH AND BODILY AUTONOMY

7.1 Athletes should never be pressured by an International Federation, sports organization, or any other party (either by way of the eligibility criteria or otherwise) to undergo medically unnecessary procedures or treatment to meet eligibility criteria.

7.2 Criteria to determine eligibility for a gender category should not include gynaecological examinations or similar forms of invasive physical examinations, aimed at determining an athlete's sex, sex variations or gender.

7.3 Sports organisations should seek to educate coaches, managers and other members of the entourage to prevent interpretations of their eligibility criteria that can lead to harm.

## 8. STAKEHOLDER-CENTRED APPROACH

8.1 When drafting, reviewing, evaluating and updating eligibility criteria, sports organisations should meaningfully consult with a cross-section of athletes who may be negatively affected in order to prevent harm.

8.2 Any decisions affecting an athlete's ability to compete should follow the basic standards of procedural fairness, including neutrality and impartiality.

8.3 Sports organisations should put in place internal mechanisms that offer athletes and other affected stakeholders accessible, legitimate, safe and predictable avenues to raise concerns and grievances connected to gender-based eligibility.

## 9. RIGHT TO PRIVACY

9.1 Sports organisations should ensure transparency in their decision-making processes on eligibility while working to preserve the privacy of individuals who may be affected by such restrictions. This includes all personally identifiable information processed in the context of eligibility decisions which should be handled in compliance with applicable laws and international standards.

9.2 Medical information about an athlete, including testosterone levels, that is collected in the context of anti-doping or otherwise, must be handled in compliance with applicable privacy laws and should be used only for the purposes disclosed to the athlete at the time such information is collected.


International
Olympic
Committee

9.3 Informed consent should be acquired from athletes prior to the collection of data that is obtained for the purpose of determining eligibility to compete in the men's or women's category.

9.4 Sports organisations should avoid public disclosure of athletes' confidential health and other personal information in the absence of the athlete's consent. In addition, sports organisations should consult with the athletes concerned on the best ways to publicly communicate about their eligibility.

## 10. PERIODIC REVIEWS

10.1 Eligibility criteria should be subject to predictable periodic review to reflect any relevant ethical, human rights, legal, scientific, and medical developments in this area and should include the affected stakeholder's feedback on their application.

\*\*\*\*\*\*\*

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023



World Athletics Partner 

World Athletics Championships Budapest 23 **SEIKO** Countdown    4d 11h 53m 37s

| All | News | Press Releases | Reports | Previews | Features | Series | Register for Press Releases |
|-----|------|----------------|---------|----------|----------|--------|------------------------------|



World Athletics logo

  

The World Athletics Council has today made a number of important decisions regarding the future participation of the Russian and Belarusian Member Federations in athletics, and the eligibility regulations for athletes who are transgender or who have Differences of Sexual Development (DSD).

The Council agreed to the reinstatement of the Russian Federation (RusAF) following seven years of suspension due to egregious institutional doping violations. However, athletes, officials and supporting personnel from Russia and Belarus are still excluded from competition for the foreseeable future due to Russia's invasion of Ukraine.

## Russia Taskforce recommendation

COOKIE CONSENT

We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.

☐ Allow marketing preferences

Continue

These Special Conditions are designed to enable the Athletics Integrity Unit to monitor, evaluate, communicate, mentor, oversee, and assist RusAF and its external stakeholders to ensure they maintain good governance practices and to protect RusAF from external pressures and attempts to influence or control its functioning.

They focus on four areas: organisational good governance, protection from inappropriate external influence and control, operational capability and capacity (with a particular emphasis on ethical and anti-doping requirements, and change in the regions), and budget allocation and fiscal management.

These Special Conditions are intended be applied for a period of **three years**, with a review at the end of that period to determine whether or not it is necessary to maintain those conditions (as they are or with variations) for a further period.

