Nos. 20-35813, 20-35815

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LINDSAY HECOX; JANE DOE, with her next friends Jean Doe and John Doe,

*Plaintiffs-Appellees,*

*v.*

BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho; SHERRI YBARRA, in her official capacity as the Superintendent of Public Instruction of the State of Idaho; INDIVIDUAL MEMBERS OF THE STATE BOARD OF EDUCATION, in their official capacities; BOISE STATE UNIVERSITY; MARLENE TROMP, in her official capacity as President of Boise State University; INDEPENDENT SCHOOL DISTRICT OF BOISE CITY, #1; COBY DENNIS, in his official capacity as superintendent of the Independent School District of Boise City #1; INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION, in their official capacities,

*Defendants-Appellants,*

*and*

MADISON KENYON; MARY MARSHALL,

*Intervenors-Defendants.*

On Appeal from the United States District Court
for the District of Idaho
No. 1:20-cv-00184-DCN
The Honorable David C. Nye

## PETITION FOR REHEARING EN BANC

RAÚL R. LABRADOR
  *Attorney General*
Idaho Office of the Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
theodore.wold@ag.idaho.gov
lincoln.wilson@ag.idaho.gov
josh.turner@ag.idaho.gov
brian.church@ag.idaho.gov

THEODORE J. WOLD
  *Solicitor General*

JOSHUA N. TURNER
  *Deputy Solicitor General*

LINCOLN DAVIS WILSON
  *Chief, Civil Litigation and
  Constitutional Defense*

BRIAN V. CHURCH
  *Deputy Attorney General*

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION AND RULE 35(B) STATEMENT ................................... 1

BACKGROUND ...................................................................................... 2

REASONS FOR GRANTING REHEARING EN BANC ............................... 3

I.   The Panel Decision Conflicts with Ninth Circuit and Supreme Court Law ........... 3

   A. The Panel Decision Conflicts with This Court's Precedents .............................. 4

   B. The Panel Decision Conflicts with Supreme Court Precedent .......................... 9

      1.  The Supreme Court treats sex as immutable and binary ............................ 10

      2.  The panel decision is infected with category error ...................................... 11

      3.  Original meaning precludes the panel's revolutionary reading ................... 14

II.  Plaintiff Lacks Standing to Challenge "Sex Verification" Provisions ................... 15

CONCLUSION ...................................................................................... 17

## TABLE OF AUTHORITIES

### CASES

*Adams ex rel. Kasper v. Sch. Bd. St. John's Cnty.*,
  57 F.4th 791 (11th Cir. 2022)(en banc) ..........................................................4, 7, 12, 13

*Ballard v. U.S.*,
  329 U.S. 187 (1946)............................................................................................ 10

*Bauer v. Lynch*,
  812 F.3d 340 (4th Cir. 2016).............................................................................. 7

*Bostock v. Clayton Cnty., Ga.*,
  140 S. Ct. 1731 (2020) ................................................................................*Passim*

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993)............................................................................................ 11

*Cape v. Tenn. Secondary Sch. Athletic Ass'n*,
  563 F.2d 793 (6th Cir. 1977).............................................................................. 7

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
  695 F.2d 1126 (9th Cir. 1982).....................................................................*Passim*

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
  886 F.2d 1191 (9th Cir. 1989)......................................................................... 1, 5

*Clark v. Jeter*,
  486 U.S. 456 (1988)............................................................................................ 11

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)............................................................................................ 16

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ...................................................................................... 14

*Eknes-Tucker v. Gov. of Ala.*,
  ___ F.4th ____, 2023 WL 5344981 (11th Cir. Aug. 21, 2023) .................................... 8

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)............................................................................................ 10

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) .................................................................. 12

*L.W. ex rel. Williams v. Skrmetti,*
    73 F.4th 408 (6th Cir. 2023) .................................................. 8, 9

*Latta v. Otter,*
    771 F.3d 456 (9th Cir. 2014) ................................................... 11

*Michael M. v. Super. Ct. of Sonoma Cnty.,*
    450 U.S. 464 (1981) .................................................................... 6

*Miss. Univ. for Women v. Hogan,*
    458 U.S. 718 (1982) .................................................................. 11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................. 14

*Nguyen v. Immig. Naturalization Serv.,*
    533 U.S. 53 (2001) ............................................................... 6, 10

*United States v. Virginia,*
    518 U.S. 515 (1996) .................................................................. 11

