Appeal Nos. 20-35813, 20-35815

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

LINDSAY HECOX and JANE DOE, with her
next friends Jean Doe and John Doe,
*Plaintiffs-Appellees*,

v.

BRADLEY LITTLE, *et al.*,
*Defendants-Appellants*,

and

MADISON KENYON and MARY MARSHALL,
*Intervenors-Appellants*.

_____

On Appeal from the United States District Court
for the District of Idaho
District Court Case No. 1:20-cv-00184-DCN
Hon. David C. Nye

_____

## PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' AND INTERVENORS-APPELLANTS' PETITIONS FOR REHEARING EN BANC

_____

James Esseks
Chase Strangio
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2569

Julie Veroff
Kathleen Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Ctr., 20th Fl.
San Francisco, CA 94111
(415) 693-2000

Selim Aryn Star
AMERICAN CIVIL LIBERTIES
UNION OF IDAHO FOUNDATION
Cooperating Attorney for
American Civil Liberties Union
of Idaho Foundation
219 S. River Street, Suite 202
Hailey, Idaho 83333
(208) 788-9232

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
(212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
(202) 842-7800

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION .................................................................................. 1

ARGUMENT ........................................................................................ 5

    A.    There Is Alignment, Not Conflict, Between this Court's Decisions in *Clark* and the Panel's Ruling. ......................... 5

        1.    *Clark* Had Nothing to Do with Transgender Athletes. ....................................................................... 5

        2.    Under *Clark*'s Reasoning, Transgender Women Should Be Permitted to Play Women's School Sports. ......................................................................... 7

    B.    The Panel's Case-Specific Conclusion that H.B. 500 Discriminates Based on Transgender Status Is Consistent with Precedent and Does Not Create an Inter-Circuit Split. ............................................................... 10

    C.    The Panel Applied Intermediate Scrutiny Consistent with Circuit Precedent. ......................................................... 16

        1.    The Panel Followed Circuit Precedent Providing that Transgender-Status Classifications Warrant Heightened Scrutiny. ................................................. 16

        2.    The Panel's Intermediate Scrutiny Analysis Was Correct and Does Not Warrant Rehearing. ................ 18

    D.    The Panel Correctly Did Not Import *Dobbs* and *Bruen* Into Its Equal Protection Analysis. .................................... 20

    E.    The Scope of the Preliminary Injunction Does Not Warrant Rehearing. ........................................................... 21

i

# TABLE OF CONTENTS
(continued)

**Page**

F.    The Panel's Decision that Lindsay Has Standing to Challenge H.B. 500's Sex-Verification Provisions Does Not Warrant Rehearing. ...................................................... 23

CONCLUSION ........................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. School Board of St. Johns County*,
   57 F.4th 791 (11th Cir. 2022) (en banc) ................................. 13, 14, 16

*Clark ex rel. Clark v. Ariz. Intersch. Ass'n*,
   695 F.2d 1126 (9th Cir. 1982) .................................................... *passim*

*Clark ex rel. Clark v. Ariz. Intersch. Ass'n*,
   886 F.2d 1191 (9th Cir. 1989) .................................................... 5, 9, 10

*Dobbs v. Jackson Women's Health Organization*,
   142 S. Ct. 2228 (2022) .......................................................................... 20

*Doe v. Reed*,
   561 U.S. 186 (2010) ................................................................................ 22

*Frontiero v. Richardson*,
   411 U.S. 677 (1973) ................................................................................ 21

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ................................................................ 14

*Hundley v. Aranas*,
   2023 WL 166421 (9th Cir. Jan. 12, 2023) .......................................... 17

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) .................................................. 12, 13, 17

*L.W. by & through Williams & Skrmetti*, 73 F.4th 408 (6th
   Cir. 2023) ................................................................................................. 16

*Lopez-Valenzuela v. Arpaio*,
   770 F.3d 772 (9th Cir. 2014) ................................................................ 19

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) .......................................................................... 20

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)...................................................................... 14, 15

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017)............................................................................ 21

*United States v. Virginia*,
   518 U.S. 515 (1996)...................................................................... 18, 21

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1*
   *Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017)........................................................... 14

**Statutes**

Idaho Code
   § 33-6202(11)..................................................................................... 11
   § 33-6203(2)....................................................................................... 12
   § 33-6203(3)....................................................................................... 12

