**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LINDSAY HECOX; JANE DOE, with
her next friends Jean Doe and John
Doe,

          *Plaintiffs-Appellees*,

   v.

BRADLEY LITTLE, in his official
capacity as Governor of the State of
Idaho; SHERRI YBARRA, in her
official capacity as the Superintendent
of Public Instruction of the State of
Idaho and as a member of the Idaho
State Board of Education;
INDIVIDUAL MEMBERS OF THE
STATE BOARD OF EDUCATION,
in their official capacities; BOISE
STATE UNIVERSITY; MARLENE
TROMP, in her official capacity as
President of Boise State University;
INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY, # 1;
COBY DENNIS, in his official
capacity as superintendent of the
Independent School District of Boise
City #1; INDIVIDUAL MEMBERS

No.20-35813

D.C. No.
1:20-cv-00184-
DCN

AMENDED
OPINION

OF THE BOARD OF TRUSTEES OF
THE INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY, # 1; in
their official capacities; INDIVIDUAL
MEMBERS OF THE IDAHO CODE
COMMISSION, in their official
capacities,

*Defendants-Appellants*,

and

MADISON KENYON; MARY
MARSHALL,

*Intervenors*.

LINDSAY HECOX; JANE DOE, with
her next friends Jean Doe and John
Doe,

*Plaintiffs-Appellees*,

v.

BRADLEY LITTLE, in his official
capacity as Governor of the State of
Idaho; SHERRI YBARRA, in her
official capacity as the Superintendent
of Public Instruction of the State of
Idaho and as a member of the Idaho
State Board of Education;

No.20-35815

D.C. No.
1:20-cv-00184-
DCN

INDIVIDUAL MEMBERS OF THE
STATE BOARD OF EDUCATION,
in their official capacities; BOISE
STATE UNIVERSITY; MARLENE
TROMP, in her official capacity as
President of Boise State University;
INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY, # 1;
COBY DENNIS, in his official
capacity as superintendent of the
Independent School District of Boise
City #1; INDIVIDUAL MEMBERS
OF THE BOARD OF TRUSTEES OF
THE INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY, # 1; in
their official capacities; INDIVIDUAL
MEMBERS OF THE IDAHO CODE
COMMISSION, in their official
capacities,

*Defendants*,

and

MADISON KENYON; MARY
MARSHALL,

*Intervenors-Appellants*.

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted November 22, 2022
San Francisco, California
Opinion Filed August 17, 2023
Opinion Withdrawn April 29, 2024
Amended Opinion Filed June 7, 2024

Filed June 7, 2024

Before:  Kim McLane Wardlaw, Ronald M. Gould, and
Morgan Christen, Circuit Judges.*

Opinion by Judge Wardlaw

**SUMMARY**[**]

**Equal Protection**

In an amended opinion, the panel affirmed in part and
vacated in part the district court's order preliminarily
enjoining Idaho's Fairness in Women's Sports Act, a
categorical ban on the participation of transgender women
and girls in women's student athletics, and remanded.

The Act bars all transgender girls and women from
participating in, or trying out for, public school female sports

---

* Pursuant to General Order 3.2(h), Judge Christen has been drawn to
replace Judge Kleinfeld in this matter. Judge Christen has reviewed the
briefs and the record, and listened to the recording of the oral argument
in this case.

** This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

teams at every age, from primary school through college, and at every level of competition, from intramural to elite teams. It also provides a sex dispute verification process whereby any individual can "dispute" the sex of any student athlete participating in female athletics in the State of Idaho and require her to undergo intrusive medical procedures to verify her sex, including gynecological exams. Student athletes who participate in male sports are not subject to a similar dispute process.

Applying heightened scrutiny, as set forth in *United States v. Virginia*, 518 U.S. 515, 555 (1996), and *Karnoski v. Trump,* 926 F.3d 1180, 1200–01 (9th Cir. 2019), the panel held that the district court did not abuse its discretion when it found that the Act likely violates the Equal Protection Clause of the Fourteenth Amendment. Because the Act subjects only students who wish to participate in female athletic competition to an intrusive sex verification process and categorically bans all transgender girls and women from competing on female women of girls teams and because the State of Idaho failed to adduce any evidence demonstrating that the Act is substantially related to its asserted interests in sex equality and opportunity for women athletes, the panel affirmed the district court's grant of preliminary injunctive relief to Lindsay Hecox.

The panel vacated the injunction as applied to non-parties. It found that the scope of the injunction was not clear because the order does not specify whether enforcement of the Act is enjoined in whole or in part, nor does it specify whether enforcement of the Act is enjoined facially or as applied to particular persons. The panel instructed the district court on remand to consider the effect, if any, of the Supreme Court's decision in *Labrador v. Poe,* 144 S. Ct. 921 (2024), before deciding whether it can accord Lindsay

Hecox complete relief without enjoining the Act in part or in
whole as to all female student athletes in Idaho.

---

## COUNSEL

W. Scott Zanzig (argued), Dayton P. Reed, Timothy
Longfield, and Brian V. Church, Deputy Attorneys General;
Lincoln D. Wilson; Steven L. Olsen, Chief of Civil
Litigation Division; Brian Kane, Assistant Chief Deputy;
Lawrence G. Wasden, Attorney General; Boise, Idaho, for
Defendants-Appellants.

Kristen K. Waggoner, John J. Bursch, and Christiana M.
Holcomb, Alliance Defending Freedom, Washington, D.C.;
Bruce D. Skaug and Raul R. Labrador, Skaug Law PC,
Nampa, Idaho; Roger G. Brooks, Alliance Defending
Freedom, Scottsdale, Arizona; Christopher P. Schandevel,
Alliance Defending Freedom, Ashburn, Virginia; Cody S.
Barnett, Alliance Defending Freedom, Lansdowne,
Virginia; for Intervenors-Appellants.

Andrew Barr (argued), Cooley LLP, Broomfield, Colorado;
Chase Strangio and James D. Esseks, American Civil
Liberties Union Foundation, New York, New York; Richard
Eppink and Dina M. Flores-Brewer, American Civil
Liberties Union of Idaho Foundation, Boise, Idaho;
Elizabeth Prelogar, Cooley LLP, Washington, D.C.;
Catherine West, Legal Voice, Seattle, Washington; Kathleen
R. Hartnett, Cooley LLP, San Francisco, California; Selim
Aryn Star, Star Law Office PLLC, Hailey, Idaho; for
Plaintiffs-Appellees.

Lauren R. Adams, Women's Liberation Front, Washington,
D.C., for Amicus Curiae Women's Liberation Front.

James A. Campbell, Solicitor General; David T. Bydalek, Chief Deputy Attorney General; Douglas J. Peterson, Attorney General of Nebraska; Nebraska Attorney General's Office, Lincoln, Nebraska; for Amici Curiae States of Nebraska, Alabama, Alaska, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina, Texas, and West Virginia.

Kara Dansky, Women's Human Rights Campaign – USA, Medford, Oregon, for Amicus Curiae Women's Human Rights Campaign – USA.

Randall L. Wenger, Independence Law Center, Harrisburg, Pennsylvania; Gary S. McCaleb, Flagstaff, Arizona; for Amici Curiae Medical Professionals.

Thomas E. Chandler, Matthew J. Donnelly, and Elizabeth Hecker, Attorneys; Alexander V. Maugeri, Deputy Assistant Attorney General; Eric S. Dreiband, Assistant Attorney General; United States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C.; Candice Jackson and Farnaz F. Thompson, Deputy General Counsels; Reed R. Rubinstein, Principal Deputy General Counsel; United States Department of Education, Office of the General Counsel, Washington, D.C.; Peter L. Wucetich, Assistant United States Attorney; Bart M. Davis, United States Attorney; Boise, Idaho; for Amicus Curiae United States.

Edward M. Wenger, Tallahassee, Florida, for Amicus Curiae Sandra Bucha, Linda Blade, Vicki Huber-Rudawsky, Inga Thompson, Maria Blower, and Rebecca Dussault.

Chris N. Ryder and Gail Hammer, Lincoln LGBTQ+ Rights Clinic, Spokane, Washington, for Amicus Curiae Lincoln LGBTQ+ Rights Clinic.

Jessica L. Ellsworth, Kaitlyn A. Golden, Danielle D. Stempel, Nel-Sylvia Guzman, and Ray Li, Hogan Lovells US LLP, Washington, D.C.; Fatima G. Graves, Emily Martin, Sunu Chandy, Neena Chaudhry, Shiwali Patel, and Cassandra Mensah, National Women's Law Center, Washington, D.C.; Jon Greenbaum, David Hinojosa, and Bryanna A. Jenkins, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; for Amici Curiae National Women's Law Center, Lawyers' Committee for Civil Rights Under Law and 60 Additional Organizations.

Carl S. Charles, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia; Paul D. Castillo, Lambda Legal Defense and Education Fund Inc., Dallas, Texas; Diana Flynn and Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund Inc., New York, New York; Sasha Buchert, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; for Amici Curiae 176 Athletes in Women's Sports, The Women's Sports Foundation, and Athlete Ally.

Jonah M. Knobler, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amicus Curiae interACT: Advocates for Intersex Youth.

Jesse R. Loffler, Cozen O' Connor, for Amici Curiae Transgender Women Athletes.

Aaron M. Panner, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; Scott B. Wilkens, Wiley Rein LLP, Washington, D.C.; for Amici Curiae American Academy of Pediatrics, American Medical Association, American Psychiatric Association, and 10 Additional Healthcare Organizations.