Totalling 35 separate monitoring and evaluation measures, the special conditions cover: organisational governance, presidium leadership oversight, anti-doping, cultural change in the regions, engagement with external stakeholders, ethics, anti-corruption and anti-conflicts of interest, fiscal management.

Further, the Athletics Integrity Unit, has determined that RusAF should be categorised as a Category 'A' member federation after its reinstatement.

That means that RusAF will have to comply not only with the general obligations applicable to all member federations that are set out in WA ADR 15.4 but also with the special obligations applicable to Category 'A' member federations that are set out in WA ADR 15.5. These federations are subject to greater scrutiny and more testing requirements.

The Taskforce confirmed that RusAF has paid all of the costs of the reinstatement process until the end of 2022. World Athletics will invoice RusAF in early April for the costs incurred by World Athletics in January-March, and the prompt payment of that invoice will be one of the Special Conditions.

RusAF must also pay all of the costs incurred by the AIU in overseeing RusAF's compliance with the Category A requirements and the Special Conditions over the next three years, as well as any World Athletics costs in connection with this oversight.

As a consequence of these decisions, the Authorised Neutral Athlete (ANA) programme will be discontinued, and the Doping Review Board, which rules on ANA applications, will be stood down.

The Russia Taskforce, having completed its work, will be disbanded and the two international experts who have advised it will be stood down.

World Athletics President Sebastian Coe said: "I would like to express my deep gratitude to Rune Andersen and the Taskforce members for staying the course and helping us to resolve a major integrity issue in our sport. It has been a mammoth undertaking over seven years but their commitment and diligence has given the Council confidence that the Russian Federation has reformed its structure and culture and is now on the right path in terms of addressing doping issues. It is important that RusAF continues on this path, but we are confident the Athletics Integrity Unit has the expertise to monitor and assess the situation going forwards."

## War in Ukraine

The World Athletics Council has also reaffirmed the decision it originally made in March 2022, to exclude Russian and Belarusian athletes, support personnel, Member Federation officials and officials who are citizens of those two countries from all World Athetics Series events for the foreseeable future.

These sanctions take effect immediately and include:

COOKIE CONSENT

We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.
Allow marketing preferences

Continue

c. no accreditation to attend any World Athletics Series events;

d. no involvement of Member Federation personnel in any official World Athletics development or professional programmes; and

e. Athletes, Athlete Support Personnel, Member Federation Officials and Officials who are Citizens of Russia and Belarus are excluded from World Athletics Series Events for the foreseeable future.

The Council recommends to the meeting organisers of the Diamond League, Continental Tour, Label Races and the various other Tours that they take the same approach and exclude Athletes and Officials from RusAF and the Belarus Athletic Federation.

The Council also agreed to establish a working group to advise and recommend to Council the conditions that would need to be met for the restrictions on Athletes and Officials from RusAF and the Belarus Athletic Federation participating at World Athletics Series Events to be lifted.

World Athletics President Sebastian Coe said: "As I noted at the time these measures were introduced last year, the unprecedented sanctions imposed on Russia and Belarus by countries and industries all over the world appear to be the only peaceful way to disrupt and disable Russia's current intentions and restore peace. The death and destruction we have seen in Ukraine over the past year, including the deaths of some 185 athletes, have only hardened my resolve on this matter. The integrity of our major international competitions has already been substantially damaged by the actions of the Russian and Belarusian governments, through the hardship inflicted on Ukrainian athletes and the destruction of Ukraine's sports systems. Russian and Belarusian athletes, many of whom have military affiliations, should not be beneficiaries of these actions."

In accordance with the World Athletics constitution, the Member Federations from Russia and Belarus have been informed of the Council's decisions and have the right to respond. If necessary, the Council will reconvene to consider that response.

## Transgender and DSD Regulations

The Council agreed to update the eligibility regulations for transgender and DSD athletes to compete in the female category.