## STATUTES

Idaho Code § 33-6203 ................................................... 3, 9, 15, 16

Idaho Code § 33-6202 .......................................................... 2

## OTHER AUTHORITIES

Carl R. Trueman, THE RISE AND TRIUMPH OF THE MODERN SELF 350-57 (2020) ..... 14

Peter Bronski, *A Look Back: The Most Perfect Education of Body, Mind & Heart*, 107
    VASSAR, THE ALUMNAE/I QUARTERLY (2011),
    https://tinyurl.com/2p8yzfp8 ................................................ 13

## INTRODUCTION AND RULE 35(B) STATEMENT

In this appeal, a panel of this Court affirmed a first-of-its-kind injunction against a state law that would uphold the traditional practice of sex separation in sports—Idaho's Fairness in Women's Sports Act. The panel's decision not only conflicts directly with two prior decisions of this Court that held that sex-separation of sports does not violate the Equal Protection Clause but also flouts the basic definition of sex that is inherent to the entire corpus of the Supreme Court's Equal Protection jurisprudence. The Court should grant rehearing en banc to bring the panel's decision into conformity with the law and to protect fairness in athletic competition in Idaho and beyond.

*First*, the panel decision conflicts with decisions both of this Court and of the Supreme Court. This Court has held twice before that the Equal Protection Clause permits sex-separation in sports to promote "equality of athletic opportunity" based on "average physiological differences" between men and women. *See Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (*Clark I*); *see also Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191 (9th Cir. 1989) (*Clark II*). The panel held the opposite. It purported to distinguish this case from *Clark* on the ground that the law here classifies based on whether athletes have gender dysphoria. But that is not so. The Fairness Act classifies only based on sex, not gender dysphoria, and one does not logically imply the other, since people with gender dysphoria are members of both sexes. And so the panel's adoption of a subjective understanding of sex based on how individuals feel about themselves conflicts directly with the Supreme Court's

recognition of sex as both binary and immutable. The panel decision would import modern concepts of gender identity, popularized only within the last decade, into a constitutional provision ratified in 1868 by people to whom such notions would be completely foreign. The Court should grant rehearing and correct these fundamental errors on these questions of immense importance.

*Second*, the panel reached out to decide questions about the law over which it plainly lacked jurisdiction. Jane Doe, the only plaintiff who had standing to challenge those provisions, was dismissed from the case. Yet the panel ruled those provisions were unconstitutional as to the remaining plaintiff, Lindsay Hecox, who is undisputedly and openly a biological male and thus has no threat of being subject to those provisions. There is no active case or controversy concerning this aspect of the law and the Court should have dismissed that challenge as moot.

The Court should grant rehearing, vacate the panel opinion, and reverse the judgment below. And since college sport participation is inherently time-limited, it should do so expeditiously.

## BACKGROUND

Based on legislative findings about "inherent differences between men and women" that "result in different athletic capabilities," the Idaho legislature enacted the Fairness in Women's Sports Act to "promote sex equality … by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities." Idaho Code § 33-6202(1), (8), (12). The Fairness Act requires that athletic teams be designated

2

and limited as males, females, or co-ed, all "based on biological sex." Idaho Code § 33-6203(1). Hecox, a biological male with gender dysphoria, and Doe, an anonymous biological female, sued to enjoin the law. 5-ER-762; 5-ER-769. Hecox alleged that the law wrongly denied the opportunity to participate in women's sports, and Doe alleged injury from the possibility of being subjected to the sex verification provisions of the Fairness Act. 5-ER-770-73. The district court granted a preliminary injunction, and the State Defendants appealed. 1-ER-087.

While the case was on appeal, Doe moved out of state, and the panel remanded to the district court for further factual findings on whether the case was moot. Dkt. 143. The district court concluded the case was not moot as to Hecox, and the panel affirmed. Dkt. 190. The panel then requested supplemental briefing on the merits of the claims remaining in the case. Dkt. 191. On August 17, 2023, the panel affirmed the injunction. Dkt. 218-1 ("Order," Ex. A).

## REASONS FOR GRANTING REHEARING EN BANC

## I.     The Panel Decision Conflicts With Ninth Circuit and Supreme Court Law.

The panel's blinkered approach creates an intra-circuit split and an alarming departure from Supreme Court precedent. The law *was* clear in this Circuit that women's sports were both constitutional and warranted protection. But the panel ignored controlling precedent and dismantled the protections women once had in that arena. Now, the legal groundwork has been laid for men to overtake women's sports or, more likely, for the very concept of women's sports to fade out of existence. Under the panel's

telling, Idaho could not defend female athletes without simultaneously discriminating against males with gender dysphoria. And to accommodate the sporting ambitions of the latter, the panel wholly disregarded the protections due the former. That swap ignores governing law.