**Other Authorities**

9th Cir. R. 35-1..................................................................................... 17

Fed. R. App. P. 35(a).............................................................................. 1

## INTRODUCTION

Rehearing en banc is warranted only when necessary to resolve a conflict or when "a question of exceptional importance" is at stake. Fed. R. App. P. 35(a). The State and Intervenors (collectively, "Appellants") fail to meet—indeed, do not even seriously engage with—that standard. Their petitions repeatedly misrepresent what this case is about and what the undivided panel held. This case is not about men and boys playing on sports teams for women and girls. Nor is it about maintaining a general policy of sex separation in school sports. Rather, this case is about a sweeping Idaho law, House Bill 500 ("H.B. 500"), that categorically bars all women and girls who are transgender from playing school sports on girls' teams. The law applies at every age, in every sport, at every level—from kindergarten to college, from intramural to Division I athletics—regardless of whether a banned athlete experienced endogenous puberty or is receiving hormone therapy. The law also puts all female athletes—both cisgender and transgender—at risk of having their sex "disputed." If that happens, they must submit to invasive and medically unnecessary testing to "verify" their sex using criteria—reproductive anatomy, genetic makeup, and endogenous testosterone

levels[1]—that were chosen because they ensure women who are transgender cannot qualify to participate on women's teams.

Athletics rules in Idaho have long provided for separate men's and women's school sports teams and prevented men from playing on women's teams. (Op. 37 n.14; 1-ER-73.) Prior to H.B. 500, those rules also allowed transgender women to play on women's teams following a period of testosterone suppression. (Op. 16; 1-ER-73-74.) H.B. 500 was enacted to override that policy of inclusion and instead exclude transgender women.

Lindsay Hecox and Kayden Hulquist (formerly "Jane Doe") challenged H.B. 500. Lindsay is a woman who is transgender. She loves running and being part of a team, and wants to play women's sports at Boise State University ("BSU"), where she is a student. (Op. 20.) Lindsay receives hormone therapy that lowers her circulating testosterone levels and raises her estrogen levels. (Op. 40.)[2]

---

[1] "Endogenous" refers to testosterone levels naturally produced by the body, as opposed to testosterone levels resulting from hormone therapy.

[2] Kayden is a cisgender woman. She played high school sports in Idaho and was afraid her sex would be disputed under H.B. 500. (Op. 20.) Kayden has since graduated and attends college out-of-state. (Dkt. 143 at 2 n.1.)

In a lengthy opinion that fully engaged with the parties' arguments and the proffered evidence, and that faithfully applied precedent, the District Court preliminarily enjoined H.B. 500, finding that the law discriminates based on transgender status and sex; that the State failed to show that the law is substantially related to the asserted interest of providing equal opportunities for women athletes and so likely violates the Equal Protection Clause; and that H.B. 500's enforcement would irreparably harm all women and girl athletes in Idaho, including those who are transgender. (1-ER-1-87.) An undivided panel of this Court affirmed in a carefully reasoned decision that also faithfully applied precedent.

The District Court's preliminary injunction allowed Lindsay to try out for the BSU women's cross-country and track teams in Fall 2020; she failed to make both teams. (Op. 22 n.7.) The injunction also allowed her to join the BSU women's club soccer team, which does not require try-outs, in Fall 2022. (*Id.*) Earlier this month, Lindsay again tried out for the women's cross-country and track teams; she again did not make the teams. She continues to play women's club soccer at BSU, which she could not do absent the preliminary injunction. (Op. 54.)

3

Appellants argue for rehearing en banc based primarily on a defense of sex separation in sports generally. But Lindsay does not challenge sex separation in sports, and the panel's opinion does not jeopardize sex separation in sports. To the contrary, the panel opinion affirms the District Court's order *retaining* the general rule of sex separation in sport that pre-dated H.B. 500. (1-ER-73-74.) Appellants' arguments thus ultimately hinge on their contention that women who are transgender are the same as men who are cisgender. That contention is unsupported as both a matter of law and fact, and provides no basis for revisiting the District Court's and panel's sound rulings.