Adam R. Tarosky, Seth D. Levy, and Sarah E. Andre, Nixon Peabody LLP, Los Angeles, California, for Amicus Curiae Three Former Idaho Attorneys General.

Matthew D. Benedetto, Thomas F. Costello, William Cutler Pickering, Hale and Dorr LLP, Los Angeles, California; Adam M. Cambier and Alison Burton, Wilmer Cutler Pickering, Hale and Dorr LLP, Boston, Massachusetts; for Amici Curiae Teammates, Coaches, and Allies of Transgender Athletes.

Angela R. Vicari, Rosalyn Richter, Arnold & Porter Kaye Scholer LLP, New York, New York; Kirk Jenkins, Arnold & Porter Kaye Scholer LLP, San Francisco, California; for Amici Curiae Altria Group Inc., Amalgamated Bank, Asana Inc., Ben and Jerry's Homemade Inc., Lush Cosmetics LLC, Nike Inc., and The Burton Corporation.

Kaliko'onalani D. Fernandes, Deputy Solicitor General of Counsel; Kimberly T. Guidry, Solicitor General; Clare E. Connors, Attorney General of Hawaii; Honolulu, Hawaii; Linda Fang, Assistant Solicitor General of Counsel; Anisha S. Dasgupta, Deputy Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, Attorney General, State of New York; New York, New York; Xavier Becerra, California Attorney General, Sacramento, California; Philip J. Weiser, Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Wilmington, Delaware; Kwame Raoul, Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, August, Maine; Brian E. Frosh, Maryland Attorney General, Baltimore, Maryland; Maura Healey, Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Keith Ellison,

Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Carson City, Nevada; Gurbir S. Grewal, New Jersey Attorney General, Trenton, New Jersey; Hector Balderas, New Mexico Attorney General, Santa Fe, New Mexico; Joshua E. Stein, North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Salem, Oregon; Joshua Shapiro, Commonwealth of Pennsylvania Attorney General, Philadelphia, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Providence, Rhode Island; Thomas J. Donovan, Jr., Vermont Attorney General, Montpelier, Vermont; Mark R. Herring, Commonwealth of Virginia Attorney General, Richmond, Virginia; Robert W. Ferguson, Washington Attorney General, Olympia, Washington; Karl A. Racine, District of Columbia Attorney General, Washington, D.C.; for Amici Curiae States of New York, Hawai'i, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia.

Susan B. Manning, Morgan Lewis & Bockius LLP, Washington, D.C.; for Amici Curiae GLBTQ Legal Advocates & Defenders and the National Center for Lesbian Rights.

Abbey J. Hudson, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Amicus Curiae The Trevor Project Inc..

## OPINION

WARDLAW, Circuit Judge:

In March 2020, Idaho enacted the Fairness in Women's Sports Act, Idaho Code §§ 33-6201–06 (2020) (the "Act"), a first-of-its-kind categorical ban on the participation of transgender women and girls in women's student athletics. At the time, Idaho had no history of transgender women and girls participating in competitive student athletics, even though Idaho's interscholastic athletics organization allowed transgender girls to compete on female athletic teams under certain specified conditions. Elite athletic regulatory bodies, including the National Collegiate Athletic Association (NCAA) and the International Olympic Committee (IOC), also had policies allowing transgender women athletes to compete if they met certain criteria. The Act, however, bars all transgender girls and women from participating in, or even trying out for, public school female sports teams at every age, from primary school through college, and at every level of competition, from intramural to elite teams. *See* Idaho Code § 33-6203(1)–(2). The Act also provides a sex dispute verification process whereby any individual can "dispute" the sex of any student athlete participating in female athletics in the State of Idaho and require her to undergo intrusive medical procedures to verify her sex, including gynecological exams. *See* Idaho Code § 33-6203(3). Student athletes who participate in male sports are not subject to a similar dispute process.

Today, we decide only the question of whether the federal district court for the District of Idaho abused its discretion in August 2020 when it preliminarily enjoined the Act, holding that it likely violated the Equal Protection

Clause of the Fourteenth Amendment. Because the Act subjects only students who wish to participate in female athletic competitions to an intrusive sex verification process and categorically bans transgender girls and women at all levels from competing on "female[], women, or girls" teams, Idaho Code § 33-6203(2), and because the State of Idaho failed to adduce any evidence demonstrating that the Act is substantially related to its asserted interests in sex equality and opportunity for women athletes, we affirm the district court's grant of preliminary injunctive relief to Lindsay Hecox. We remand this case to the district court to reconsider the appropriate scope of injunctive relief in light of the Supreme Court's decision in *Labrador v. Poe*, 144 S. Ct. 921 (2024).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.

As the district court noted, and as we recognize in this context, "such seemingly familiar terms as 'sex' and 'gender' can be misleading." *Hecox v. Little (Hecox I)*, 479 F. Supp. 3d 930, 945 (D. Idaho 2020) (quoting *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018)). We therefore adopt the terminology that has been employed throughout this case.

"Gender identity" is "the term used to describe a person's sense of being male, female, neither, or some combination of both."[1] A person's "sex" is typically assigned at birth based on an infant's external genitalia, though "external genitalia" do not always align with other sex-related characteristics, which include "internal

---

[1] Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 N. Eng. J. Med. 2451, 2451 (2019).

reproductive organs, gender identity, chromosomes, and secondary sex characteristics." A "transgender" individual's gender identity does not correspond to their sex assigned at birth, while a "cisgender" individual's gender identity corresponds with the sex assigned to them at birth. Around two percent of the population are born "intersex," which is an umbrella term for people "born with unique variations in certain physiological characteristics associated with sex, such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response." *Id.* at 946 (internal quotation marks omitted).

Over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older.[2] Youth ages 13 to 17 are significantly more likely to identify as transgender, with the Centers for Disease Control (CDC) estimating that roughly 1.8 percent of high school students identify as transgender. *See* Br. of Amici Curiae Am. Acad. of Pediatrics, et al. ("AAP Br.") at 10.

Transgender individuals often experience "gender dysphoria," which is defined by the Fifth Edition, Text Revision, of the Diagnostic and Statistics Manual of Mental Disorders (DSM-5-TR) as a condition where patients experience "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration" that "is associated with clinically significant distress or impairment in social, occupation, or

---

[2] *See* Jody L. Herman, Andrew R. Flores, Kathryn K. O'Neill, *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Inst. 1 (2022).

14　　　　　　　　　　HECOX V. LITTLE

other important areas of functioning."**[3]**  For over thirty years, medical professionals have treated individuals experiencing gender dysphoria following the protocols laid out in the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7)*, which were developed by the World Professional Association for Transgender Health (WPATH).  AAP Br. at 19.

B.

On March 16, 2020, Idaho passed House Bill 500 ("H.B. 500"), a categorical ban against transgender women and girls' participation in any public-school funded women's sports, enforced by subjecting all participants in female athletics to an intrusive sex verification process if their gender is disputed by anyone.  *See* H.R. 500, 65th Leg., 2d Reg. Sess. (Idaho 2020).  Although Idaho was the first state in the nation to issue such a ban, more than twenty other states have enacted similar—though perhaps not as potentially intrusive against all female athletes—restrictions on female transgender athletes.**[4]**

---

[3] *See* Am. Psychiatric Ass'n, *Diagnostic and Statistics Manual of Mental Disorders* 512–13 (5th ed., text rev. 2022).

[4] Since the Act's passage, twenty-four other states have passed laws or regulations limiting the participation of transgender students in women's athletics.  However, no other state appears to have enacted an enforcement mechanism for those restrictions like the sex dispute verification process in the Act.  *See* Ala. Code § 16-1-52 (2021); 4 Alaska Admin. Code § 06.115(b)(5)(D); Ariz. Rev. Stat. Ann. § 15-120.02 (2022); Ark. Code Ann. § 6-1-107 (West 2021); Fla. Stat. Ann. § 1006.205 (West 2021); Ind. Code Ann. § 20-33-13-4 (West 2022); Iowa Code Ann. § 261I.2 (West 2022); H.B. 2238, 2023 Leg. Sess. (Kan. 2023); Ky. Rev. Stat. Ann. § 164.2813 (West 2022); La. Stat. Ann. § 4:442 (2022); Miss. Code Ann. § 37-97-1 (West 2021); Mo. Rev. Stat.

In the United States, high school interscholastic athletics are generally governed by state interscholastic athletic associations, such as the Idaho High School Activities Association (IHSAA).  The NCAA sets policies for member colleges and universities in Idaho and elsewhere, including Boise State University (BSU).  Prior to the Act's passage, IHSAA policy allowed transgender girls in 9–12 athletics in Idaho to compete on girls' teams after they had completed one year of hormone therapy suppressing testosterone under the care of a physician.  At that time, NCAA policy similarly allowed transgender women attending member colleges and universities in Idaho (and elsewhere) to compete on women's teams after one year of hormone therapy to suppress testosterone.[5]   Idaho itself had no record of transgender women and girls participating in competitive women's sports.

On February 13, 2020, Representative Barbara Ehardt introduced H.B. 500 in the Idaho House of Representatives.

---

163.048 (2023); Mont. Code Ann. § 20-7-1306 (West 2021); H. 574 (N. C. 2023); Legis. Assemb. 1489, 68th Legis. Assemb., Reg. Sess. (N.D. 2023); Legis. Assemb. 1249, 68th Legis. Assemb., Reg. Sess. (N.D. 2023); Ohio Rev. Code § 3313.5320; Okla. Stat. Ann. tit. 70, § 27-106 (West 2022); S.C. Code Ann. § 59-1-500 (2022); S.D. Codified Laws § 13-67-1 (2022); Tenn. Code Ann. § 49-7-180 (2022); Tex. Educ. Code Ann. § 33.0834 (West 2022); Utah Code Ann. § 53g-6-902 (West 2022); W. Va. Code Ann. § 18-2-25d (West 2021); S. 92, 67th Leg., Gen. Sess. (Wyo. 2023).