For DSD athletes, the new regulations will require any relevant athletes to reduce their testosterone levels below a limit of 2.5 nmol/L for a minimum of 24 months to compete internationally in the female category in any event, not just the events that were restricted (400m to one mile) under the previous regulations.

The principle of restricted events has been removed from the regulations.

Interim provisions will be introduced for those relevant athletes who are already competing in what were the unrestricted events (distances below 400m and above one mile, plus field events). These provisions include a requirement to suppress their testosterone levels below 2.5nmol/L for a minimum of six months, before they are eligible to compete again.

The six months period is consistent with the previous regulations, which required six months of testosterone suppression (below 5nmol/L) for DSD athletes to compete in the restricted events. The interim provisions do not apply to the previously restricted events (400m to one mile) where two years of testosterone suppression will be required before the relevant athlete is eligible to compete.

These regulations will come into effect on 31 March 2023.

In regard to transgender athletes, the Council has agreed to exclude male-to-female transgender athletes who have been through male puberty from female World Rankings competition from 31 March 2023.

World Athletics conducted a consultation period with various stakeholders in the first two months of this year, including Member

COOKIE CONSENT
We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.
Allow marketing preferences
Continue

In terms of DSD regulations, World Athletics has more than ten years of research and evidence of the physical advantages that these athletes bring to the female category.

However, there are currently no transgender athletes competing internationally in athletics and consequently no athletics-specific evidence of the impact these athletes would have on the fairness of female competition in athletics.

In these circumstances, the Council decided to prioritise fairness and the integrity of the female competition before inclusion.

However the Council agreed to set up a Working Group for 12 months to further consider the issue of transgender inclusion.

This Working Group will include an independent chair, up to three Council Members, two athletes from the Athletes' Commission, a transgender athlete, three representatives of the Member Federations and representatives of the World Athletics Health and Science Department.

Its remit will be to consult specifically with transgender athletes to seek their views on competing in athletics; to review and/or commission additional research where there is currently limited research and to put forward recommendations to Council.

World Athletics President Sebastian Coe said: "Decisions are always difficult when they involve conflicting needs and rights between different groups, but we continue to take the view that we must maintain fairness for female athletes above all other considerations. We will be guided in this by the science around physical performance and male advantage which will inevitably develop over the coming years. As more evidence becomes available, we will review our position, but we believe the integrity of the female category in athletics is paramount."

**World Athletics**

Latest News



cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

COOKIE CONSENT
We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.
Allow marketing preferences

Continue

14 AUG 2023

**Council selects host cities for future World Athletics Series events**



11 AUG 2023

**Sustainability at WCH Budapest 23 - what to expect**

COOKIE CONSENT

We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.

Allow marketing preferences

Continue



11 AUG 2023

**Rudisha, Thompson and Vlasic announced as ambassadors for WCH Budapest 23**

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813, archived on August 14, 2023

MORE NEWS



WORLD ATHLETICS.

WORLD ATHLETICS CONFIDENTIALITY

Contact Us

Terms and Conditions

Cookie Policy

Privacy Policy

COOKIE CONSENT

We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.

Allow marketing preferences

Continue

Twitter

Youtube

TikTok

---

©2023 World Athletics. All Rights Reserved.

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

**COOKIE CONSENT**

We use cookies to improve your experience. By using our site you are accepting our Cookie Policy.

Allow marketing preferences

Continue

# USA SWIMMING NEWS

Tuesday, February 1, 2022

## USA Swimming Releases Athlete Inclusion, Competitive Equity and Eligibility Policy

  



by USA Swimming

credit: USA SWIMMING, HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 15, 2023

CONNECT WITH OUR COMMUNITY



Following several months of internal work, critical stakeholder discussions, and medical and legal review, and in light of updated information regarding the Fédération Internationale de Natation's (FINA) policy development, USA Swimming has elected to release its Athlete Inclusion, Competitive Equity and Eligibility Policy. This policy, effective immediately, is applicable only to USA Swimming athlete members and approved elite events as defined in the policy and will remain in place until the release of an elite policy by FINA.