This Circuit and the Supreme Court have instead long recognized that sex-based classifications are often perfectly constitutional. And until the panel's decision, this Court was equally clear that states can ensure that women's sports are protected from non-female participation. The panel's decision leaves states no room to implement that legitimate policy. The Court should grant rehearing en banc and correct the error.

**A. The Panel Decision Conflicts With This Court's Precedents.**

The panel's intermediate scrutiny[1] analysis of the Fairness Act conflicts directly with this Court's own precedent, which has twice upheld laws imposing sex-classification in sports under the Equal Protection clause. The panel attempted to dance around that precedent, but ultimately provided no ground that would distinguish the Fairness Act from the policies this Court previously upheld in *Clark*. As a result, the panel created two contradictory lines of authority, and district courts will be at a total loss to

---

[1] The Eleventh Circuit has expressed "grave doubt" gender dysphoria is a "quasi-suspect class" for purposes of Equal Protection analysis. *Adams ex rel. Kasper v. Sch. Bd. St. John's Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc) (cleaned up). Although intermediate scrutiny applies either way, en banc review would also provide the full Court a platform to determine the appropriate standard of review for classifications based on gender dysphoria.

know whether and when such classifications in sports withstand scrutiny. The Court should grant rehearing en banc to reconcile this conflict.

This Court, more so than other courts of appeals, does not write on a blank slate in considering Equal Protection challenges to sex classifications in sports: it twice addressed these very questions in the *Clark* litigation. In *Clark I*, the Court considered a challenge by a male high school athlete to regulations that prohibited him from playing on the girls' volleyball team. 695 F.2d 1126. Applying intermediate scrutiny, this Court held that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is a "legitimate and important governmental interest." *Id.* at 1131. The Court then concluded that excluding all "boys is substantially related to this interest," because "real differences"—the same differences recognized by the Fairness Act—"exist between boys and girls" that "would prevent realization of the goal if the exclusion were not allowed." *Id.* The panel did not consider the circumstances of the specific plaintiff, but rather ruled that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" together. *Id.* Thus, the categorical exclusion of boys "simply recogniz[ed] the physiological fact that males would have an undue advantage competing against women for positions on the volleyball team" and therefore satisfied intermediate scrutiny. *Id.* The Court reaffirmed that holding in *Clark II*, 886 F.2d at 1193.

This Court's decisions in the *Clark* litigation ought to have disposed of Plaintiffs' claims here. Yet instead, the panel ruled that the same fairness objectives that were

sufficient in *Clark* are "not substantially related to, and in fact undermine, those asserted objectives" of the Fairness Act. Order-38. It purported to distinguish *Clark* on the ground that the Fairness Act "perpetuates historic discrimination" by "categorically" excluding men with gender dysphoria "from athletic competition." Order-41. But this is factually incorrect, since the Fairness Act "categorically" excludes based on sex, not based on gender dysphoria, which is a "distinct concept[] from sex." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1746-47 (2020). And more important, this is not a distinction from *Clark* at all, because the policy at issue there, just like the Fairness Act, excluded *all* men from women's sports. *Clark I*, 695 F.2d at 1127. That was regardless of gender identity or "historic discrimination"—minority men had no greater claim to play women's sports than white men. *Id.* The policy in *Clark* had the same definitions and the same effects as the Fairness Act, and so the panel decision cannot stand without overruling *Clark*.

In parting from this Court's rationale in *Clark*, the panel twisted intermediate scrutiny to the point that it was indistinguishable from strict scrutiny. Intermediate scrutiny requires only that sex classifications serve an "important" government objective and that the "means" used "substantially relate[] to" the state's goal. *Nguyen v. INS*, 533 U.S. 53, 60 (2001). The fact that a "statute is drawn as precisely as it might have been" is no barrier to its survival under intermediate scrutiny. *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality op.). A perfect fit is not required. *Nguyen*, 533 U.S. at 60.