The panel also did not hold that all sex-based classifications are transgender-status classifications, despite Appellants' suggestions to the contrary. Instead, the panel made a case-specific determination based on H.B. 500's text, effect, and expressed legislative purpose that the law discriminates based on transgender status (in addition to sex). The panel then applied intermediate scrutiny and held—based on the case-specific evidence and arguments—that Appellants failed to show that H.B. 500 substantially serves an important state interest. In so doing, the panel held, among other things, that the District Court did not clearly err in

finding that the record did not support Appellants' contention that transgender women athletes who suppress their testosterone levels through hormone therapy on average athletically outperform cisgender women athletes.

The panel decision is case-specific, consistent with precedent, and does not create any intra- or inter-circuit splits. It does not warrant en banc review. Appellants' petitions should be denied.

## ARGUMENT

### A. There Is Alignment, Not Conflict, Between this Court's Decisions in *Clark* and the Panel's Ruling.

Appellants incorrectly assert that the panel decision creates an intra-circuit conflict with this Court's prior *Clark* decisions. *See Clark ex rel. Clark v. Ariz. Intersch. Ass'n*, 695 F.2d 1126 (9th Cir. 1982) ("*Clark I*") and 886 F.2d 1191 (9th Cir. 1989) ("*Clark II*") (collectively, "*Clark*"). Those decisions had nothing to with transgender student athletes, and their reasoning in fact *supports* the result here.

### 1. *Clark* Had Nothing to Do with Transgender Athletes.

*Clark* considered an entirely different question—whether public schools can constitutionally maintain sex-separated sports teams and prohibit cisgender boys from playing on girls' teams in order to redress

5

past discrimination against women in athletics and advance equality of athletic opportunity. *Clark I*, 695 F.2d at 1131. The plaintiffs in *Clark* were cisgender boys whose "overall opportunities" to play school sports were "equal" to those provided to girls, but who could not play high school volleyball because their schools sponsored only girls' volleyball teams and a state policy prevented them from playing on girls' teams. *Id.* at 1127-28, 1131. The parties *stipulated* that boys would "on average be potentially better volleyball players than girls" and would "dominate" particular "skills in volleyball," thus creating an "undue advantage" in competitions with girls. *Id.* at 1127, 1131. Based on those stipulated facts, this Court concluded that the policy of excluding cisgender boys from girls' volleyball survived heightened scrutiny because the boys and girls in the school district had an equal number of overall athletic opportunities, and (per the stipulation), "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* at 1131.

Unlike the plaintiffs in *Clark*, Lindsay does not challenge sex separation in sports. Nor does the panel decision threaten the constitutionality of sex-separated sports or the exclusion of cisgender

boys from girls' school sports. That exclusion existed in Idaho prior to and throughout the period in which H.B. 500 has been preliminarily enjoined. This case presents the distinct question whether categorically excluding transgender women from women's school sports teams likely violates the Equal Protection Clause. *Clark* did not consider or resolve this separate question.

Appellants' contention that this appeal should have been resolved in their favor by *Clark* requires accepting both their misguided notion that transgender women are cisgender men and their incorrect argument that H.B. 500 merely reaffirms a general principle of sex-separation in sport. But transgender women are not cisgender men, and the policy of sex-separation in *Clark* is not "the same" as the policy of transgender exclusion in H.B. 500. (State 6.)

2.   <u>Under *Clark*'s Reasoning, Transgender Women Should Be Permitted to Play Women's School Sports.</u>

If anything, under the analysis in *Clark*, transgender women should be permitted to play on women's teams.

*First*, *Clark* observed that women historically have been deprived of athletic opportunities compared to men. *Clark I*, 695 F.2d at 1131. Advancing that interest is not served by discriminating against

7

transgender women, who likewise historically have faced discrimination. (Op. 40-41.)

*Second*, whereas the cisgender boys excluded from participating in girls' volleyball in *Clark* still had an equal number of overall athletic opportunities, *see Clark I*, 695 F.2d at 1127, 1131, the District Court found that transgender women who are excluded pursuant to H.B. 500 have *no* scholastic athletic opportunities—they are prohibited from playing on women's teams in *any* sport at *any* level, including club sports; they cannot play on men's teams because they are not men; and co-ed teams are rare. (Op. 41; 1-ER-65.)