[5] In April 2023, the NCAA updated its policy to require that transgender student-athletes meet the "sport-specific standard[s] (which may include testosterone levels, mitigation timelines and other aspects of sport-governing body policies)" of the national governing body of that sport. *See* Press Release, NCAA, Transgender Student-Athlete Participation Policy (April 17, 2023), https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (last visited May 3, 2024).

At the first hearing on the bill, Ty Jones, Executive Director of the IHSAA, testified that no student in Idaho had ever complained about participation in public school sports by transgender athletes, and that no transgender athlete had ever competed in Idaho under the existing IHSAA policy. Representative Ehardt acknowledged that she had no evidence that any person in Idaho had ever disputed an athlete's eligibility to play based on that athlete's gender.

After the Idaho House Committee approved the bill, Idaho Attorney General Lawrence Wasden warned in a written opinion letter to the House that H.B. 500 raised serious constitutional questions due to the legislation's disparate treatment of transgender and intersex athletes and the potential invasion of all female athletes' privacy inherent in the sex dispute verification process. Nevertheless, the bill proceeded to a debate and passed on the House floor on February 26, 2020.

After passage by the House, H.B. 500 was heard by the Senate State Affairs Committee and sent to the full Idaho Senate on March 10, 2020. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic and many states adjourned legislative sessions indefinitely. The Idaho Senate remained in session, however, and passed H.B. 500 as amended on March 16, 2020. The House concurred in the Senate amendments on March 18, and the bill was delivered to Idaho Governor Bradley Little on March 19, 2020.

As Governor Little considered the bill, critics questioned the legislation's findings and legality. Professor Dorianne Lambelet Coleman, whose work on testosterone and athletics was cited in the legislative findings in support of the bill, wrote to Governor Little urging him to veto the bill

HECOX V. LITTLE                    17

and explaining that her research had been misinterpreted and misused in the legislative findings. Similarly, five former Idaho Attorneys General implored Governor Little to veto the Act, labeling it a "legally infirm statute."**[6]** Nonetheless, Governor Little signed H.B. 500 into law on March 30, 2020, and it went into effect on July 1, 2020.

C.

In enacting H.B. 500, the legislature made several findings based on Professor Coleman's study, including "that there are 'inherent [biological] differences between men and women,'" Idaho Code § 33-6202(1) (quoting *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996)), and that men have "higher natural levels of testosterone," *id.* § 33-6202(4), which "have lifelong effects, including those most important for success in sport," *id.* § 33-6202(5). Relying on Professor Coleman's work, the legislature found that "[t]he benefit[] that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones." *Id.* § 33-6202(11). The legislature also found that "women's performances at the high[est] level [of athletics] will never match those of men." *Id.* § 33-6202(9) (quoting Valerie Thibault et al., *Women and Men in Sport Performance: The Gender Gap Has Not Evolved Since 1983*, 9 J. of Sports Sci. & Med. 214, 219 (2010)). The legislature concluded that "[h]aving separate sex-specific teams furthers efforts to promote sex equality" by "providing opportunities for female athletes to

---

[6] *See also* Tony Park et al., *5 Former Idaho Attorneys General Urge Transgender Bill Veto*, Idaho Statesman (Mar. 17, 2020), https://www.idahostatesman.com/opinion/readers-opinion/article241267071.html (last visited May 23, 2023).

demonstrate their skill, strength, and athletic abilities, while
also providing them with opportunities to obtain recognition
and accolades, college scholarships, and numerous other
long-term benefits that flow from success in athletic
endeavors." *Id.* § 33-6202(12).

Three provisions of the Act are most salient to this
appeal.   First, the Act provides that "[i]nterscholastic,
intercollegiate, intramural, or club athletic teams or sports"
shall be organized "based on biological sex." *Id.* § 33-
6203(1).  It specifically provides that:

> Interscholastic, intercollegiate, intramural, or
> club athletic teams or sports that are
> sponsored by a public primary or secondary
> school, a public institution of higher
> education, or any school or institution whose
> students or teams compete against a public
> school or institution of higher education shall
> be expressly designated as one (1) of the
> following based on biological sex:
>
>> (a) Males, men, or boys;
>>
>> (b) Females, women, or girls; or
>>
>> (c) Coed or mixed.

*Id.* The Act then provides that "[a]thletic teams or sports
designated for females, women, or girls shall not be open to
students of the male sex." *Id.* § 33-6203(2) (the "categorical
ban provision").  The Act's provisions apply to all levels of
competition in Idaho state schools, including elementary
school and club teams, and do not include any limitation for
transgender individuals who wish to participate on athletic
teams designated for men.  Moreover, the provisions apply

not only to public schools, but also to nonpublic "school[s] or institution[s] whose students or teams compete against a public school or institution of higher education." *Id.* § 33-6203(1).

Second, the Act creates a "sex verification" process to be invoked by any individual who wishes to "dispute" a student's sex, providing that:

> A dispute regarding a student's sex shall be resolved by the school or institution by requesting that the student provide a health examination and consent form or other statement signed by the student's personal health care provider that shall verify the student's biological sex. The health care provider may verify the student's biological sex as part of a routine sports physical examination relying only on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels.

*Id.* § 33-6203(3) (the "sex dispute verification provision").

And third, the Act creates an enforcement mechanism to ensure compliance with its provisions by establishing a private cause of action for any student who is "deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of [the Act]." *Id.* § 33-6205(1).

## D.

On April 15, 2020, Lindsay Hecox ("Lindsay"), a transgender woman who wishes to try out for the BSU women's track and cross-country teams, and Jane Doe

("Jane"), a cisgender woman who plays on high school varsity teams and feared that her sex would be "disputed" under the Act due to her masculine presentation, filed this lawsuit against Governor Little, Idaho Superintendent of Public Instruction Sherri Ybarra, and various school officials at both the high school and collegiate levels (collectively, "Idaho"). They sought a declaratory judgment that the Act violates Title IX and the United States Constitution, including the Equal Protection Clause, and preliminary and permanent injunctions against the Act's enforcement, as well as an award of costs, expenses, and reasonable attorneys' fees.

On May 26, 2020, Madison ("Madi") Kenyon and Mary ("MK") Marshall (collectively, "the Intervenors") were permitted to intervene in this case. Intervenors are cisgender women residing in Idaho and collegiate athletes who run track and cross-country on scholarship at Idaho State University. In 2019, both athletes competed against and lost to June Eastwood, a transgender woman athlete at the University of Montana, and found it a "discouraging" and "deflating" experience.

On April 30, 2020, Plaintiffs moved for preliminary injunctive relief based solely on their equal protection claims. The district court issued preliminary injunctive relief in August 2020, ruling that both Plaintiffs were likely to succeed on the merits of their equal protection claims and would suffer irreparable harm if the injunction was not granted, and that the balance of equities weighed in favor of an injunction. Idaho and the Intervenors (collectively, the "Appellants") timely appealed.

We first held oral argument in this appeal on May 3, 2021. At that time, Lindsay informed the court that she had

tried out for and failed to make the women's track team and
that she subsequently withdrew from BSU classes in late
October 2020.  Because the parties' arguments raised several
unanswered factual questions as to whether Lindsay's claim
was moot, we remanded the case to the district court for
further factual development and findings on justiciability
questions on June 24, 2021.

On July 18, 2022, the district court issued factual
findings and concluded that Lindsay's claim was not moot.
We affirmed the district court's determination that Lindsay's
claim was not moot in an order issued on January 30, 2023.
*See Hecox v. Little* (*Hecox II*), No. 20-35813, 2023 WL
1097255, at \*1 (9th Cir. Jan. 30, 2023).[7]  We then asked the
parties to brief us on which claims remained for decision in
this appeal and any intervening authority.  The parties agree
that the only issue that we must decide is whether the district
court abused its discretion in issuing the preliminary
injunction.

## II.  STANDARD OF REVIEW

We review a district court's grant of a preliminary
injunction for an abuse of discretion.  *Puente Arizona v.
Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016).  That said,

---

[7] In our January 2023 order, we determined that Lindsay's claim was not
moot when she withdrew from BSU in October 2020, because she
expressed a concrete plan to re-enroll and try out for BSU sports teams.
*Hecox II*, 2023 WL 1097255, at \*1. Lindsay followed through on those
plans by re-enrolling at BSU after she established Idaho state residency
and training to participate in women's sports teams. *Id.* Indeed, Lindsay
planned to try out again for the BSU women's cross-country and track
teams in Fall 2023, and has been playing for the BSU women's club
soccer team since Fall 2022. *Id.*, at \*2. Absent the preliminary
injunction against the Act's enforcement, Lindsay would be banned from
participating on the BSU women's club soccer team. *Id.*

"legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000)); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). We do "not 'determine the ultimate merits'" of the case, "but rather 'determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand.'" *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141–42 (9th Cir. 2018) (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015)). However, we will reverse a grant of the preliminary injunction if the district court "based its decision . . . on clearly erroneous findings of fact." *Does 1-5 v. Chandler*, 83 F.3d 1150, 1552 (9th Cir. 1996).