USA Swimming has and will continue to champion gender equity and the inclusivity of all cisgender and transgender women and their rights to participate in sport, while also fervently supporting competitive equity at elite levels of competition.

The development of the elite policy therefore acknowledges a competitive difference in the male and female categories and the disadvantages this presents in elite head-to-head competition. This is supported by statistical data that shows that the top-ranked female in 2021, on average, would be ranked 536th across all short course yards (25 yards) male events in the country and 326th across all long course meters (50 meters) male events in the country, among USA Swimming members. The policy therefore supports the need for competitive equity at the most elite levels of competition.

While recognizing the need for the aforementioned guidelines in elite competition, sport is an important vehicle for positive physical and mental health, and, for this reason, USA Swimming remains steadfast in its continued commitment to greater inclusivity at the non-elite levels.

In order to balance these two priorities, specific guidelines have been developed for both non-elite and elite athletes and elite events. At the non-elite level, an inclusive process has been established by which an athlete can elect to change their competition category in order for them to experience the sport of swimming in a manner that is consistent with their gender identity and expression. At the elite level, a policy has been created for transgender athlete participation in the U.S. that relies on science and medical evidence-based methods to provide a level-playing field for elite cisgender women, and to mitigate the advantages associated with male puberty and physiology. Elite athletes shall include any athlete who has achieved a time standard and desires to participate in elite events as defined in the policy.

The elite athlete policy will be implemented by a decision-making panel comprised of three independent medical experts and eligibility criteria will consist of:

- Evidence that the prior physical development of the athlete as a male, as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender female competitors.
- Evidence that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L (as measured by liquid chromatography coupled with mass spectrometry) continuously for a period of at least thirty-six (36) months before the date of application.

Athletes will need to abide by USA Swimming's Athlete Inclusion, Competitive Equity and Eligibility Policy to be eligible to set USA Swimming National Age-Group Records in the 13-14 age group and above or to be eligible to set an American Record, per the USA Swimming Rules & Regulations, in a competition category which is different than the gender assigned to the athlete at birth.

USA Swimming's policy is not applicable to non-USA Swimming athlete members or non-approved Elite events, as defined in the policy.

USA Swimming will continue to learn and to evaluate its policy, with a focus on balancing inclusion and equity, and will continue to work closely within FINA on global standards.

The complete policy, for both elite and non-elite athletes, which is part of the USA Swimming Operating Policy Manual, is available online at https://www.usaswimming.org/inclusion.

USA Swimming Diversity, Equity, and Inclusion Resources
USA Swimming LGBTQ Resources

# RELATED ARTICLES





## RELATED ARTICLES



cans Finish Strong on Final Day of uropean U23 Swimming pionships

3, 2023



U.S. Women Post Three Wins on Day Two of LEN European U23 Swimming Championships

AUG 12, 2023



Americans Shine on Opening Night of LEN European U23 Swimming Championships

AUG 11, 2023



cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL No. 20-35813 archived on August 14, 2023



**OUR COMMUNITY**

Swimmers

Coaches

Officials

Team Leaders

**RESOURCES**

SafeSport

Club Portal

Find a Team

Find Swim Lessons

Diversity, Equity & Inclusion

Rules & Policies

**ABOUT**

Overview

Board of Directors

Careers

Contact

**THE FOUNDATION**

About the Foundation

Support the Foundation

Ambassadors

News & Events

**FOLLOW**

DONATE

© Copyright 2023 USA Swimming. All Rights Reserved.     Privacy Policy     Terms & Conditions     Personal Data Request Form

News

# The UCI Announces Changes to Its Policy on Transgender Athletes

CYCLING'S INTERNATIONAL GOVERNING BODY EXTENDS TRANSITION TIME AND LOWERS TESTOSTERONE THRESHOLD FOR COMPETITION.