But despite the wide berth of intermediate scrutiny, the panel had scores of narrow complaints about the Fairness Act. *Clark I* reached its decision based on "average physiological differences" between men and women, 695 F.2d at 1131, but the panel faulted Idaho for lack of anecdotal evidence of competitive threats from men with gender dysphoria in Idaho sports. Order-41, 45. It then quibbled that Plaintiff's physiological advantages could "be altered through medical treatment … through hormone therapy to conform to elite athletic regulatory guidelines," in effect complaining that Idaho had not adopted a different competition standard that the Court would deem more fair. Order-27. And while it conceded that many athletic regulatory bodies pose limits on men with gender dysphoria competing with women, Order-46, it still objected that Idaho has chosen to regulate the same issues in a different manner. Order-46-47. The panel's stringent version of intermediate scrutiny warrants attention of the full court, especially given the conflict it generates with *Clark*.

The panel's twisting of the standard of review disserves women. Men and women are not "the same for the purposes of physical" activities, *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016), and without sex separation in sports, "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977). "[I]t is neither myth nor outdated stereotype that there are inherent differences between … male[s] and … female[s] and that those born male … have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring). Thus, allowing

an individual with gender dysphoria "who is born a biological male ... to try out for and compete on a sports team" for biological females "would significantly undermine the benefits afforded to female student athletes." *Id.* Several studies have confirmed that irreversible physiological differences exist between biological males and females that give biological male athletes significant advantages over female competitors. *Id.* at 819-20 (citing studies). In this way the Fairness Act tracks Title IX, which "paved the way for significant increases in athletic participation for girls and women." *Id.* at 818 (cleaned up). And as this Court held in *Clark I*, "[t]here is no question that" these goals are an "important governmental interest." 695 F.2d at 1131 (citation omitted).

The panel did acknowledge that more than a dozen states—Alabama, Arizona, Arkansas, Florida, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia— have acted to protect women's sports by passing substantially similar laws. Order-15 n.4. It tried to distinguish them because they do not include a sex verification procedure, but that is immaterial, since Plaintiff lacks standing to challenge that procedure anyway. *See infra* Point II. And more important, minor differences in how Idaho has chosen to regulate the matter does not suggest that its law is unconstitutional. Rather, as Judge Sutton recently explained, these "vexing line-drawing dilemmas for legislatures" over the relation of gender dysphoria to sports and other issues ought to provoke "hesitancy" for the courts to step in. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023); *Eknes-Tucker v. Gov. of Ala.*, ___ F.4th ____, 2023 WL 5344981 (11th Cir.

Aug. 21, 2023). Where "the States are currently engaged in serious, thoughtful debates about the issue," then "[t]he burden of … constitutionalizing new areas of American life is not—and should not be—a light one." *L.W.*, 73 F.4th at 415-16 (citation omitted). And so the panel's decision to jump into that debate and pick sides warrants this Court's full attention.

### B. The Panel Decision Conflicts With Supreme Court Precedent.

Even more fundamental than its conflict with *Clark*, this case is a battle for control of the definition of sex. That question should be easy to answer. Both the Idaho law at issue and the Supreme Court's Equal Protection jurisprudence have treated sex—or "biological sex," in the parlance of the Fairness Act—as a binary construct that distinguishes men and women based on their genetic, chromosomal differences, as evidenced by external genitalia. Idaho Code § 33-6203; *Bostock*, 140 S. Ct. at 1739. But the panel held that the very notion of such a sex classification "can cause confusion" and would be "an oversimplification of the complicated biological reality of sex and gender." Order-29. It grounded this new view of "reality" in the testimony of Plaintiffs' experts, who say that sex depends not just on those biological facts, but also on a personal sense of "gender identity." Order-41-42. Thus, the panel reasoned that laws classifying based on the traditional understanding of sex are really "classif[ying] based on transgender status." *Id.* at 35. And so it concluded that Idaho's state law instituting traditional separation of sports by sex is actually a "first-of-its-kind categorical ban on

the participation of transgender women and girls in women's student athletics." Order-12.

This is a radical view of the law that is as novel in this Circuit as it is troubling. The notion that classifying based on sex is classifying based on gender dysphoria conflicts directly with the precedents of the Supreme Court. The Court should not allow this conflict to stand; it should grant rehearing en banc to resolve it.

### 1. The Supreme Court treats sex as immutable and binary.

The panel's decision upends the Equal Protection framework for sex discrimination by redefining the key word in that framework: sex. Idaho's Fairness Act adopts the same understanding of sex that underlies all of the Supreme Court's Equal Protection cases. There are "two sexes," and they "are not fungible." *Ballard v. U.S.*, 329 U.S. 187, 193 (1946). Those holdings are not outdated: even in recent decisions addressing gender dysphoria, the Supreme Court has continued to recognize sex as referring "to biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. That is because gender dysphoria is a "distinct concept[] from sex." *Id.* at 1746-47.