*Third*, whereas the parties in *Clark* stipulated that cisgender boys have an athletic advantage over cisgender girls that would result in the former substantially displacing the latter, Appellants failed to show that women who are transgender and suppress their testosterone—as was

8

required pre-H.B. 500—will have better average athletic performances than cisgender women and so substantially displace them. (Op. 42-44.)[3]

Moreover, *Clark*'s concern with substantial displacement is not implicated by transgender women, who represent a very small percentage of the population. (Op. 42-43.) Indeed, during more than three years of litigation, Appellants have never identified a single transgender athlete in Idaho other than Lindsay.

Intervenors take out of context language from *Clark II* to contend that H.B. 500's categorical exclusion is justified to bar the participation of a single transgender woman. They claim *Clark II* said that the participation of even one cisgender boy on a girls' volleyball team would "set back" the "goal of equal participation by females in interscholastic athletics." (Intervenors 8 (quoting 886 F.2d at 1193).) As the panel explained, Intervenors' reliance on that language is misplaced. (Op. 42, 74.) The cisgender boy plaintiff in *Clark II* had argued that because

---

[3] The State asserts that "[s]everal studies have confirmed that irreversible physiological differences exist between biological males and females that give biological male athletes significant advantages over female competitors." (State 8). The District Court disagreed, finding those studies either "came to the opposite conclusion" or were otherwise "flawed," and the panel agreed. (Op. 44.)

Arizona's interscholastic athletic association "had been wholly deficient in its efforts to overcome the effects of past discrimination against women," it could not justify maintaining "a girls-only volleyball team." 886 F.2d at 1193. This Court dismissed that argument as "mystifying," explaining that even if the boy were correct that the association had not done enough to remedy past discrimination against female athletes, allowing him—and therefore all "other [cisgender] boys," who "outnumber females by two to one" in school sports—to join a girls' team would not aid that effort. *Id.* This language in *Clark* has no bearing or relevance here, as the panel correctly concluded.

**B.**  **The Panel's Case-Specific Conclusion that H.B. 500 Discriminates Based on Transgender Status Is Consistent with Precedent and Does Not Create an Inter-Circuit Split.**

Appellants next attempt to manufacture a split by asserting that the panel concluded that H.B. 500 discriminates based on transgender status simply because it "classif[ies] based on sex." (State 10; *see also* Intervenors 11.) That is wrong.

The panel's conclusion that H.B. 500 discriminates based on transgender status was a case-specific determination based on multiple factors—namely, the fact that H.B. 500 "explicitly references transgender

10

status, as did its legislative proponents, and" because "its text, structure, purpose, and effect all demonstrate that the Act categorically bans transgender women and girls from public school sports teams that correspond with their gender identity." (Op. 25.) Specifically, the panel considered the following:

*First,* the panel reviewed H.B. 500's "'legislative findings and purpose,'" which "explicitly discuss transgender women athletes" and assert that they have an athletic advantage from testosterone that cannot be "'diminished through the use of puberty blockers and cross-sex hormones.'" (Op. 25-26 (quoting Idaho Code § 33-6202(11)).)

*Second*, the panel canvassed "the legislative debate on H.B. 500," during which "the Act's supporters stated repeatedly that the Act's purpose was to ban transgender women athletes from participating on female athletic teams in Idaho." (Op. 26.)[4]

*Third*, the panel reviewed "[t]he plain language" of H.B. 500, which "bans transgender women from 'biologically female' teams" by "divid[ing]

---

[4] The State effectively admits that the legislature acted to exclude transgender women from women's sports by acknowledging that H.B. 500 was a response to "new reports of men with gender dysphoria competing against women." (State 13.)

sports teams into three categories based on biological sex"; limits "the methods for 'verify[ing] the student's biological sex'" to characteristics that cannot be altered through gender-affirming medical care (Op. 26-27 (quoting Idaho Code §§ 33-6203(2)-(3)); and forecloses consideration of circulating testosterone, "the 'one [sex-related] factor that a consensus of the medical community appears to agree' actually affects athletic performance" (Op. 28).

*Finally*, the panel observed that H.B. 500 changed the status quo in Idaho from transgender *inclusion* to *exclusion*. Prior to H.B. 500, transgender female athletes were allowed to compete on women's teams after suppressing their testosterone through hormone therapy for one year. (Op. 16.) Under H.B. 500, transgender women athletes are categorically barred from women's teams. By contrast, H.B. 500 changed nothing for cisgender students.