We review the scope of a preliminary injunction for an abuse of discretion. *California v. Azar*, 911 F.3d 558, 567 (9th Cir. 2018).

### III. PRELIMINARY INJUNCTION

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*

HECOX V. LITTLE                    23

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## A. Likelihood of Success on the Merits

The primary issue presented by this appeal is whether the district court abused its discretion in concluding that Lindsay was likely to succeed on the merits of her equal protection challenge. The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The state may not discriminate against classes of people in an "arbitrary or irrational" way or with the "bare . . . desire to harm a politically unpopular group." *Id.* at 446–47.

When considering an equal protection claim, we determine what level of scrutiny applies to a classification under a law or policy, and then decide whether the policy at issue survives that level of scrutiny. Our "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest," *id.* at 440, otherwise known as rational basis review. However, as gender classifications "generally provide[] no sensible ground for differential treatment," *id.*, "'all gender-based classifications today' warrant 'heightened scrutiny.'" *VMI*, 518 U.S. at 555 (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)). Under heightened scrutiny, "a party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification."

*Id.* at 524 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

### *1. Heightened scrutiny applies.*

The district court did not err in concluding that heightened scrutiny applies because the Act discriminates against transgender women by categorically excluding them from female sports, as well as on the basis of sex by subjecting all participants in female athletics, but no participants in male athletics, to invasive sex verification procedures to implement that policy. Appellants contend that the Act classifies based only on sex, not "transgender status," and permissibly excludes "biological males" from female sports under our precedent. *See, e.g.*, *Clark ex rel. Clark v. Arizona Interscholastic Ass'n* (*Clark I*), 695 F.2d 1126, 1131–32 (9th Cir. 1982) (holding that excluding boys from a girls' high school volleyball team was permissible to redress past discrimination against women athletes and to promote equal opportunity for women). We conclude that while the Act certainly classifies on the basis of sex, it also classifies based on transgender status, triggering heightened scrutiny on both grounds.

a. The Act discriminates based on transgender status.

Appellants argue that the Act does not discriminate based on transgender status because "[t]he distinction and statutory classification is based entirely on [biological] sex, not gender identity." They assert that the Act's definition of "biological sex" describes only the "physiological differences between the sexes relevant to athletics." But the Act explicitly references transgender women, as did its legislative proponents, and its text, structure, findings, and effect all demonstrate that the purpose of the Act was to categorically ban transgender women and girls from public

school sports teams that correspond with their gender identity.

A discriminatory purpose is shown when "the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Here, the district court found that "the law is directed at excluding women and girls who are transgender, rather than on promoting sex equality and opportunities for women." *Hecox I*, 479 F. Supp. 3d at 983. This finding is not clearly erroneous.

Section 33-6202 straightforwardly sets forth the "legislative findings and purpose" of the Act, and makes clear that its animating purpose was to ban transgender women from "biologically female" teams. These findings explicitly discuss transgender women athletes by stating that "a man [sic] who identifies as a woman and is taking cross-sex hormones 'ha[s] an absolute advantage' over female athletes," and noting that "[t]he benefit[] that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones." Idaho Code § 33-6202(11).

During the legislative debate on H.B. 500, the Act's supporters stated repeatedly that the Act's purpose was to ban transgender women athletes from participating on female athletic teams in Idaho. Representative Ehardt, who introduced the bill, characterized the law as a "preemptive" strike that would allow Idaho to "remove [transgender women] and replace them with the young gal that should have been on the team." Representative Ehardt reiterated that the Act would require transgender women to "compete

on the side of those biological boys and men with whom they look or, about whom they look alike." Much of the legislative debate centered around two transgender women athletes running track in Connecticut high schools, as well as one running college track in Montana, and the potential "threat" those athletes presented to female athletes in Idaho. When Idaho's then-Attorney General Wasden expressed concerns about the Act's constitutionality, he expressly described it as "targeted toward transgender and intersex athletes."

The plain language of section 33-6203 bans transgender women from "biologically female" teams. The Act divides sports teams into three categories based on biological sex: "(a) Males, men, or boys; (b) Females, women, or girls; or (c) Coed or mixed." *Id.* § 33-6203(1). Sports designated for "females, women, or girls" are not open to students of the male sex. *Id.* § 33-6203(2). And the methods for "verify[ing] the student's biological sex" are restricted to "reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." *Id.* § 33-6203(3). However, most gender-affirming medical care for transgender females, especially minors, will not or cannot alter the characteristics described in the only three verification methods prescribed by the Act, thus effectively banning transgender females from female sports.**[8]** As the district court determined, "the overwhelming majority of women who are transgender have XY chromosomes," which indicate the male sex, and transgender women cannot change

---

[8] In 2023, Idaho adopted legislation prohibiting minors from receiving gender-affirming medical care. *See* Idaho Code § 18-1506C, *enjoined by Poe ex rel. Poe v. Labrador*, 2023 WL 8935065, at *2 (D. Idaho Dec. 26, 2023), *injunction modified in part sub nom. by Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024).

that genetic makeup when they transition. *Hecox I*, 479 F. Supp. 3d at 984. Similarly, as medical expert Dr. Deanna Adkins opined, many transgender women and girls do not undergo gender-affirming genital surgery to alter their external "reproductive anatomy," often because they cannot afford it or it is inappropriate for their individual needs.

Further, because surgery cannot change transgender women's internal reproductive anatomy by creating ovaries, Dr. Adkins testified that transgender women "typically continue to need estrogen therapy" even after surgery and can never alter their "endogenously produced"—or naturally produced—testosterone levels. By contrast, the Act does *not* allow sex to be verified by a transgender woman's levels of circulating testosterone, which can be altered through medical treatment. A transgender woman like Lindsay, for example, can lower her circulating testosterone levels through hormone therapy to conform to elite athletic regulatory guidelines, but cannot currently alter the endogenous testosterone that her body naturally produces. Yet the district court found and the record before it supports that circulating testosterone is the "one [sex-related] factor that a consensus of the medical community appears to agree" actually affects athletic performance. *Id.*

Appellants suggest that "biological sex" is a neutral and well-established medical and legal concept, rather than one designed precisely by the Idaho legislature to exclude transgender and intersex people.[9] But the Act's definition of

---

[9] In supplemental briefing, Appellants also argue that the Supreme Court's recent decisions in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), "are fatal to Hecox's claim" because the ratifiers of the Fourteenth Amendment would have understood

---

"male" to correspond to the definition of "biological male" written into the Act. We fail to see how *Dobbs*, a substantive due process decision about whether the federal Constitution protects a woman's right to obtain an abortion, and *Bruen*, a Second Amendment decision about gun rights, are relevant to an equal protection claim based on sex discrimination, unless Appellants are suggesting that the Framers would have understood the term "biological sex" by reference to reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels. Indeed, the ratifiers of the Fourteenth Amendment would certainly not have understood the Act's definition of "biological sex." For example, the drafters of the Fourteenth Amendment would have had no concept of what "endogenously produced testosterone levels" meant in 1868, because testosterone was not named and isolated as a hormone until 1935. *See* John M. Tomlinson, *The Testosterone Story*, Trends in Urology & Men's Health 34, 35 (2012). Similarly, the ratifiers would not have understood how "genetic makeup" influences sex, as chromosomes were first discovered by Walther Flemming in 1882. D.W. Rudge, *The Man Who Invented the Chromosome*, 97 Heredity 136, 136 (2006) (reviewing Oren Harman, *The Man Who Invented the Chromosome: A Life of Cyril Darlington* (2004)).

Moreover, there is evidence that transgender people have existed since ancient times. *See generally* Lauren Talalay, *The Gendered Sea: Iconography, Gender, and Mediterranean Prehistory*, *in* THE ARCHEOLOGY OF MEDITERRANEAN PREHISTORY 130–33 (Emma Blake & A. Bernard Knapp eds., 2005). Appellants appear to argue that because transgender people were marginalized in 1868, they should be afforded no constitutional protections on the basis of their transgender status. But this argument would undermine decades of Supreme Court precedent striking down laws that discriminate on the basis of sex. *See Reed v. Reed*, 404 U.S. 71, 76 (1971) (holding that an Idaho statute that preferenced men as administrators of estates "ma[d]e the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment"); *Frontiero v. Richardson*, 411 U.S. 677, 687 (1973) ("[S]tatutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members."); *see also Weinberger v. Weisenfeld*, 420 U.S. 636, 645

HECOX V. LITTLE                    29

"biological sex" is likely an oversimplification of the complicated biological reality of sex and gender. As Dr. Joshua Safer, Executive Director of the Center for Transgender Medicine and Surgery at Mount Sinai, explained in his declaration, citing the Endocrine Society Guidelines:

> The phrase "biological sex" is an imprecise term that can cause confusion. A person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity. These attributes are not always aligned in the same direction.

Indeed, two percent of all babies are born "intersex," or with "a wide range of natural variations in physical traits— including external genitals, internal sex organs, chromosomes, and hormones—that do not fit typical binary notions of male and female bodies." Br. of Amici Curiae InterACT at 3–4. Intersex people who identify as women are equally banned under the Act from playing on Idaho women's teams. And while scientists are not fully certain why some people identify as transgender, it appears likely that there is some biological explanation—such as gestational exposure to elevated levels of testosterone—that causes certain individuals to identify as a different gender than the one assigned to them at birth. *See* AAP Br. at 14.

---

(1975); *Craig v. Boren*, 429 U.S. 190, 210 (1976); *Duren v. Missouri*, 439 U.S. 357, 360 (1979); *VMI*, 518 U.S. at 519.