BY NO LONGER EXISTS   Published: Jun 17, 2022



RvS.Media/Basile Barbey // Getty Images

- The UCI has adjusted its policy on the inclusion of transgender athletes in cycling.

- The transition period on low testosterone has been extended to 24 months, from the previous 12-month period.

- The UCI has halved the maximum permitted plasma testosterone level from 5 nmol/L to 2.5 nmol/L.

---

On June 16, the Union Cycliste Internationale (UCI) adjusted its racing and competition policy for transgender athletes. The new regulations were outlined quietly in a press release and will go into effect on July 1.

The key changes are two-fold. First, the transition period on low testosterone has been extended to 24 months from the previous 12-month period. Second, the UCI has halved the maximum permitted plasma testosterone level from 5 nmol/L to 2.5 nmol/L.

This news comes just days before the world governing body for swimming is set to release their updated guidelines after a drama-filled season, according to *The Washington Post*.

The news, however, wasn't released with great fanfare. The following paragraphs are buried deep in the press release titled "UCI Management Committee approves the Federation's Agenda 2030 and awards the first UCI Gravel World Championships":

> In March 2020, the UCI published rules governing the participation of transgender athletes in events on the UCI International Calendar in the category corresponding to their new gender identity. Although these rules are stricter and more restrictive than those published by the International Olympic Committee (IOC) in 2015, the UCI has begun consideration on their adjustment following the publication of new scientific studies in 2020 and 2021. The principle of eligibility of transgender athletes (in particular female athletes, ie those who have made a transition from male to female) is based on the reversibility under low blood testosterone (the level commonly observed in "born female" athletes) of the physiological abilities that determine sports performance, and on the time needed to achieve this reversibility.

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

The latest scientific publications clearly demonstrate that the return of markers of endurance capacity to "female level" occurs within six to eight months under low blood testosterone, while the awaited adaptations in muscle mass and muscle strength/power take much longer (two years minimum according to a recent study). Given the important role played by muscle strength and power in cycling performance, the UCI has decided to increase the transition period on low testosterone from 12 to 24 months. In addition, the UCI has decided to lower the maximum permitted plasma testosterone level (currently 5 nmol/L) to 2.5 nmol/L. This value corresponds to the maximum testosterone level found in 99.99% of the female population.

This adjustment of the UCI's eligibility rules is based on the state of scientific knowledge published to date in this area and is intended to promote the integration of transgender athletes into competitive sport, while maintaining fairness, equal opportunities and the safety of competitions. The new rules will come into force on 1st July. They may change in the future as scientific knowledge evolves.

Moreover, the UCI envisages discussions with other International Federations about the possibility of supporting a research programme whose objective would be to study the evolution of the physical performance of highly trained athletes under transitional hormone treatment

The release then cites a position paper from Xavier Bigard, previous scientific advisor of the French anti-doping agency and former president of the French Society for Sports and Exercise Medicine (SFMES). He's currently the medical director of the UCI. The 17-page statement covers several performance metrics, including VO2 max, and Bigard concludes:

Given the current body of knowledge, the question of when it is fair to authorize TransWomen to compete in sports in line with their experienced

gender identity is challenging. Despite an obvious lack of knowledge in well-trained athletes, and based on the most recent current literature (Harper et al., 2021; Hilton and Lundberg, 2021; Roberts et al., 2020), it can be hypothesized that more than 12 months of testosterone suppression may be necessary to ensure that TransWomen do not have an unfair competitive advantage when competing at an elite level. Very little data have been provided to clarify on the potential remaining physical advantage for TransWomen after medical interventions, but based on one of the only published studies to date, it can be assumed that this potential advantage on muscle strength / power cannot be erased before a period of 24 months (Roberts et al., 2020).