The panel said the Fairness Act's definition is "an oversimplification." Order-29. So it treated sex as a flexible construct that varies according to "a person's sense of being male, female, neither, or some combination of both." Order-13. But the Supreme Court regards sex as an "immutable characteristic," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), defined by "our most basic biological differences." *Nguyen*, 533 U.S. at 73. "The difference between men and women … is a real one." *Id.* Of course, those

"inherent" and "enduring" physiological differences between men and women should be a "cause for celebration," not the denigration, of the "two sexes." *United States v. Virginia*, 518 U.S. 515, 533 (1996). But it is precisely because sex is fixed, and yet very real, that the Supreme Court subjects sex classifications to intermediate scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).

Controlling Supreme Court precedent leaves no room for the panel's holding that a classification based on sex is really a classification based on gender dysphoria. The panel was not free to supplant this fundamental understanding of sex with its own novel view. Yet it did not even attempt to grapple with the Supreme Court's understanding of sex classifications as binary and unchanging. It just breezed on past. That warrants rehearing.

### 2. The panel decision is infected with category error.

The panel's conception of sex as a negotiable term in constitutional law infected its entire decision. Having ruled that classifications based on the traditional understanding of sex are actually ways to exclude people with gender dysphoria, the panel concluded that "the Act's use of biological sex functions as a form of proxy discrimination." Order-31 (cleaned up). But that too conflicts with Supreme Court precedent: proxy discrimination happens where a law discriminates based on a characteristic that is coextensive with a suspect class—e.g., "[a] tax on wearing yarmulkes is a tax on Jews." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) (classifying couples based on "procreative capacity" is equivalent to

classifying them based on sexual orientation). That is not the case here because, as the Supreme Court has held, gender dysphoria is a "distinct concept[] from sex." *Bostock*, 140 S. Ct. at 1746-47. Thus, there are people with gender dysphoria on both sides of the sex-based line drawn by the Fairness Act.

The en banc Eleventh Circuit recently recognized this very point in upholding what it termed "the unremarkable—and nearly universal—practice of separating school bathrooms based on biological sex." *Adams*, 57 F.4th at 796. It rejected the notion that traditional sex-separation in this area was really discriminating against students with gender dysphoria, since there are people with gender dysphoria on both sides of that sex-based line. *Id.* at 809 (discussing *Geduldig v. Aiello*, 417 U.S. 484, 486, 496-97 (1974)). And there, just as here, the law did "not depend in any way on how students act or identify." *Adams*, 57 F.4th at 809. Rather, it classified "based on biological sex, which is not a stereotype." *Id.* So too here.

The panel decision nevertheless purported to distinguish *Adams* based on its different factual context relating to bathrooms. Order-32. But while that different factual context might bear on whether laws survive intermediate scrutiny, it makes no difference to the threshold question of how the law classifies. According to the Eleventh Circuit, a classification based on sex is just that: a sex-based classification. *Adams,* 57 F.4th at 796. But according to the panel, classifying based on sex—as that term has been interpreted by the Supreme Court—is actually classifying based on gender dysphoria. That reasoning of the two decisions is irreconcilable.

The panel also attempted to distinguish *Adams* on the ground that the Fairness Act "was designed precisely as a pretext" to keep men with gender dysphoria out of "women's athletics." Order-33. That is not so. When a legislature responds to new events by redoubling its protection of a traditional boundary, that does not mean that traditional boundary only existed as a pretext. Women's sports first emerged around the time of the ratification of the Fourteenth Amendment, and this Court's *Clark* decisions show that sex-separation of sports was well established at that time. *See* Peter Bronski, *A Look Back: The Most Perfect Education of Body, Mind & Heart*, 107 Vassar, The Alumnae/I Quarterly (2011), https://tinyurl.com/2p8yzfp8. The sex-based standard of the Fairness Act already existed, so it is unremarkable that Idaho acted to reinforce it based on news reports of men with gender dysphoria competing against women. *See* Order-45-46. These widespread standards based on fundamental biological differences do not become bigoted just because a legislature reifies them in response to social controversy.