This case-specific inquiry into whether a policy discriminates based on transgender status is consistent with this Court's approach in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), where this Court rejected an argument that a military service policy classified based on

"'gender dysphoria' and 'gender transition' rather than transgender status" by considering specific provisions of the policy's text. *Id.* at 1201.

Ignoring all of these case-specific factors, Appellants claim a conflict with the Eleventh Circuit's decision in *Adams v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), which held that a policy excluding transgender students from using the bathroom consistent with their gender identity did not target transgender students. (Intervenors 11; State 12.) But as the panel explained, "in *Adams*—as opposed to here—there was 'no record evidence suggesting that the School Board enacted the policy because of its adverse effects upon transgender students.' To the contrary, the school district in *Adams* had studied the issues raised by the LGBTQ community and had also enacted policies that affirmatively accommodated transgender students." (Op. 32 (quoting *Adams*, 57 F.4th at 810)) (cleaned up). *Adams* is therefore not

13

in conflict with the panel's conclusion that H.B. 500 discriminates based on transgender status.[5]

Appellants also wrongly suggest that the panel's analogy to "proxy discrimination" cases conflicts with precedent. (State 11; Intervenors 11.) It does not. The panel observed that "the Act's use of 'biological sex' functions as a form of 'proxy discrimination'" because "biological sex" as used in H.B. 500 does not encompass all the attributes of sex but rather was "carefully drawn to target transgender women and girls." (Op. 31.) It was thus H.B. 500's outcome-driven construction of "biological sex" that the panel analogized to the proxy discrimination cases.

Intervenors claim that this analysis conflicts with *Feeney*, which held that veteran hiring preferences were not a "pretext" for sex discrimination because "all nonveterans—male as well as female—are placed at a disadvantage." (Intervenors 11 (quoting *Pers. Adm'r of Mass.*

---

[5] Although this case does not implicate it, a circuit split on whether excluding transgender students from restrooms consistent with their gender identity can constitute sex and transgender-status discrimination pre-dates the panel decision. *Compare Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) *with Adams*, 57 F.4th 791.

*v. Feeney*, 442 U.S. 256, 275 (1979)).)  They argue that here, H.B. 500 targets all people assigned a male sex at birth—*i.e.*, both cisgender men and transgender women—and bars all of them from women's teams, thus treating them the same, regardless of gender identity.  (Intervenors 11; *see also* State 11-12.)  But H.B. 500 bars only transgender women from women's sports; cisgender men already were excluded from women's teams in Idaho prior to H.B. 500.  And athletic policies pre-dating H.B. 500 *allowed* transgender women to compete on women's teams.  Thus, the only change worked by H.B. 500 was to exclude transgender women from women's teams (and therefore all school sports).  If anything, *Feeney supports* the preliminary injunction here, because there is ample evidence that H.B. 500 was passed "at least in part 'because of'" its exclusionary impact on transgender women.  442 U.S. at 279; (*see* Op. 26).

**C.    The Panel Applied Intermediate Scrutiny Consistent with Circuit Precedent.**

1.    The Panel Followed Circuit Precedent Providing that Transgender-Status Classifications Warrant Heightened Scrutiny.

Appellants claim that an inter-circuit conflict concerning whether transgender status is a quasi-suspect classification justifies rehearing. (Intervenors 12; State 4 n.1.)  It does not.[6]

To start, resolution of this question will not change the level of scrutiny applied here—Appellants have conceded that intermediate scrutiny applies to H.B. 500 regardless of whether transgender individuals are a quasi-suspect class because the law discriminates based on sex.  (State 4 n.1; Dkt. 33 (Intervenors' Opening Br.) at 18.)

Moreover, this Court's conclusion that transgender status is a quasi-suspect classification is correct.  Appellants do not argue otherwise. Instead, Intervenors suggest, incorrectly, that the panel decision is the first from this Court to hold that transgender-status discrimination

---

[6] The claimed split is overstated.  The Eleventh Circuit has not actually decided the question.  *See Adams*, 57 F.4th at 803 n.5.  And the Sixth Circuit motions panel observed only that "neither the Supreme Court nor this court has recognized transgender status as a quasi-suspect class." *L.W. by & through Williams & Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023).