Finally, the Act's discriminatory purpose is further evidenced by the Act's prohibition of "biological males" from female-designated teams because that prohibition affects one group of athletes only—transgender women. *See Crawford v. Board of Education*, 458 U.S. 527, 544 (1982) (explaining that the "disproportionate effect of official action provides an important starting point" for determining whether a "[discriminatory] purpose was [its] motivating factor" (internal quotation marks omitted)). Before the Act's passage, both the IHSAA and the NCAA prohibited cisgender men and boys from participating on female-designated sports teams. Both associations also had policies that allowed transgender women and girls to participate on female athletic teams after completing one year of hormone therapy to suppress testosterone levels. Giving effect to the Act still prohibits men and boys from participating on female athletic teams. But all transgender girls and women, even those who were previously eligible consistent with the IHSAA and NCAA policies, are now barred from female athletics. The Act's *only* contribution to Idaho's student-athletic landscape is to entirely exclude transgender women and girls from participating on female sports teams. And where a statute's "undisputed purpose [] and only effect . . . is to exclude transgender girls . . . from participation on girls sports teams," that statute discriminates on the basis of transgender status. *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 556 (4th Cir. 2024).

In addition to having a discriminatory purpose and effect, the Act is also facially discriminatory against transgender female athletes. We have previously rejected an argument like that Appellants raise here—that because section 33-6203 uses "biological sex" in place of the word "transgender," it is not targeted at excluding transgender

girls and women. In *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), we held that Idaho and Nevada laws that banned same-sex marriage facially discriminated on the basis of sexual orientation, even though the laws did so by classifying couples based on "procreative capacity" instead of sexual orientation. *Id.* at 467–68. We explained:

> Effectively if not explicitly, [defendants] assert that while these laws may disadvantage same-sex couples and their children, heightened scrutiny is not appropriate because differential treatment by sexual orientation is an incidental effect of, but not the reason for, those laws. However, the laws at issue distinguish on their face between opposite-sex couples, who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose marriages are not recognized. Whether facial discrimination exists "does not depend on why" a policy discriminates, "but rather on the explicit terms of the discrimination." Hence, while the procreative capacity distinction that defendants seek to draw could represent a *justification* for the discrimination worked by the laws, it cannot overcome the inescapable conclusion that Idaho and Nevada do discriminate on the basis of sexual orientation.

*Id.* at 467–68 (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)). Here, the Act's

use of "biological sex" functions as a form of "[p]roxy discrimination." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). The definition of "biological sex" in the Act is written with "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Id.*; *see also Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination . . . ."). The Act's specific classification of "biological sex" has similarly been carefully drawn to target transgender women and girls, even if it does not use the word "transgender" in the definition.

*Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), upon which Appellants rely to support their argument that the Act does not discriminate against transgender girls or women, is inapposite. There, the Eleventh Circuit upheld a lower court order rejecting an equal protection challenge to a K-12 school policy that provided female, male, and sex-neutral bathrooms and required male students to use the male-designated bathrooms, required female students to use the female bathrooms, and accommodated transgender students with the sex-neutral bathrooms. *See id.* at 797. The policy defined "male" and "female" as the gender identified on a student's birth certificate. *See id.* The Eleventh Circuit rejected the argument that the policy unconstitutionally discriminated on the basis of transgender status because it was "substantially related" to the school district's important interest in securing its pupils' privacy and welfare and was not targeted at transgender students—at most, it had a

disparate impact upon them which did not rise to the level of a constitutional violation because no animus was shown. *See id.* at 811. Importantly, in *Adams*—as opposed to here— there was "no [record] evidence suggesting that the School Board enacted the [] policy because of . . . its adverse effects upon transgender students." *Id.* at 810 (second alteration in original) (internal quotation marks omitted). To the contrary, the school district in *Adams* had studied the issues raised by the LGBTQ community and had also enacted policies that affirmatively accommodated transgender students.[10]

Appellants likewise misrely on a footnote in *Geduldig v. Aiello*, 417 U.S. 484 (1974), for the proposition that a legislative classification based on biological sex is not a classification based on transgender status. *See id.* at 496 n.20. In *Geduldig*, the Supreme Court stated that a classification based on pregnancy is not per se a classification based on sex, even though "it is true that only women can become pregnant." *Id.* However, the Court held that "distinctions involving pregnancy" that are "mere pretexts designed to effect an invidious discrimination" are subject to heightened scrutiny. *Id.* Here, it appears that the definition of "biological sex" was designed precisely as a pretext to exclude transgender women from women's athletics—a classification that *Geduldig* prohibits.

Finally, Appellants contend that the Act does not discriminate based on transgender status because the "Act does *not* prohibit biologically female athletes who identify as male from competing on male sports teams consistent with their gender identity." But a law is not immune to an

---

[10] Although *Adams* is plainly distinguishable, we express no view on the merits of the decision.

equal protection challenge if it discriminates only against some members of a protected class but not others. *See, e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977) (holding that singling out some but not all undocumented immigrants for discrimination constituted a "classification based on alienage"); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976) ("That the statutory classifications challenged here discriminate among illegitimate children does not mean, of course, that they are not also properly described as discriminating between legitimate and illegitimate children.").

b. Heightened scrutiny applies because the Act discriminates on the basis of transgender status.

We have previously held that heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a "quasi-suspect class." *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019).

In *Karnoski*, we reviewed an injunction against the implementation of a 2017 Presidential Memorandum and Departments of Defense and Homeland Security policies that effectively precluded transgender individuals from serving in the U.S. military. *Id.* at 1189. The district court had applied strict scrutiny in enjoining the policy, while the government argued that the policy should be reviewed under a rational basis standard. *Id.* at 1200. We held that because the implementing policy "on its face treats transgender persons differently than other persons . . . something more than rational basis but less than strict scrutiny applies." *Id.*

at 1201. We therefore adopted the heightened scrutiny approach of *VMI* and *Witt v. Department of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008), to review the military's ban on transgender persons who experienced gender dysphoria or who have undergone gender transition.[11] *Id.* We are thus compelled to review the constitutionality of the Act under heightened scrutiny as it classifies based on transgender status.

Moreover, discrimination on the basis of transgender status is a form of sex-based discrimination. It is well-established that sex-based classifications are subject to heightened scrutiny. *See VMI*, 518 U.S. at 533–34. The Supreme Court recently held in the Title VII context that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020).[12] Indeed, "[m]any courts . . . have held that

---

[11] The Supreme Court determined in *VMI* that for "cases of official classification based on gender" a reviewing court must apply a "heightened review standard" and determine whether the state has demonstrated an "exceedingly persuasive justification" for the classification. 518 U.S. at 533–34. In *Witt*, we applied a "heightened scrutiny" approach to the military's "Don't Ask, Don't Tell" policy for gay and lesbian servicemembers, determining that "when the government attempts to intrude upon the personal and private lives of homosexuals . . . the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest." 527 F.3d at 819.

[12] *See also* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,571 (Aug. 1, 2024) (to be codified at 34 C.F.R. pt. 106) (clarifying that "discrimination on the basis of sex" under Title IX

various forms of discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (applying heightened scrutiny to a bathroom policy); *see also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), *abrogated on other grounds, Illinois Republican Party v. Pritzker*, 972 F.3d 760 (7th Cir. 2020) (same); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670–71 & n.4 (8th Cir. 2022) (applying heightened scrutiny to affirm a preliminary injunction against a law that prohibited "gender transition procedures" because the law discriminated on the basis of sex); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022) (applying heightened scrutiny to a law that prohibited various medical treatments for gender dysphoria in minors).[13]

c. Heightened scrutiny applies because the Act discriminates against all participants in female sports.

In addition to discriminating on the basis of transgender status, the Act discriminates on the basis of sex, because only

---

includes discrimination based on "sex stereotypes, sex characteristics . . . and gender identity").

[13] Both Idaho and the Intervenors note that the Eleventh Circuit expressed "grave doubt" in a footnote in *Adams* that transgender people constitute a "quasi-suspect class." *Adams*, 57 F.4th at 803 n.5 (internal quotation marks omitted). This dictum is unpersuasive, as the Eleventh Circuit declined to decide the issue or further opine on its "doubt." In any event, as a three-judge panel we cannot overrule the binding precedent of our circuit. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

students who participate on female designated sports teams, and not students who participate on male designated sports teams, are subject to the sex dispute verification process. The Act expressly states that only "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." Idaho Code § 33-6203(2). The Act does not ban "biological females" from "teams or sports designated for males." Therefore, transgender and cisgender men who compete on male-designated teams are not subject to the sex dispute verification process. The sex dispute verification process simply does not apply to male designated sports teams.

The Act thus classifies on the basis of sex by subjecting only participants in women's and girls' sports, whether cisgender or transgender, to the risk and humiliation of having their sex "disputed" and then suffering intrusive medical testing as a prerequisite for participation on school sports teams. And where women's and girls' sports are subject to separate requirements for educational opportunities that are "unequal in tangible and intangible" ways from those for men, those requirements are tested under heightened scrutiny. *VMI*, 518 U.S. at 547.

*2. The Act likely does not survive heightened scrutiny.*

The district court correctly concluded that the Act likely does not survive heightened scrutiny. Heightened scrutiny is a "demanding" standard, with the burden "rest[ing] entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *VMI*, 518 U.S. at 533. To survive heightened scrutiny, the government must demonstrate "that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially

related to the achievement of those objectives." *Id.* at 516 (alteration in original) (internal quotation marks and citations omitted). Our review under heightened scrutiny is an extremely fact-bound test, requiring us to "examine [a policy's] actual purposes and carefully consider the resulting inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 483 (9th Cir. 2014).