The maximum serum testosterone concentration required is a fairly easy question to answer. The 95% confidence interval for serum testosterone in CisWomen is 0.6 - 1.68 nmol/L (Handelsman et al., 2018). For a 99.99% confidence interval (which involves no more than 1 in 10,000 values outside the confidence interval), the highest value of serum testosterone is 2.44 nmol/L. Therefore the maximum serum testosterone value can be defined as 2.5 nmol/L

cited in LINDSAY HECOX ET AL V. BRADLEY LITTLE, ET AL.
No. 20-35813 archived on August 2023

UCI President David Lappartient also included a statement in the release, saying: "With the adaptation of new rules for the participation of transgender athletes in competitions on the UCI International Calendar, our sport has a regulation that is fully consistent with the most recent scientific knowledge in this area. It is indeed important in this field to rely on objective knowledge to reconcile the very real need for inclusion with the essential need for fairness."

This decision has been met with displeasure on both sides. For riders who champion trans inclusion, it feels like a setback. For those who want trans women banned from competition entirely, it feels like 'not enough.'

**RELATED STORIES**

 Molly Cameron Won't Stay Silent Any More

 CRCA Demands Action From USA Cycling

 Alex Showerman Is No Longer Riding From Her Past

---

Furthermore, announcing this decision without a full press release or press conference to adequately answer questions and explain the reasoning feels as though the UCI has purposefully tried to downplay a decision that has momentous consequences for riders.

For Emily Bridges in the U.K., who began hormone therapy in 2021 and was physically threatened after trying to compete in the women's category this season, she may now have to wait another two years to make it to the start line.

"We'd received no communication from the UCI on their plans and, specifically, how it impacts Em's current application which has been part of the UCI process since March 2022," Bridges's team told ITV. "Given that the UCI requested, on May 11, Em provide additional blood tests (specifically over an extended period of three months) and detailed personal information... We are now seeking clarity on why they asked for this information when they were planning on a policy change."

Bridges was barred from racing in the women's category on short notice by the UCI earlier this March, reportedly due to her racing license, though she had been approved to compete by British Cycling. She learned of the UCI's most recent decision through the media, and not from the organization directly.

While conversation around how to best ensure fairness and inclusivity in women's sport is vitally important, it's equally critical to remember that every athlete in question is a human being. Certainly, all discussions should begin with empathy and a desire for understanding, along with full transparency to the public. A *real* need for

inclusion should be an open process, not a few paragraphs tucked away in a lengthy, multi-topic press release.

---

## Want to drool over the latest and greatest bikes?

Sign up for the most comprehensive gear reviews out there.

| ✉ Enter your email address here. | LET'S RIDE! |

By signing up, I agree to the Terms of Use (including the dispute resolution procedures) and have reviewed the Privacy Notice.

---

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

## World Triathlon

Home › News

### World Triathlon Executive Board approves Transgender Policy

*by Olalla Cernuda* on 03 Aug, 2022 04:04 •    Español



cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

World Triathlon's Executive Board has approved the Transgender Policy, following a period of consultation with the Medical Committee, Athletes Committee, Coaches Committee, Legal & Constitution Committee, Women's Committee and the Equality, Diversion & Inclusion Commission, as well as multiple experts in the field and the transgender community, World Triathlon states:

The Policy, that will be put in place in 30 days' time, states:

"To compete in the female category in an Elite or Age-Group triathlon competition, a Transgender athlete must demonstrate that the concentration of testosterone in the athlete's serum has been less than 2.5 nmol/L continuously for a period of at least 24 months. Also, at least 48 months must have elapsed since the Transgender athlete has competed as a male in any sporting competition".

The Transgender Policy was approved by the majority of the Executive Board, with the votes against of Vice President Ian Howard and President of the Athletes Committee Tamas Toth.