There is nothing to the contrary in *Bostock*. If *Bostock* applies at all, it favors the Fairness Act, since it continued to recognize the sex as a binary concept referring "to biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. And more important, the heart of *Bostock*'s analysis that the panel relied on—that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex," Order-35—is not at issue here. *Id.* at 1741. This is not a case like *Bostock* where the panel held that a classification based on gender dysphoria is really a classification based on sex. In fact, the panel held the opposite: that a

13

classification based on sex is really a classification based on gender dysphoria. Nothing in *Bostock* permits that logical inversion, and this Court should grant rehearing en banc to correct it.

### 3. Original meaning precludes the panel's revolutionary reading.

The understanding of sex as unchangeable and distinctive matters even more in light of the Supreme Court's demand that the Constitution be interpreted according to its text and original public meaning. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). "Constitutional analysis must begin with 'the language of the instrument,' … which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs*, 142 S. Ct. at 2244-45 (citation omitted). That analysis is "rooted in the … text, as informed by history[,]" *Bruen*, 142 S. Ct. at 2127, and a constitutional challenge to state law will not succeed where an "overwhelming consensus" has historically upheld the regulations in question. *Dobbs*, 142 S. Ct. at 2253-54.

Plaintiff's claims cannot survive this interpretive framework. The entire modern construct of gender identity had not even been contemplated when the Equal Protection clause was ratified in 1868. It did not emerge in an academic setting until the late twentieth century, and in popular understanding, only within the last decade. *See* Carl R. Trueman, The Rise and Triumph of the Modern Self 350-57 (2020). So even while the statement "I am a woman trapped in a man's body" is one that many "ordinary people" now find both meaningful and significant, it would not have even been

coherent to someone born in the early 20th century, much less to the people who ratified the Fourteenth Amendment in 1868. *Id.* at 19.

In a footnote, the panel dismissed these fundamental interpretive standards as inapplicable, suggesting that law has been superseded by science. Order-28 n.8. It dismissed this history because "the drafters of the Fourteenth Amendment would have had no concept of what 'endogenously produced testosterone levels' meant in 1868," *id.*, and suggested there is "likely that there is some biological explanation" for gender dysphoria, even though "scientists are not fully certain why" it exists. Order-30. But whatever the merits of the panel's view about the "complicated biological reality of sex and gender," Order-29, those views cannot backfill the interpretation of a clause enacted by people who regarded sex as fixed, not mutable. And if in fact science and justice have worked such a revolution in these ancient concepts, that revolution warrants more than a footnote. It deserves the attention of the full court.

## II.    Plaintiff Lacks Standing to Challenge "Sex Verification" Provisions.

Finally, the Court should grant rehearing to vacate the portion of the panel opinion addressing the sex-verification provisions of the Fairness Act. Those provisions, which apply only if there is "[a] dispute regarding a student's sex" under the terms of the Act, Idaho Code § 33-6203(3), were previously challenged by Doe, a female who sued anonymously because she alleged injury from the threat of having her sex verified. 5-ER-774. However, the parties conceded that Doe's claims were moot when she moved out of state. Dkt. 143 at 2 n.1. While that should have ended the dispute over

the sex verification provisions of the law, the panel nevertheless opined on them based on the claims of Hecox. Order-49-50 n.17. But Hecox lacks standing to assert those claims, since this action affirmatively and publicly alleges that Hecox is male. 5-ER-769. Hecox's claims do not raise "[a] dispute regarding a student's sex," Idaho Code § 33-6203(3), and any risk of enforcement of those provisions against Hecox is just as speculative as enforcement against a Plaintiff who lives out of state. The only Plaintiff who may have had standing to assert these claims has been dismissed, and there is no Article III controversy over these provisions of the Act. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). The Court should grant rehearing and vacate that portion of the panel's opinion as moot.

CONCLUSION

The Court should grant rehearing, vacate the panel decision, and reverse the judgment below.

August 31, 2023

Respectfully submitted,

HON. RAÚL R. LABRADOR
Attorney General

/s/ *Lincoln Davis Wilson*

THEODORE J. WOLD
Solicitor General
LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense Division
JOSHUA N. TURNER
Deputy Solicitor General
BRIAN V. CHURCH
Deputy Attorney General

*Attorneys for Defendants-Appellants*

17

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Circuit Case No.:                    20-35813

I am the attorney representing Appellants.

**This petition contains 4,179 words,** excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 40-1.


/s/ *Lincoln Davis Wilson*                              August 31, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing/attached documents on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

Description of Documents: Petition for Rehearing En Banc

/s/ *Lincoln Davis Wilson*                                    August 31, 2023