16

triggers heightened scrutiny. In so arguing, Intervenors focus on the Court's statement in *Karnoski* that "the district court should apply a standard of review that is more than rational basis but less than strict scrutiny." (Intervenors 12-13 (quoting 926 F.3d at 1201).) But this Court has been clear that *Karnoski* held that transgender-status classifications trigger intermediate scrutiny. *See Hundley v. Aranas*, 2023 WL 166421, at *2 (9th Cir. Jan. 12, 2023) ("Discrimination against an individual based on a person's gender identity demands heightened scrutiny." (citing *Karnoski*, 926 F.3d at 1200-01)). In so concluding, the panel here was simply following circuit precedent. Appellants never actually argue that precedent should be revisited; they simply pivot to their main, incorrect contention that H.B. 500 does not discriminate based on transgender status. (Intervenors 13.)

Finally, an inter-circuit conflict warrants rehearing only when the panel decision "substantially affects a rule of national application in which there is an overriding need for national uniformity." 9th Cir. R. 35-1. Appellants make no effort to show that test is met here, and it is not.

17

2. <u>The Panel's Intermediate Scrutiny Analysis Was Correct and Does Not Warrant Rehearing.</u>

Appellants also quibble with the panel's intermediate scrutiny analysis, wrongly contending it was closer to strict scrutiny. (State 6-7; Intervenors 9.) This argument mischaracterizes the panel's analysis, which faithfully applied intermediate scrutiny.

At the outset, the panel correctly set out the heightened equal protection scrutiny inquiry. (Op. 38.) Appellants resist the rigorous inquiry required under heightened scrutiny, urging deference to the Idaho legislature. (State 8-9; Intervenors 9, 13.) But heightened equal protection scrutiny is "demanding," not deferential. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The "burden of justification . . . rests entirely on the State," *id.*, which must provide an "'exceedingly persuasive justification'" for the discriminatory classification, *id.* at 531, and show the specific "discriminatory means employed are substantially related to the achievement of" the proffered interests, *id.* at 533.

Applying that standard, the panel, like the District Court, among other things, concluded:

*First,* the State failed to show that transgender women who suppress their testosterone have a significant physiological advantage as compared to cisgender women. (Op. 43-44.)

*Second*, H.B. 500's exclusion of transgender women from women's sports is "sweeping"—it bars transgender women at every age, in every sport, at every level of competition, and applies "regardless of whether they have gone through puberty or hormone therapy." (Op. 43; *see also* Op. 45.)

*Third*, there was "very little anecdotal evidence at the time of the Act's passage that transgender women had displaced or were displacing cisgender women in sports or scholarships or like opportunities." (Op. 45.)[7]

In short, the panel appropriately held the State to its burden under heightened scrutiny, and the State could not meet it.

---

[7] The State dismisses this point as "narrow" (State 7), but this Court has been clear that "the absence of any credible showing that the [challenged law] addressed a particularly acute problem" is "quite relevant" to the heightened scrutiny analysis. *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 784 (9th Cir. 2014); (*see also* Op. 47 (collecting Supreme Court and Ninth Circuit cases providing that courts applying heightened scrutiny should not uncritically defer to unsubstantiated legislative concerns)).

19

**D.    The Panel Correctly Did Not Import *Dobbs* and *Bruen* Into Its Equal Protection Analysis.**

Appellants additionally argue that the panel decision requires rehearing because it failed to import the historical-analogical approach utilized in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), into the Equal Protection Clause context. According to Appellants, because the Reconstruction Congress did not contemplate transgender people, and because there is no historical record of including transgender women on women's sports teams, Lindsay's equal protection claim fails.  (State 14; Intervenors 14.)  This unfounded argument is wrong and does not warrant rehearing.

The historical-analogical approach set out in *Dobbs* and *Bruen* was specific to the substantive due process and Second Amendment claims there.  *See Dobbs*, 142 S. Ct. at 2247 ("Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the 'liberty' protected by the Due Process Clause."); *Bruen*, 142 S. Ct. at 2127 (justifying consideration of history when assessing constitutionality of firearms regulations "because it has always been widely understood that

20

the Second Amendment . . . codified a *pre-existing* right" (quotation marks omitted)).