Appellants contend that, "[d]ue to the average physiological differences" between men and women, the Act substantially advances the important state interest of "promot[ing] sex equality . . . by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities [and] opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code § 33-6202(12). We have previously held that furthering women's equality and promoting fairness in female athletic teams is an important state interest. *Clark I*, 695 F.2d at 1131. However, on the record before us, the district court correctly determined that the Act's means—categorically banning transgender women and girls from all female athletic teams and subjecting all participants in female athletics to intrusive sex verification procedures—likely are not substantially related to, and in fact undermine, those asserted objectives.

a. *Clark I* and *Clark II* do not control the outcome of Lindsay's claim.

Our decisions in *Clark I* and *Clark ex rel. Clark v. Arizona Interscholastic Ass'n* (*Clark II*), 886 F.2d 1191 (9th Cir. 1989), are inapposite. In *Clark I* and *Clark II*, we held

that public high schools could constitutionally prohibit cisgender male student athletes from participation on women's teams in order to further the important government interest of "redressing past discrimination against women in athletics and promoting equality of opportunity between the sexes." *Clark I*, 695 F.2d at 1131.

Specifically in *Clark I*, we held that an Arizona Interscholastic Association policy that separated high school volleyball teams by gender and prohibited boys from playing on girls' teams did not violate the Equal Protection Clause. *Clark I*, 695 F.2d at 1127. There, Clark wished to play on the girls' volleyball team because his particular high school did not offer boys' volleyball teams. *Id.* We first recognized that, in applying heightened scrutiny, "the Supreme Court is willing to take into account actual differences between the sexes, including physical ones." *Id.* at 1229 (citing *Michael M. v. Sonoma Cnty. Superior Ct.*, 450 U.S. 464, 468–69 (1981) (upholding a statutory rape statute that held only males culpable because only women can become pregnant, thus furthering the government's interest in preventing teen pregnancy)). We concluded that general gender separation in school sports was substantially related to the government's interest in women's equality in athletics. *Id.* at 1131. We reasoned that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* Thus, if men were allowed to compete on the women's teams, women's overall athletic opportunities would decrease, while men's overall athletic opportunities would remain greater than women's.

Eight years later, in *Clark II*, the original *Clark I* plaintiff's brother brought a second "mystifying" action challenging the same policy, arguing that the state "ha[d]

been wholly deficient in its efforts to overcome the effects of past discrimination against women in interscholastic athletics, and that this failure vitiate[d] its justification for a girls-only volleyball team." *Clark II*, 886 F.2d at 1193. Applying *Clark I*, we affirmed that the gender classification for Arizona school sports was constitutional. *Id.* at 1194.

Appellants argue that "[t]he only difference between Hecox and the Clark brothers is gender identity," which does not change the physiological advantages that "biological males" have over cisgender women. But this is a false assumption. First, Lindsay takes medically prescribed hormone therapy to suppress her testosterone and raise her estrogen levels. This treatment has lowered her circulating testosterone levels—which impact athletic prowess and have slowed her racing times by at least "five to ten percent"— and her testosterone levels were "well below the levels required to meet NCAA eligibility for cross country and track" in Fall 2022, as the district court found. *See Hecox I*, 479 F. Supp. 3d at 946. Lindsay's treatment has dramatically altered her bodily systems and secondary sex characteristics. As the district court found, "it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women," unlike the cisgender boys at issue in *Clark I* and *Clark II*. *Id.* at 978. The record in *Clark I* made clear that sex was a valid proxy for average physiological differences between men and women. Here, by contrast, the district court found that the ban on transgender female athletes applies broadly to many students who do *not* have athletic advantages over cisgender female athletes. Thus, a faithful application of *Clark I* supports, rather than undermines, the district court's reasoning here.

Second, as the district court noted, transgender women, "like women generally ... have historically been discriminated against, not favored." *Id.* at 977. A recent study by the CDC concluded that "transgender students reported significantly higher incidents of being bullied, feeling unsafe traveling to or from school, being threatened with a weapon at school, and being made to engage in unwanted sexual relations." Br. of Amici Curiae GLBTQ Legal Advocates & Defenders and the National Center for Lesbian Rights, at 9; *see also Whitaker*, 858 F.3d at 1051 ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."). Unlike the policy in *Clark I*, the Act perpetuates historic discrimination against both cisgender and transgender women by categorically excluding transgender women from athletic competition and subjecting all participants in women's athletics to an invasive sex dispute verification process.

Moreover, the district court correctly found that "under the Act, women and girls who are transgender will not be able to participate in any school sports, unlike the boys in *Clark I*, who generally had equal [or greater] athletic opportunities." *Hecox I*, 479 F. Supp. 3d at 977. Here, unlike in *Clark I*, transgender women are not being denied one "particular opportunity" to participate on women's teams even though their "overall opportunity is not inferior" to that of women. *Clark I*, 695 F.2d at 1126. As a practical matter, the Act bars transgender women and girls in Idaho from all participation in student athletics—under its explicit terms, they cannot play on teams that conform to their transgender status. The argument advanced by Representative Ehardt that the Act does not discriminate against transgender women because they can still play on

men's teams is akin to the argument we rejected in *Latta*, that same-sex marriage bans do not discriminate against gay men because they are free to marry someone of the opposite sex.  *See Latta*, 771 F.3d at 467 (holding unconstitutional two marriage bans that "distinguish on their face between opposite-sex couples who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose marriages are not recognized").  As medical expert Dr. Jack Turban stated, "forcing [transgender students] to play on a sports team that does not match their gender identity would damage their mental health" by "forcing them to express themselves as cisgender."  Lindsay declared that she would never compete on a men's team, as it would be "embarrassing and painful to be forced onto a team for men—like constantly wearing a big sign that says 'this person is not a "real" woman.'"

The district court also found that, on the record before it, "transgender women have not and could not 'displace' cisgender women in athletics 'to a substantial extent.'" *Hecox I*, 479 F. Supp. 3d at 977 (quoting *Clark I*, 695 F.2d at 1131).  Appellants misrely on a single line from *Clark II* to argue that the participation of just one transgender woman on a team risks displacing any individual cisgender woman: "If males are permitted to displace females on the school volleyball team even to the extent of one player like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced."  *Clark II*, 886 F.2d at 1193.  This statement, however, was made in response to the argument in *Clark II* that because sex separation had not fully met Arizona's goal of equality of participation in sports, Arizona no longer had an important interest in the policy.  We did not think Clark's proposed remedy for the

inequality of opportunities for female athletes—allowing him to play on the girls' teams—would advance the "goal of equal participation by females in interscholastic sports." *Id.* Because transgender women represent about 0.6 percent of the general population, the district court did not err in finding it unlikely that they would displace cisgender women from women's sports.

The only issue we decided in *Clark*—whether a sex-based classification was constitutionally permissible—is not in dispute here. Lindsay does not challenge the exclusion of cisgender males from female-designated sports. The question that *is* presented here—whether a classification based on transgender status is constitutionally permissible—is one that was not presented or discussed in *Clark*.

b. The Act is likely not substantially related to an important government interest.

Nor did the district court err in concluding that the Act likely fails heightened scrutiny because it is not substantially related to its stated goals of equal participation and opportunities for women athletes. The district court concluded that the Act's categorical ban does not advance its asserted objectives based on three factual findings, none of which is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (citation omitted). Moreover, the Act's sweeping prohibition on transgender female athletes in Idaho—encompassing all students, regardless of whether they have gone through puberty or hormone therapy, without any evidence of transgender athletes displacing female athletes in Idaho, and enforced through a mechanism that subjects all participants in female athletics to the threat of an invasive

physical examination—is likely too unrelated to the State's legitimate objectives to satisfy heightened scrutiny.

First, the district court found that there was scientifically "no evidence to suggest a categorical bar against a transgender female athlete's participation in sports is required in order to promote 'sex equality' or to 'protect athletic opportunities for females' in Idaho." *Hecox I*, 479 F. Supp. 3d at 978–79. Appellants argue that the district court misread the available medical evidence, which they contend demonstrates that endogenous testosterone levels give "biological males" a permanent athletic advantage over cisgender women. However, the district court did not clearly err by relying upon the testimony of a medical expert, Dr. Safer, who testified that there was a medical consensus that the "primary known driver of differences in athletic performance between elite male athletes and elite female athletes" is "the difference in [circulating] testosterone" levels, as opposed to "endogenously produced" testosterone levels, and "[a] person's genetic make-up and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades." The district court reasonably credited Dr. Safer's opinion that a transgender woman who received hormone therapy to lower her circulating levels of testosterone would likely not have "physiological characteristics" that would lead to enhanced athletic prowess when compared to a cisgender woman.

Appellants presented contrary medical testimony by Dr. Gregory Brown that hormone therapy suppression did not eliminate all of the physiological advantages that an individual experiences through male puberty. However, as the district court found, Dr. Brown's opinion was not supported by the studies he relied upon, because the majority

of the studies he cited discussed the average differences between male and female athletes in general, not the difference between transgender and cisgender women athletes. And one study that he cited—the Handelsman study—actually came to the opposite conclusion, concluding that "evidence makes it highly likely that the sex difference *in circulating testosterone* of adults explains most, if not all, of the sex differences in sporting performance."