"We have been studying this matter for over a year, we have listened to the voices of all World Triathlon stakeholders, and I can only thank all the Committees and Commissions for the detailed work carried out by them to inform this policy. We are a small International Federation, but one that has always had inclusion and gender balance in our DNA. The Policy that we have just approved shows that we are prioritizing the fairness principle but showing inclusiveness. It is fully aligned with the IOC's recommendation, and similar to what other IFs have done in the last months. We will of course monitor the situation and the evolution of this policy, and we are open to reviewing and discussing it as much as necessary over time, as this subject is still evolving and we need to be flexible", said World Triathlon President and IOC Member, Marisol Casado.

Among the groups consulted in the last month by World Triathlon are sport scientists including Emma Hilton, Yannis Pitsidalis and Ross Tucker; University experts including Dr. Roger Pielke Jr, Dr. Alun Willims and Dr. Ada Cheung; IOC Human Rights expert Madeleine Pape; IOC advisor Daniel Berezowsky, and transgender athletes including Joanna Harper, Chris Mosier, Rachel McBride, Verity Smith, Patty Actually, Annie Lieberman and Veronica Ivy.

### Latest News

**Athletes chase first Paris 2024 spots at Thursday's huge Olympic Games Test Event**
Thursday morning in the French capital will see 65 women lining up for arguably…
14 Aug 2023

**First Olympic spots up for grabs at the Paris Test Event**
Welcome to the dazzling city of Paris, where the world's best elite triathletes…
1? Aug 2023

**The future is bright as Anderson and Holmes earn gold in the Commonwealth Youth Games**
The 2023 Commonwealth Youth Games is currently being staged in the Port of Spain,...
08 Aug 2023

more news →

---

Latest **Videos**

SHOWCASE: Elite men's World Cup race in Yeongdo
09 Aug, 2023

SHOWCASE: Elite women's World Cup race in Yeongdo
09 Aug, 2023

Highlights - 2023 World Triathlon Cup Yeongdo Elite Men's Race
07 Aug, 2023

Highlights - 2023 World Triathlon Cup Yeongdo Elite Women's Race
07 Aug, 2023

All videos

---

Latest **Event Galleries**

2023 World Triathlon Cup Yeongdo
05 Aug, 2023

2023 World Triathlon Championship Series Sunderland
29 Jul, 2023

2023 World Triathlon Sprint & Relay Championships Hamburg
13 Jul, 2023

2023 World Triathlon Para Series Swansea
15 Jul, 2023

All event galleries

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023

© World Triathlon

Women's Sports Foundation®

# 50 Years of Title IX: We're Not Done Yet



Published on May 4th, 2022

June 23, 2022 marks the 50th anniversary of the passage of Title IX. This federal civil rights law has been credited with profoundly changing education in the United States by barring sex discrimination in the nation's schools. Title IX, along with other equity laws, helped to unlock access to educational and athletic opportunities, paving the way for inroads into historically male-dominated professions. The work of five decades of Title IX's impact is writ large in every sector of American society.

This report is grounded in the rich history of Title IX and takes a multi-dimensional look at its impact. The report is based on a rigorous literature review and original research using publicly available data sets. The focus is primarily on the enforcement of Title IX in athletics and the three major areas that should be reviewed in ongoing and regular Title IX audits: athletic participation opportunities, allocation of athletic scholarship funding, and



50 Years of Title IX: We're Not Done Yet Executive Summary

Title IX Fast Facts

Share This    Print

## 50 Years of Title IX: We're Not Done Yet

Download File



Keep being inspired.
Subscribe to our newsletter

GO!

### WHO WE ARE
WSF History
Our Team
Athletes
Our Partners
Financials

### WHAT WE DO
Advocacy
Programs
Research
Resources
Awards

### THE EQUITY PROJECT
Get Involved
Annual Salute
Share Your Story

### SUPPORT US
Donate
Fundraise
Contact Us



Privacy Policy | Terms of Use

cited in LINDSAY HECOX, ET AL V. BRADLEY LITTLE, ET AL
No. 20-35813 archived on August 14, 2023