It makes no sense to import that approach to sex discrimination claims under the Equal Protection Clause, and Appellants cite no authority for doing so. As the Supreme Court has repeatedly cautioned, nineteenth-century laws and court decisions were "laden with gross, stereotyped distinctions between the sexes" and so should not be the reference point for equal protection claims. *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973); *see also Virginia*, 518 U.S. at 531-32 (discussing our country's history of sex discrimination and detailing the Supreme Court's doctrinal evolution and modern willingness to find equal protection violations based on sex discrimination where it previously did not); *Sessions v. Morales-Santana*, 582 U.S. 47, 60 (2017) (finding an equal protection violation in citizenship policies extending from "habitual, but now untenable, assumptions . . . of male dominance in marriage").

## E. The Scope of the Preliminary Injunction Does Not Warrant Rehearing.

The panel properly concluded that the District Court did not abuse its discretion in crafting the preliminary injunction. (Op. 55-58.) Intervenors contend that the preliminary injunction is overbroad because

21

it provides relief to individuals beyond Lindsay despite dismissing Lindsay's facial challenge. (Intervenors 15-17.) Although they concede that the Supreme Court has recognized that an as-applied claim can be "'facial' in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly," *Doe v. Reed*, 561 U.S. 186, 194 (2010), they argue that this precedent "is inapposite" here, because it is possible to limit the relief to Lindsay alone. (Intervenors 16-17.) Not so. The District Court found that H.B. 500 discriminates based on transgender status and sex and does not substantially serve the State's asserted interests, and so concluded that H.B. 500 as a whole is likely "unconstitutional as currently written" and harms "the constitutional rights of every girl and woman athlete in Idaho." (1-ER-86-87.) The panel affirmed the District Court's findings and conclusion, and emphasized "the total lack of means-end fit here." (Op. 49.) Given that holding—which did not hinge on characteristics unique to Lindsay and Kayden—the panel correctly held that the District Court did not abuse its discretion in preliminarily enjoining H.B. 500 in full. Notably, Appellants do not contend that H.B. 500 could constitutionally be applied to some, but not all, women who are transgender.

22

**F.    The Panel's Decision that Lindsay Has Standing to Challenge H.B. 500's Sex-Verification Provisions Does Not Warrant Rehearing.**

The State requests rehearing en banc to vacate the panel decision on H.B. 500's sex-verification provisions, arguing that Kayden is the only plaintiff to have challenged those provisions and the only plaintiff with standing to do so.  (State 15-16.)  This issue does not warrant rehearing, and in any event, the panel appropriately reached the sex-verification claims because Kayden and Lindsay *both* challenged H.B. 500's sex-verification provisions, and the District Court correctly held that they each had standing to do so. (Op. 50 n.17; 1-ER-35-41; 5-ER-799-805.)

## CONCLUSION

The Court should deny Appellants' petitions for rehearing en banc.

23

Dated:  September 28, 2023   Respectfully submitted,

            */s/ Julie Veroff*

James Esseks        Julie Veroff
Chase Strangio       Kathleen Hartnett
AMERICAN CIVIL LIBERTIES  Zoë Helstrom
UNION FOUNDATION    COOLEY LLP
125 Broad St.        3 Embarcadero Center
New York, NY 10004    20th Floor
(212) 549-2569       San Francisco, CA 94111
            (415) 693-2000
Selim Aryn Star      jveroff@cooley.com
AMERICAN CIVIL LIBERTIES
UNION OF IDAHO FOUNDATION Katelyn Kang
Cooperating Attorney for American COOLEY LLP
Civil Liberties Union of Idaho  55 Hudson Yards
Foundation        New York, NY 10001-2103
219 S. River Street, Suite 202  (212) 479-6000
Hailey, Idaho 83333
(208) 788-9232       Elizabeth Reinhardt
            COOLEY LLP
            1299 Pennsylvania Ave., NW
            Washington, DC 20004-2400
            (202) 842-7800

            *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2023, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Julie Veroff*
Julie Veroff
*Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 20-35813, 20-35815

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,199.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** */s/ Julie Veroff*　　**Date** September 28, 2023