The studies that the Idaho legislature relied upon to conclude that the benefits of "natural testosterone" could not be diminished through hormone therapy were likewise flawed. For example, one of the studies was altered after peer review to remove its conclusions regarding transgender athletes, and, as Idaho concedes, that "study and its findings were not based specifically on transgender athletes." The legislature also relied on a study by Professor Coleman, who personally urged Governor Little to veto the bill because the legislature had misinterpreted her work.

Moreover, as the district court found, the Act sweeps much more broadly than simply excluding transgender women who have gone through "endogenous puberty." The Act's categorical ban includes transgender students who are young girls in elementary school or even kindergarten. Other transgender women take puberty blockers and never experience endogenous puberty, yet the Act indiscriminately bars them from participation in women's student athletics, regardless of their testosterone levels. Although the scientific understanding of transgender women's potential physiological advantage is fast-evolving and somewhat inconclusive, we are limited to reviewing the record before the district court. And the record in this case does not ineluctably lead to the conclusion that all transgender women, including those like Lindsay who receive hormone

therapy, have a physiological advantage over cisgender women.

Second, as the district court found, there was very little anecdotal evidence at the time of the Act's passage that transgender women had displaced or were displacing cisgender women in sports or scholarships or like opportunities. In 2020, both the IOC and the NCAA required transgender women to suppress their testosterone for only a year for eligibility to compete on women's teams.[14] The record before the district court includes anecdotal evidence of only four transgender athletes who had ever competed in cisgender women's sports, including two high school runners who competed in Connecticut and

---

[14] Although today the IOC and NCAA policies evaluate eligibility for transgender participation in athletics on a sport-by-sport basis, neither policy endorses the categorical exclusion of transgender women. They instead favor an "evidence-based approach" with "no presumption of advantage." Int'l Olympics Comm., *IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations* 4 (2021), https://stillmed.olympics.com/media/Documents/Beyond-the-Games/Human-Rights/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf#page=4 (last visited June 6, 2023); *see also* Nat'l Collegiate Athletics Ass'n, *Transgender Student-Athlete Participation Policy* (April 17, 2023), https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx (last visited May 24, 2023). And while the World Athletics Council, the international governing body for track and field, recently adopted a more stringent policy of categorically excluding post-pubescent transgender women from elite athletic competitions, its policy does not bar transgender women who have not experienced endogenous puberty from eligibility. *See* Press Release, World Athletics Counsel, World Athletics Council Decides on Russia, Belarus, and Female Eligibility (Mar. 23, 2023), https://worldathletics.org/news/press-releases/council-meeting-march-2023-russia-belarus-female-eligibility (last visited May 24, 2023).

HECOX V. LITTLE                    47

were subsequently defeated by cisgender women in
competition. While the Intervenors state they were defeated
by a transgender athlete, June Eastwood, in a running
competition at the University of Montana, Eastwood
eventually lost to a different cisgender athlete in that same
competition. Lindsay's own athletic career belies the
contention that transgender women who have undergone
male puberty have an absolute advantage over cisgender
women: she has never qualified for BSU's track team despite
trying out.

There is likewise no evidence in the record of a
transgender woman receiving an athletic scholarship over a
cisgender woman in Idaho. Moreover, as the district court
noted, the Act's broad sweep—banning transgender
women's participation not just in high school and college
athletics, but elementary school and club sports—"belies any
genuine concern with an impact on athletic scholarships,"
which are relevant to only a small portion of the competitive
teams encompassed by the Act. *Hecox I*, 479 F. Supp. 3d at
983.

Of course, when applying heightened scrutiny, we "must
accord substantial deference to the predictive judgments" of
legislative bodies. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S.
622, 665 (1994). But this does not "insulate[]" predictive
judgments "from meaningful judicial review altogether." *Id.*
at 666. "[U]nsupported legislative conclusions as to whether
particular policies will have societal effects of the sort at
issue in this case—determinations which often, as here,
implicate constitutional rights—have not been afforded
deference by the [Supreme] Court." *Latta*, 771 F.3d at 469;
*see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 784 (9th
Cir. 2014) (en banc) ("[T]he absence of any credible
showing that the [challenged law] addressed a particularly

acute problem" was "quite relevant" to a showing that the law did not survive heightened scrutiny.). A vague, unsubstantiated concern that transgender women might one day dominate women's athletics is insufficient to satisfy heightened scrutiny.

Third, the district court questioned the Act's true objectives, finding that Idaho's interest was not in "promoting sex equality" but in "excluding transgender women and girls from women's sports entirely." *Hecox I*, 479 F. Supp. 3d at 983. Before the Act's passage, the existing NCAA and Idaho state rules governed transgender women's participation as measured by circulating testosterone levels, and there was no record evidence that transgender women and girls threatened to dominate female student athletics. The record indicates that Idaho may have wished "to convey a message of disfavor" toward transgender women and girls, who are a minority in this country. *See Latta*, 771 F.3d at 476. And "[t]his is a message that Idaho . . . simply may not send" through unjustifiable discrimination.[15] *Id.* at 476.

---

[15] The Fourth Circuit recently held that West Virginia's categorical ban could not be applied to "prevent a 13-year-old transgender girl who takes puberty blocking medication and has publicly identified as a girl since the third grade from participating in her school's cross country and track teams." *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir. 2024). Other federal and state courts have similarly enjoined transgender sports bans, and no categorical ban has yet been upheld on appeal. *See Doe v. Horne*, No. 23-16026 (9th Cir.) (pending appeal challenging the preliminary injunction against Arizona's statute regulating transgender female athlete participation); *A.M. by E.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950, 969 (S.D. Ind. July 26, 2022), *appeal dismissed*, No. 22-2332, 2023 WL 371646, at *1 (7th Cir. Jan. 19, 2023) (granting a preliminary injunction against transgender participation in athletics under Title IX); *Roe v. Utah High Sch. Activities*

Further evidencing the lack of means-ends fit between the categorical ban of transgender female athletes and the Legislature's purported purpose of promoting athletic equality is the Act's overly broad enforcement mechanism: the sex dispute verification provision, which is integral to the Act's operation.[16] Under the Act, anyone—be it a teammate, coach, parent, or a member of an opposing team—may "dispute" a player's "biological sex," requiring that player to visit her "personal health care provider . . . [who will] verify the student's biological sex" through the player's "reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." Idaho Code § 33-6203(3). The Act's express terms limit the verification procedure to a "routine sports physical examination" by "relying *only* on one (1) or more of the following:   the

---

*Ass'n*, No. 220903262, 2022 WL 3907182, at \*1 (Utah Dist. Ct. Aug. 19, 2022) (granting a preliminary injunction against a categorical ban under the Utah Constitution's equivalent of an equal protection clause); *see also Barrett v. Montana*, No. DV-21-581B, at \*5–7 (Mont. Dist. Ct. Sept. 14, 2022) (granting summary judgment against a categorical ban on the ground that only Montana public university officials have the authority to regulate athletic competition in public universities).

[16] In its petition for rehearing en banc, Idaho argues that Lindsay lacks Article III standing to challenge the dispute and sex verification procedures. Pet. Reh'g En Banc at 2, 15–16. We need not address this argument because we do not consider whether the dispute and sex verification procedures constitute an independent equal protection violation; we address only whether Lindsay is likely to succeed on her equal protection challenge to the transgender ban as a whole. Furthermore, to the extent Idaho challenges Lindsay's standing to challenge section 33-6203(3), we reject the argument.  Lindsay has standing to challenge section 33-6203(3) because it is an integral part of the transgender ban that she indisputably has standing to challenge—it supplies "the Act's definition of 'biological sex.'" *Hecox I*, 479 F. Supp. 3d at 984.

student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." *Id.* (emphasis added). By its plain text, the Act provides that a student's sex can be verified exclusively by these three enumerated methods. Thus, the district court reasonably found incredulous defense counsel's argument that the Act merely required Lindsay to obtain a letter from her doctor stating that Lindsay "is female." *Hecox I*, 479 F. Supp. 3d at 964 & n.19, 983. If that was all that was required to verify a student's sex under the Act, Lindsay could simply obtain such a statement and the Act (and this appeal) would be rendered meaningless.

Any one of the three exclusive procedures requires far more than a "routine sports physical" exam or simply asking whether a patient is female or not. As Lindsay's medical expert Dr. Sara Swobada described, analyzing a student's "genetic makeup" would require referral to a "pediatric endocrinologist" who would conduct a "chromosomal microarray" that would reveal a "range of genetic conditions" beyond sex chromosomes. Hormone testing would also require an "pediatric endocrinologist," and is not a "routine part of any medical evaluation." Of course, the expense and burden of these tests would be borne only by the students who play female athletics and their families.

Requiring a student to find a medical practitioner to examine their reproductive anatomy, which is what a typical gynecological exam entails, is unconscionably invasive, with the potential to traumatize young girls and women. As Dr. Swobada opined, examining a female patient's "reproductive anatomy" would necessitate inspecting a student athlete's genitalia and conducting a pelvic examination or transvaginal ultrasound to determine whether that student has ovaries. She further explained that

pelvic examinations for young patients are generally not required for minors, including adolescents, and are only conducted when medically necessary "with sedation and appropriate comfort measures to limit psychological trauma." Yet the Act's sex verification process subjects girls as young as elementary schoolers to unnecessary gynecological examinations merely because an individual "disputes" their sex.

The psychological burden of these searches falls not only on transgender women like Lindsay but also on *all* women and girls who play female athletics. As amici describe, "[s]ex verification procedures have a long, checkered history in female sports that continue to this day." Br. of Amici Curiae National Women's Law Center, et al. at 15. In the 1960s, the IOC would force female athletes to strip and parade in front of a panel of doctors to prove that they were, in fact, women. *Id.* The process was discontinued after a public outcry. *Id.* One intersex athlete who failed a sex verification procedure described being "so 'tormented' and 'unbearably embarrassed' that 'she attempted suicide' by 'swallowing poison.'" *Id.* at 17 (quoting Ruth Padawer, *The Humiliating Practice of Sex-Testing Female Athletes*, N.Y. Times Magazine (June 28, 2016)). Tellingly, while many athletic organizations have tightened their rules for transgender women's competition since 2020, none appears to have instituted a process that required gynecological examinations or invasive physical examinations.[17] Of the twenty-four other states that have passed restrictions on

---

[17] The IOC has expressly disavowed invasive sex verification procedures, stating that "[c]riteria to determine eligibility for a gender category should not include gynecological examinations or similar forms of invasive physical examinations, aimed at determining an athlete's sex, sex variations or gender." *See* Int'l Olympic Comm., *supra*, at 5.

transgender women's participation in women's sports, none has authorized a similar sex verification process.**[18]**  Idaho has not offered any "exceedingly persuasive justification" warranting the imposition of this objectively degrading and disturbing process on young women and girls who participate in female athletics.

We must "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 137 582 U.S. 47, 63 n.13 (2017).  While the Act purports to further athletic opportunities for Idaho's female students, the district court correctly concluded that the Act does not further this goal, and in fact "appears unrelated to the interests the Act purportedly advances." *Hecox I*, 470 F. Supp. 3d at 979. And "[i]ntentional discrimination on the basis of gender by state action violates the Equal Protection Clause[] where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994).  Thus, we need not and do not decide what policy would justify the exclusion of transgender women and girls from Idaho athletics under the Equal Protection Clause, because the profound lack of means-end fit here demonstrates that the Act likely does not survive heightened scrutiny.

---

[18] Most states that have instituted categorical bans on transgender participation in student athletics have verified sex via a student's birth certificate.  Oklahoma and Kentucky require a student or a student's parent or legal guardian submit sworn affidavits to confirm their "biological sex."  *See* Okla. Stat. Ann. tit. 70, § 27-106(D); Ky. Rev. Stat. Ann. § 164.2813(2).

## B.  Irreparable Harm

The district court properly concluded that Lindsay faced irreparable harm absent an injunction.  "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal quotation marks and citation omitted).    Therefore, as the Act is likely unconstitutional, "it follows inexorably . . . that [Hecox] ha[s] [] carried [her] burden as to irreparable harm."  *Id.* at 995.

More concretely, if the preliminary injunction is lifted, Lindsay will be barred from trying out for or participating on any women's sports at BSU, including the women's club soccer team, which she joined to improve her running skills and experience "the camaraderie of being on a team."  *See* Idaho Code § 33-6203(3).  Lindsay would also be subject to the threat of the sex dispute verification process and unnecessary examinations or medical testing.  These are all specific "harm[s] for which there is no adequate legal remedy" in the absence of an injunction.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

## C.  Balance of the Equities & Public Interest

The district court also did not err in concluding that the balance of the equities weighed in favor of a preliminary injunction.    The third and fourth preliminary injunction factors—assessing the harm to the opposing party and weighing the public interest—merge where, as here, the government is the opposing party.  *Nken*, 556 U.S. at 435. Here, Lindsay faces deeply personal, irreparable harms without injunctive relief, including being barred from all female college athletic teams and the prospect of invasive medical testing if her gender is "disputed."

The preliminary injunction does not appear to inflict any comparable harm on the Appellants. Under the pre-Act status quo, the NCAA policies for college athletics and the IHSAA policies for high school athletics govern transgender female participation in sports, and Idaho schools have complied with those policies for over a decade. The district court found no "evidence that transgender women threatened equality in sports, girls' athletic opportunities, or girls' access to scholarships in Idaho" during that decade, and thus Appellants failed to demonstrate any harm from issuance of the injunction. *Hecox I*, 479 F. Supp. 3d at 988. Moreover, as the district court found, Intervenors themselves may also be harmed by the sex dispute verification process, to which they are subject simply by virtue of playing sports in Idaho. Because "the public interest and the balance of the equities favor preven[ting] the violation of a party's constitutional rights," *Ariz. Dream Act*, 757 F.3d at 1060 (alteration in original) (internal quotation marks and citation omitted), we affirm that the district court did not abuse its discretion in weighing this factor.

## IV. SCOPE OF THE INJUNCTION

Although we agree with the district court that the Act harms "not just the constitutional rights of transgender girls and women athletes . . . [but also] the constitutional rights of every girl and woman athlete in Idaho," we remand to the district court to clarify the scope of the preliminary injunction. *Hecox I*, 479 F. Supp. 3d at 988. "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir.1982)). However, injunctive relief

"must be tailored to remedy the specific harm alleged," and "[a]n overbroad injunction is an abuse of discretion." *Id.* (finding that a worldwide injunction to protect a trade secret was *not* an abuse of discretion). Under Federal Rule of Civil Procedure Rule 65(d)(1), "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

Here, the scope of the injunction is not clear. Although the district court granted Plaintiffs' motion for preliminary injunction, the court's order does not specify whether enforcement of the Act is enjoined in whole or in part, nor does it specify whether enforcement of the Act is enjoined facially or as applied to particular persons. *See Hecox I*, 479 F. Supp. 3d at 988. On remand, the district court should tailor the injunction to provide the specificity that Rule 65(d)(1) requires.

We do not agree with the Intervenors, however, that the preliminary injunction would necessarily be overbroad as a matter of law if it extends to nonparties despite the district court's dismissal of Lindsay's facial challenge. "[A]n injunction 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.'" *City & County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) (quoting *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)). "[B]ut there is 'no general requirement that an injunction affect only the parties in the suit.'" *East Bay Sanctuary Covenant*, 993 F.3d 640, 680 (9th Cir. 2021) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1169–1170 (9th Cir. 1987). Rather, "[t]he equitable relief granted by the district court is acceptable where it is necessary to give prevailing parties the

relief to which they are entitled." *Id.* (quotation marks omitted). Before deciding whether it can accord Lindsay complete relief without enjoining the Act in part or in whole as to all female student athletes in Idaho, the district court should consider the effect, if any, of the Supreme Court's decision in *Labrador v. Poe*, 144 S. Ct. 921 (2024).

## V.

While we address only the Act before us, and opine on no other regulation or policy, we must observe that both the science and the regulatory framework surrounding issues of transgender women's participation in female-designated sports is rapidly evolving. Since Lindsay filed her initial challenge, the IOC and NCAA have adopted more limited policies as to transgender female participation in women's sports, requiring the governing entities for each sport to formulate sport-specific policies. Relying on medical evidence, many sports organizations have tightened their eligibility criteria for transgender women's teams, including incorporating guidelines for lower testosterone levels for eligibility to compete.[19] The U.S. Department of Education has proposed new Title IX regulations addressing

---

[19] *See, e.g.*, USA Swimming, *USA Swimming Releases Athlete Inclusion, Competitive Equity and Eligibility Policy* (Feb. 1, 2022), https://tinyurl.com/mr2k4tvp (announcing a policy for USA Swimming that elite transgender women athletes must show testosterone levels below 5 nmol/L continuously for at least 36 months); Bicycling, *The UCI Announces Changes to Its Policy on Transgender Athletes* (June 17, 2022), https://www.bicycling.com/news/a40320907/uci-transgender-policy-2022/ (announcing a testosterone limit of 2.5 nmol/L for elite bicyclists (halved from the previous 5.0 nmol/L) for a suppression period of 24 months); Olalla Cernuda, *World Triathlon Executive Board approves Transgender Policy*, World Triathlon (Aug. 3, 2022), https://tinyurl.com/yxw4syzw (requiring below a 2.5 nmol/L testosterone level for 24 months for triathletes).

restrictions on transgender athletes' eligibility that would require "such criteria" to "be substantially related to the achievement of an important educational objective and minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied."**[20]**  These more narrowly drawn policies, which are not before us, attempt to balance transgender inclusion with competitive fairness—a policy question that such regulatory bodies are best equipped to address.

## VI. CONCLUSION

We recognize that, after decades of women being denied opportunities to meaningfully participate in athletics in this country, many cisgender women athletes reasonably fear being shut out of competition because of transgender athletes who "retain an insurmountable athletic advantage over cisgender women." *See* Br. of Amici Curiae Sandra Bucha, et al. at 8.  We also recognize that athletic participation confers on students not just an opportunity to win championships and scholarships, but also the benefits of shared community, teamwork, leadership, and discipline. *See generally* Br. of Amici Curiae 176 Athletes in Women's Sports (describing the benefits of sports, and diversity in women's sports, on all students).  Excluding transgender youth from sports necessarily means that some transgender youth will be denied those educational benefits.

However, we need not and do not decide the larger question of whether any restriction on transgender

---

[20] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (proposed April 13, 2023) (to be codified at 34 C.F.R. pt. 106).

participation in sports violates equal protection. Heightened scrutiny analysis is an extraordinarily fact-bound test, and today we simply decide the narrow question of whether the district court, on the record before it, abused its discretion in finding that Lindsay was likely to succeed on the merits of her equal protection claim. Because it did not, we affirm the district court's order granting preliminary injunctive relief as applied to Lindsay, vacate the injunction as applied to non-parties, and remand to the district court to address the scope and clarity of the injunction.

**AFFIRMED IN PART; VACATED IN PART; REMANDED.**